1   Jason Cobb
    828 Weeks St
2   Palo Alto, CA 94303
    650-323-9155
3   symmetry_law@ymail.com

4   Plaintiff

5

6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

8

9   JASON COBB                                    Civil Action No.

                Plaintiff,                        **CV 13 1955**
10

11          vs.                                   **COMPLAINT**

12  JPMORGAN CHASE BANK, N.A.,
    ALFRED ALTAMIRANO, ELLEN                      COMPLAINT FILED:
    ALTAMIRANO, JENNIFER
13  ALTAMIRANO, RICHARD ASHE,
    CAMERON BOWMAN, ERNEST BREDE,
14  LUIS CONTRERAS, PAUL
    DEMOSTHENES, BILL DOUGLAS, EDDIE
15  ESTRADA, BJ FADEM, LEON FAIR,
    DONALD FERRIS, AMANDA FREEL,
16  SUSAN GREENBERG, ROBERT JONSEN,
    JEFF KITAGAWA, JEFFREY KLINE,
17  PAUL KOEHLER, TARA LAPPIN, LARRY
    LAVERDURE, ALLAN LEE, LAWRENCE
18  LEE, MICHAEL MARCHI, DONALD
    MAYNOR, BILL MCKEON, RON NERIO,
19  DAN NILGES, PETER OHTAKI, ALICIA
    PERDUE, JEROME PIERCE, BRUCE
20  RADITICH, ALAN SHUSTER, DONALD
    SHOWERS III, DENNIS SINCLITICO, JR.,
21  ANTHONY SMITH, LEONARDO
    TREVINO, GLENN WATSON, KERRY
22  WOODHAMS, PAUL YAMAGUCHI,
    STEPHEN WAGSTAFFE, THE CITY OF
23  MENLO PARK, THE DISTRICT
    ATTORNEY'S OFFICE OF SAN MATEO
24  COUNTY, MORGAN, LEWIS AND
    BOCKIUS, LLP, SAN MATEO COUNTY,
25  SUPERIOR COURT OF CALIFRONIA FOR
    SAN MATEO COUNTY, DOES 1 – 100
26
                Defendants.
27

28

FILED
APR 29 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

JCS

Plaintiff Jason Cobb for his Complaint against the Defendants listed below alleges as follows:

## INTRODUCTION

1. Over the course of several years, the association-in-fact RICO enterprise discussed herein has sought to defraud and intentionally harm Plaintiff and others by means of a scheme that has been conceived and substantially executed in the United States. This scheme has been carried out by a U.S.-based enterprise comprised of persons affiliated with Morgan, Lewis and Bockius LLP, Cisco Systems, Inc., varied agencies within San Mateo County, the Superior Court of California for San Mateo County and deviant members of the religious organization known as Jehovah's Witnesses.

2. In August 2010, Jonathan D. Cobb, Sr. and W. Arlen St. Clair filed federal civil action C 10-03907-MEJ in response to acts of fraud allegedly perpetrated by Richard Ashe, Alan Shuster, Steve Misterfeld, Paul Koehler and Ernest Brede, amongst others. This action came to focus on concerns of unlawful activity specific to the non-profit corporation employed by the English - Menlo Park Congregation of Jehovah's Witnesses located at 811 Bay Road in Menlo Park, CA. Soon after the presiding Judge, The Honorable Maria Elena-James, stated that a court Order would be issued to obtain the complete set of bank records in question to establish whether or not any wrongs had been committed, the action was dismissed pursuant to alleged acts of conspiracy, bribery and fraud upon the Court (See C 12-01372-JSW). This case has been appealed.

3. The fraudulent dismissals of federal civil actions C 10-03907-MEJ and C 11-02496-DMR in addition to numerous civil RICO violations was the focus of the complaint for federal civil action C 12-01372-JSW filed in March 2012. This action provided the first detailed description of the association-in-fact Enterprise discussed herein, identifying the varied components and members that constitute the whole as well as its methods and pattern of activity. In response to the filing of this action, the Enterprise moved quickly to exert intense pressure in every facet of Plaintiff Jason Cobb's life, as discussed herein.

## THE RICO ENTERPRISE

4. The association-in-fact RICO Enterprise previously identified in federal civil action C 12-01397-JSW and cited herein, in its present form, has exploited the inherent basis of trust that exists amongst members of the religious organization known as Jehovah's Witnesses to the end of developing a network of persons operating as agents of influence, assets or useful idiots within

varying religious, governmental, legal, financial and secular capacities.

5. This RICO Enterprise leverages its established relationships and contacts in executing acts of fraud, misappropriation, coercion and oppression. Additionally, this Enterprise corruptly influences and conspires with persons beyond its immediate borders who's services are obtained by and through bribery and payoffs (e.g.: Defendants Susan Greenberg, Jeffrey Kline, Cameron Bowman), on an as need basis, depending on the requirements of a given scheme.

6. The principal purposes and objectives of the Enterprise include violations of 18 U.S.C. §§ 1943 (Wire Fraud) and 1956 (Laundering of Monetary Instruments), fraudulent acquisition of real property under color of office and right, and other forms of fraud. In order to prevent any exposure of its activities, obstruction of justice, bribery, coercion, extortion and cover-up schemes are central to the management and operation of the Enterprise. Consequently, such egregious acts occur as a matter of course within the Enterprise' continuing pattern of racketeering activity.

7. This action is intended to detail and address the progression of the Enterprise' seminal scheme as identified in federal civil action C 10-03907-MEJ and further detailed in federal civil action C 12-01372-JSW.

8. The current scheme prompting this action manifested during the prosecution of federal civil action C 12-01372-JSW. In being threatened by the pleadings in that action and recognizing the central role played by Plaintiff Jason Cobb in prosecuting the case, the Enterprise launched a full assault on Plaintiff in order to force his withdrawal from that action, the withdrawal of his appeal of federal civil action C 11-02496-DMR and the withdrawal of state civil action CIV 508137, by and through a series of coordinated attacks and disruptions to each facet of his life in the attempt to oppress, discredit, neutralize and, in the end, destroy Jason Cobb, making an example of him in order to discourage any further efforts to expose its activities.

9. The Enterprise, in its present form, as discussed in this action, is comprised of certain deviant members of the religious organization known as Jehovah's Witnesses, employees of Morgan, Lewis and Bockius LLP, Cisco Systems, Inc., as well as varied lawyers and psychologists, amongst others.

**A. Deviant Members of the Religious Organization Known as Jehovah's Witnesses**

10. A deviant is one who deviates or departs from a particular standard of conduct. Individual

3

1   members of the religious organization known as Jehovah's Witnesses who have deviated from the

2   standard of conduct established by the Holy Scriptures and organizational directives by virtue of their

3   participation in the Enterprise' schemes include, but are not limited to, Alfred Altamirano, Ellen

4   Altamirano, Richard Ashe, Ernest Brede, Paul Demosthenes, Bill Douglas, Leon Fair, Paul Koehler,

5   Allan Lee, Lawrence Lee, Donald H Maynor, Steve Misterfeld, Jerome Pierce, Bruce Raditich, Alan

6   Shuster, Donald Showers, Anthony Smith and Leonardo Trevino, amongst others. All have

7   participated directly or indirectly in the management and operation of the Enterprise described herein.

8   In collectively executing the Enterprise' scheme to oppress and neutralize Plaintiff, defamation, false

9   accusations, coercion, and extortion have been their weapons of choice. Such tactics are intended to

10  destroy Plaintiff's reputation and credibility in order to undermine confidence in the statements he has

11  made regarding unlawful activity specific to the non-profit corporation employed by the English

12  Menlo Park Congregation of Jehovah's Witnesses. (See C 10-03907-MEJ; C 12-01372-JSW)

13  **B. Employees of Morgan, Lewis and Bockius LLP**

14      11. Employees of this law firm manifested as participants in the Enterprise when Plaintiff

15  filed federal civil action C 11-02496-DMR against multiple employees of Cisco Systems, Inc. in May

16  2011. Cisco is a client of Morgan, Lewis.

17      12. As a corporate risk mitigation, damage control and cover-story specialist, Defendant

18  Sinclitico is a key member of the Enterprise. Drawing upon his experience of framing circumstances

19  within a preferred light to the end of manipulating facts and fabricating perceptions of reality, he

20  helped to conceive and direct the systematic attacks executed against Plaintiff in the workplace by

21  varied Cisco employees since 2010. Defendant Sinclitico also colluded with other Enterprise

22  members including Defendants Maynor and Smith as well as members of the Altamirano family in

23  the corresponding and related attacks that intentionally disrupted Plaintiff's family and personal life,

    suddenly and on cue, when federal civil action C 12-01372-JSW was filed in March 2012.

24      13. While Defendant Sinclitico is not one of Jehovah's Witnesses, he has stated that his

25  parents and siblings are all members of this religious organization, which further underscores his

26  involvement in these matters.

27  **C. Employees of Cisco Systems, Inc.**

28      14. Federal civil action C 11-02496-DMR, filed in May 2011, details a history of adverse

4

1    treatment suffered by Plaintiff at the hands of varied Cisco employees. This pattern of harassment and

2    abuse began in August 2010 and plateaued in July 2011, prompting Plaintiff to take a leave of

3    absence.

4        15. Defendant Sinclitico became acquainted with federal civil action C 10-03907-MEJ and

5    Defendant Anthony Smith, the AOR for the Defendants in that action, pursuant to reviewing

6    Plaintiff's archived data files extracted from his work computer. Thereafter Defendant Sinclitico

7    formed an alliance with Defendant Smith to coordinate their efforts to contend with Plaintiff.

8    Defendant Sinclitico proceeded to ghostwrite several filings on Defendant Smith's behalf in state civil

9    action CIV 508137 and federal civil action C 10-03907-MEJ. Defendant Sinclitico also participated in

10    the eventual hijacking of federal civil action C 10-03907-MEJ, forging several court orders including

11    the dismissal of the action as discussed in federal civil action C 12-01372-JSW.

12        16. Since forming the mutually beneficial alliance with Defendant Smith, Defendant Sinclitico

13    has used varied Cisco employees including Chris Glasser, Shenita McKinney, Terry Johnson, Alicia

14    Perdue, Jeff Kitagawa and Tara Lappin as foot soldiers to execute directives and/or attacks against

15    Plaintiff intended to vex, annoy, harass and/or coerce him in furtherance of the Enterprise' campaign

16    of obstruction.

17        17. Overtures were made by Cisco representatives that Plaintiff could transition to a new

18    department within Cisco, thus finally escaping the hostile work environment, IF he did not appeal the

19    dismissal of case C 11-02496-DMR. Intimations and threats constituting extortion were also made

     suggesting an unfavorable performance review IF the appeal was filed.

20        18. When Plaintiff did file his appeal, Cisco employees were then directed to treat Plaintiff

21    well to encourage his withdrawal of the appeal. This effort was supported by persons in seemingly

22    unrelated settings and circumstances who presented as agents of influence on behalf of Cisco

23    Systems, Inc. by urging Plaintiff to cease litigation against the Cisco employees per the notion that

24    Cisco had put an end to the abusive treatment. Such agents of influence include non-party co-

25    conspirator John Sorrell as well as Defendants Jeffrey Kline, Lawrence Lee and Defendant Jennifer

26    Altamirano.

27        19. When Plaintiff did withdraw the Cisco appeal, the hostile work environment reemerged

28    including efforts to oppress Plaintiff under color of right with tasks specifically intended to vex,

5

annoy and harass him. Such tactics have presented in and around key filing dates for the civil actions of concern for Cisco Systems, Inc., Morgan, Lewis, and the Enterprise described herein. This insidious form of obstruction has been perpetrated within the workplace for legally strategic purposes at the direction of Morgan, Lewis and other Enterprise members.

**D. Individual Lawyers**

20. The enterprise frequently uses lawyers in its schemes as such are required to maintain confidences.

21. Non-party co-conspirators Nancy De Ita and Linda Noeske as well as Defendants Deborah Appel, BJ Fadem, Ron Nerio, Cameron Bowman, and "investigator" Amanda Freel have all played supporting roles in the Enterprise' campaign of obstruction. Their involvement has enabled the Enterprise to assume greater control of family law case 116981filed in the Superior Court for San Mateo County by Defendant Jennifer Altamirano at the direction of the Enterprise to use such as weapon in attack on Plaintiff's family and personal life. Consequently, this case constitutes a malicious act of fraud being filed for strategic purposes to the end of oppressing Plaintiff and impeding his prosecution of civil action C 12-01372-JSW. Furthermore, per the scheme, the family law case has been used as a means to create the required leverage to extort involuntary acts from Plaintiff, including his withdrawal of or from the civil actions that threaten the Enterprise.

22. Defendants Deborah Appel, BJ Fadem, Ron Nerio, Amanda Freel and Cameron Bowman have worked collectively to consume Plaintiff's resources, impede discovery and perform acts of witness tampering and obstruction. In particular, Defendants Fadem and Nerio, who were retained by Plaintiff Jason Cobb were unduly influenced to violate attorney-client privilege in sharing Plaintiff's discovery plan with Defendant Jennifer Altamirano, thus enabling her to then initiate damage control measures to obscure her financial activity, which includes the misuse of child support payments and community funds to the benefit of her parents and fellow RICO Defendants Alfred and Ellen Altamirano.

23. In September 2012, Defendant Jennifer Altamirano falsely accused Plaintiff of domestic violence initiating a case in Santa Clara County. Plaintiff retained Defendant Cameron Bowman of the law firm Valencia, Ippolito & Bowman, hereinafter referred to as VIB Law, to represent him. Defendant Bowman has been unduly influence by the Enterprise to the end of impeding discovery

while demonstrating functional alignment with Defendant Appel and her client Defendant Jennifer Altamirano in the effort to undermine Plaintiff's case. The private investigator employed by VIB Law, Defendant Amanda Freel, has also participated in this effort to obstruct justice. Both Defendants Bowman and Freel have impeded discovery throughout the pretrial period specifically to sabotage Plaintiff's case while consistently urging him to settle by accepting a conviction on a lesser charge, the very thing desired by the Enterprise in its relentless effort to discredit Plaintiff. Plaintiff is innocent and will prove it.

**E. Individual Psychologists**

24. Non-party co-conspirators Dr. Janet Busic, one of Jehovah's Witnesses, and Dr. Louis Everstine actively supported the effort to further disrupt Plaintiff's family life by providing biased "expert" opinion intended to further reduce the time Plaintiff spends with his children during the current physical separation. Upon doing so, both refused to share observations and/or the rationale employed in making their respective recommendations with Plaintiff when such was requested. Their job was to fabricate a perception of plausibility for Defendant Greenberg's prearranged decision to modify the visitation format and schedule, per the Enterprise' direction.

25. Defendant Greenberg's ruling in these regards, in conjunction with the input of Dr. Busic, one of Jehovah's Witnesses, and Dr. Everstine, furthered the Enterprise' scheme to use the family law case as a weapon against Plaintiff to the end of disheartening, oppressing and neutralizing him, as discussed herein.

26. Pursuant to acts of collusion on the part of non-party co-conspirator Nancy De Ita and Defendants Susan Greenberg, Eddie Estrada and Jennifer Altamirano, Defendant Jeffrey Kline was appointed as child custody evaluator for case FAM 116981 on 5/24/2012. In being hand-picked by the Enterprise, Defendant Kline has demonstrated a biased leaning toward the Enterprise' asset, Defendant Jennifer Altamirano, throughout the engagement to the end of permanently separating Plaintiff from his children under color of law and right. Defendant Kline has also participated in the effort to induce Plaintiff's withdrawal of or from civil actions which threaten the Enterprise, clearly presenting as an agent of influence regarding specific legal matters, which are simply not his concern, and even as an advocate for the cited Defendants, including Cisco Systems, Inc., during discussions with Plaintiff. Having been unduly influenced, Defendant Kline has proven to be a participant in the

7

scheme to ensure that Defendant Jennifer Altamirano maintains custody of the children, as decided by the Enterprise over and above any court.

## F. Non-RICO Defendants

### 1. The Superior Court of California for San Mateo County

27. In addition to the RICO Defendants cited herein, the *non-RICO* defendants include Superior Court Judge Susan Greenberg and Superior Court representative Eddie Estrada who colluded with Defendant Jennifer Altamirano in the systematic deprivation of Plaintiff's parental and civil rights, as a matter of course, within California Superior Court case FAM 116981. In actuality, each of these persons have directly participated in the pattern of racketeering activity perpetrated by the RICO Enterprise, committing predicate RICO acts including conspiracy to commit RICO, mail fraud, obstruction of justice and acceptance of a bribe. However, per congressional intent, the provisions of civil RICO do not reach persons possessing judicial and/or quasi-judicial immunity and so these individuals are not listed as RICO Defendants despite having willfully committed a range of predicate RICO acts.

28. While not summoned to this court as violators of civil RICO, Defendants Greenberg and Estrada appear in this matter pursuant to their willful violation of Plaintiff's civil and Constitutional rights and are thus stripped of their "official or representative character" to the end of being held accountable for their misconduct.

29. The U.S. Supreme Court, in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 1687 (1974) stated that "when a state officer acts under a state law in a manner violative of the Federal Constitution, he "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States."

### 2. San Mateo County and Its Agents

30. Varied agencies within San Mateo County have provided ongoing support to the Enterprise' campaign of obstruction including the District Attorney's Office, the City of Menlo Park and its City Attorney. These entities have supported the interests of the Enterprise by collectively impeding the investigation for Menlo Park PD case 11-973.

8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31. By actively protecting Defendant Ernest Brede, these public "servants" have directly enabled the Enterprise' effort to execute damage control and cover-up measures to mitigate its exposure. In doing so they continue to violate Plaintiff's civil rights, including his right to "due process" and "equal protection under law."

## PARTIES

**Plaintiffs**

32. Plaintiff Jason E. Cobb is a long time resident of the San Francisco Bay Area. He has served as a Director and Officer of the non-profit corporation employed by the English Menlo Park Congregation of Jehovah's Witnesses to hold title to its property located at 811 Bay Rd in Menlo Park, California. He is a husband and father of two children.

**RICO Defendants**

33. The Defendants listed in paragraphs 34 through 87 are persons who have conspired to engage in a pattern of racketeering activity and have committed numerous criminal acts as part of a scheme to defraud and injure Plaintiff Jason Cobb without due cause. Each have participated in the operation and/or management of the criminal enterprise. These Defendants, listed in alphabetical order by last name, constitute the "RICO Defendants" and/or "Enterprise members."

34. Defendant Alfred Altamirano is a husband and father of three children living in Ventura County. He is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks in his family/personal life, in the congregation and in the campaign of obstruction..

35. Defendant Ellen Altamirano is a wife and mother of three children living in Ventura County. She is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks in his family/personal life, in the congregation and in the campaign of obstruction.

36. Defendant Jennifer Altamirano is a wife and mother of two children living in the San Francisco bay area. She is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff and in the attacks in his family/personal life, in the congregation and in the campaign of obstruction.

37. Defendant Richard Ashe has held positions of responsibility with the Christian

9

1    Congregation of Jehovah's Witnesses, Inc., specifically in the Service Department. He is a RICO

2    Defendant participating in the management and operation of the Enterprise described herein playing a

3    key role in the defamation scheme against Plaintiff and in the attacks in his family/personal life and in

4    the congregation.

5       38. Defendant Cameron Bowman has served as an attorney for Plaintiff Jason Cobb and is

6    currently practicing law at the firm of VIB LAW. He is a RICO Defendant participating in the

7    operation of the Enterprise described herein playing a key role in the defamation scheme against

8    Plaintiff, the attacks in his family/personal life and in the campaign of obstruction.

9       39. Defendant Ernest Brede became a member of the English Menlo Park Congregation of

10   Jehovah's Witnesses in July 2010. Defendant Brede's general course of conduct includes both civil

11   and criminal conspiracy, theft by trick, affinity fraud, obstruction of justice, witness tampering, bank

12   fraud, slander, extortion and business identity theft. He is a RICO Defendant participating in the

13   operation of the Enterprise described herein playing a key role in the defamation scheme against

14   Plaintiff, the attacks in his family/personal life, in the congregation and in the campaign of

15   obstruction.

16      40. Defendant Luis Contreras is a RICO Defendant participating in the operation of the

17   Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks

     in his family/personal life, in the congregation and in the campaign of obstruction.

18      41. Defendant Paul Demosthenes is a RICO Defendant participating in the operation of the

19   Enterprise described herein playing a supporting role in the defamation scheme against Plaintiff, the

20   attacks in his family/personal life, in the congregation and in the campaign of obstruction.

21      42. Defendant Bill Douglas is a RICO Defendant participating in the operation of the

22   Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks

23   in his family/personal life, in the congregation and in the campaign of obstruction.

24      43. Defendant BJ Fadem has served as an attorney for Plaintiff Jason Cobb and is currently

25   practicing law at the firm of BJ Fadem Law. He is a RICO Defendant participating in the operation of

26   the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the

27   attacks in his family/personal life and in the campaign of obstruction.

28      44. Defendant Leon Fair is a RICO Defendant participating in the operation of the Enterprise

10

described herein playing a key role in the defamation scheme against Plaintiff, the attacks in his family/personal life and in the congregation.

45. Defendant Donald Ferris is a RICO Defendant participating in the operation of the Enterprise described herein playing a supporting role in the attacks against Plaintiff in his family/personal life and in the congregation.

46. Defendant Amanda Freel has served as an investigator employed by VIB Law in support of defense trial preparation. She is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks in his family/personal life and in the campaign of obstruction.

47. Defendant Robert Jonsen is the Chief of Police for the Menlo Park Police Department. He is a RICO Defendant participating in the operation of the Enterprise playing a key role in the defamation scheme against Plaintiff, the campaign of obstruction and the violation of Plaintiff's civil and Constitutional rights.

48. Defendant Jeff Kitagawa is an employee and representative of Cisco Systems, Inc. Being unduly influenced, he has followed directives from the Enterprise described herein playing a key role in the attacks against Plaintiff in his family/personal life, in the workplace and in the campaign of obstruction.

49. Defendant Jeffrey Kline is a clinical psychologist with prior experiences with attorneys of ill repute including non-party co-conspirator Nancy De Ita and Defendants BJ Fadem and Ron Nerio. Defendant Kline was handpicked by Defendant Jennifer Altamirano and pre-selected to serve as the child custody evaluator in support of and in furtherance of the scheme described herein prior to the hearing on 5/24/2012 when the formal and perfunctory appointment occurred, as ordered by Defendant Susan Greenberg, for the sake of appearances.

50. Defendant Kline has slowed the pacing and progression of the child custody evaluation as called for to allow for the execution of malicious acts against Plaintiff, including but not limited to, the false allegations of domestic violence perpetrated in September 2012.

51. Defendant Kline is briefed on the planned attacks against Plaintiff then delays the proceeding until said attacks are executed. Upon resuming the evaluation proceeding, the new set of allegations against Plaintiff are then incorporated into the review in the systematic effort to weaken

Plaintiff's position in the child custody evaluation, per the scheme. Such evaluations typically take three months. However, the evaluation being conducted by Defendant Kline is in its eighth month, and counting, as it is still not complete. The consistent display of synchronization, as described, and the entire proceeding itself, are the result of collusion between Defendants Jennifer Altamirano, Jeffrey Kline and Donald Maynor, amongst others.

52. Defendant Jeffrey Kline is a RICO Defendant participating in the operation of the Enterprise playing a key role in the attack against Plaintiff in his family/personal life and in the campaign of obstruction.

53. Defendant Paul Koehler has served as a traveling representative of the Christian Congregation of Jehovah's Witnesses, Inc. He is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks in the congregation and in his family/personal life having participated in the recruitment of Defendant Jennifer Altamirano in-line with his tendency and habit to use women in his recurring shenanigans.

54. Defendant Tara Lappin is an employee and representative of Cisco Systems, Inc. Being unduly influenced, she has followed directives from the Enterprise, in particular Morgan, Lewis and Bockius, LLP, as represented by Defendant Dennis Sinclitico, Jr. playing a key role in the attacks against Plaintiff in his family/personal life, in the workplace and in the campaign of obstruction.

55. Defendant Larry Laverdure is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks in his family/personal life and in the congregation.

56. Defendant Lawrence Lee is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks in his family/personal life, in the congregation and in the campaign of obstruction.

57. Defendant Allan Lee is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks in his family/personal life, in the congregation and in the campaign of obstruction.

58. Defendant Michael Marchi is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks

in his family/personal life, in the congregation and in the campaign of obstruction.

59. Defendant Donald Maynor is a RICO Defendant participating in the management and operation of the Enterprise playing a leading role in the defamation scheme against Plaintiff, the attacks in his family/personal life, in the workplace, in the congregation and in the campaign of obstruction.

60. Pursuant to affiliations derived from his father's work as an FBI agent, Defendant Maynor has admittedly served as an unofficial resource for the Bureau at varying points in time since the 1960s. Due to this fact as well as his status as a lawyer in Silicon Valley, he has considerable political capital and influence leveraging such within the local counties (San Mateo County; Santa Clara County), municipalities, including the City of Menlo Park, district attorney offices, law enforcement agencies and universities (Stanford).

61. Defendant Bill MacKeon is a RICO Defendant participating in the operation of the Enterprise described herein playing a supporting role in the defamation scheme against Plaintiff.

62. Defendant Ron Nerio has served as an attorney for Plaintiff Jason Cobb and is currently practicing law at the firm of BJ Fadem Law. He is a RICO Defendant participating in the operation of the Enterprise described herein playing a key role in the attacks against Plaintiff in his family/personal life and in the campaign of obstruction.

63. Defendant Dan Nilges is a traveling representative of the Christian Congregation of Jehovah's Witnesses, Inc., and the successor to Defendant Paul Koehler as Circuit Overseer for Circuit 13.

64. Two years into his assignment, Defendant Nilges is yet to address the misconduct of the elders currently serving in the Menlo Park Congregation of Jehovah's Witnesses.

65. When advised of the mistreatment of Plaintiff's family, discussed herein on page 39 at paragraphs 206 and 206, Defendant Nilges apathetically cited the legal actions as justification for such, even in the case of the children.

66. As Defendant Jennifer Altamirano initiated the strategic disruption of the Cobb household, she colluded with Defendant Nilges by phone and other means in and around the execution of key milestones in this micro-scheme.

67. Defendant Nilges organized the judicial and appeal committees that executed acts of

1    extortion leading to the claims of Serbian Collusion and Serbian Fraud contained herein.

2    68. Defendant Nilges is a RICO Defendant participating in the management and operation of

3    the Enterprise described herein playing a leading role in the defamation scheme against Plaintiff, the

4    attacks in the congregation and in his family/personal life.

5    69. Defendant Peter Ohtaki is the mayor of the City of Menlo Park and serves as the Presiding

6    Officer of the City Council. He is a RICO Defendant participating in the management and operation

7    of the Enterprise playing a leading role in the defamation scheme against Plaintiff, the campaign of

8    obstruction and the violation of Plaintiff's civil and constitutional rights.

9    70. Defendant Alicia Perdue is an employee and representative of Cisco Systems, Inc. She has

10   followed directives from Defendant Tara Lappin playing a supporting role in the attacks against

11   Plaintiff in the workplace and in the campaign of obstruction.

12   71. Defendant Jerome Pierce is a RICO Defendant participating in the operation of the

13   Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the attacks

14   in his family/personal life, in the congregation and in the campaign of obstruction.

15   72. Defendant Bruce Raditich is a RICO Defendant participating in the management and

16   operation of the Enterprise playing a leading role in the defamation scheme against Plaintiff, the

17   attacks in his family/personal life, in the workplace, in the congregation and in the campaign of

     obstruction.

18   73. Defendant Raditich has ties to both San Mateo and Santa Clara County, including but not

19   limited to, the district attorney offices in both counties pursuant to his former employment as a police

20   officer and subsequent employment as a corporate security specialist in Silicon Valley. His

21   employment history, range of clients and contacts have enabled him to build a vast professional

22   network to the end of amassing considerable political capital and influence. Defendant Raditich's

23   close friend, the late Peter Gallego, referenced herein, was employed at SLAC for decades and

24   contributed to the expansion of Defendant Raditich's professional network to include persons of

25   influence employed by and/or affiliated with Stanford University and Hospital.

26   74. Defendant Alan Shuster has held positions of responsibility with the Christian

27   Congregation of Jehovah's Witnesses, Inc., specifically in the Service Department. He is a RICO

28   Defendant participating in the management and operation of the Enterprise described herein playing a

                                                    14

1    leading role in the defamation scheme against Plaintiff, the attacks in his family/personal life, in the

2    congregation and in the campaign of obstruction.

3        75. Defendant Donald T. Showers III is a RICO Defendant participating in the operation of

4    the Enterprise described herein playing a key role in the defamation scheme against Plaintiff, the

5    attacks in his family/personal life, in the congregation and in the campaign of obstruction.

6        76. Defendant Dennis J Sinclitico Jr. is a lawyer employee by Morgan, Lewis and Bockius

7    LLP and is a RICO Defendant participating in the management and operation of the Enterprise

8    described herein playing a leading role in the defamation scheme against Plaintiff, the attacks in his

9    family/personal life, the workplace, in the congregation and in the campaign of obstruction.

10       77. Defendant Sinclitico initiated a conspiratorial alliance with Defendant Anthony Smith

11   sometime after Plaintiff Jason Cobb filed federal action C 11-02496-DMR on May 23, 2011. This

12   alliance involved Defendant Sinclitico providing legal assistance to Defendant Smith, which initially

13   included ghost writing legal documents for the overmatched and outclassed Defendant Smith in state

14   action CIV 508137 and federal action C 10-03907-MEJ.

15       78. Eventually, such assistance came to include falsifying orders sent via U.S. Mail that were

16   represented as being from Judge Maria-Elena James, the presiding judge for federal civil action

17   C 10-03907-MEJ. This fraudulent course of conduct progressed to the point of Defendant Sinclitico

18   falsifying the dispositive order for federal civil action C 10-03907-MEJ. This act of fraud upon the

19   court directly executed by Dennis Sinclitico, Anthony Smith, Chris Nathan and Brenda Tolbert

20   benefitted the association-in-fact RICO Enterprise described herein as this terminated the execution of

21   a court order demanding production of records for JPMorgan Chase Bank account xxxxx2300. Thus,

22   the fraudulently manufactured "dismissal" of this action provided Enterprise insiders within

23   JPMorgan Chase Bank with a plausible "out" in relation to the subpoenas that had already been

24   served and insincerely approved for delivery as the Chase Bank insiders simply waited for the

     fraudulent dismissal of the case to be executed.

25       79. Defendant Sinclitico is a key member of the Enterprise as he and his Morgan, Lewis

26   colleagues exert a strong influence in three key areas of Plaintiff Jason Cobb's life: his

27   family/personal life, the workplace (Cisco) and in the congregation by virtue of the alliance with

28   Defendant Anthony Smith that has progressed to include Defendants Donald Maynor, Bruce Raditich

and Jennifer Altamirano amongst others.

80. ~~Defendant Anthony V. Smith~~ Defendant Donald T. Showers III is a RICO Defendant participating in the operation of the Enterprise playing a key role in the defamation scheme against Plaintiff, the attacks in his family/personal life, in the congregation and in the campaign of obstruction.

81. Defendant Leonardo Trevino is a representative of the Regional Building Committee of Jehovah's Witnesses, Inc. (RBC #7) and is a RICO Defendant participating in the management and operation of the Enterprise described playing a leading role in the defamation scheme against Plaintiff, the attacks in his family/personal life and in the congregation.

82. Defendant Stephen Wagstaffe is the District Attorney for San Mateo County. He is a RICO Defendant participating in the management and operation of the Enterprise playing a leading role in the defamation scheme against Plaintiff, the campaign of obstruction and the violation of Plaintiff's civil and constitutional rights.

83. Defendant Glenn Watson is a RICO Defendant participating in the operation of the Enterprise playing a foundational and supporting role in the defamation scheme against Plaintiff and the attacks in the congregation.

84. Defendant Kerry Woodhams is a RICO Defendant participating in the operation of the Enterprise described herein playing a supportive role in the defamation scheme against Plaintiff, the attacks in the congregation and in the campaign of obstruction.

85. Defendant Paul Yamaguchi is a RICO Defendant participating in the operation of the Enterprise described herein playing a supportive role in the defamation scheme against Plaintiff, the attacks in the congregation and in the campaign of obstruction.

86. JPMorgan Chase Bank, N.A. is an FDIC insured financial institution doing business within this State, U.S. District and County. Pursuant to the vicarious liability principles of *Respondeat Superior*, Apparent Authority and Collective Knowledge, JPMorgan Chase Bank, N.A. has engaged in a pattern of racketeering activity by and through willful violations of 18 U.S.C. §§ 1341, 1344, 1346, 1503, 1964(c) and 1964(d) by RICO Enterprise insiders Donna A Craig, Diana Stinson and Christina Wilson, amongst others.

87. Morgan, Lewis and Bockius LLP is a law firm doing business within San Francisco, CA.

Pursuant to the vicarious liability principles of *Respondeat Superior*, Apparent Authority and Collective Knowledge, Morgan Lewis and Bockius LLP has engaged in a pattern of racketeering activity by and through willful violations of 18 U.S.C. §§ 201, 371, 1341, 1344, 1346, 1503, 1961, 1964(c) and 1964(d) by RICO Enterprise insider Defendant Dennis J. Sinclitico Jr., amongst others.

**Non-RICO Defendants**

88. <u>Defendant Eddie Estrada</u> is a representative of the Family Court Services department within the Superior Court of California for San Mateo County. Being unduly influenced and due to malice born of racial bias, he has followed directives from the Enterprise described herein playing a foundational and key role in the defamation scheme against Plaintiff, the attacks in his family/personal life and in the campaign of obstruction.

89. <u>Defendant Susan Greenberg</u> is a family law commissioner and representative of The Superior Court of California for San Mateo County. Being unduly influenced by the Enterprise and due to inherent malice born of both gender and racial bias, she has played a foundational, leading and central role in the defamation scheme against Plaintiff, the attacks in his family/personal life, the campaign of obstruction and the systematic and willful violation of Plaintiff's parental, civil and Constitutional rights. Her egregious and self-serving course of action constitutes a disgrace to all public servants and an indelible blight on the human condition.

90. <u>The City of Menlo Park</u> is a municipality operating and doing business within Menlo Park, CA that has engaged in a persistent course of discrimination against Plaintiff Jason Cobb born of racial bias and corruption. The City has played a leading role in the defamation scheme against Plaintiff, the attacks in his family/personal life and in the campaign of obstruction.

91. <u>The District Attorney's Office for San Mateo County</u> is a law enforcement agency operating within Redwood City, CA that has engaged in a persistent course of discrimination against Plaintiff Jason Cobb born of racial bias and corruption. The DA's office has played a leading role in the defamation scheme against Plaintiff, the attacks in his family/personal life and in the campaign of obstruction.

92. <u>The County of San Mateo</u> is a governmental agency operating within Redwood City, CA that has engaged in a persistent course of discrimination against Plaintiff Jason Cobb born of racial bias and corruption. The County has played a leading role in the defamation scheme against Plaintiff,

1  the attacks in his family/personal life and in the campaign of obstruction.

2  93. The Superior Court of California for San Mateo County is a governmental agency

3  operating within Redwood City, CA that has engaged in a persistent course of discrimination against

4  Plaintiff Jason Cobb born of undue influence, racial bias and corruption. The Superior Court has

5  played a leading role in the defamation scheme against Plaintiff, the attacks in his family/personal life

6  and in the campaign of obstruction.

7  **SUBJECT MATTER JURISDICTION AND VENUE**

8  94. Plaintiffs' first claim for relief arises under the **Civil Rights Act**, which "expressly gives

9  the District Court Jurisdiction, no matter how imperfectly the claim is stated." - *Harmon v. Superior*

10  *Ct of the State of California*, 307 F 2d 796, CA 9(1962)

11  95. Furthermore, this Court has subject matter jurisdiction over Plaintiffs' claims under 28

12  U.S.C. §§ 1331 and 1332, and under 18 U.S.C. § 1964(c).

13  96. Plaintiffs' third claim for relief arises under 18 U.S.C. § 1961 *et seq*., as hereinafter more

14  fully appears. Additionally, the amount in question exceeds $75,000, exclusive of interest and costs.

15  Plaintiffs' state law claims arise out of the same case or controversy as their federal law claims, as all

16  claims in this action, arise out of a common nucleus of operative facts. Thus, this Court also has

17  supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

18  97. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial number of

19  the events giving rise to this action occurred in this District, and also under 18 U.S.C. § 1965.

20  **PERSONAL JURISDICTION**

21  98. Pursuant to the provisions of 18 U.S.C. § 1965(a), § 1965(b) and 28 U.S.C. § 1391(b)(2),

22  exercise of jurisdiction over Defendant Alfred Altamirano is proper in this District as the ends of

23  justice require such (Butcher's Union Local No. 498, 788 F. 2d at 539). Defendant Altamirano

24  conducts business within the Northern District of California. Through his activities in California, he is

25  a participant within the scheme described herein.

26  99. Pursuant to the provisions of 18 U.S.C. § 1965(a), § 1965(b) and 28 U.S.C. § 1391(b)(2),

27  exercise of jurisdiction over Defendant Ellen Altamirano is proper in this District as the ends of

28  justice require such (Butcher's Union Local No. 498, 788 F. 2d at 539). Defendant Altamirano

18

frequents Northern California and is a participant within the scheme described herein.

100. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Jennifer Altamirano</u> is reasonable and proper in this District because he resides and conducts business within the Northern District of California. Through her activities in California, Defendant Altamirano is a participant within the scheme described herein.

101. Pursuant to the provisions of 18 U.S.C. § 1965(a), § 1965(b) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Richard Ashe</u> is proper in this District as the ends of justice require such (Butcher's Union Local No. 498, 788 F. 2d at 539). Defendant Ashe is a participant within the scheme described herein.

102. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Cameron Bowman</u> is reasonable and proper in this District because he resides and conducts business within Northern California. Through his activities in California, Defendant Bowman is a participant within the scheme described herein.

103. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Ernest Brede</u> is reasonable and proper in this District because he resides and conducts business within the Northern District of California. Through his activities in California, Defendant Brede is a participant within the scheme described herein.

104. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Luis Contreras</u> is reasonable and proper in this District because he resides and conducts business within the Northern District of California. Through his activities in California, Defendant Contreras is a participant within the scheme described herein.

105. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Paul Demosthenes</u> is reasonable and proper in this District because he resides and conducts business within the Northern District of California. Through his activities in California, Defendant Demosthenes is a participant within the scheme described herein.

106. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Bill Douglas</u> is reasonable and proper in this District because he resides and conducts business within the Northern District of California. Through his activities in California, Defendant Douglas is a participant within the scheme described herein.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

107. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over Defendant Eddie Estrada is reasonable and proper in this District because he resides and conducts business within Northern California. Through his activities in California, Defendant Estrada is a participant within the scheme described herein.

108. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over Defendant BJ Fadem is reasonable and proper in this District because he resides and conducts business within Northern California. Through his activities in California, Defendant Fadem is a participant within the scheme described herein.

109. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over Defendant Leon Fair is reasonable and proper in this District because he resides and conducts business within the Northern District of California. Through his activities in California, Defendant Fair is a participant within the scheme described herein.

110. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over Defendant Donald Ferris is reasonable and proper in this District because he resides and conducts business within Northern California. Through his activities in California, Defendant Ferris is a participant within the scheme described herein.

111. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over Defendant Amanda Freel is reasonable and proper in this District because she resides and conducts business within Northern California. Through her activities in California, Defendant Freel is a participant within the scheme described herein.

112. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over Defendant Susan Greenberg is reasonable and proper in this District because she resides and conducts business within Northern California. Through her activities in California, Defendant Greenberg is a participant within the scheme described herein.

113. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over Defendant Robert Jonsen is reasonable and proper in this District because he resides and conducts business within Northern California. Through his activities in California, Defendant Jonsen is a participant within the scheme described herein.

114. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

of jurisdiction over <u>Defendant Jeff Kitagawa</u> is reasonable and proper in this District because he resides and conducts business within Northern California. Through his activities in California, Defendant Kitagawa is a participant within the scheme described herein.

115. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Jeffrey Kline</u> is reasonable and proper in this District because he resides and conducts business within Northern California. Through his activities in California, Defendant Kline is a participant within the scheme described herein.

116. Pursuant to the provisions of 18 U.S.C. § 1965(a), § 1965(b) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Paul Koehler</u> is proper in this District as the ends of justice require such (Butcher's Union Local No. 498, 788 F. 2d at 539). Defendant Koehler is a participant within the scheme described herein.

117. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Tara Lappin</u> is reasonable and proper in this District because she resides and conducts business within Northern California. Through her activities in California, Defendant Lappin is a participant within the scheme described herein.

118. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Larry Laverdure</u> is reasonable and proper in this District because he resides and conducts business within the Northern District of California. Through his activities in California, Defendant Laverdure is a participant within the scheme described herein.

119. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Lawrence Lee</u> is reasonable and proper in this District because he resides and conducts business within Northern California. Through his activities in California, Defendant Lee is a participant within the scheme described herein.

120. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Allan Lee</u> is reasonable and proper in this District because he resides and conducts business within the Northern District of California. Through his activities in California, Defendant Lee is a participant within the scheme described herein.

121. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise of jurisdiction over <u>Defendant Michael Marchi</u> is reasonable and proper in this District because he

1    resides and conducts business within the Northern District of California. Through his activities in

2    California, Defendant Marchi is a participant within the scheme described herein.

3        122. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

4    of jurisdiction over Defendant Donald Maynor is reasonable and proper in this District because he

5    resides and conducts business within the Northern District of California. Through his activities in

6    California, Defendant Maynor is a participant within the scheme described herein.

7        123. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

8    of jurisdiction over Defendant Bill McKeon is reasonable and proper in this District because he

9    resides and conducts business within the Northern District of California. Through his activities in

10   California, Defendant McKeon is a participant within the scheme described herein.

11       124. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

12   of jurisdiction over Defendant Ron Nerio is reasonable and proper in this District because he resides

13   and conducts business within Northern California. Through his activities in California, Defendant

14   Nerio is a participant within the scheme described herein.

15       125. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

16   of jurisdiction over Defendant Dan Nilges is reasonable and proper in this District because he resides

17   and conducts business within the Northern District of California. Through his activities in California,

     Defendant Nilges is a participant within the scheme described herein.

18       126. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

19   of jurisdiction over Defendant Peter Ohtaki is reasonable and proper in this District because he resides

20   and conducts business within Northern California. Through his activities in California, Defendant

21   Ohtaki is a participant within the scheme described herein.

22       127. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

23   of jurisdiction over Defendant Alicia Perdue is reasonable and proper in this District because she

24   resides and conducts business within the Northern District of California. Through her activities in

25   California, Defendant Perdue is a participant within the scheme described herein.

26       128. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

27   of jurisdiction over Defendant Jerome Pierce is reasonable and proper in this District because he

28   resides and conducts business within Northern California. Through his activities in California,

1    Defendant Pierce is a participant within the scheme described herein.

2        129. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

3    of jurisdiction over Defendant Bruce Raditich is reasonable and proper in this District because he

4    resides and conducts business within Northern California. Through his activities in California,

5    Defendant Raditich is a participant within the scheme described herein.

6        130. Pursuant to the provisions of 18 U.S.C. § 1965(a), § 1965(b) and 28 U.S.C. § 1391(b)(2),

7    exercise of jurisdiction over Defendant Alan Shuster is proper in this District as the ends of justice

8    require such (Butcher's Union Local No. 498, 788 F. 2d at 539). Defendant Shuster is a participant

9    within the scheme described herein.

10       131. Pursuant to the provisions of 18 U.S.C. § 1965(a), § 1965(b) and 28 U.S.C. § 1391(b)(2),

11   exercise of jurisdiction over Defendant Donald T. Showers III is proper in this District as the ends of

12   justice require such (Butcher's Union Local No. 498, 788 F. 2d at 539). Defendant Showers is a

13   participant within the scheme described herein.

14       132. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

15   of jurisdiction over Defendant Dennis Sinclitico, Jr. is reasonable and proper in this District because

16   he resides and conducts business within the Northern District of California. Through his activities in

     California, Defendant Sinclirico is a participant within the scheme described herein.

17       133. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

18   of jurisdiction over Defendant Anthony Smith. is reasonable and proper in this District because he

19   resides and conducts business within the Northern District of California. Through his activities in

20   California, Defendant Smith is a participant within the scheme described herein.

21       134. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

22   of jurisdiction over Defendant Leonardo Trevino is reasonable and proper in this District because he

23   resides and conducts business within Northern California. Through his activities in California,

24   Defendant Trevino is a participant within the scheme described herein.

25       135. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

26   of jurisdiction over Defendant Stephen Wagstaffe is reasonable and proper in this District because he

27   resides and conducts business within Northern California. Through his activities in California,

28   Defendant Wagstaffe is a participant within the scheme described herein.

                                              23

1

2    136. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

3    of jurisdiction over Defendant Glenn Watson is reasonable and proper in this District because he

4    resides and conducts business within Northern California. Through his activities in California,
     Defendant Watson is a participant within the scheme described herein.

5    137. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

6    of jurisdiction over Defendant Kerry Woodhams is reasonable and proper in this District because he

7    resides and conducts business within the Northern District of California. Through his activities in

8    California, Defendant Woodhams is a participant within the scheme described herein.

9    138. Pursuant to the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2), exercise

10   of jurisdiction over Defendant Paul Yamaguchi is reasonable and proper in this District because he

11   resides and conducts business within the Northern District of California. Through his activities in

12   California, Defendant Yamaguchi is a participant within the scheme described herein.

13   139. Pursuant to the provisions of 18 U.S.C. § 1965(a), exercise of jurisdiction over The City

14   of Menlo Park is reasonable and proper in this District because it has agents and transacts its affairs

15   within the Northern District of California. Further, it has served as a central and leading participant
     within the scheme described herein.

16
     140. Pursuant to the provisions of 18 U.S.C. § 1965(a), exercise of jurisdiction over The
17
     County of San Mateo is reasonable and proper in this District because it has agents and transacts its
18
     affairs within the Northern District of California. Further, it has served as a central and leading
19
     participant within the scheme described herein.

20   141. Pursuant to the provisions of 18 U.S.C. § 1965(a), exercise of jurisdiction over The

21   District Attorney's Office of San Mateo County is reasonable and proper in this District because it has

22   agents and transacts its affairs within the Northern District of California. Further, it has served as a

23   central and leading participant within the scheme described herein.

24   142. Pursuant to the provisions of 18 U.S.C. § 1965(a), exercise of jurisdiction over JPMorgan

25   Chase Bank, N.A is reasonable and proper in this District because it has agents and transacts its

26   affairs within the Northern District of California. Further, it has served as a central and leading

27   participant within the scheme described herein.

28   143. Pursuant to the provisions of 18 U.S.C. § 1965(a), exercise of jurisdiction over Morgan,

Lewis & Bockius, LLP is reasonable and proper in this District because it has agents and transacts its affairs within the Northern District of California. Further, it has served as a central and leading participant within the scheme described herein.

144. Pursuant to the provisions of 18 U.S.C. § 1965(a), exercise of jurisdiction over The Superior Court of California for San Mateo County is reasonable and proper in this District because it has agents and transacts its affairs within the Northern District of California. Further, it has served as a central and leading participant within the scheme described herein.

145. The just provisions of 18 U.S.C. § 1965(b) stand ready to address any other jurisdiction or venue concerns as the ends of justice may require (Butcher's Union Local No. 498, 788 F. 2d at 539).

## FACTUAL BASIS FOR CLAIMS

### A.  Background

146. Factual background is as follows.

147. The present point of conflict is born of past circumstances and situations that constitute interesting chapters in the history of the Menlo Park Congregation of Jehovah's Witnesses, Circuit-13 and San Mateo County.

148. At one time, Plaintiff, Jonathan D. Cobb, Sr., Defendants Douglas, Fair, Ferris, Maynor and others were all members of the Menlo Park congregation. Over the years disagreements occurred in some cases straining what had been strong bonds of love and friendship. Eventually Defendants Fair, Maynor and others, including the late Peter Gallego, left the congregation, with hard feelings that persisted. In harboring resentment, such ones consistently employed gossip and slander in the attempt to damage the reputation of the Cobb family.

149. When traveling representatives of the Christian Congregation of Jehovah's Witnesses, Inc. visited congregations in the San Francisco bay area region, known as Circuit-13 to organizational members, Defendants Maynor, Fair and others within their "clique" would express their grievances and encourage these representatives to right the perceived wrongs committed by the Cobb family, in particular Jonathan D. Cobb, Sr. and Plaintiff Jason Cobb, who at times were criticized for their efforts to uphold bible standards in the congregation when such may not have been popular or politically advantageous, from the standpoint of men.

25

150. In 2003, Arlen Meier, a long-time and distinguished traveling representative of the Christian Congregation of Jehovah's Witnesses, Inc. located in Patterson, NY, visited the Menlo Park congregation on two occasions. Certain issues arose and the manner in which Arlen Meier handled them caused some concern. These concerns were shared by Plaintiff with the District Overseer assigned at that time, Gary Novak. Soon thereafter, Arlen Meier retired from the traveling work.

151. Prior to his retirement, Brother Meier had stated that he knew several persons in the *Service Department* at Patterson, NY, a department which participates in the oversight of the preaching work and congregational matters in the U.S. In fact he had studied the bible with some of them and helped them get baptized. He intimated that getting on his bad side, or the bad side of the persons he knew in the *Service Department*, would not be wise.

152. In 2007, representatives of the Spanish Menlo Park Congregation of Jehovah's Witnesses contacted Plaintiff to express their desire to begin using the meeting facility or Kingdom Hall located at 811 Bay Rd in Menlo Park, CA. Discussions of the proposal ensued. However, it was eventually determined that this request could not be accommodated at that time. The representatives of the Spanish congregation were understandably disappointed with this conclusion and expressed their concerns directly to the Christian Congregation of Jehovah's Witnesses, Inc. located in Patterson, NY.

153. Thereafter, Paul Koehler, a traveling representative of the Christian Congregation of Jehovah's Witnesses, Inc., was reassigned to the San Francisco bay area, to Circuit 13. His initial visit to the Menlo Park congregation occurred during October 2008. From the beginning, Paul Koehler had an agenda that involved two things: 1) Attacking the Cobbs (Jonathan; Jason) and 2) Initiating a transfer of ownership of the Menlo Park Kingdom Hall.

154. As Paul Koehler made his rounds visiting each congregation in Circuit 13, he identified other persons with grievances against the Cobbs including a group of persons hereinafter referred to collectively as "The Clique," consisting of Ernest Brede, Leon Fair, Consuela Fair, Peter Gallego, Natalie Gallego, Donald Maynor, Bruce Raditich, Henry Young Sr. and Priscilla Young, amongst others. When finding such ones with burning embers of resentment toward the Cobbs, Defendant Koehler applied the gasoline, rallied the troops, then pointed at Jonathan D. Cobb, Sr. and Plaintiff. Consequently, principals within The Clique, in-line with their established patterns of conduct, have played recurring roles in support of the scheme against Plaintiff operating from their customary

vantage point, in the shadows facing Plaintiff's back with daggers in-hand.

155. When Paul Koehler attended a renovation planning meeting with representatives of Regional Building Committee #7, as chaired by Defendant Leonardo Trevino, held in November 2008, he expressed a desire to have the Spanish congregation meet in the Menlo Park meeting facility. During a subsequent meeting, members of the Regional Building Committee or RBC expressed the idea of using the Menlo Park Kingdom Hall as a means to address varied needs within the area for meeting facilities etc. In short, a plan was forming regarding the desired use and/or sale of the property and Paul Koehler, the RBC and members of both the Spanish and Japanese Menlo Park congregations were in alignment as regards this plan. However, none of them owned the property. The Menlo Park Congregation of Jehovah's Witnesses, Inc. (Corporate Entity No: C0983980) owned the property with George T. Stock, W. Arlen St. Clair, Jonathan D. Cobb Sr. and Plaintiff occupying spiritual positions of oversight within the congregation and, with the exception of Jonathan Cobb, legal positions within the corporation. The idea of selling the property created concern as it is centrally located within the congregation's locale and preaching territory. Also, the members, who shoulder the expense, were not in favor of a major renovation to the property but rather a modest one that addressed the primary needs to a sufficient degree. The differing views created an impasse that stalled the renovation project from April 11, 2009 onward.

156. Undeterred, Defendant Koehler appointed Defendant Bruce Radetich to head up a Land Search Committee. The purpose of this committee was represented as being to identify opportunities for land acquisition to use in building new Kingdom Halls. However, Defendant Raditich exhibited the same preoccupation with the Menlo Park congregation Kingdom Hall, as had Defendants Koehler and Trevino establishing such as the "primary target" within his charter.

157. In and around September 2009, Peter Gallego, Sr., one of Jehovah's Witnesses and a long-time member of the Menlo Park congregation fell asleep in death. This was a true loss as he was a fine minister and loved by many. Unfortunately, his passing added to standing feelings of resentment on the part of certain persons including Defendants Maynor and Fair as well as Peter's close friend, Bruce Raditich an elder in the West Sunnyvale Congregation of Jehovah's Witnesses. At varying points in time, Peter Gallego, Sr. made certain decisions that, for a congregation elder, constituted serious errors in judgment, calling into question his qualifications as a congregation elder,

27

thus initiating a review of such. Members of The Clique felt that the added stress from these situations exacerbated his health issues and so, when he died in 2009, such persons erroneously blamed the Cobbs, especially Plaintiff.

158. Also in September 2009, the body of elders serving in the Menlo Park congregation of Jehovah's Witnesses sent a letter of concern regarding Paul Koehler's behavior to then District Overseer Charles Valorz and to the Christian Congregation of Jehovah's Witnesses, Inc.'s Service Department just prior to Defendant Koehler's pending visit (Exhibit 1). On the following Sunday, Kenneth Woodhams came to the Menlo Park congregation to substitute as Defendant Koehler had been "benched," presumably by Charles Valorz, as good of a man that one will ever find, pursuant to the letter of concern. Further "after-shocks" ensued.

159. On 10/17/09, Defendant Raditich's planned update regarding the Land Search Committee during the Circuit Assembly business meeting was inexplicably cancelled. According to Jonathan D. Cobb, Sr., Defendant Raditich looked like he had just been run over by a truck. Whatever Defendants Koehler, Trevino and Raditich were planning concerning the "Land Search" effort, which is to say the effort to commandeer real property owned by the non-profit corporation employed by the Menlo Park congregation, was shut down by Charles Valorz. Looks of agitation and concern appeared on the faces of Defendant Koehler, Raditich and others. It was clear that they'd been taken to the proverbial "wood shed" and they were still trying to recover.

160. At this point, there was a mounting feeling of antagonism toward Jonathan D. Cobb, Sr. and Plaintiff for the following reasons, as stated above: 1) The long-standing grievances of Defendants Maynor, Fair et al. stemming from past disagreements, 2) Reactions on the part of certain ones in Circuit 13 and, upon information and belief, certain ones in the Service Department in Patterson, NY, to Plaintiff's perceived role in the retirement of travelling overseer Arlen Meier, 3) the declining of the request made by the Spanish Menlo Park Congregation to share the Kingdom Hall (church building), 4) the impasse delaying the Menlo Park Kingdom Hall renovation project, 5) the Menlo Park Congregation body of elders' (W. Arlen St. Clair, George T. Stock, Jonathan D. Cobb, Sr., Jason Cobb) hesitance to accept Paul Koehler's proposal that the Menlo Park and South Redwood City congregations be merged, 6) the death of Peter Gallego, Sr. and the subsequent blame for such erroneously placed by "The Clique" on Plaintiff and 7) the letter of concern regarding Paul Koehler's

behavior (Exhibit 1).

161. A micro-scheme to remove the entire body of elders serving in the Menlo Park congregation ensued pursuant to acts of *Serbian Collusion* and *Serbian Fraud* on the part of Defendants Alan Shuster and Richard Ashe, members of the Service Department in Patterson, NY; Defendant Leonardo Trevino, Chairman of Regional Building Committee #7; Defendant Paul Koehler, traveling overseer (Circuit 13); Substitute District Overseer Steve Misterfeld and Talbert Petersen, Regional Building Committee member and Coordinator for the body of elders serving in the Mark West English congregation in Santa Rosa, CA. (*Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976))

162. The intent was to remove the body of elders, especially Jonathan D. Cobb, Sr. and Plaintiff, under the color of right and office so a "reason" to do so had to be manufactured. Consequently, the sequence of events regarding the requested transference of Nansie Vaca's S-21 card (aka: congregation member biography/service record) ensued, per Exhibit 2. Having manufactured the desired set of circumstances leading to a false charge of insubordination, the participants in this micro-scheme succeeded in orchestrating the removal of the body of elders as planned, thus addressing several of the standing points of concern referenced above on page 27 at paragraph 150.

163. Defendant Brede and his fellow elders from the South Redwood City congregation began attending the Menlo Park congregation in May 2010, as directed by Defendants Ashe and Shuster, (Exhibit 3). Discussions with Regional building Committee #7 resumed and the previous proposal for a full renovation of the Kingdom Hall was approved by the new body of elders and initiated.

164. On July 1, 2010, Defendant Brede et al began to occupy spiritual positions within the congregation as opposed to legal positions within the corporation.

165. On July 9, 2010, despite having no legal authority or standing in the Menlo Park Corporation, Defendants Brede, Contreras and Showers visited a local Chase branch and used a California Business Portal printout with Plaintiff's credentials to represent that they had legal standing in the Menlo Park Corporation to the end of opening a new account (Acct No: xxxxx2300), which constitutes an act of business identity theft. The balance of this Chase account was roughly $60,000 in April 2011. However, the amount listed in financial reports posted at the Menlo Park congregation

meeting facility was roughly $45,000.000, a differential that has never been explained.

166. On July 12, 2010, Defendant Brede et al, with the assistance of Defendant Glenn M. Watson, who had been entrusted with bank account duties by the actual Menlo Park Corporation directors years ago, also added their names to existing Wells Fargo Bank checking account #87894705. At the same time, Defendant Brede et al removed Plaintiff's name and that of the other legitimately authorized signer(s) from this account. Thereafter, in and around the first week in November 2010, Defendant Brede took the stage during an evening service and advised the congregation members that the total funds on-hand in the operating fund was $3,500.00, which caused a disturbance amongst the members as most knew that that figure was much too low based on past financial reports. At the conclusion of the program, when asked by concerned members about the reported amount, Defendant Brede directed individuals to Plaintiffs as well as W. Arlen St. Clair and Georg T. Stock inferring that they were responsible for the missing funds, per Exhibit 4

167. The November bank statements provided in Exhibit 5 clearly establish that this report was false. As of November 2010, the funds within all known Wells Fargo accounts totaled $20,144.08. It was later discovered that JP Morgan Chase Bank account xxxxx2300, opened in the name of the Menlo Park Congregation of Jehovah's Witnesses, Inc., had a balance in excess of $50,000.00 during this same time frame. Clearly the congregation and corporation had funds in excess of $3,500.00, contrary to Defendant Brede's false report. When delivering the erroneous financial report, Defendant Brede referenced the standing plans to renovate the Menlo Park Corporation meeting facility in light of the now apparent "need" for members to intensify their efforts to donate to the building fund since, per his report, the corporation had less money than previously thought. Defendant Brede's financial report to the members intentionally misrepresented the financial condition of the corporation and also had a tendency to induce contributions in violation of California Corporations Code 6812:

168. 6812. (a) Every director or officer of any corporation is **guilty of a crime** if such director or officer knowingly concurs in making or publishing, either generally or privately, to members or other persons (1) any materially false report or statement as to the financial condition of

the corporation, or (2) any willfully or fraudulently exaggerated report, account or statement of operations or financial condition, intended to induce and having a tendency to induce, contributions or donations to the corporation by members or other persons.

169. Upon returning to the bay area from a stay in southern California, Plaintiff reviewed the details regarding the 12/16/2010 "corporate" meeting that Defendant Brede et al attempted to hold in his absence verifying that varied legal requirements, per the California Corporations Code had not been met which rendered the proceeding invalid by law. He then conferred with the actual board of directors on April 8, 2011 and reached a decision to remove Defendants Brede and Showers as well as Glenn M. Watson from the Wells Fargo accounts and add Plaintiff as a signer.

170. In gaining online access to the accounts, Plaintiff began reviewing the statements. In doing so, he noted that $15,000.00 was withdrawn from the original operating fund (Acct No: 87894705) on July 12, 2010. Next, on July 13, 2010, $14,900.00 was used to open a new checking account, #1940935883 & the remaining balance of $100.00 was used to open a new savings account, #9841455224.

171. Interestingly, the balance of $8,436.59 in account 87894705 remained untouched, as if it had been set aside for another purpose. Account #1940935883 became the new functional operating fund as seemingly "miscellaneous" and recurring monthly expenses began to be paid exclusively from it.

172. Generally speaking, arbitrary decisions were being made with funds that had been donated by members over the years for a specific purpose without the benefit of any communication with or approval from them.

173. Concerned by these findings in conjunction with the other known facts, Plaintiff went to the Menlo Park Police Department to file a report and was referred to Officer Jeff Keegan, a specialist in corporate fraud and white collar crime cases. Based on a series of discussions, Officer Keegan eventually outlined a preliminary range of offenses which included, amongst other offenses, identity theft, false financial statement and embezzlement (Note: The full range of offenses that were identified in discussions with officer Keegan and Sergeant William Dixon is found within Exhibit 6).

174. On April 15, 2011, Plaintiff notified Defendant Brede of his discoveries and intervening actions by email. Thereafter, Defendants Brede and Contreras recorded a new deed on April 18, 2011 in direct response to Plaintiff reassuming control per his legal office.

175. Next, Defendants Brede and Showers filed a report with the Menlo Park Police Department falsely accusing Plaintiff of theft. Plaintiff discussed this false report with officers Jeff Keegan and Burke Bruttig in April 2011. Plaintiff advised that he had not used any of the corporate funds and that his actions to date were intended to protect the interests of the shareholders. Both officers agreed that no wrong had been committed by Plaintiff.

176. In a follow-up discussion, Officer Keegan advised that he had received an extensive set of documents from Defendant Anthony Smith that were represented as establishing the legitimacy of Defendant Brede et al.'s actions to date specific to the banking activity and corporate appointments etc. According to Officer Keegan, Defendant Smith provided paperwork representing that Defendant Brede et al. had legal standing within the Menlo Park Corporation as of December 16, 2010, the date of the fraudulent corporate meeting previously referenced. In response Officer Keegan requested any and all documentation that established their legal standing in July 2010, prior to the transactions they executed on behalf of the Menlo Park Corporation at both Chase and Wells Fargo. Officer Keegan advised Plaintiff that the response from Defendant Smith was still pending, which made sense from Plaintiff's standpoint as he already knew that Defendant Smith would not be able to provide the requested documentation as such did not exist.

**B.     Corrupting Local Law Enforcement**

177. At this critical juncture in case 11-973, all communications from Officer Keegan ceased and any and all attempts by Plaintiff to make contact with him directly or by phone were unsuccessful.

178. Plaintiff visited the Menlo Park PD station and spoke with Officer Keegan's supervisor, Sergeant William A. Dixon, in an effort to obtain the case status. Thereafter, Plaintiff received no update regarding the case from any representative of the Menlo Park Police Department until receiving a copy of the letter contained in Exhibit 7.

179. The problem with this response is that it fails to acknowledge and address the full scope of concerns expressed by Plaintiff Jason Cobb to both Officer Keegan and Sergeant Anthony William Dixon. The response creates the false impression that concerns regarding embezzlement constituted the sole complaint to the Menlo Park Police Department, which is incorrect as Plaintiff expressed concerns regarding business identity theft, money laundering and theft by trick or device (Exhibit 6).

180. When Plaintiff had notified Officer Keegan of the concern regarding theft by trick, he requested a statement from an eyewitness. Plaintiff provided a statement in and around the first week in May 2011, per Exhibit 4. Plaintiff also discussed this concern and others with Sergeant Dixon then with Commander Lacy Burt who provided no response as they deferred to the D.A. who reportedly denied the subpoena for the bank records.

181. The problem with this response and rationale is that no further bank records were or are needed to address the concern of theft by trick in violation of CA Penal Code 484. The bank records that directly contradict the financial report given by Defendant Brede are already in-hand and the Menlo Park Police Department has long since received copies of such and thus has the basis to determine whether Defendant Brede's financial report was true or not. However, this concern as well as others reported by Plaintiff to the Menlo Park Police Department, have not been addressed.

182. During this same time, Plaintiff Jason Cobb submitted a case request to the District Attorney's Office for San Mateo County. However, Plaintiff received a response declining his request for an investigation, per Exhibit 8.

183. Officer Keegan's ultimatum to Defendant Smith referenced above is significant since Defendant Smith had no basis to provide any documentation establishing that Defendants Brede et al. had legal standing within the corporation in July 2010 as such does not exist. Officer Keegan essentially told Plaintiff that if Defendant Smith did not produce anything then the police would proceed in addressing the range of overt acts as described. However, the Enterprise could not allow this to happen as it would interfere with the execution of the scheme as described above and so it intervened by bribing Menlo Park Police Department members, which in turn halted the investigation, under the guise that the bank records were needed to investigate the charge of embezzlement, which

was an oversimplification of the situation as this stance failed to acknowledge and account for the full range of concerns that Plaintiff had reported (Exhibit 6).

184. In having contact with Jeff Keegan, Defendant Anthony Smith knew first hand that things were getting serious especially when he could not provide the documentation that Officer Keegan had requested. An indictment of Defendant Brede et al. would have destroyed their credibility as well as any chance they might have had of winning federal action C 10-03907-MEJ. Further, their indictment could lead to further exposure of the broader scheme and Enterprise described herein. Upon information and belief, Defendant Smith delivered the payoff to Menlo Park Police Department representatives, including Jeff Keegan, causing them to stand down. In doing so, Defendant Smith, who practices corporate law, explained the import of CA Corporations Code §§ 5527 and 5617, which provides as follows:

185. 5527. An action challenging the validity of any election, appointment or removal of a director or directors must be commenced within nine months after the election, appointment or removal. If no such action is commenced, in the absence of fraud, any election, appointment or removal of a director is conclusively presumed valid nine months thereafter.

186. 5617(a) Upon the filing of an action therefor by any director or member, or by any person who had the right to vote in the election at issue, the superior court of the proper county shall determine the validity of any election or appointment of any director of any corporation.

187. The Menlo Park police Department was not only to suspend active investigation of case 11-973 pursuant to the payoff but they were also to discontinue any further communication with Plaintiff Jason Cobb as all concerned parties initiated a "quiet period" as they collectively waited for the nine month deadline to pass on September 16, 2011 pursuant to Plaintiffs' presumed ignorance of this somewhat obscure point of corporate law. Once the deadline had passed, Defendants Brede et al.'s corporate appointments would have been "conclusively presumed valid" under law, effectively rendering several, not all, of their reported actions as non-crimes.

188. However, in discerning this aspect of the scheme, Plaintiff Jason Cobb did file state civil action CIV 508137 pursuant to the provisions of CA Corp. Code 5617 on September 2, 2011.

However, this action was consumed by the Enterprise' obstruction campaign from start to finish being dismissed under highly questionable circumstances on February 22, 2012 pursuant to continuous delay tactics that prejudiced Plaintiff's case as perpetrated by Defendant Smith in concert with Defendant Sinclitico, as well as members of the Superior Court itself. Plaintiff Jason Cobb filed a motion for a new trial on March 7, 2012, which was later withdrawn in May 2012 amidst coercive pressure from Enterprise members including Defendants Jennifer Altamirano, Lawrence Lee and Michael Marchi.

189. Varied Menlo Park Police Department representatives, including Jeff Keegan, are guilty of honest services fraud, accepting a bribe and conspiracy pursuant to their collective role in furthering the scheme described herein. Furthermore, the Enterprise' obstruction campaign also unduly influenced the District Attorney's decision to decline Plaintiff's request for an investigation as well as the D.A.'s refusal to authorize a subpoena for the set of bank records that would have supported the investigation for Menlo Park PD case 11-973 (Exhibit 8).

C.    **Corrupting the Judicial Process**

190. The RICO Enterprise moved quickly to further obstruct justice when viable concerns were raised in the judicial system at both the state (CIV 508137) and federal level (C 10-03907-MEJ; C 11-02496-DMR), corrupting the actual judicial machinery and process in doing so.

   **1. Federal Civil Action C 10-03907-MEJ**

191. This federal action was filed on August 31, 2010 by Plaintiffs Jonathan D. Cobb and W. Arlen St. Clair. The Presiding Judge is The Honorable Maria-Elena James, Chief Magistrate for the Northern District. Defendant Brenda Tolbert is her deputy clerk.

192. Plaintiffs Jonathan Cobb and Arlen St. Clair appear pro se in this action which is presently awaiting review by the U.S. Appeals Court for the Ninth District. The overview is as follows.

193. In November 2010 Defendants filed a 12(b)(1) and 12(b)(6) motion to dismiss, pursuing such as a matter of law in citing the Free Exercise Clause and the Doctrine of Abstention as the basis for dismissal of all claims with prejudice. The motion was denied pursuant to Plaintiffs' Opposition to Motion.

194. As Defendant Smith, the AOR for the Defendants in said action (C 10-03907-MEJ), began to struggle against the weight of mounting evidence against his clients, he began to collude with Chris Nathan Brenda Tolbert to the end of obstructing and impairing legitimate government activity as regards the entire proceeding in violation of 18 U.S.C. §§ 201, 371, 1346 & 1503). Plaintiffs' filings were entered in the docket sporadically and chamber copies were not being distributed in each case. In addition to generally undermining Plaintiffs' efforts to try their case, the intent was also to impede the free flow of information as public interest in the case increased.

195. Enter Defendant Dennis J. Sinclitico Jr.

196. In being employed by Morgan, Lewis and Bockius LLP and subsequently serving as an ongoing counselor to Cisco Systems, Inc., a client of Morgan, Lewis and Bockius LLP, Defendant Sinclitico gained awareness of federal action C 10-03907-MEJ. This occurred by and through his review of data obtained from the Cisco issued work computer utilized by Plaintiff Jason Cobb, a Cisco employee, who had stored documents specific to said federal action on his work computer. Defendant Sinclitico began reviewing Plaintiff Jason Cobb's personal information and data, as stored on the Cisco issued work computer, pursuant to him being called upon to devise and orchestrate a constructed dismissal scheme intended to defraud, tortiously injure and destroy Plaintiff Jason Cobb and his family that intensified when Plaintiff Jason Cobb filed a federal action against several Cisco employees on May 23, 2011 in direct response to said scheme. (See *Cobb v. Consunji et al.*, C 11-02496-DMR)

197. Defendant Dennis J. Sinclitico Jr. is a professional bully. His specialty is devising and orchestrating diabolically comprehensive campaigns of psychological torture and abuse while at the same time establishing and/or retroactively engineering a basis of plausible deniability for the perpetrators and participants by virtue of carefully constructed alternative explanations for the intentionally oppressive and harmful circumstances and treatment encountered by his targets. If a corporation targets an employee for constructed dismissal, but is wary of potential legal liability, they call Morgan, Lewis and Bockius, LLP who in turn assign Defendant Dennis J. Sinclitico Jr. to "get the job done" with a cold-hearted, amoral efficiency that would make Adolf Hitler proud.

198. A favored tactic of Defendant Sinclitico is to establish alliances with attorneys, agents of the court or anyone in proximity to his chosen target to devise synchronized attacks and subtle micro-

36

schemes in the effort to distract, disorientate, oppress and burden a common foe. Plaintiff has encountered this phenomenon on each of the cases he has been involved with which inevitably are overtaken and adversely affected by Defendant Sinclitico's abuse of process and tampering schemes. This explains the conspiratorial connection between Defendants Sinclitico and Smith. When Defendant Sinclitico became aware of federal action C 10-03907-MEJ, as described above, then he reached out to Defendant Smith and formed a mutually beneficial strategic alliance. This alliance extended the boundaries of Defendant Sinclitico's influence beyond just Cisco Systems, Inc. to then include the Menlo Park congregation of Jehovah's witnesses and other persons within Circuit 13, thus expanding the radius of his attack against Plaintiff Jason Cobb.

199. In and around the September 1, 2011 status conference with Judge Maria-Elena James, Defendant Sinclitico began to assume an active unaccredited role in federal action C 10-03907-MEJ, assisting Defendant Smith. This included ghost writing documents filed in the name of Defendant Smith, and in time, came to include writing fraudulent documents and orders that were represented as being produced by Judge James. These included denials of any number of requests made by the Plaintiffs, and most recently even included an order dismissing the entire case pursuant to Defendants' motion for summary judgment (C 10-03907-MEJ; Doc. 137). Dismissing this case became necessary for two reasons: 1) The Plaintiffs' opposition (C 10-03907-MEJ; Doc. 129) clearly defeated the Defendants' motion for summary judgment which meant that 2) the court order demanding bank records from both Chase and Wells Fargo would be sent acquiring this key evidence. Again, the Chase account is a component within the alleged money laundering scheme. As such, it will illuminate other accounts and individuals associated with this broader master scheme which makes the content therein extremely important. When Defendant Smith failed to secure the blanket protective order he initially wanted and thereafter failed to orchestrate Plaintiff Jason Cobb's signing of the modified protective order, drafted by Judge James, during a deposition on October 11, 2011, then the only recourse was to "kill" the entire case by trick, chicane or overreaching through the falsification of the magistrate's Order dismissing the action, as stated.

200. The RICO Defendants are all parties to the same scheme and the related micro-schemes as described herein and thus are all liable for conspiracy to commit a range of predicate RICO acts, including honest services mail fraud, pursuant to their scheme to defraud Plaintiffs and others of the

right to honest services as well as their Constitutional right to due process.

**2. Federal Civil Action C 11-02496-DMR**

201. This federal action was filed on May 23, 2011 by Plaintiff Jason Cobb. The Presiding Judge is The Honorable Donna M. Ryu. Ivy Garcia is her clerk.

202. This case was born from issues and circumstances that were not initially related to federal action C 10-03907-MEJ or this new action, as discussed above. However, as Plaintiff discerned that the AOR for C 11-02496-DMR, Defendant Sinclitico, was colluding with Defendant Smith and ghost writing documents for him in state action CIV 508137 as well as C 10-03907-MEJ, then federal action C 11-02496-DMR became a related action by virtue of said collusion.

203. This case was a "problem" as it involved liability and potential bad publicity for Cisco Systems, Inc., a leading Fortune 500 company. Further, Plaintiff had discerned that Defendant Sinclitico went beyond simply providing general counsel to Cisco representatives and actually became an active participant in the egregious acts being progressively perpetrated by the Defendants cited in that action. Consequently, his fear of exposure added to his existing intent and desire to have the case dismissed as quickly as possible, by any means necessary.

204. However, when Plaintiff submitted the subpoena to Chase Bank within action C 11-02496-DMR, "killing" that case as well became an urgent need as the Chase insiders needed a valid and plausible reason to deny the document requests that had already been agreed to in writing. Thus Defendants Sinclitico and Smith along with Brenda Tolbert collectively falsified an order dismissing that action as they did in the case of civil action C 10-03907-MEJ to prevent the acquisition of the outstanding bank records from both Chase and Wells Fargo. An added indication of malicious intent is that in each case, no notice of the correct and specific process and time to file an appeal was given in the falsified dispositive Orders. The specific idea and intent was for the Plaintiffs in each related action, who are pro se, to embrace the intentional efforts of Defendant Sinclitico et al. to induce the perception that no further options existed or could be pursued, causing them to miss the deadline to submit a timely notice of appeal out of pure ignorance, thus waiving their right to such ahead of said conspirators entering the final judgment and closing each case out with no recourse, in furtherance of the scheme.

**3. State Action CIV 508137**

205. This action was encumbered by delay tactics as coercive pressure was exerted on Plaintiff and his family by members of the Menlo Park congregation and other persons within Circuit 13. Such treatment included being avoided and shunned at meetings and in social settings, not being allowed to comment during question and answer sessions at congregation meetings in the absence of any formal restrictions, Plaintiff's children not being allowed to deliver assignments on the school for extended periods and then after repeated discussions with the school overseer, Defendant Donald Showers, the children received occasional assignments in the secondary school but were never allowed to deliver assignments in the main auditorium despite having prior experience doing so.

206. In mistreating Plaintiff and his family, Defendant Brede et al. endeavored to force the family out of the Menlo Park congregation as a point of strategy in support of their defense for civil action CIV 508137. If Plaintiff had moved to a different congregation, this would have affected his resignation from the Menlo Park Corporation, thus giving Defendant Brede et al. the victory by default since the action was filed to validate and confirm the officers and directors of the Menlo Park Corporation.

207. The Enterprise' obstruction effort was supported by representatives of the Superior Court of California for San Mateo County, including but not limited to, Karen Brocka, a leading member of the court's Master Calendar Department and one of Jehovah's witnesses, who has played a recurring role in support of the Enterprise described herein.

208. The subject matter being considered in state civil action CIV 508137 were relevant to certain issues within federal civil action C 10-03907-MEJ. Consequently, Mrs. Brocka helped to ensure that key hearings in CIV 508137 were scheduled on dates that were advantageous to the Defendants in both civil actions, her fellow Enterprise members. When the enterprise orchestrated a settlement conference in C 10-03907-MEJ scheduled to be held on 10/18/11, Defendant Anthony Smith and Mrs. Brocka colluded to the end of ensuring that the hearing date for state civil action CIV 508137 was scheduled after 10/18/11 to reduce any point of leverage the Plaintiffs in C 10-03907-MEJ may have had pursuant to the expected ruling in favor of Plaintiff Jason Cobb in CIV 508137.

209. When the Plaintiffs in C 10-03907-MEJ did not settle their case on 10/18/11, then the Enterprise, with the support of court employees executed an act of subterfuge to induce Plaintiff Jason

Cobb's belief that the hearing in CIV 508137 would not occur as scheduled pursuant to the tentative ruling being posted on the Superior Court's website the preceding day stating that the hearing would be taken off-calendar and continued. When Plaintiff attended the hearing expecting affirmation of the tentative ruling he was shocked when the presiding Judge Freeman stated that the matter would be heard that day by Judge Kashin. This "bait and switch" maneuver caught Plaintiff completely off-guard and ill-prepared to argue his case. Furthermore, he was unable to present key evidence during the hearing as such had not been admitted in advance as required.

210. The court ruled in favor of the Defendants in direct opposition to governing state law regarding the application of neutral points of law in the case of religious organizations/corporations, and even if such represent themselves as being hierarchical. Plaintiff's argument highlighting the critical flaw in the court's ruling, which was the result of undue influence by the Enterprise as were the preceding acts of subterfuge, is attached hereto in Exhibit 9. This argument exposed the error in judgment, thereafter causing the Enterprise to exert pressure directly on Plaintiff to force the withdrawal of his motion for a new trial.

### 4. State Action FAM 116981: Defendants Jennifer Altamirano, Estrada and Greenberg

211. Defendant Greenberg and her fellow Superior Court defendants are non-RICO defendants, technically speaking, who nevertheless participated in the Enterprise' pattern of racketeering activity that threatens to continue. In violating Plaintiff's civil and Constitutional rights as a matter for course throughout case FAM 116981 they have created liability for themselves as individuals and liability for the Superior Court as well pursuant to the vicarious liability principles of *Respondeat Superior*, Apparent Authority and Collective Knowledge.

212. As stated, Defendant Jennifer Altamirano's filing of case FAM 116981 constitutes a malicious act of fraud as the case stems from the Enterprise' strategic intent to create a weapon and point of leverage against Plaintiff.

213. From the beginning, initiating a child custody evaluation was a key objective that was achieved through collusion on the part of Defendants Greenberg, Estrada and Jennifer Altamirano. This unholy trinity took point on executing the systematic deprivation of Plaintiff's parental and civil rights as directed by the Enterprise.

214. On April 11, 2012, Both Defendant Jennifer Altamirano and Eddie Estrada collaborated

1   in creating the initial point of leverage against Plaintiff through the deprivation of his parental rights,

2   specifically his right to joint legal and physical custody of the children.

3       215. Unbeknownst to Plaintiff at the time, Defendant Jennifer Altamirano had been instructed

4   to file TWO petitions for family law case FAM 116981: 1) A petition for a restraining order heard in

5   Department 33 on 4/11/2012 and 2) an entirely separate petition for child custody heard in

6   Department 32, Defendant Susan Greenberg's department, on 4/26/2012.

7       216. The initial discussion with Defendant Eddie Estrada occurred on 4/11/2012, the day of

8   the restraining order hearing in Department 33. The entire situation was most unsettling for Plaintiff

9   who has always provided and enjoyed a stable, loving environment within his family and home. Not

10  realizing that his wife was a member of the association-in-fact RICO Enterprise that Plaintiff had

11  identified, he struggled to make sense of her sudden behavioral shift followed by the unwarranted

12  filing in family court. Within these strange and unfamiliar circumstances, Plaintiff was an easy

13  "mark" as the expression goes.

14      217. Defendant Eddie Estrada participated in the ruse executed against Plaintiff on this

15  occasion by taking advantage of Plaintiff's inexperience in family court matters. Defendant Estrada

16  stated that a situation like this could take some time to resolve and so Plaintiff should think about the

17  best child visitation approach in the near term, until things got back to normal. In directing the

18  conversation along this line, Defendant Estrada narrowed the focus of the conversation to a reduced

19  set of options for Plaintiff's consideration. He then employed subtle scare tactics to create an

20  impression within Plaintiff that things could be much worse so that Plaintiff would be less inclined to

21  object to the biased and prearranged recommendation that Defendant Estrada was about to make. The

22  idea of a balanced custody and visitation plan was never discussed Plaintiff or considered when

23  Plaintiff referenced such. Rather, Defendant Estrada steered the discussion toward highly unbalanced

    visitation options while smoothly influencing Plaintiff's acceptance of such.

24      218. Acts of deception by Defendant Jennifer Altamirano also played a key role in the ruse.

25  Still believing that he could trust his wife, Plaintiff was further influenced to accept Defendant

26  Estrada's recommendation when Defendant Jennifer Altamirano stated that she and the children

27  would return home if her petition was denied. By design, this created the false impression that

28  Defendant Eddie Estrada's pending child custody/visitation recommendation was specific to and valid

for the restraining order petition hearing only, meaning that, if that petition was denied, there would be no formal custody/visitation order in place. Consequently, when Defendant Jennifer Altamirano's restraining order petition was denied, Plaintiff thought this strange ordeal was over. However, immediately after this hearing ended he was served with her 2nd and previously undeclared petition for child custody set to be heard in Department 32 by Defendant Greenberg on 4/26/2012. So, the unbalanced child/custody visitation recommendation submitted by Defendant Eddie Estrada would be reviewed by Defendant Greenberg and accepted, drastically reducing Plaintiff's time with his children, especially when Defendant Jennifer Altamirano reversed field and did not return home with the children, as promised, per the scheme.

219. The custody/visitation recommendation called for Defendant Jennifer Altamirano to have sole physical custody of the children. To put that decision in perspective, a woman who runs off with the children leaving the family residence without cause, has no job, no stable living situation, is sleeping on a friends couch with a total of eight people stuffed inside of a 1200 square foot house, with one bathroom, receives full physical custody of the children. Only bribery and/or undue influence can explain a decision that biased and that stupid. This decision violated Plaintiff's civil rights by depriving him of equal protection under law. At worst, custody and visitation should have been equitably shared by both parents in accord with the public policy of this state pursuant to California Family Code Section 3020(b):

220. "The Legislature finds and declares that it is the public policy of this state to assure that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, or ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy."

221. The initial custody/visitation arrangement produced on 4/11/2012 could have easily been changed during the 4/26/2012 hearing as Plaintiff's responsive declaration sought full physical custody of the children, or alternatively joint physical custody with balanced visitation. However both of these requests were denied.

222. During the 4/26/2012 hearing, as agreed per acts of collusion, Defendant Greenberg accepted Defendant Estrada's unbalanced child custody/visitation recommendation that was a direct by-product of the ruse perpetrated by both of them against Plaintiff on 4/11/2012, as discussed above.

1    Defendant Greenberg also inserted a condition in the order that family visitation in the Cobb home

2    occur in the presence of one or two Menlo Park congregation members, which exceeds the scope of

3    the Court's authority in view of the *Free Exercise Clause* making it unconstitutional (Exhibit 10).

4        223. The order is also violative of Plaintiff's civil rights and his freedom of religion in that it

5    seeks to mandate his attendance at congregation meetings, again in violation of the *Free Exercise*

6    *Clause*. The verbiage in this regard was suggested by Defendant Jennifer Altamirano at the

7    Enterprise' direction. The intent being to bring Plaintiff "into the fold" so to speak one month after he

8    filed federal civil action C 12-01372-JSW in an effort to induce reconciliation with Defendant Brede

9    et al. over time to the end of Plaintiff withdrawing the case. The flaw in this approach is that Plaintiff

10   does not have a personal grievance with Defendant Brede per say, rather Plaintiff's actions have been

11   born from concerns regarding the congregation's financial records. Becoming "buddy – buddy" with

12   Defendant Brede in no way would address standing questions regarding the finances and how the

13   contributions of sincere congregation members were being used or how the corporation itself and the

14   corporate accounts were being used. Generally speaking, the Enterprise' intent to leverage the family

15   law case as a means to exert an intrusive influence, and coercive pressure in Plaintiff's family and

16   personal life became clear.

17       224. On 5/24/2012, Defendant Greenberg denied Plaintiff's second request for a balanced

18   custody/visitation plan without due cause. During this same hearing, Defendant Greenberg granted the

19   child custody evaluation requested by both Defendants Jennifer Altamirano and Eddie Estrada.

20   Defendant Estrada's report exhibited a biased slant against Plaintiff and toward a court appointed

21   evaluation, per the scheme. By design the child/custody evaluation became a pressure cooker and

22   means to execute acts of extortion, by congregation members like Defendant Bill Douglas and also by

     the evaluator himself, Defendant Jeffrey Kline, as discussed herein.

23       225. In being unduly influenced, Defendant Greenberg did not preside and she did not judge,

24   and in truth, she did not "think." Rather, she did exactly what the Enterprise *told* her to do without

25   exception. Pursuant to its scheme of obstruction, the Enterprise wanted to disrupt Plaintiff's family

26   and personal life and it gave Defendant Greenberg something of value in return for her services, and

27   she delivered, calling to mind the transactional framework of a certain other profession. By agreeing

28   in advance to grant each and every petition Defendant Jennifer Altamirano was directed to make in

family law case 116981, Defendant Greenberg established a record of bias and partiality that culminated in her recusal amidst concerns of judicial misconduct.

226. Defendant Jennifer Altamirano is incapable of defeating Plaintiff within a legal setting, yet she has done so consistently for twelve consecutive months in family law case 116981 and, in several instances, without the benefit of a lawyer. This fact, in itself, establishes foul play.

### 5. State Action FAM 116981: Defendants BJ Fadem and Ron Nerio

227. In December 2012, Plaintiff retained the services of BJ Fadem Law Firm being represented by Defendants BJ Fadem and Ron Nerio. Plaintiff did so primarily to 1) receive assistance with the hearing for his Motion for Reconsideration pursuant to Defendant Greenberg's decision to award her new best friend, Defendant Jennifer Altamirano, attorney's fees in excess of $10,000 on 8/27/2012 and 2) to have BJ Fadem issue the required subpoenas for discovery and represent him at any motion hearings for such.

228. During preliminary stages and after formally retaining BJ Fadem, a key topic of discussion with Defendant Fadem and Nerio was the Motion for Reconsideration regarding the attorney's fee ward. However, the Enterprise sought to disrupt Plaintiff's effort to have that matter reconsidered as the award provided financial gain for Defendant Jennifer Altamirano to the end of financing the continued use of family law case 116981 as a weapon against Plaintiff, while at the same time further depleting Plaintiff's financial resources, another aspect of the scheme and attack against him. Attempting to exhaust Plaintiff's financial resources is also an intended means to undermine his ability to defend himself against the false domestic violence allegations regarding the case filed in Santa Clara County (Note: typical trial expenses range from $2 - $2500 a day). Consequently, for these varied reasons, the Enterprise moved to obstruct Plaintiff's motion for reconsideration regarding the attorney's fees awarded to Defendant Jennifer Altamirano.

229. Plaintiff and Defendant Ron Nerio had discussed the idea of taking the Motion for reconsideration off-calendar as BJ Fadem had been retained right before the pending hearing date. In each instance, the stated intent was to take the current hearing off-calendar, continuing such to a future date to allow sufficient preparation time. Subsequently, Defendant Nerio obtained Plaintiff's permission to take the hearing off-calendar, as previously discussed, but then proceeded to withdraw the motion entirely, which was an intentional act of obstruction and sabotage to the benefit of the

Enterprise. In discussing this, Defendants Fadem and Nerio stated that the hearing had to be taken off-calendar as Plaintiff had committed a procedural error in filing it that would have resulted in him being sanctioned. However, when Plaintiff sent a response detailing the provisions of CCP 1008 and his full compliance with such by email, establishing the assertions of Defendants Fadem and Nerio as false, Defendant Nerio responded abruptly ending the engagement having been exposed as liar, and worse, a member of the association-in-fact RICO Enterprise described herein (Exhibits 11 and 12).

230. Prior to this, When Plaintiff mentioned varied procedural errors on Defendant Jennifer Altamirano's part, which included her request to reduce Plaintiff's visitation time with the children solely by virtue of a Declaration, without formally requesting such on form FL-300 as required by law, Defendants Fadem and Nerio stammered saying that Defendant Jennifer Altamirano could legitimately do so since she had filed a standing petition at the start of the family law case in March 2012 and discouraged Plaintiff from filing a motion to set aside the default judgment. However, has since been confirmed that each request for a new Order or a request to modify an existing Order is separate and distinct, requiring the formal submission of a completed Request for Order (Form FL-300).

231. In being unduly influenced by the Enterprise, as indicated by their course of action in furtherance of the scheme against Plaintiff, Defendants Fadem and Nerio violated attorney client privilege by sharing Plaintiff's "game plan," his discovery objectives and specific points of strategy with Defendants Jennifer Altamirano and Appel thus enabling them to initiate damage control measures specific to varied consumer accounts, indicating foreknowledge of Plaintiff's discovery targets. Defendant Jennifer Altamirano's point of motivation becomes clear in that several of Plaintiff's discovery targets stem from a concern that child support and community funds are being used to the benefit of other persons outside of the immediate family circle, without the benefit of disclosure to Plaintiff within Form Interrogatory responses or by any other means.

232. Pursuant to the Enterprise' effort to protect its key asset, Defendant Jennifer Altamirano, Defendants Fadem and Nerio executed subtle acts of obstruction when serving subpoenas. When serving the subpoena for Attorney Nancy De Ita's billing records, specific to the attorney's fee award discussed above, Defendants Fadem and Nerio had the subpoena personally served as required by rule. However, when serving the varied subpoenas for medical/billing records, subpoenas that have

been vigorously opposed by Defendants Altamirano and Appel, Defendants Fadem and Nerio had such served by U.S. mail. Plaintiff did endeavor to perform due diligence by asking if service by mail had perhaps been agreed to by the witnesses in question but Defendants Fadem and Nerio never responded.

233. In all, Defendants Fadem and Nerio did an outstanding job defending the Enterprise and its key asset, Defendant Jennifer Altamirano, but conversely did a terrible job defending their actual client, Plaintiff Jason Cobb, thus their inclusion in this action pursuant to their egregious conduct, which includes honest services mail fraud, conspiracy to commit RICO and common fraud, amongst other things.

**6. State Action B1262610**

234. As cited above, the Enterprise' pattern has been to direct Defendant Jennifer Altamirano to initiate some false complaint against Plaintiff then assume control of the resulting legal action by unduly influencing the attorneys for both parties, if not the judge, to the end of using the proceeding as a weapon and point of leverage against Plaintiff within its campaign of obstruction.

235. In September 2012, Plaintiff retained Cameron Bowman of the firm VIB Law to defend him against the Enterprise's allegation of domestic violence. Before joining VIB Law, Defendant Bowman had previously worked in the DA's office in Santa Clara County and maintains relationships with varied persons therein.

236. Defendants Bowman and the investigator employed by his firm to assist in trial preparation, Defendant Amanda Freel, were unduly influenced by Enterprise members, including but not limited to Defendants Maynor, Raditich and Altamirano to obstruct the formation of Plaintiff's defense by sabotaging discovery, while, at the same time, requesting a series of hearing continuances in an effort to exhaust time to the end of the court demanding that the case either settle or go to trial with Plaintiff being ill prepared to do either one. With each continuance, Defendants Bowman and Freel actively encouraged Plaintiff to settle by accepting a lesser charge as they downplayed his prospects for success since, per the scheme, discovery "efforts" were not yielding fruitage.

237. From the beginning, Plaintiff's efforts to suggest points of discovery were ignored. If Defendant Bowman did eventually respond, it was simply to deny the discovery request.

238. As Defendant Freel obtained statements from some of the persons Plaintiff directed her

to, she consistently avoided Defendants Jennifer Altamirano and Bill Douglas. Defendant Freel generally downplayed the significance of her findings in an intentional effort to discourage Plaintiff while mentioning the idea of settling the case.

239. The allegations of Defendant Jennifer Altamirano and key witness Bill Douglas against Plaintiff, which is to say the allegations of the Enterprise against Plaintiff,…are lies. In fact, Defendant Jennifer Altamirano presents as being a pathological liar through the series of attacks she has been told to execute against Plaintiff. Consequently, her body of lies are adding up. Logically, this provides an opportunity for comparative analysis of her statements in order to identify inconsistencies, especially since her lies regarding alleged situations have often changed depending on the day, hour or minute that she relates them.

240. Recognizing the damage that such analysis would cause for the Enterprise and her client within case FAM 116981, Defendant Appel has stymied Plaintiff's efforts to obtain information to corroborate statements made by Defendant Jennifer Altamirano, including but not limited to a report made to the DA's office for San Mateo County in March 2012. Defendant Appel has also presumed to execute the same strategy in the Santa Clara County case as well by and through collusion with Defendant Bowman. When Defendant Bowman finally agreed to issue certain subpoenas Plaintiff had requested during a meeting on March 15, 2013, including the report to the DA's office in San Mateo County, he later refused to do so after the hearing on March 18, 2013 pursuant to communications with Defendant Appel who was in attendance and remained after the hearing for some time to confer with Defendant Bowman and Deputy DA Thanh Ngo (Exhibit 13).

241. To protect the Enterprise' interests as embodied by her client, Defendant Jennifer Altamirano, Defendant Appel became an active participant in case B1262610 contacting Defendant Bowman, Deputy DA Thanh Ngo and even the Judge in the effort to vilify Plaintiff and undermine his case, in any way possible, per the scheme. She has been a "point guard," coordinating the lower rung effort between herself, Defendant Bill Douglas and Defendant Bowman to prevent Plaintiff from acquiring information and evidence in preparation for trial in June 2013.

242. Throughout pre-trial "preparation," when Plaintiff pressed for the issuance of subpoenas to obtain key information, Defendants Bowman and Freel initiated evasive maneuvers becoming unresponsive and when finally cornered by Plaintiff sidestepped the request or pushed back, while

1

endeavoring to maintain the illusion that they were defending him.

2

243. In one conversation, Defendant Freel rationalized her delays by representing to plaintiff

3

that she had to go to the clerk's office to get subpoenas issued. Thereafter, Plaintiff advised that such

4

was not necessary since, as a lawyer, Defendant Bowman could issue the subpoenas himself (Exhibit

5

14). Then Defendant Freel represented that it was necessary to personally serve notice of the

6

subpoenas on Defendant Jennifer Altamirano. Plaintiff advised that personal service of notice was not

7

required and that any notice could be sent via U.S. Mail (Exhibit 15). In fact, the formal Notice to

8

Consumer process outlined in CCP section 1985.3, which is the rule in civil court, does not apply to

9

criminal proceedings. Any consumer notice is provided through personal service of such or via U.S.

10

mail as generally called for due to federal and state privacy laws. As a licensed and experienced

11

process server and investigator, Defendant Freel knows this already, establishing that her effort to

12

represent personal service of notice as the sole means to affect such was an intentional stall tactic.

13

Furthermore, subpoenas can be served in criminal cases without notice, if the attorney so chooses, as

14

the witness will typically provide notice to the consumer due to both privacy and liability concerns,

15

thus prompting a hearing for the court to review any objections prior to denying or approving the

16

subpoena.

17

244. In view of this, Defendant Freel was being evasive while attempting to take advantage of

18

Plaintiff's presumed ignorance of law and procedure being a pro se litigant. When Plaintiff caught her

19

doing so, she abruptly exited from his defense team having been exposed a liar and pawn of the

Enterprise (Exhibit 15).

20

245. Defendants Bowman and Freel obtained information from Plaintiff then colluded with

21

Defendant Appel thus positioning her to execute damage control measures. When Plaintiff expressed

22

a desire to inspect Defendant Douglas' 5th wheel, Defendant Freel stated she did not know how to

23

accomplish that. Plaintiff then advised that a subpoena to inspect such would work. Defendant Freel

24

stammered then suggested obtaining the DMV records for the 5th Wheel so the layout could be

25

confirmed. Thereafter, Defendant Freel communicated directly or indirectly with Defendant Bill

26

Douglas advising him of the pending discovery. Further delay tactics ensued on the part of

27

Defendants Bowman and Freel prior to Plaintiff eventually being advised that a 5th wheel was not

28

listed amongst the vehicles registered in Defendant Douglas' name. Upon information and belief,

1    Defendants Freel and Bowman notified Defendant Douglas of the pending acquisition of his DMV

2    records ahead of him having the 5th wheel registered in the name of another person in order to evade

3    discovery. Per coaching from Defendant Appel, Defendant Douglas has continued to resist any

4    discovery regarding his 5th wheel (Exhibit 16). Defendant Appel has likewise endeavored to impede

5    this particular point of discovery going so far as asking the court to prevent such during the last

6    hearing for family law case 116981 despite the fact that she doesn't even represent Defendant Bill

7    Douglas.

8           246. RICO Defendants Appel, Bowman and Freel, amongst others, have actively participated

9    in the coordinated campaign to impede Plaintiff's efforts to conduct discovery. In addition to the cited

10   RICO violations this egregious course of action also constitutes a violation of Plaintiff's civil and

11   Constitutional rights as he is due "equal protection under law" as a U.S. citizen. Plaintiff Jason Cobb

12   has the right to conduct discovery in his defense against the false charges levied against him and

13   Defendant Bowman and Freel have sought to infringe upon and deprive Plaintiff of that right through

14   their systematic participation in the pattern of racketeering activity perpetrated by the association-in-

15   fact RICO Enterprise described herein. The fact that they both have a fiduciary responsibility to

     Plaintiff establishes the full extent of their corruption.

16

### D.    Corrupting Financial Institutions

17          247. Efforts to perform discovery for actions C 10 03907-MEJ, C 11-02496-DMR and

18   CIV 508137 have been hampered by acts of obstruction on the part of Enterprise insiders within

19   JPMorgan Chase Bank, N.A. and Wells Fargo Bank, N.A. These bank insiders have worked to

20   obstruct any and all efforts to obtain key evidence specific to the claims in these proceedings. In

21   particular, Chase Account xxxxx2300 has very much proven to be the "Bermuda Triangle" as every

22   effort to obtain the records therein inevitably fails. Upon information and belief, this account is a

23   gateway to firmly establishing the existence of activity in violation of 18 U.S.C. §§ 1943 and 1956,

24   which accounts for the fierce and frenzied efforts to protect it. The most recent examples of such are

25   attached hereto in Exhibit 17.

26          248. Why would JPMorgan Chase retain legal representation to protect the information of

27   private parties who should have nothing to do with the interests of such a financial institution? Such

28   strange behavior adds to the basis of inference that JP Morgan Chase an integral part of the

Enterprise' pattern of racketeering activity and a key partner in the alleged violations of 18 U.S.C. §§ 1943 and 1956.

249. The bank insiders include but are not limited to Donna A Craig, Lisa Wilson and Diana Stinson of JPMorgan Chase and Lourdes Chaparro, Shauntel Gould, Michael L. Gutierrez and E. Susie Wong of Wells Fargo. Such persons have furthered the interests of the Enterprise, over and above the interests of their employer. As noted in *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 775-76 (9th Cir. 2002):

250. "This possibility of respondeat superior liability for an employee's RICO violations encourages employers to monitor closely the activities of their employees to ensure that those employees are not engaged in racketeering. It also serves to compensate the victims of racketeering activity. Vicarious liability based on the doctrine of respondeat superior thereby fosters RICO's deterrent and compensatory goals." (citations omitted)

251. In all, the degree of functional alignment and synergy between these financial institutions and the RICO Enterprise described herein appears to be so extensive that it may not be possible to definitively distinguish one from the other, which creates an interesting point of investigation for this action, as well as for the internal fraud and investigative agencies for each financial institution to whatever extent that such have not already been infiltrated, compromised and assimilated by said Enterprise.

**E.      Corrupting Employees of Cisco Systems, Inc.**

252. Cisco Systems, Inc. has played an ongoing role in furtherance of the campaign of obstruction intended to impede Plaintiff's prosecution of the cited civil actions which threaten the Enterprise. Egregious acts against Plaintiff have been performed by Jeff Kitagawa, Alicia Perdue and Tara Lappin, amongst others.

253. The background information is as follows.

254. Pursuant to workplace harassment on the part of Chris Glasser, Christina Consunji and Shenita McKinney, amongst others, as discussed in civil action C 11-02496-DMR, Plaintiff took a leave of absence from Cisco Systems, Inc. from July 2011 to March 2012.

255. Civil action C 11-02496-DMR, was fraudulently dismissed pursuant to an act of fraud upon the court on 12/28/2011. Thereafter, Plaintiff filed his notice of appeal on 1/23/2012 then began

composing the complaint for civil action C 12-01372-JSW (aka: *Chimera*). During this time, Defendant Jennifer Altamirano progressively began disrupting the Cobb household, committing varied acts of obstruction and spoliation of evidence as described herein. Per the Enterprise' direction, she was endeavoring to prevent the completion of the complaint for civil action C 12-01372-JSW and its subsequent filing. When Plaintiff did finish the complaint, Defendant Jennifer Altamirano created a sudden and highly strategic diversion by abruptly leaving the family residence under false pretense on 3/15/2012, and unbeknownst to Plaintiff at the time, initiated family law case 116981 the next day, per the scheme.

256. Discerning that Defendant Jennifer Altamirano's actions were intended to distract him from launching the second case against the Enterprise, Plaintiff proceeded to file federal civil action C 12-01372-JSW on 3/19/2012.

257. On 3/22/2012, Plaintiff was served Defendant Jennifer Altamirano's petition for family law case 116981, the same day that he returned to work since his leave.

258. In returning to work, Plaintiff noted that his exploits in federal court were affecting his work environment. In short, people were more careful and not as openly hostile.

259. Plaintiff's new manager, Jeff Kitagawa, made an effort to be nice and accommodating. These circumstances were strategic as Defendant Sinclitico and others from Morgan, Lewis had specifically instructed Cisco to create an environment that would support the effort to pacify Plaintiff to the end of inducing him to withdraw his appeal (Appeal Case No: 12-15158).

260. In April 2012, Plaintiff began pursuing other roles outside of the CVC IT organization. In doing so he had productive discussions with John Campisi, a director in Cisco Advanced Services organization, and other members of Mr. Campisi's team, including nunes and gore.

261. In and around this same time, Plaintiff was contacted by Steven Soderberg, a member of the VP's staff, who offered to provide a professional coaching session. The timing of this offer coupled with the fact that such a provision had not been made available at any other time in Plaintiff's experiences in CVC IT, caused Plaintiff to feel that this "coaching session" was really a negotiation session or settlement discussion.

262. During the 1:1 meeting on 4/24/12, Steven Soderberg asked leading questions to steer the discussion toward Plaintiff's job search and the specific opportunities he was pursuing. This was done

1  to cause Plaintiff to reflect on his current opportunities to leave CVC IT, something that Cisco and

2  Morgan, Lewis already knew that he wanted. So the productive discussions that Plaintiff had with Mr.

3  Campisi and his team in conjunction with the discussion Plaintiff was having with Jon Doe

4  constituted a composite overture made by Cisco representatives that Plaintiff could transition to a new

5  department within Cisco, and thus finally escape the hostile work environment, IF he did not file his

6  opening brief. Per rule, not filing the brief by the designated deadline initiates an automatic dismissal

7  of the appeal, which is exactly what the Enterprise wanted.

8      263. Along this same line, intimations and inferences constituting extortion were made by Jeff

9  Kitagawa suggesting an unfavorable job performance review IF the opening brief was filed and the

10  appeal continued.

11      264. Plaintiff had a favorable job performance review when beginning his leave from work in

12  July 2011. However, after returning in March 2012, his performance rating had been changed to

13  unfavorable in the system, which was incorrect. Defendant Kitagawa said he would look into it. As

14  weeks then months passed by, the rating went unchanged. Such an issue is unusual and does not take

15  weeks or months to fix. The intent was to create anxiety and fear regarding Plaintiff's performance

16  ranting and job security. As Plaintiff met the series of deadlines in for his appeal, the intrigue with the

17  rating continued with Kitagawa periodically stating that he was yet to get the problem fixed. After

18  several months, with Plaintiff staying the course regarding his appeal, Kitagawa finally advised that

    the rating issue had been resolved in all respects.

19      264. During this same period of time, as coercive pressure was being exerted on Plaintiff in

20  the workplace, Defendants Alfred and Jennifer Altamirano were directed by the Enterprise to do the

21  same in Plaintiff's family and personal life to the end of extorting Plaintiff into withdrawing the Cisco

22  appeal, as well as civil action C 12-01372-JSW.

23      265. In March 2012, Defendant Alfred Altamirano told Plaintiff by phone that all of the

24  family issues stemmed from the legal cases and that things would get better once all of the cases went

25  away. He went on to voice his uncertainty regarding whether Defendant Jennifer Altamirano would

26  return home with the children as long as the cases continued. These statements, which constitute

27  extortion, were heard by two other persons.

28      266. In like manner, Defendant Jennifer Altamirano, echoed the exact same messaging and

coercive rationale. Then, during a discussion at the Menlo Park Kingdom Hall, Defendant Lawrence Lee reiterated the same messaging as well.

267. So, having directed Defendant Jennifer Altamirano to instigate trouble and disrupt the family, the Enterprise then directed Defendant Lawrence Lee and others including Defendant Bill Douglas to convince Plaintiff that "all of the problems" were due to the legal cases. God was displeased with Plaintiff and so removed his blessing from the family - because of the legal cases. Such ones assured Plaintiff that Defendant Jennifer Altamirano would return home with the children - once the legal cases went away. Such rhetoric has been a key part of the strategy employed by the Enterprise to induce the desired actions on Plaintiff's part through coercion and extortion, the primary offense being the use of such tactics in God's name.

268. While this sub-section of the complaint focuses primarily on the actions of varied Cisco employees, it is necessary to identify and articulate the corresponding efforts of other Enterprise members who exerted the same coercive pressure for the same reason in other facets of Plaintiff's life - the home and the congregation, per the scheme. In this manner the Enterprise executed a "full court press" against Plaintiff, mobbing and attacking him from all sides and in all areas to extort involuntary acts from him including his withdrawal of and/or his withdrawal from the cited civil actions that threatened the Enterprise.

269. When Plaintiff did eventually remove his name from civil action C 12-01372-JSW and then withdraw the Cisco appeal (C 11-02496-DMR), the workplace environment again became openly hostile. A new micro-scheme presented which involved Defendant Lappin and others creating a set of circumstances specifically intended to induce Plaintiff's acceptance of a formal accommodation from Cisco.

270. Cisco makes accommodations for persons with disabilities. If an employee requires such, they obtain input from their doctor with recommended adjustments to their job/role to better accommodate the limitations of the employee (Exhibit 18). Some questions on the form relates to mental impairment. This is noteworthy in view of the Enterprise' effort to downplay and discredit allegations made by Plaintiff in the cited civil actions by maliciously asserting that Plaintiff has health issues that account for his statements and allegations regarding unlawful activity on the part of the Enterprise. Defendant Alfred Altamirano, Ellen Altamirano, Jennifer Altamirano and Lawrence Lee

53

have the lead in making unfounded assertions regarding Plaintiff's mental health, citing his involvement in the civil actions of concern, in itself, as an indication of some mental impairment. (Compare Exhibit 19).

271. In direct support of this effort, Enterprise members within Cisco Systems, Inc. began assigning voluminous, detail oriented tasks to Plaintiff, with aggressive deadlines, and insufficient training with the intent of systematically triggering adverse physiological responses in Plaintiff. Having been previously advised by Plaintiff of the physiological reactions he can experience under certain circumstances due to an aspect of his medical history, Defendant Lappin used this knowledge to manufacture a "perfect storm" of oppression, under the guise of work assignments within the normal course of business at the direction of the Enterprise, in particular Defendant Sinclitico and/or his colleague Howard Holderness. This systematic oppression created a general pressure point to exploit in Plaintiff's case but also a strategic means of obstruction as the timing of the new assignments and/or the completion deadlines for such paralleled the appeal brief filing deadlines (2/28/13 then 3/28/13) for civil action C 12-01372-JSW, a case of concern for both Cisco Systems, Inc. and Morgan, Lewis and Bockius, LLP (Exhibit 20). Consequently, the nature and timing of the assignments in question further establish that such constitute an insidious form of obstruction perpetrated within the workplace for legally strategic purposes (Exhibit 20).

272. Based on the actions of the cited Cisco employees in conjunction with a persistent course of action on the part of Defendant Jennifer Altamirano and others, the Enterprise wanted a report or some diagnosis to support the assertion that Plaintiff Jason Cobb had some health issue or condition to the end of undermining his credibility as a witness against the Enterprise. This has been a key objective throughout family law case 116981. Consequently, the documentation to support a formal accommodation from Cisco Systems, Inc. was intended to be an additional means to accomplish that goal, which is why every effort was made to induce and force Plaintiff's acceptance of such. Thereafter, any and all documentation relating to the accommodation could then be subpoenaed within family law case 116981 or any other civil action and then misconstrued in any number of ways in furtherance of the Enterprise' general effort to defame and discredit Plaintiff.

273. Discerning the actual intent and point of strategy, Plaintiff declined the offer for an accommodation, instead choosing to address Defendant Lappin's actions internally within Cisco and

by virtue of this action.

**F.    Corrupting Individual Members of the Christian Congregation of Jehovah's Witnesses**

274. As stated, Jonathan D. Cobb, Sr. and W. Arlen St. Clair filed federal civil action C 10-03907-MEJ in August 2010. Upon doing so, they each received phone calls from Richard Ashe and Alan Shuster, both Jehovah's Witnesses, regarding the legal action. Ashe and Shuster introduced themselves as members of the Service Department, a department within the U.S. branch office of the organization known as Jehovah's Witnesses located at 2821 Route 22 in Patterson, NY. In calling to express concerns regarding the legal action both of them manifested an awareness of the issues and a strong desire to contain the situation.

275. The reason for these phone calls became clear when Defendant Anthony Smith later confirmed that he was representing Richard Ashe and Alan Shuster along with the other named Defendants including Steve Misterfeld, Paul Koehler, Ernest Brede et al. This confirmation was made when Defendant Smith was asked about the names of the persons associated with the Service Department desk symbols "SDG:SSX" which had appeared on the correspondence letters sent to the body of elders serving in the Menlo Park congregation at that time, per Exhibits 2 and 3. This established that Richard Ashe and Alan Shuster were participants in the series of events prompting civil action C 10-03907-MEJ. They were the persons who received the letter of concern regarding Paul Koehler and who participated in the formation and execution of the micro-scheme to remove the body of elders serving in Menlo Park, approving the prearranged decision to recommend such.

276. The letter contained in Exhibit 3 signaled the transition.

277. In coming to the Menlo Park congregation, Defendant Brede and his fellow elders were directed to employ a range of "push out" tactics to induce the former elders' departure from the congregation in order to affect their resignation as officers/directors of the corporation since no provision for their automatic removal as such, pursuant to being removed as elders, existed as the corporation had no by-laws. The type of treatment described above on page 29 typifies the tactics employed to drive the former elders out of the congregation, in particular the Cobbs.

278. When Plaintiff discovered evidence of fraud he notified the police of such. Thereafter Defendants Brede and Showers falsely accused Plaintiff of theft. This began a series of false allegations against the former Menlo Park elders, in particular Jonathan D. Cobb, Sr. and Plaintiff.

This smear campaign was intended to undermine any confidence in the allegations presented within the legal actions. (Compare Exhibit 19).

279. Defendant Brede et al. have consistently endeavored to legitimize their actions under the color of religious right by stating that they have acted within the scope of their organizational responsibilities as directed by the Governing Body of Jehovah's Witnesses.

280. This was and is an oversimplification as well as a fallacious appeal to authority. While it is true that the Defendants have occupied appointed roles within the organization, this in no way constitutes an endorsement of their individual conduct, to whatever extent such is actually known by members of the Governing Body or other persons within organizational roles of oversight. Notably, the Plaintiffs in each action to date have alleged a scheme that has been devised and executed in a clandestine manner. Consequently, suggesting that the actions of the Defendants inherently establish a basis of knowledge and, further, approval from the Governing Body equates to suggesting that unlawful actions by one police officer inherently implicate his/her entire department, precinct, city or county.

281. The factually accurate and true statement in these regards is that Ashe and Shuster and their subordinate, Defendant Koehler were providing direction to Defendant Brede et al. as they are all participants within the same Enterprise and scheme.

282. The Enterprise' campaign of obstruction influenced the outcome of civil actions C 10-03907-MEJ, C 11-02496-DMR and C 12-01372-JSW.

283. When an action has been dismissed, Defendant Brede et al. proudly advise congregation members that God had blessed them, representing that the dismissals were legitimate and proper as opposed to being achieved by and through acts of fraud upon the court (Exhibit 21). As legal proxies for the Enterprise, Defendants Anthony Smith and Dennis Sinclitico played a leading role in orchestrating the fraudulent dismissals.

284. Regarding action C 12-01372-JSW, Defendant Jennifer Altamirano played her assigned role in disrupting Plaintiff's family and personal life by initiating a physical separation under false pretense followed by her ongoing efforts to prevent Plaintiff from seeing his children. During this time she has used the children as a means to extort involuntary decisions from Plaintiff including his withdrawal of or from the legal actions that threaten to expose the Enterprise' dealings. She has also

participated in the smear campaign launching a series of false allegations against Plaintiff in-line with the Enterprise' scheme to attack, oppress and neutralize him.

285. The physical separation was initiated by Defendant Jennifer Altamirano for strategic purposes at the direction of the Enterprise. Notably, the subsequent deprivation of Plaintiff's parental rights and association with his children occurred after an extended period of recurring threats against Plaintiff regarding his children.

286. Throughout 2011, the statement "think about your children" began to be uttered by members of The Clique during informal conversations at congregation meetings or assemblies. The statement was an elegantly veiled threat intended to discourage Plaintiff's then involvement with federal civil action C 10-03907-MEJ. Defendants Fair, Maynor and Raditich, amongst others, consistently uttered this statement ("think about your children") when speaking with Plaintiff, even when the topic of conversation did not call for such. In noting the sustained pattern and ominous manner/tone in which the statement was presented in each case, Plaintiff discerned that such was a threat. However, Plaintiff had difficulty understanding how such a threat regarding his children could be executed by such persons so he was unconcerned by it.

287. At this point in time, the basis of this threat is clear. Defendant Jennifer Altamirano was aligned with The Clique - the Fairs, the Youngs, the Raditichs, Donald Maynor etc…and pursuant to this standing alliance, in addition to other sources of influence including her parents, she was commissioned to execute the threat, the planned disruption of Plaintiff's family and personal life, including the theft of his children under color of law.

288. Defendant Maynor has admittedly assisted Defendant Jennifer Altamirano with family law case 116981. Throughout that proceeding, Defendant Jennifer Altamirano has exhibited a legal savvy beyond her knowledge and ability indicating advanced legal preparation and coaching that was provided by Defendant Maynor, a seasoned lawyer. Defendant Maynor participated in the planning and execution of the meditated disruption of Plaintiff's family and personal life. Further underscoring his interest and involvement, Defendant Maynor has appeared outside of Defendant Jeffrey Kline's office on several occasions when Plaintiff was leaving. In each instance, Defendant Maynor stops then looks intently at Plaintiff for an extended period issuing a non-verbal taunt and threat. These instances have caused Plaintiff to feel that, in making such threats, Defendant Maynor is asserting his

basis of influence regarding the child custody evaluation in an effort to create fear in Plaintiff, the intent being to discourage Plaintiff's involvement in the civil actions of concern. The significance of such behavior is amplified in that Defendant Maynor issued the recurring threat, "think about your children," to Plaintiff throughout 2011.

289. Federal civil action C 12-01372-JSW was filed on 3/19/2012. Twenty two days later Defendants Ashe and Shuster modified their approach this time directing congregation elders Allan Lee (Foster City Congregation), Jerome Pierce and Lawrence Lee (Menlo Park Congregation), to meet with Jonathan D. Cobb, Sr., W. Arlen St. Clair and Plaintiff.

290. On 4/10/12, Jerome Pierce and Allan Lee visited the home of Jonathan D. Cobb, Sr. stating that they had been asked by "the Branch" to meet with him and discuss the current legal issues specific to the Menlo Park Congregation/corporation, in particular the newly fined case (C 12-01372-JSW). Jerome Pierce specifically stated that the purpose and intent was to generally discuss matters. In doing so, Mr. Pierce did not represent the discussion as a formal judicial hearing but, again, as a discussion.

291. Thereafter, on April 12, 2012, Plaintiff attended the meeting at the Menlo Park congregation. Before the meeting began he was advised by Defendants Lawrence Lee and Michael Marchi that a judicial meeting had been arranged due to concerns of apostasy and fraud. No other information was provided despite Plaintiff's efforts to obtain further details as he was confused. Defendants Lawrence Lee and Michael Marchi did not ask any questions or verify any facts relative to the two charges. Neither the circumstances prompting the judicial meeting or the basis of the charges were explained scripturally so things were very unclear.

292. In retrospect, the intent was to apply coercive pressure to the end of forcing Plaintiff and his father to withdraw civil action C 12-01372-JSW, the point of leverage in this congregational setting being the prospect of being disfellowshipped (excommunicated) as one of Jehovah's Witnesses. If the effort to force the withdrawal of the action under the color of religious right failed then disfellowshipping Plaintiff and the other cited persons would advance the Enterprise' agenda to silence and discredit them.

293. Plaintiff was reluctant to meet with any elders from the Menlo Park congregation due to the legal issues and concerns of partiality. These concerns were expressed via email to Defendant

1   Allan Lee (Exhibit 22), in a letter personally delivered to Defendant Lee's home and multiple

2   voicemails. Defendant Lee never responded, which is unusual. Within these communications Plaintiff

3   expressed a willingness to meet with Defendants Jerome Pierce and Allan Lee to discuss matters per

4   organizational protocol and directives.

5       294. The entire situation was highly irregular so Plaintiff simply waited to hear back from

6   Defendant Allan Lee but no response came.

7       295. Jonathan D. Cobb, Sr. and W. Arlen St. Clair also noted the irregularities in this situation

8   and were soon caught off guard by an announcement during a Menlo Park congregation meeting that

9   both had been disfellowshipped (excommunicated).

10      296. On May 19, 2012, Defendants Lawrence Lee and Michael Marchi advised Plaintiff that

11  he too had been disfellowshipped and that he had seven days to appeal the decision. Having served as

12  a congregation elder, Plaintiff knew how matters should be handled and remained puzzled at the

13  strange series of events especially when he had endeavored to communicate with all concerned. He

14  sent the letter in Exhibit 23 to the Service Department in Patterson, NY and thereafter met with an

15  appeal committee consisting of Defendants Paul Demosthenes, Paul Yamaguchi and Kerry

16  Woodhams with Defendants Jerome Pierce, Allan Lee and Michael Marchi also in attendance.

17      297. During this meeting the charge of fraud against Plaintiff was discussed. A member of the

18  congregation who had been very close to the Cobb family unfortunately came under the influence of

19  Defendants Koehler and Maynor and became a participant in the smear campaign discussed herein.

20  This person had requested assistance in updating a will and asked Plaintiff's parents for help in doing

21  so. Later, after the filing of civil action C 10-03907-MEJ and efforts to refute those allegations by

22  discrediting the Plaintiffs intensified, this person was visited repeatedly by Defendant Donald Maynor

23  who advised that the Cobbs had taken advantage of her requiring corrective changes to the will.

24  Plaintiff Jason Cobb was also blamed in this regard despite having no involvement in this situation

25  whatsoever.

26      298. In discussing this matter during the appeal hearing Defendants Jerome Pierce and Allan

27  Lee advised Defendants Paul Demosthenes and Paul Yamaguchi that due diligence had been done in

28  the investigation as he and Allan Lee made sure that they spoke to all concerned persons to establish

the facts. The only problem is that they did not discuss this situation and accusation with the accused

persons: Jonathan, Lois and Jason Cobb. Exactly how could a "thorough investigation" be performed if the accused persons were never interviewed by the investigators, especially in advance of a judicial hearing to review the evidence?

299. The so-called "investigation" was incomplete highlighting the importance of putting forth an earnest and honest effort to establish all of the facts **before** the formation of a judicial committee, per organizational directives. That the investigation as well as the entire proceeding had been undermined and compromised by suspect motives with a view to a secular purpose, more so than a spiritual or religious purpose, was plainly evident.

300. Next the appeal committee, advised Plaintiff that the Declaration of Support he filed for civil action C 10-03907-MEJ (Exhibit 24) as well as his effort to notify the Police and the IRS of his concerns regarding unlawful activity to the detriment of Menlo Park congregation members constituted acts of disloyalty to the organization, requiring that he be disfellowshipped (Compare Exhibits 25 & 26).

301. During the discussion, no consideration was given to the legitimacy of Plaintiff's discoveries or concerns regarding unlawful activity or whether or not congregation members had been wronged. The legitimacy of the concerns were completely irrelevant from the standpoint of the judicial and appeal committee. Their point of view simply was that Plaintiff should not have taken any action or spoken out regarding his concerns, essentially that he should have simply followed direction without thought and without question. (Acts 5:29, Galatians 1:8; 1 John 4:1; 4/1/88 *Watchtower* p. 30 - 31).

302. While some effort was made to refer to the cited documents as "proof" of Plaintiff's "wrongdoing," one as old as seventeen months (Exhibit 24), it was clear that the actual issue and immediate point of concern was federal civil action C 12-01372-JSW as it presented a serious threat to the Enterprise.

303. At the end of the appeal hearing, Defendant Paul Demosthenes asked Plaintiff how many other legal actions he was involved in had members of the congregation named as Defendants. Plaintiff confirmed that there was one (C 12-01372-JSW). Defendant Demosthenes then advised that a person could be reinstated as one of Jehovah's Witnesses in a few months, a year, or longer inferring that Plaintiff's future prospects for reinstatement directly depended on his withdrawal of the

60

action in question or at least the removal of the names of any Defendants that are members of the congregation.

304. When Plaintiff was disfellowshipped, Defendant Jennifer Altamirano issued further coercive demands stating that Plaintiff would be reinstated quickly and that the family would be together again IF he removed the names of all Defendants that were members of the congregation and removed his name as Plaintiff from the action, echoing the same point made by Defendant Demosthenes in the judicial appeal meeting. Plaintiff had not shared the details of the appeal hearing with his wife so her comments and actions further establish her alignment with the perpetrators of this extra-judicial act of punishment, executed with a view to a secular purpose, namely obstruction and extortion.

305. On 5/24/2012, Plaintiff Jennifer Altamirano's request in family law case 116981 for a full child custody evaluation was granted, per the scheme. This evaluation has been a strategic tool intended to place Plaintiff in a situation where the family's future was taken from his hands and placed in the hands of Defendants Greenberg, Kline and Douglas as well as other congregation members.

306. Per the scheme, Defendant Estrada referenced the Menlo Park congregation several times in his Family Court Services reports establishing such as a participant and factor in the custody evaluation that he was unduly influenced to recommend, per the scheme. The objective was to put Plaintiff in a circumstance that made him dependent on assistance from others to such an extent that he would be more susceptible to coercive influence and acts of extortion.

307. Defendants Bill Douglas and Donald Ferris, both Jehovah's Witnesses, in addition to other members of the Menlo Park congregation began inferring in conversations with Plaintiff that they or others would provide favorable input when interviewed by Defendant Kline, IF Plaintiff "returned to God" by withdrawing civil action C 12-01372-JSW as stated above. Comments such as "we need our brothers especially when times are tough," "we have to stick together in these difficult times," "things will work out for your family as long as you repent and return to God" or "Don't worry, you'll get your kids back, as long as you do the right thing" became vehicles of coercive influence in the effort to extort involuntary acts from Plaintiff within the obstruction campaign. This further establishes family law case 116981 as a strategic means to execute acts of coercion and

1

extortion under color of right and law.

2

308. As civil action C 12-01372-JSW progressed so did the oppression of Plaintiff. When the

3

U.S. Attorney certified that the federal employees in question acted within the scope of their

4

employment the Plaintiffs in that action (Jonathan D. Cobb, Sr; Jason Cobb) had the option to

5

challenge that certification. If they did not do so then the case would have been dismissed with

6

prejudice. When Plaintiffs did file their timely challenge of the certification on 9/14/2012, per the

7

docket, this angered the Enterprise and so it retaliated one day later on 9/15/2012. The details of this

8

micro-scheme of retaliation is as follows.

9

309. On 8/27/2012, Defendant Greenberg granted Defendant Jennifer Altamirano's petition

10

that Plaintiff's visitation time with the children be sharply reduced and also supervised at the San

11

Mateo County visitation center due to her false allegation that the children were adversely affected by

12

visitations with Plaintiff as supported by the two quacks for hire, non-party co-conspirators Janet

13

Busic (one of Jehovah's Witnesses) and Louis Everstine.

14

310. On 9/8/2012, Plaintiff visited the tailgating area outside of Stanford Stadium to deliver

15

tickets to the football game for his sons. Even though the 8/27/12 court order issued by Defendant

16

Greenberg was in effect, no effort was made to prevent the children from approaching Plaintiff and

17

interacting with him. Defendant Jennifer Altamirano was inside of the 5th wheel trailer with other

18

persons playing a game. Plaintiff was greeted by his sons and spoke with them, provided the tickets

then left. Everything was fine.

19

311. On 9/14/2012, Plaintiff filed a challenge of the U.S. Attorney's certification of

20

employment preventing civil action C 12-01372-JSW from being dismissed with prejudice (Exhibit

21

21). The next day, on 9/15/2012, and under the exact same set of circumstances as noted on 9/8/2012,

22

an act of retaliation in furtherance of the defamation scheme against Plaintiff was perpetrated by

23

Defendant Jennifer Altamirano and other members of the Menlo Park congregation. Defendant

24

Jennifer Altamirano verbally antagonized Plaintiff then feigned being pushed by him, flung herself

25

backwards several steps, paused momentarily, then suddenly flopped to the floor of the 5th wheel. She

26

instantly got up stating that Plaintiff had knocked her down then called the police and filed a domestic

27

violence report against him.

28

312. This situation was planned and executed as a direct response in retaliation to Plaintiff's

filing in federal court the previous day on 9/14/2012 (Exhibit 21). The standing scheme to oppress, vilify and discredit Plaintiff pursuant to his sincere efforts to report unlawful activity was furthered by this latest act of malice and fraud.

313. An eye witness who initially was pressured into remaining silent has since come forward to confirm that this was in fact a planned attack against Plaintiff, adding that Defendant Bill Douglas stated in advance that it was necessary to "do this" to Plaintiff and the Cobbs in order to "protect the (Menlo Park) congregation and keep it clean."

314. Thereafter the involved persons and witnesses, who are all members of the Menlo Park congregation of Jehovah's Witnesses, were instructed by Defendant Bill Douglas and Defendant Jennifer Altamirano, amongst others that they were not to speak with any other member of the Cobb family and that they were to refuse any requests for a statement or any effort to depose them. Such persons were told to contact Defendant Bill Douglas if they were approached by any other member of the Cobb family or had any questions or concerns.

315. In and around this same time, another material witness, one of Jehovah's Witnesses, who will be referred to as "Jane Doe" for her privacy and protection, as well as the eye witness cited above agreed to be formally deposed by Plaintiff. Prior to doing so, Jane Doe received a phone call from Defendant Ernest Brede. Defendant Brede referenced the situation involving the domestic violence allegation against Plaintiff then asked Jane Doe to come to the Kingdom Hall and meet with him and others to make sure that she (Jane Doe) was on the "right page," which she took as meaning the same page as everyone else from the Menlo Park congregation that had been present during the alleged incident. Jane Doe refused to do so stating that she and the other material witness were very clear regarding the facts and intended to tell the truth when asked. According to Jane Doe, Defendant Brede became upset and the call ended.

316. Thereafter Jane Doe and the other material witness began to receive the same type of mistreatment described above on page 39 at paragraphs 205 & 206. In time, Jane Doe felt compelled to leave the Menlo Park congregation and begin attending a different Kingdom Hall entirely where she has been consistently treated with kindness and love, as typically occurs in spiritually healthy congregations of Jehovah's Witnesses around the globe.

317. Plaintiff dismissed himself from federal civil action C 12-01372-JSW. In and around

December 2012 he expressed his desire to be reinstated as one of Jehovah's Witnesses having complied with the expressed requirement for such, in this instance, as stated by Paul Demosthenes at the conclusion of the appeal hearing.

318. Interestingly, further procedural irregularities were noted at this point.

319. First, a person requesting reinstatement is to meet with the exact same judicial committee that rendered the original decision. In this case that would be Allan Lee, Jerome Pierce and Michael Marchi. However, at the meeting to review Plaintiff's request for reinstatement, Michael Marchi, Lawrence Lee and Bill McKeon were present.

320. Second, when Plaintiff was advised that his request for reinstatement was denied, two new prerequisites for reinstatement were established: A) When Plaintiff submitted his next request for reinstatement, approval of such would be contingent on the outcome of a hearing to review the original charge of "fraud" that had been made, despite the fact that this erroneous charge was not truly investigated prior to the judicial meeting, which occurred in Plaintiff's absence, or even prior to the appeal meeting that Plaintiff attended, and despite the fact that this charge had been set aside after some discussion, if even as a display of mock impartiality; B) Lawrence Lee advised Plaintiff that his prospects for reinstatement were dependent on whether or not he succeeded in proving his innocence specific to the (false) charge of domestic violence made against him by Defendant Jennifer Altamirano and Defendant Bill Douglas, amongst others.

321. Simply put, this meeting, the discussion, comments that were made by Lawrence Lee as endorsed by his colleagues was entirely inconsistent with organizational protocol and directives as well as bible principles. While Plaintiff met with Lawrence Lee for this discussion, Enterprise members including Defendants Jennifer Altamirano, Bill Douglas, Deborah Appel, Cameron Bowman, Amanda Freel, BJ Fadem and Ron Nerio work intently to impede and tamper with discovery in the family law case and the pending case in Santa Clara County to the end of undermining Plaintiff's basis of success in both regards.

322. In this manner the synchronized attacks on each facet of Plaintiff's life including the congregation and his family/personal life persisted in unison.

**G.     Corrupting the Family Arrangement**

323. The Altamirano family consisting of Alfred, Ellen and Jennifer were selected by the

64

1  Enterprise as key participants in its scheme against Plaintiff for one simple reason: their proximity to

2  the target.

3       324. Defendants Alfred and Ellen Altamirano as well as Brede, Maynor, Fair and others

4  collectively played upon Defendant Jennifer Altamirano's her religious convictions as well as her

5  loyalty to her parents, convincing her that participating in the scheme against Plaintiff constituted an

6  act of obedience and worship to God and that such was required as Plaintiff's effort to expose

7  wrongdoing could stumble and discourage other congregation members.

8       325. In early 2012, Defendant Jennifer Altamirano manifested as an agent of influence,

9  informant and saboteur in service of the Enterprise' obstruction campaign, gathering information,

10  obtaining documents, falsifying and/or destroying legal evidence that threatened the Enterprise,

11  intentionally disrupting the Cobb household at strategic times relative to key filing dates in the civil

12  actions of concern, all at the direction of the Enterprise, per her defined role within the scheme.

13       326. Upon departing the family residence with the children under false pretense and initiating

14  family law case 116981 when directed to do so by the Enterprise, Defendant Jennifer Altamirano,

15  who has no litigation experience and is generally ignorant of the law, was provided a script of what to

16  file and what to say for each hearing, when such actions were not performed for her by Enterprise

17  members and adherents, including her formally retained attorneys in addition to her unaccredited

18  attorney, Defendant Maynor, one of Jehovah's Witnesses, who stated before an eye witness that he

19  has assisted Defendant Jennifer Altamirano with case FAM 116981. Defendant Jennifer Altamirano

20  has likewise directly or indirectly colluded with Defendant Anthony Smith, also one of Jehovah's

21  Witnesses, and Defendant Dennis Sinclitico, who, by his own admission, is related to several

22  members of the Christian Congregation of Jehovah's Witnesses. In doing so Defendant Jennifer

23  Altamirano has acted in parallel to and in unison with such persons within the nexus of the scheme

24  described herein, to the end of fulfilling her assigned role in the Enterprise' attack against Plaintiff, to

25  the exclusion of her God assigned role as a wife and mother.

26                                    **CLAIMS FOR RELIEF**

27                                  **FIRST CLAIM FOR RELIEF**

28       **Violations of Constitutional Rights (Civil Rights Act; Free Exercise Clause)**

        **(Against Defendants Superior Court of California for San Mateo County, San Mateo County,**

District Attorney's Office for San Mateo County, Jennifer Altamirano, Deborah Appel,
Cameron Bowman, Eddie Estrada, Amanda Freel, Susan Greenberg, Robert Jonsen, Peter
Ohtaki, Stephen Wagstaffe)

Violation of Constitutional Rights – Count 1

327. Family law case 116981 is an act of fraud being filed for strategically egregious purposes in furtherance of the Enterprise' scheme against Plaintiff. In being unduly influenced to participate in its scheme, the Defendants willfully embarked on a course of action to deprive Plaintiff of his Constitutional rights including "Equal protection under law" as well as rights afforded each U.S. citizen by virtue of the *Free Exercise Clause*.

328. In depriving Plaintiff of his parental and constitutional rights without cause, and based on nothing else but the lies, antics and shenanigans of the Enterprise described herein, as embodied and represented in the proceedings for FAM 116981 by its asset, Defendant Jennifer Altamirano, Defendant Susan Greenberg et al. defied the Constitution of the United States presuming to subjugate such to their own personal will and judgment born of amorality, inherently bent minds, undue influence, bribery, corruption and fraud.

329. During the initial hearing in Department 32 of the Superior Court for San Mateo County, as heard by Defendant Greenberg, Plaintiff did not receive equal protection under law. All of Plaintiff's requests which were reasonable and in full accord with the stated policy of California that children have frequent and ongoing contact with both parents were unjustly denied. The sole basis for this "decision" was the unfounded assertions and nonsensical ravings of a single layman and simpleton, Defendant Jennifer Altamirano. In the absence of any proof or any compelling reason, Defendant Greenberg denied Plaintiff's petition for joint legal and physical custody of the children and balanced visitation for no other reason but to create the agreed upon point of leverage against Plaintiff by and through the inexcusable use of his children by the Enterprise and its asset, Defendant Jennifer Altamirano, as a means to extort involuntary acts from him as described herein.

330. Having denied Plaintiff his rights in this regard and without due cause or compelling reason, Defendant Greenberg then proceeded to issue an inoperative and inherently void Order that opposes the Constitution, as if a state official, let alone a commissioner, could ever do such a thing in defiance of the Supreme authority of the United States. The Order sought to mandate participation in

1
2
3
4
5
6

family visitation time within the Cobb home by members of the Menlo Park Congregation of Jehovah's Witnesses. A court Order can't mandate that Plaintiff invite congregation members into his home or require that such participate in family visitation. Such a decree is inherently beyond the jurisdiction and authority of Defendant Greenberg as it is beyond the jurisdiction and authority of the Superior Court itself or any other court in this land pursuant to the provisions of *Free Exercise Clause*.

7
8
9
10
11
12
13
14
15
16
17

331. The same can be said regarding language in the order seeking to regulate Plaintiff's attendance at the Menlo Park Congregation of Jehovah's Witnesses. This is inappropriate, firstly, because this language was included in the order specifically to facilitate, encourage and induce reconciliation between Plaintiff and Defendants Brede et al. to the end of Plaintiff agreeing to withdraw federal civil action C 12-01372-JSW. This Order, in conjunction with the Order issued pursuant to the 5/24/12 hearing provided the basis for deviant members of the Menlo Park Congregation of Jehovah's Witnesses to then exert coercive pressure on Plaintiff regarding the child custody evaluation, assuring him of their support and positive input – to the extent that he "returned to God" by disengaging from the civil actions which threatened, not God or his true servants, but rather the association-in-fact RICO Enterprise described herein. It is not the business of a state court, or any court, to directly enable and facilitate an extortion scheme or any effort to oppress innocent persons.

18
19
20

332. Secondly, language in the Order issued on 4/26/2012 regarding Plaintiff's attendance at congregation meetings is offensive to Constitutional law as it seeks to mandate and regulate said attendance, which is also beyond the jurisdiction and authority of any court in this land pursuant to the *Free Exercise Clause*.

21
22
23
24
25
26
27

333. Similar concerns arise when reviewing Defendant Estrada's second report considered during the 5/24/12 hearing. In this report Defendant Estrada recommended that Plaintiff's visitation with his children not be increased. Comments made by Defendant Estrada in this report and also to Plaintiff's face, in front of two witnesses, confirm that this decision was influenced by Plaintiff's alleged non-compliance with the 4/26/2012 order due to him periodically attending religious services at other congregations of Jehovah's Witnesses, instead of the Menlo Park congregation. Being penalized for how he chose to practice his faith on occasion clearly violates Plaintiff's Constitutional

28

rights pursuant to the provisions of the *Free Exercise Clause*.

334. "There can be no sanction or penalty imposed upon one because of his exercise of Constitutional rights." Sherar v. Cullen, 481 F 2d 946(1973)

335. "It is the duty of the courts to be watchful for the CONSTITUTIONAL RIGHTS of the citizen, against any stealthy encroachments thereon." Boyd v. U.S., 116 US 616, 635, (1885)

336. The (state) court presenting as some form of advocate and arbitrator on behalf of the Menlo Park Congregation of Jehovah's Witnesses is also evident in the varied references to "the congregation" within the two Family Court Services reports generated by Defendant Eddie Estrada pursuant to his collusion with Enterprise members, including but not limited to, Defendant Jennifer Altamirano. Designating the "Congregation" as a participant within the child custody evaluation that Defendant Estrada's biased and slanted report irrationally pushes for, pursuant to multiple references to the "Congregation" and issues therein relative to the civil actions which threaten the Enterprise, establishes a point of alignment between the Menlo Park Congregation of Jehovah's Witnesses, the Enterprise described herein and the Superior Court of California for San Mateo County. The Enterprise' scheme specifically required stealing Plaintiff's children under color of law as well as a child custody evaluation and that is precisely what Defendants Greenberg, Estrada and Jennifer Altamirano jointly provided through case FAM 116981.

337. Aside from the civil RICO considerations the Order issued by Defendant Greenberg in concert with her fellow Defendants as described is unconstitutional.

338. In denying Plaintiff's subsequent requests for joint child custody and balanced visitation in light of the entire proceedings for case FAM 116981, Defendant Greenberg continued to deprive Plaintiff of his parental and civil rights as a matter of course.

339. Family Law case 116981 was born of and directly influenced by fraud and corruption and is fully compromised and dysfunctional in remaining offensive to the Constitution of the United States.

Violation of Constitutional Rights – Count 2

340. The Equal Protection Clause, part of the Fourteenth Amendment to the United States Constitution, provides that "no state shall ... deny to any person within its jurisdiction the equal

68

protection of the laws."

341. The original intent of the Equal Protection Clause in the Civil Rights Act was to give the humblest and poorest the same civil rights as the most powerful and wealthy.

342. With this in mind, Plaintiff redirects attention to the seminal events for Menlo Park PD case 11-973.

343. Based on concerns of wrongdoing pursuant to reviewing banking records for accounts held by the non-profit corporation employed by the Menlo Park congregation of Jehovah's Witnesses, Plaintiff went to the Menlo Park Police Department to file a report. In doing so he was referred to Officer Jeff Keegan, a specialist in corporate fraud and white collar crime. Based on a series of discussions, Officer Keegan progressively outlined a range of offenses which included business identity theft, false financial statement to shareholders and embezzlement (Note: The full range of offenses that were identified in discussions with officer Keegan and Sergeant William Dixon is found within Exhibit 6).

344. On April 15, 2011, Plaintiff notified Defendant Brede of his discoveries and intervening actions by email. Thereafter, Defendants Brede and Showers filed a report with the Menlo Park Police Department falsely accusing Plaintiff of theft. Plaintiff discussed this false report with officers Jeff Keegan and Burke Bruttig in April 2011. When Plaintiff explained the actions he had taken to protect the interests of the shareholders, both officers agreed that no wrong had been committed by Plaintiff.

345. In a follow-up discussion, Officer Keegan advised that he had received an extensive set of documents from Defendant Anthony Smith that were represented as establishing the legitimacy of Defendant Brede et al.'s actions to date specific to the banking activity and corporate appointments etc. According to Officer Keegan, Defendant Smith provided paperwork representing that Defendant Brede et al. had legal standing within the Menlo Park Corporation as of December 16, 2010, the date of the fraudulent corporate meeting previously referenced. In response Officer Keegan requested any and all documentation that established their legal standing in July 2010, in view of the banking transactions they executed on behalf of the Menlo Park Corporation at both Chase and Wells Fargo at that time. Officer Keegan advised Plaintiff that the response from Defendant Smith was still pending,

1

2

which made sense from Plaintiff's standpoint as he already knew that Defendant Smith would not be able to provide the requested documentation as such did not exist.

3

4

5

346. At this critical juncture in case 11-973, all communications from Officer Keegan ceased and any and all attempts by Plaintiff to make contact with him directly or by phone were unsuccessful.

6

7

8

9

10

347. Plaintiff visited the Menlo Park PD station and spoke with Officer Keegan's supervisor, Sergeant William A. Dixon, in an effort to obtain the case status. Thereafter, Plaintiff received no update regarding the case from any representative of the Menlo Park Police Department until receiving a copy of the letter contained in Exhibit 7. The fact that the DA's office also declined Plaintiff's request for an investigation compounded the problem (Exhibit 8).

11

12

13

14

15

16

17

348. As stated herein, the lack of response from any representative of the Menlo Park Police Department was due to a collective effort directed by the Enterprise to cease communications and initiate evasive maneuvers to execute the "solution" discussed above. When this tactic failed then, per the micro-scheme, Menlo Park PD representatives maintained the impasse with case 11-973 saying nothing could proceed without a subpoena for the outstanding bank records while advising that the DA had denied such as no crime had been committed. This stonewalling protected Defendant Brede and more importantly, the Enterprise, by design.

18

19

20

21

349. The problem is that Jeff Keegan had initiated a case that was halted and suppressed by the enterprise and then covered up through the combined efforts of the DA's office, Menlo Park PD and the City Attorney, which explains the aversion to releasing any information under the guise that it is an open case or that it is a criminal matter requiring that details remain confidential.

22

23

24

25

26

27

350. In being falsely accused of domestic violence as described herein, Plaintiff recently sought copies or even a summarization of the allegations presented against him in case 11-973 by Defendants Brede and Showers to substantiate the pattern of false accusations to date, in response to Plaintiff's effort to expose wrongdoing. It will be important for any court, judge or jury to understand that the series of false accusations are strategic acts within a cover-up scheme born of malicious intent, as opposed to any actual wrongdoing on Plaintiff's part, and thereby constitute retaliation

28

70

against Plaintiff for being a whistleblower. Despite explaining this, Plaintiff's request was denied by Menlo Park PD then referred to the City Attorney (Nicolas Flegel) who also issued a denial for the requested information per Exhibit 27. "You're not entitled to this information" or "We don't have to give you this information" have been the responses to date. In this way, the cover-up of the conscious and willful decision on the part of the cited entities and persons to look the other way regarding case 11-973 and then perform overt acts in support of the Enterprise constituting obstruction of justice continues. Defendant Cameron Bowman has likewise become a participant in such refusing to subpoena information specific to case 11-973 and JP Morgan Chase bank account xxxxx2300, per Exhibit 13.

351. A single subpoena to obtain the records for JP Morgan Chase account xxxxx23000 is the remaining task, yet no one, including Defendant Bowman, wants to do it. The reason for such is now painfully obvious: The Enterprise doesn't want the police, the DA or Defendant Cameron Bowman to pursue this evidence and so they all bow their heads, step aside and concede. In providing such deference to the Enterprise and its local members including Defendant Brede, the Menlo Park Police Department and the DA's Office for San Mateo County are disregarding the fact that Plaintiff, and more importantly, the range of persons that have been financially injured through fraudulent fund raising practices are entitled to "equal protection under law."

352. The statement reportedly issued from the DA's office that the reported actions of Defendant Brede et al. are not criminal acts but rather are civil infractions is, simply not true under scrutiny of law per Exhibit 6. For the District Attorney's Office for San Mateo County to dismiss the reported actions on the part of Defendant Brede et al. as non-crimes is entirely inconsistent with the facts. The "non-crime" response is an excuse to look the other way in support of and in furtherance of the Enterprise' scheme. Such an act of omission born of unlawful intent and racial bias does not constitute "equal protection under law."

353. As a lifelong resident of San Mateo County and Menlo Park, Plaintiff and many others can speak to the history of racial bias in this locale. San Mateo County does not have a "good old boy" network. It IS a "good old boy" network, and the City of Menlo Park is very much a part of that. A clear disparity in the execution of justice within the disparate social and economic demographics of Menlo Park (Belle Haven) and West Menlo Park as well as San Mateo County has existed for

1  decades, which underscores issues surrounding case 11-973 as Plaintiff Jason Cobb is black and

2  Defendants Brede and Showers are white. The basic rule in Menlo Park has always been that the

3  word, accusation or testimony of a white man trumps that of a black man or other minority. That fact

4  is manifesting in these matters. Plaintiff Jason Cobb has provided corporate and financial records,

5  formal statements and other forms of evidence, yet the investigation can't proceed. Further, the

6  request for one subpoena to substantiate multiple criminal allegations including violations of

7  violations of 18 U.S.C. §§ 1943 (Wire Fraud) and 1956 (Laundering of Monetary Instruments) can't

8  be obtained by Menlo Park PD and won't be issued by the DA's office for San Mateo County.

9  Plaintiff feels that **Stevie Wonder** could easily see what's going on here, and why. It is anticipated

10  that any District Court Judge and any jury can as well.

11  354. Each of the cited San Mateo County entities have exhibited a biased leaning toward

12  protecting Defendant Brede and the interests of the Enterprise, in particular its efforts to execute

13  damage control and cover-up measures to mitigate its exposure. By catering to and protecting

14  Defendant Brede, in the same manner that Defendant Jennifer Altamirano has been catered to and

15  protected by the Superior Court in case FAM 116981 by and through ongoing displays of bias and

16  partiality born of undue influence and fraud, the City of Menlo Park, including Menlo Park PD

17  representatives and the City Attorney are violating Plaintiff's civil rights, specifically his right to

"equal protection under law."

18  Violation of Constitutional Rights – Count 3

19  355. Defendants Bowman and Freel have willfully violated Plaintiff's civil rights, specifically

20  the provisions of the *Equal Protection Clause* and the *Due Process Clause*.

21  356. The Equal Protection Clause, part of the Fourteenth Amendment to the United States

22  Constitution, provides that "no state shall ... deny to any person within its jurisdiction the equal

23  protection of the laws."

24  357. Having members of his own defense team, including the attorney, systematically impede

25  and undermine his defense to the end of inducing and forcing his acceptance of a conviction on a

26  lesser charge is a direct offense to and violation of Plaintiff's right to "equal protection" under law.

27  358. Regarding the *Due Process Clause*, procedural due process is essentially based on the

28  concept of "fundamental fairness."

72

359. Procedural Due Process includes:

1.  **An unbiased tribunal.**

2.  Notice of the proposed action and the grounds asserted for it.

3.  **Opportunity to present reasons why the proposed action should not be taken.**

4.  **The right to present evidence, including the right to call witnesses.**

5.  The right to know opposing evidence.

6.  The right to cross-examine adverse witnesses.

7.  **A decision based exclusively on the evidence presented.**

8.  **Opportunity to be represented by counsel.**

9.  Requirement that the tribunal prepare a record of the evidence presented.

10. Requirement that the tribunal prepare written findings of fact and reasons for its decision

360. To the end of receiving a fair hearing, Plaintiff has the right to conduct discovery in support of his defense. By systematically impeding discovery in case B1262610 with specific intent to undermine Plaintiff's case to the end of inducing and forcing his acceptance of a conviction, in furtherance of the Enterprise' defamation scheme, Defendants Bowman and Freel have willfully violated Plaintiff's civil rights pursuant to the provisions of the Due Process Clause.

361. In failing to properly discharge their fiduciary duty to Plaintiff, as their client, instead opting to participate in the Enterprise' scheme by sabotaging Plaintiff's case pursuant to being unduly influenced through collusion with Defendants Appel and Maynor, as well as Defendant Bowman's associates within the DA's Office for Santa Clara County, they have committed violations of civil RICO and the Civil Rights Act within a single course of action.

## SECOND CLAIM FOR RELIEF

### (Serbian Collusion and Serbian Fraud)

**(Against Defendants Richard Ashe, Paul Demosthenes, Paul Koehler, Allan Lee, Lawrence Lee, Michael Marchi, Bill McKeon, Steve Misterfeld, Dan Nilges, Jerome Pierce, Alan Shuster, Leonardo Trevino, Paul Yamaguchi and Kerri Woodhams)**

362. Plaintiff realleges and incorporates herein by references each and every foregoing paragraph of this Complaint as if set forth in full.

Serbian Collusion and Serbian Fraud - Count 1

363. A micro-scheme to remove the entire body of elders serving in the Menlo Park Congregation of Jehovah's Witnesses in 2009 ensued pursuant to acts of *Serbian Collusion* and *Serbian Fraud* on the part of Defendants Alan Shuster and Richard Ashe, members of the Service Department in Patterson, NY; Defendant Leonardo Trevino, Chairman of Regional Building Committee #7; Defendant Paul Koehler, traveling overseer (Circuit 13); Substitute District Overseer Steve Misterfeld and Talbert Petersen, Regional Building Committee member and Coordinator for the body of elders serving in the Mark West English congregation in Santa Rosa, CA. (*Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976))

364. This particular micro-scheme was predicated on the *Free Exercise Clause*, specifically the *Doctrine of Abstention*. In *Watson v. Jones*, the United States Supreme Court developed a framework for the judicial review of ecclesiastical disputes that has persisted to this day. The Court held that "whenever the questions of discipline, or of faith, of ecclesiastical rule, custom, or law have been decided by the highest church judicatory to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them . . ."

365. With this in mind, the Defendants felt that they could arbitrarily remove the body of elders with impunity in furtherance of the foundational scheme to acquire ownership and operational control of real property held by the non-profit corporation employed by the Menlo Park Congregation of Jehovah's Witnesses. To this end, Defendants Ashe, Koehler, Misterfeld, Petersen, Shuster and Trevino colluded in collectively manufacturing a charge of convenience relative to the matter involving Nansie Vaca's S-21 card (membership card), as discussed above. (See Exhibit 28 for comments made by the Governing Body of Jehovah's Witnesses which establish that no basis for disciplinary action exists in such regards as family heads and/or single adults are at liberty to decide for themselves which congregation they will attend)

366. In seizing ownership of said property and control of the non-profit corporation employed by the Menlo Park congregation, Defendants Brede et al. then proceeded to open JP Morgan Chase bank account xxxxx2300 and began executing financial transactions in violation of 18 U.S.C. §§ 1943 (Wire Fraud) and 1956 (Laundering of Monetary Instruments), in addition to performing acts of religious affinity fraud by and through dishonest fundraising practices. Per the allegations originally presented in federal civil action C 10-03907-MEJ, this is and has been the foundational and central purpose, objective and scheme of the association-in-fact RICO Enterprise described herein. This scheme establishes and underscores that the judicial hearing (religious tribunal hearing) resulting in the removal of the body of elders serving in the Menlo Park Congregation of Jehovah's Witnesses, held 2/26 – 2/27/2010, was motivated by bad faith, with a view to a *secular* purpose.

367. This brings us to the topic of *Serbian*, which has been a recurring consideration through the proceedings to date.

368. Pursuant to *Watson*, the court mentioned a possible exception to the *Doctrine of Abstention*. In *Gonzalez*, the Court prohibited civil court interference in the determinations of ecclesiastical bodies regarding the qualifications of clergy absent fraud, collusion, or arbitrariness.

369. In *SERBIAN* ORTHODOX DIOCES V. MILIVOJEVICH, 426 U. S. 696 (1976), the Court repudiated its 1928 ruling in *Gonzalez* to the extent that "arbitrariness" is no longer an available basis for civil court review of ecclesiastical determinations. However, it left open "fraud" and "collusion" as possible grounds for review. In doing so, the Court in *Serbian* severely limited the availability of "fraud and collusion" as grounds for civil court review by limiting their use to those occasions "when church tribunals act in bad faith for secular purposes." Therefore mere assertion of fraud or collusion cannot invoke civil court review of ecclesiastical determinations regarding church discipline. A plaintiff also must establish that the alleged fraud or collusion was motivated by "bad faith for secular purposes." Consequently, this statement and line of reasoning effectively coin the terms *Serbian Collusion* and *Serbian Fraud*.

370. In view of the foregoing, Plaintiff hereby formally pleads the first count of Serbian

Collusion and Serbian Fraud on the part of Defendants Richard Ashe, Paul Koehler, Steve Misterfeld, Talbert Petersen, Alan Shuster and Leonardo Trevino.

371. In so doing, the objective is to initiate marginal review of the religious tribunal hearing only to the extent required to illuminate and articulate the role such played in furtherance of the Enterprise's scheme. The intent is *NOT* for the court to overturn or reverse that decision, or any consequence of such, as this would grossly exceed the court's jurisdiction and authority pursuant to the requirements of the *Free Exercise Clause*.

Serbian Collusion and Serbian Fraud - Count 2

372. Plaintiff realleges and incorporates herein by references each and every foregoing paragraph of this complaint as if set forth in full.

373. Events concerning the judicial hearings initiated in and around May 2013, motivated by bad faith with a view to a secular purpose, namely obstruction of justice (*Omnibus Clause*) and extortion, discussed above on page 47, line 3 – page 49, line 20 constitute the second count of Serbian Collusion and Serbian Fraud.

374. In view of the foregoing, Plaintiff hereby formally pleads the second count of Serbian Collusion and Serbian Fraud on the part of the Defendants Richard Ashe, Paul Demosthenes, Paul Koehler, Allan Lee, Lawrence Lee, Michael Marchi, Bill McKeon, Jerome Pierce, Alan Shuster, Paul Yamaguchi and Kerri Woodhams

375. In so doing, the objective is to initiate marginal review of the religious tribunal hearing only to the extent required to illuminate and articulate the role such played in furtherance of the Enterprise's scheme. The intent is *NOT* for the court to overturn or reverse the decision, or any consequence of such, as this would grossly exceed the court's jurisdiction and authority pursuant to the requirements of the *Free Exercise Clause*.

### THIRD CLAIM FOR RELIEF

### (Violations of RICO, 18 U.S.C. § 1962(c))

### (Against All RICO Defendants)

376. Plaintiffs reallege and incorporate herein by references each and every foregoing

paragraph of this Complaint as if set forth in full.

377. The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the RICO Defendants participates in the operation or management of the Enterprise.

378. At all relevant times, the Enterprise was engaged in, and its activities affected interstate commerce within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit: Pattern of Racketeering Activity: **Bank Fraud** in Violation of 18 U.S.C. § 1344

379. Plaintiff Jason Cobb realleges and incorporates herein by references each and every foregoing paragraph of this Complaint as if set forth in full.

Bank Fraud - Count 1:

380. Plaintiff Jason Cobb served a subpoena upon JPMorgan Chase Bank on November 21, 2011. He received an acknowledgement letter dated December 8, 2011 from Dianna Stinson, a subpoena analyst serving in JPMorgan Chase' National Subpoena Processing center located at 7610 West Washington Street in Indianapolis, Indiana. Therein Ms. Stinson advised that the records would not be available by the specified return date and requested an extension date of January 20, 2012. Thereafter, Plaintiff Cobb submitted a written response dated December 12, 2011 specifying a requested delivery date of December 30, 2011.

381. While approval of the subpoena was given by Ms. Stinson, she sought a plausible reason to avoid fulfilling the demand for records. When one could not be found, Ms. Stinson sent the initial reply insincerely approving production of the bank records in full expectation of the RICO Defendants' next obstruction maneuver. At this point, Defendant Sinclitico assumed control of the situation by falsifying an order dismissing federal action C 11-02496-DMR, precisely the same tactic that was used in federal action C 10-03907-MEJ by precisely the same group of perpetrators for essentially the same reason: prevent the acquisition of the records for Chase account xxxxx2300.

382. The letter sent by Ms. Stinson via US mail was related to the Enterprise' scheme to obstruct the due administration of justice and to defraud Plaintiffs as described herein constituting a violation of 18 U.S.C. § 1341.

383. The involvement of said bank insiders within this scheme as described exposed JPMorgan Chase Bank, N.A. to potential civil liability and thereby constitutes a clear act of bank

1
2
fraud in violation of 18 U.S.C. § 1344 (*U.S. v. Lemons*, C.A.5 (Tex.) 1991, 941 F.2d 309; *U.S. v. Briggs*, C.A.5 (Tex.) 1992, 965 F.2d 10)).

3
Bank Fraud - Count 2:

4
5
6
7
8
9
384. On 3/27/13, Chase Subpoena analyst Christina Wilson (7610 West Washington St, Indianapolis, IN 46231, 317-757-7254) called Plaintiff Jason Cobb on March 27, 2013 at approximately 10:15 a.m PST regarding Plaintiff's subpoena for financial records specific to the non-profit corporation employed by the Menlo Park congregation (account xxxxx2300). In doing so, Ms. Wilson requested a statement of justification regarding the purpose of the subpoena and Plaintiff provided such.

10
11
12
13
14
15
16
17
18
19
20
385. Thereafter, Plaintiff did not receive a response to any of his follow-up phone calls to Ms. Wilson. Then Plaintiff received the letter attached hereto in Exhibit 17 advising that the two subpoenas Plaintiff had served upon JP Morgan Chase, seeking consumer records for the Menlo Park Corporation (account xxxxx2300) as well as Defendant Jennifer Altamirano would not be fulfilled. The letter marks the continuation of JP Morgan Chase' ongoing effort to withhold the financial records specific to account xxxxx2300, while also providing tangible affirmation of Defendant Jennifer Altamirano's standing as an Enterprise asset as well as the strategic value of family law case 116981 within the Enterprise' scheme. JP Morgan Chase' strange effort to extend itself in retaining an attorney to field subpoena inquiries regarding Defendant Jennifer Altamirano's personal consumer records, creates a point of interest for discovery in this action. (Note: The citation in the attached letter of "Cobb v. JP Morgan Chase" (C 12-01372-JSW) is incorrect as both subpoenas were issued from FAM 116981).

21
Pattern of Racketeering Activity: **Bribery** in Violation of 18 U.S.C. § 201

22
23
386. Plaintiffs reallege and incorporate herein by references each and every foregoing paragraph of this Complaint as if set forth in full.

24
Bribery - Count 1:

25
26
27
28
387. Per the scheme, Defendant Greenberg was unduly influenced to render decisions and orders to the benefit of Defendant Jennifer Altamirano in family law case 116981. Her participation was obtained by Enterprise members including but not limited to Defendants Altamirano, Maynor and Raditich, in exchange for something of value in violation of both federal state law which penalizes

78

both the person offering a bribe as well as the person accepting such. That Defendant Greenberg was and is entirely compromised pursuant to bribery is clearly inferred by virtue of her continuous decisions in defiance of law, material facts and reason making her recusal long overdue.

Bribery - Count 2:

388. The cited conduct of Defendants BJ Fadem and Ron Nerio in violation of their fiduciary duty to their client, Plaintiff Jason Cobb, as described herein, infer undue influence and/or bribery in violation of 18 U.S.C. § 201.

Bribery - Count 3:

389. The cited conduct of Defendants Bowman and Freel in violation of their fiduciary duty to their client, Plaintiff Jason Cobb, as described herein, infer undue influence and/or bribery in violation of 18 U.S.C. § 201.

Pattern of Racketeering Activity: **Extortion** in Violation of CA Penal Code 518

390. Plaintiffs reallege and incorporate herein by references each and every foregoing paragraph of this complaint as if set forth in full.

391. Black's Law Dictionary defines "extort" as "to compel or coerce, as a confession or information, by any means serving to overcome one's power of resistance, thus making the confession or admission involuntary, To gain by wrongful methods; to obtain in an unlawful manner by means of threats of injury to person, property or reputation.

Extortion - Count 1:

392. In and around the second week of November 2010, Defendant Brede took the stage during an evening service meeting and delivered an intentionally erroneous financial report to the members that was intended to or had the tendency to induce monetary contributions in violation of CA Penal Code §§ 484 (theft by trick or device; theft by fraudulent pretense), 518 (extortion), 182(a)(1), 182(a)(4) and CA Corp. Code 6812(false financial report to shareholders with intent and/or a tendency to induce donations). At the conclusion of the meeting he inferred that Plaintiff and his fellow elders were responsible for the "missing" funds by advising concerned persons to take the matter up with the previous elders, especially Plaintiff Jason Cobb, causing a stir amongst the members. On April 18, 2011, Defendants Brede and Showers filed an intentionally false police report accusing Plaintiff of theft in violation of CA Penal Code §§ 148.5 and 182(a)(2).

1
2
3
4
5
6

393. In addition to the cited offenses, both overt acts, which are continuous, collectively constitute extortion under state law in violation of CA Penal Code 518 as the cited RICO Defendants' actions were intended to induce fear in plaintiff that the RICO Defendants will, among other things, continue to pursue a scheme of misrepresentation to his detriment unless he formally resign as Chairman and CEO of the Corporation and further comply with Enterprise demands by disengaging from the civil actions of concern.

7

Extortion - Count 2

8
9
10
11
12
13

394. In state civil action CIV 508137, Plaintiff filed notice regarding his motion for a new trial in late February. To Plaintiff's best recollection, the deadline to file the motion for new trial was 3/7/12. On 3/2/12, Defendant Jennifer Altamirano abruptly left with the children without any prior communication to her parents' home in Ventura, CA, the intent being to disrupt and distract Plaintiff and set the stage for an act of extortion on the part of her father, Defendant Alfred Altamirano, which was executed during a phone conversation in and around 3/4/2012.

14
15
16
17
18
19
20

395. During this conversation, Defendant Alfred Altamirano told Plaintiff that the sudden family issues stemmed from the legal cases and that things would get better once all of the cases went away, in particular state civil action CIV 508137. He then endeavored to create fear and anxiety in Plaintiff by expressing his uncertainty regarding whether Defendant Jennifer Altamirano would return home with the children as long as the cases continued. These statements constitute extortion in that they were intended to cause fear to the end of discouraging Plaintiff from filing his motion for a new trial by the pending deadline of 3/7/2012. Defendant Altamirano's statements were heard by two other witnesses.

21

Extortion - Count 3

22
23
24
25
26
27
28

396. Defendant Jennifer Altamirano engaged in a general pattern of extortion upon leaving the family residence under false pretense. Her intent has been to extort involuntary acts from Plaintiff including his withdrawal of or his withdrawal from the civil actions which threatened the Enterprise as discussed herein. The physical separation, the family law case and fraudulently acquired custody of the children have all been designed to create the required leverage against Plaintiff to force his compliance with a range of demands from the Enterprise that have been presented vicariously through Defendant Jennifer Altamirano. These tactics forced Plaintiff's withdrawal of his motion for a new

1    trial in state civil action CIV 508137, the removal of his name from federal civil action C 12-01372-
2    JSW and the withdrawal of his appeal of the dismissal of federal civil action C 11-02496-DMR (aka:
3    the Cisco case).

4    Extortion - Count 4

5    397. Since March 2012, Defendant Bill Douglas has engaged in a general pattern of extortion
6    in support of Defendant Jennifer Altamirano's efforts as stated above. This has included providing
7    Plaintiff verbal assurances of support during the child custody evaluation – to the extent that Plaintiff
8    "returned to God" by disengaging from the civil actions which threaten the Enterprise. This has also
9    included efforts to create fear in Plaintiff and doubts regarding the future prospects of the marriage
10   and family if he did not "return to God" as stated. Defendant Douglas applied such coercive pressure
11   as a matter of course since March 2012 endeavoring to unduly influence Plaintiff's thinking and
12   actions in furtherance of the scheme.

13   Extortion - Count 5

14   398. During a discussion to secure his testimony for a hearing in family law case 116981,
15   Defendant Ferris stated that Plaintiff was dependent on input from others in relation to the child
16   custody evaluation. In doing so, Defendant Ferris drew Plaintiff's attention to the fact that the
17   majority of persons he could cite as references were all Jehovah's Witnesses. In making these
18   statements Defendant Ferris stressed that Plaintiff needed the help of congregation members to
19   succeed in his current circumstances, which had the tendency to induce fear and anxiety as well as a
20   feeling of dependency that necessitated Plaintiff's compliance, for the "greater good" as well as the
21   good of his family. These statements constituted extortion with clear intent to discourage Plaintiff's
22   involvement in the civil actions which threatened the Enterprise. There are two witnesses to this
      conversation.

23   Extortion - Count 6

24   399. In October 2012, during a discussion for the custody evaluation, Defendant Kline
25   presented as an agent of influence on behalf of the Enterprise. At one point in the discussion,
26   Defendant Kline directed attention to Plaintiff's legal cases. He then asked for additional details
27   regarding the causes of action. Once Plaintiff provided a general overview of each action, Defendant
28   Kline then initiated dialogue establishing a correlation between the legal matters and the current state

of the family. Plaintiff feels that Defendant Kline did so in the same manner and with the same intent as Defendants Douglas, Lawrence Lee, Alfred Altamirano and Jennifer Altamirano, amongst others, who were all endeavoring to discourage Plaintiff's involvement in the actions of concern. When Plaintiff advised that he had disengaged from one civil action (CIV 508137), Defendant Kline then probed further into the case involving Cisco Systems, Inc. by asking leading questions to focus Plaintiff's attention on the notion that Cisco had solved the problem, that the employees at Cisco were "leaving him alone," the inference and thrust being that the need to litigate the case no longer existed so Plaintiff should drop it. Defendant Kline then asked what else Plaintiff felt he could do (besides disengaging from CIV 508137) to "restore peace" to the family, which caused Plaintiff to feel that Defendant Kline was prodding him to dismiss or withdraw from the remaining civil actions which threatened the Enterprise.

400. On this occasion and others, Defendant Kline intimated that Plaintiff's continued involvement in the cited legal matters could adversely affect his standing in the child custody evaluation. This messaging and the import of such had a tendency to induce fear and uncertainty. Such comments and inferences constitute undue influence and extortion identifying Defendant Kline as a participant in the effort to discourage Plaintiff's involvement in the civil actions which threaten the Enterprise, per the scheme.

Extortion - Count 7

401. Regarding the appeal hearing in June 2012 that affirmed that Plaintiff would be disfellowshipped (excommunicated) as one of Jehovah's Witnesses, the primary line of discussion established that the threat federal civil action C 12-01372-JSW presented to the Enterprise was the key issue motivating that decision. Further the decision was strategic in that it put Plaintiff in a position that he would have to "work" to get out of.

402. As stated, at the end of the hearing, Paul Demosthenes asked Plaintiff how many other legal actions that he was involved in had members of the congregation named as Defendants. Plaintiff confirmed that there was only one, C 12-01372-JSW. Paul Demosthenes nodded while looking intently at Plaintiff, making extended eye contact, before advising that a person could be reinstated as one of Jehovah's Witnesses in a few months, a year, or longer clearly inferring that Plaintiff's future prospects for reinstatement depended on his withdrawal of the action in question or at least the

removal of the names of any Defendants that are members of the congregation.

Pattern of Racketeering Activity: **Obstruction of Justice** in Violation of 18 U.S.C. § 1503 (*Omnibus Clause*)

403. Plaintiffs reallege and incorporate herein by references each and every foregoing paragraph of this Complaint as if set forth in full.

404. The initial phase of the scheme discussed herein was specifically intended to prevent Plaintiff's completion and filing of the complaint for C 12-01372-JSW, which explains why Defendant Jennifer Altamirano began to disrupt the Cobb household during this time, committing varied acts of obstruction and spoliation of evidence as described. When this tactic failed, the Enterprise endeavored to use family law case 116981 as an ongoing means to obstruct Plaintiff's ability to focus on the prosecution of C 12-01372-JSW. A key aspect of this strategy was Defendant Altamirano's use of the children as a means to extort involuntary acts from Plaintiff to the benefit of the Enterprise. These efforts were then supplemented by the threat and eventual execution of congregational discipline to exert further coercive pressure on Plaintiff.

405. Subsequent efforts to reduce Plaintiff's visitation time with his children followed by false allegations of domestic violence marked the escalation of pressure tactics used against Plaintiff. Varied acts of witness tampering on the part of Defendants Brede, Douglas and Jennifer Altamirano align with Defendant Appel's efforts to prevent Plaintiff's acquisition of evidence to defend himself in both San Mateo County and Santa Clara County.

406. Furthermore, Defendant Sinclitico's minions within Cisco Systems, Inc. have played an ongoing role in the execution of coercive pressure and disruptive attacks under the guise of work within the course of business in and around key filing dates in the civil actions of concern for Cisco, Morgan, Lewis and the Enterprise in general.

407. Having already bribed a so-called "judge" in Superior court, the Enterprise proceeded to unduly influence Plaintiff's own attorneys to undermine his basis of success, per the scheme.

408. Varied San Mateo County entities and agents including the City of Menlo Park, City Attorney and District Attorney have collectively obstructed justice by manufacturing then intentionally maintaining an impasse with the investigation for Menlo Park PD case 11-973 while refusing to obtain key evidence by subpoena.

1

2

3

4

409. All of these efforts were then bolstered by the continuing evasive maneuvers from Chase Bank as preventing acquisition of evidence regarding account xxxxx2300 remains the prime directive for all Enterprise members strengthening the existing basis of inference that violations of 18 U.S.C. § 1956 are central to the operation and management of the Enterprise.

5

Pattern of Racketeering Activity: **Mail Fraud** in Violation of 18 U.S.C. § 1341

6

7

410. Plaintiffs reallege and incorporate herein by references each and every foregoing paragraph of this Complaint as if set forth in full.

8

Mail Fraud – Count 1

9

10

11

12

13

14

15

16

411. Plaintiff Jason Cobb served a subpoena upon JPMorgan Chase Bank on November 21, 2011. He received an acknowledgement letter dated December 8, 2011 from Dianna Stinson, a subpoena analyst serving in JPMorgan Chase' National Subpoena Processing center located at 7610 West Washington Street in Indianapolis, Indiana at his address (1101 Menlo Oaks Drive, Menlo Park, CA 94025). Therein Ms. Stinson advised that the records would not be available by the specified return date and requested an extension date of January 20, 2012. Thereafter, Plaintiff Cobb submitted a written response dated December 12, 2011 specifying a requested delivery date of December 30, 2011.

17

18

19

20

21

22

23

412. While approval of the subpoena was given by Ms. Stinson, she very much needed a valid and plausible reason to avoid fulfilling the demand for records. When one could not be found, Ms. Stinson sent the initial reply insincerely approving production of the bank records in full expectation of the RICO Defendants' next obstruction maneuver. At this point, Defendant Sinclitico assumed control of the situation by falsifying an order dismissing federal action C 11-02496-DMR, precisely the same tactic that was used in federal action C 10-03907-MEJ by precisely the same group of perpetrators for essentially the same reason: prevent the acquisition of the records for Chase account xxxxx2300.

24

25

26

413. The letter sent by Ms. Stinson via US mail was related to the Enterprise' scheme to obstruct the due administration of justice and to defraud Plaintiffs as described herein and thus constitutes a violation of 18 U.S.C. § 1341.

27

Mail Fraud – Counts 2 & 3

28

414. Two new subpoenas for consumer records were served on JP Morgan financial entities in

March 2013. The subpoenas sought financial records for the non-profit corporation employed by the Menlo Park congregation, specifically account xxxxx2300 as well as Defendant Jennifer Altamirano. The two responses received by U.S. mail are attached hereto in Exhibit 17.

415. While Chase should be a neutral third party, Chase demonstrates a vested interest specific to the cited records strengthening the basis of inference that Chase is directly involved, as a willing participant, in the Enterprise' alleged violations of 18 U.S.C. § 1956. Further, Chase' willingness to retain an attorney to prevent the immediate acquisition of Jennifer Altamirano's consumer records provides further indication of Defendant Altamirano's standing with the Enterprise as a key asset in view of the scheme to attack and oppress Plaintiff as such a gesture is highly irregular.

416. Both of the cited letters sent via US mail are related to the Enterprise' scheme to obstruct the due administration of justice and to defraud Plaintiff as described herein thus constituting violations of 18 U.S.C. § 1341.

Mail Fraud – Counts 4 & 5

417. The Law Offices of BJ Fadem & Associates, as represented by Defendants BJ Fadem and Ron Nerio, sent two letters via U.S. mail, a substitution of attorney form in February 2013 and a statement of services in April 2013, with a return address of 111 W. St. John Street, suite 1140, San Jose, CA, 95113 to Plaintiff (331 Curtner Ave, Palo Alto, CA 94306). As cited above, Defendants BJ Fadem and Ron Nerio violated their fiduciary duty to Plaintiff Jason Cobb, pursuant to being unduly influenced by the Enterprise. Having performed acts of obstruction, fraud and conspiracy, as described herein with particularity, in furtherance of the Enterprise' scheme, the two letter they sent by U.S. mail to Plaintiff relating to the fraudulent legal engagement constitute violations of 18 U.S.C. § 1341.

Mail Fraud – Counts 6 & 7

418. Plaintiff and Jonathan D. Cobb, Sr. met with Defendant Cameron Bowman in his San Jose, CA office on 3/15/2013. Outstanding discovery needs were considered during this discussion.

419. Plaintiff stated that a subpoena seeking a detailed description of the 5th Wheel recreational vehicle used at Stanford Stadium on 9/15/2012, specific to the domestic violence allegations, should be served on Defendant Bill Douglas. The intent being to establish material facts

1

regarding the vehicle to support eye witness testimony. Defendant Bowman agreed to do so.

2

3

4

5

420. Next, Plaintiff expressed the need to subpoena a copy of the report filed by Defendant Altamirano with the DA's Office for San Mateo County in March 2012. The intent being to obtain any and all documented statements by Defendant Altamirano regarding any allegations for comparative analysis to identify inconsistencies and lies. Defendant Bowman agreed to do so.

6

7

8

9

10

11

12

421. Thereafter, a status hearing for case B1262610 was held at the Superior Court for California in Palo Alto, CA. Curiously, Defendant Deborah Appel attended although having no basis to participate in the hearing or provide any input. Defendant Appel remained for an extended period after the hearing and spoke with Deputy District Attorney, Thanh Ngo and Defendant Cameron Bowman. Prior to the hearing, Defendant Appel had recurring communications with both of these persons endeavoring to insert herself into case B1262610 to exert unwholesome influence per Enterprise directives.

13

14

15

16

422. On 3/21/2013, Defendant Susan Greenberg was recused from family law case 116981 pursuant to Plaintiff's Statement of Disqualification citing her violation of his constitutional rights and displays of bias and partiality throughout the proceeding. This occurrence sent shockwaves through the Enterprise in view of the pivotal role Defendant Greenberg had played to that point in furtherance of the scheme.

17

18

19

20

423. On 3/22/2013, Defendant Cameron Bowman requested justifications for the additional subpoenas Plaintiff wanted to issue in case B1262610. Then advised that no further subpoenas would be issued. Further, Defendant Bowman refused and/or ignored any and all of Plaintiff's requests to discuss matters further by phone or in person.

21

22

23

24

25

26

27

28

424. Defendant Appel had voiced objections to subpoenas Plaintiff had served upon the DA for San Mateo County, seeking the report filed by Defendant Jennifer Altamirano and the subpoena to Defendant Bill Douglas regarding the 5th wheel vehicle, amongst others. Defendant Bowman's reversal and refusal to issue subpoenas in these two regards, coupled with Defendant Bill Douglas' corresponding objections and refusals to comply establish a basis of inference that Defendant Appel, colluded with Defendants Bowman and Douglas to impede Plaintiff's efforts to obtain the desired information. Consequently, the two objection letters attached hereto in Exhibit 16, produced and sent via U.S. mail as caused by Defendant Bill Douglas as well as Defendants Jennifer Altamirano and

1  Deborah relate to the Enterprise' scheme to obstruct the due administration of justice and to defraud

2  Plaintiff as described herein thus constituting violations of 18 U.S.C. § 1341.

3  Mail Fraud – Count 8

4  425. Count 8 is derived from the exact same set of facts and details as stated above in Mail

5  Fraud Counts 6 & 7. Consequently, the letter attached hereto in Exhibit 29, sent by John C. Biers (San

6  Mateo County Counsel) that was **caused** by communications and actions on the part of Defendants

7  Deborah Appel and Jennifer Altamirano constitute violations of 18 U.S.C. § 1341. (There is no

8  requirement under 18 USCS § 1341 that defendant participate in or personally direct the specific

9  mailing made in furtherance of fraudulent scheme. *United States v. Clark* (1973, SD NY_ 359 F sup

10  128))

11  Mail Fraud – Remaining Counts

12  426. Family law case 116981, in its entirety, is an act of fraud being filed for strategic

13  purposes in furtherance of the scheme against Plaintiff as described herein. Consequently, any and all

14  mailings performed by Defendant Jennifer Altamirano or performed on her behalf constitute acts of

15  mail fraud. Likewise, any and all mailings executed by or caused by Defendant Deborah Appel as

16  well as non-party co-conspirators Nancy De Ita and Linda Noeske, all attorneys who have represented

17  Defendant Jennifer Altamirano in the family law case(es) and matters discussed herein, constitute

18  violations of 18 U.S.C. § 1341.

   Pattern of Racketeering Activity: **Money Laundering** in Violation of 18 U.S.C. § 1596

19  427. Plaintiffs reallege and incorporate herein by references each and every foregoing

20  paragraph of this Complaint as if set forth in full.

21  428. The RICO Defendants have knowingly caused and are complicit in the transportation,

22  transmission, and/or transfer of funds across state lines with the intent that those funds be used in the

23  carrying on of unlawful activity in violation of 18 U.S.C. §§ 371 and 1596.

24  429. Non-profit corporation banking accounts utilized by some local congregations of

25  Jehovah's Witnesses provide fertile ground for the systematic expansion of such operations under the

26  color of religious right and office. In the instances where such occurs, as in the case of the Menlo Park

27  Corporation, a select few individuals with standing in the non-profit corporation sincerely employed

28  by the congregation play a supporting role in the operation of the Enterprise described herein by and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

through recurring violations of 18 U.S.C. §§ 371 and 1596. Financial transaction records for Chase account xxxxx2300 are expected to provide evidence of such.

Pattern of Racketeering Activity: **Wire Fraud** in Violation of 18 U.S.C. § 1343

Wire Fraud – Counts 1 & 2

430. Chase Subpoena analyst Diana Stinson (7610 West Washington St, Indianapolis, IN 46231, 317-757-7254) called Plaintiff Jason Cobb's phone number, 650-815-1547, on December 9, 2011 at 9:01a.m PST (Count 1) in response to his subpoena for bank records and left a voicemail regarding Chase file number 344495 (C 11-02496-DMR) stating that it would take 30 days to produce the records and thus requested an extension of the production date to 1/20/12. Next, Plaintiff Cobb sent a letter dated December 12, 2011 specifying an extension date of December 30, 2011. Thereafter, Ms. Stinson made another intrastate phone call, calling Plaintiff Jason Cobb's phone number, 650-815-1547, on December 14, 2011 at 12:37 p.m. PST leaving a voicemail advising that she would escalate the subpoena request in order to attempt to meet Plaintiff Cobb's counter proposed production date of December 30, 2011 (Count 2). These communications and the assurances of compliance were a ruse constituting fraud as the cited representatives had no intention of fulfilling the subpoena requests.

431. Plaintiff Jason Cobb's letter to Chase dated December 7, 2011 was the trigger for the responses from Dianna Stinson, Misty Wiley on behalf of Lisa Wilson (who had never responded to Plaintiff's subpoena issued from action CIV 508137), and alleged Chase fraud investigator Kim Horton. Thus that escalation attempt and the content of such sets the context in which to view the subsequent responses as damage control was the intent of each response, not actual fulfillment. As noted above, the RICO Defendants had intercepted and reviewed Plaintiff Jason Cobb's letter and concerns to the end of devising a micro-scheme to appear responsive while plans to terminate the case and subpoena request commenced.

432. Thereafter, Plaintiff received notice via email (ECF) that Magistrate Judge Donna M Ryu, as represented, had granted Defendants' Motion to dismiss each and every claim for C 11-02496-DMR with prejudice, which, by the Enterprise' design, terminated subpoena reference number 344495, thus completing the Enterprise' latest effort to prevent the acquisition of the records for Chase account No: xxxxx2300.

1    433. The bank insiders in this case worked in concert with and parallel to their counterparts,

2    namely Defendants Sinclitico and Smith to the end of obstructing the due administration of justice by

3    and through execution of fraud upon the court.

4    434. The involvement of said bank insiders within this scheme as described and their

5    intrastate use of wire communications in furtherance of such as described herein constitutes a

6    violation of 18 U.S.C. § 1343.

7    Wire Fraud – Counts 3

8    435. Plaintiff Jason Cobb submitted a letter of concern to JPMorgan Chase Bank's Global

9    Security and Investigation Department on December 7, 2011 outlining his concerns of obstruction

10   relative to multiple subpoena requests for federal civil actions C 10-03907-MEJ and

11   C 11-02496-DMR as well as state action CIV 508137, which led to Plaintiff receiving responses from

12   subpoena analyst Dianna Stinson and Misty Wiley as well as alleged fraud investigator Kim Horton.

13   436. As detailed within the related claims, Enterprise insiders devised a micro-scheme

14   pursuant to Plaintiff Jason Cobb's letter of concern dated December 7, 2011. The objective was to

15   respond to Plaintiff thus creating a paper trail of JPMorgan Chase reps being "responsive" and

16   "helpful" to the end of complying with the subpoena request(s). At the same time, a parallel effort

17   spearheaded by RICO Defendants Sinclitico and Smith ensued with a view to fraudulently dismissing

18   federal action C 11-02496-DMR by falsifying the dispositive order for that action. Any and all

19   communications, whether by U.S. Mail or intrastate wire communications by Donna A Craig, Dianna

20   Stinson, Misty Wiley and Kim Horton were in furtherance of this micro-scheme of obstruction.

21   437. Pursuant to Plaintiff Jason Cobb's letter of concern to JPMorgan Chase Bank's Global

22   Security and Investigation, dated December 7, 2011, internal fraud investigator Kim Horton

23   (Indianapolis, IN;888-282-5867; 317-684-3312) made an intrastate phone call to Plaintiff Jason Cobb

24   (Menlo Park, CA; 650-815-1547) on December 28, 2011 at 8:54a.m. PST and at 11:58a.m. PST

25   leaving a voicemail. The fact that Ms. Horton made her initial phone calls to Plaintiff in response to

26   his letter of concern on precisely the same day that the falsified order dismissing federal action

27   C 11-02496-DMR was served is the direct result of collusion with Defendant Sinclitico. In making the

28   call, Ms. Horton created a record of "response" although she and the other insiders were aware of and

1  complicit in the scheme to terminate the outstanding subpoena request by and through the act of fraud

2  upon the court as described.

3  438. Ms. Horton's intrastate phone calls to Plaintiff pertained to and generally supported the

4  scheme to defraud Plaintiffs as described herein in violation of 18 U.S.C. § 1343.

5  Wire Fraud – Count 5

6  439. On 3/27/13, Chase Subpoena analyst Christy Wilson (7610 West Washington St,

7  Indianapolis, IN 46231, 317-757-7254) called Plaintiff Jason Cobb at 408-526-8655 on March 27,

8  2013 at approximately 10:15 a.m PST regarding Plaintiff's subpoena for financial records specific to

9  the non-profit corporation employed by the Menlo Park congregation (account xxxxx2300). In doing

10 so, Ms. Wilson requested a statement of justification regarding the purpose of the subpoena and

11 Plaintiff provided such.

12 440. Thereafter, Plaintiff did not receive a response to any of his follow-up phone calls to

13 Ms. Wilson. Then Plaintiff received the letter attached hereto in Exhibit 17 advising that the two

14 subpoenas Plaintiff had served upon JP Morgan Chase, seeking consumer records for the Menlo Park

15 corporation (account xxxxx2300) as well as Defendant Jennifer Altamirano would not be fulfilled.

16 The letter marks the continuation of JP Morgan Chase' ongoing effort to withhold the financial

17 records specific to account xxxxx2300, while also providing tangible affirmation of Defendant

18 Jennifer Altamirano's standing as an Enterprise asset as well as the strategic value of family law case

19 116981 within the Enterprise' scheme. JP Morgan Chase strangely extends itself by retaining an

20 attorney to field subpoena inquiries regarding Defendant Jennifer Altamirano's personal consumer

21 records, creating an added point of discovery for this action. (Note: The citation in the attached letter

22 of "Cobb v. JP Morgan Chase" (C 12-01372-JSW) is incorrect as both subpoenas were issued from

   FAM 116981).

23 441. JP Morgan Chase' intrastate use of wire communications in furtherance of the

24 Enterprise' campaign of obstruction constitutes a violation of 18 U.S.C. § 1343.

25                          **FOURTH CLAIM FOR RELIEF**

26                   **(Conspiracy to Violate RICO, 18 U.S.C. § 1962(d))**

27                          **(Against All RICO Defendants)**

28 442. Plaintiffs reallege and incorporate herein by references each and every foregoing

paragraph of this Complaint as if set forth in full.

443. The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c), as described above, in violation of 18 U.S.C. § 1962(d).

444. The RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

445. The RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

446. Each RICO Defendant knew about and agreed to facilitate the Enterprise' scheme defraud and oppress Plaintiff. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth above.

447. As a direct and proximate result of the RICO Defendants' conspiracy, the pattern of racketeering activity perpetrated by the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff, and other persons, have been injured in their property, including pecuniary damages consisting of legal fees and costs forced upon Plaintiff due to Defendant Jennifer Altamirano's acts of fraud and malicious prosecution which have prompted both case FAM 116981 and case B1262610. Plaintiff has incurred further pecuniary damages pursuant to acts of honest services fraud on the part of Cameron Bowman, BJ Fadem, Amanda Freel and Ron Nerio.

448. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages plus costs and any attorney's fees from the RICO Defendants. Further, Plaintiff is entitled to exemplary and punitive damages pursuant to the tortious conduct on the part of all Defendants which includes fraud, malice, oppression, intentional infliction of emotional distress, defamation, extortion, harassment and invasion of privacy, as afforded by California State Law.

**FOURTH CLAIM FOR RELIEF**

**Defamation (Slander) in Violation of CA Code of Civil Procedure 46**

**(Against All Defendants)**

449. Plaintiffs reallege and incorporate herein by references each and every foregoing paragraph of this Complaint as if set forth in full.

450. On April 18, 2011, Defendants Brede and Showers visited the Menlo Park Police Department to intentionally file a false report of criminal offense falsely accusing Plaintiff Jason Cobb of theft in violation of CA Penal Code 148.5 as well as CA Penal Code 182(a)(1), 182(a)(2) and 182(a)(5). Officer Burke Bruttig fielded the initial report later advising Plaintiff Jason Cobb of the charge of theft in violation of CA Penal Code 484. These details were then consolidated into existing case 11-973 as then assigned to Officer Jeff Keegan.

451. Defendants Brede and Showers' accusations and statements were born of malice and were slanderous to Plaintiff Jason Cobb in that they falsely accused him of theft despite the fact that they had the basis to know and in fact did know that such a charge against Plaintiff was entirely false. Their accusation was strategic being filed in direct response to the report Plaintiff Cobb had already filed regarding concerns of business identity theft, theft by trick, embezzlement and fraud, in an effort to obscure the actual facts to the end of impeding the due administration of justice.

452. Since Defendants Brede and Showers' act of defamation by and through slander has never been remedied by any acknowledgement of the wrong or retraction, it is continuous and thus eligible to be addressed in this action. All other Defendants are complicit in this act by virtue of civil conspiracy as their collective actions within the Enterprise' campaign of obstruction supported and furthered this initial act of slander and subsequent instances of such described below.

**FIFTH CLAIM FOR RELIEF**

**Fraud**

**(Against All Defendants)**

453. Plaintiffs reallege and incorporate herein by references each and every foregoing paragraph of this Complaint as if set forth in full.

454. California Civil Code § 3294 (c)(3) defines "Fraud" as an "intentional misrepresentation, deceit, concealment of a material fact known to the defendant with the intention on the part of the

defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

455. In discussing "fraud," California Civil Code § 1573 describes such as "any breach of duty which,...gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him." This section also establishes that "any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud" constitutes fraud.

456. Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts as a matter of course in their respective and collective participation in the campaign of obstruction described herein which has included overt acts of bank fraud, mail fraud, wire fraud, malicious prosecution and fraud upon the court. Consequently fraud, in its varied forms as defined in both federal and state statutes, as well as common law, has been an integral part of the pattern of egregious acts perpetrated by the Enterprise to the detriment of Plaintiff and others.

457. Each and every Defendant has personally engaged in this conduct, or knew or should have known that other Defendants were engaged in it on his or her behalf.

458. As a matter of course, fraudulent acts and representations have been executed in the obstruction of the due administration of justice in countless regards by the County of San Mateo, the District Attorney's Office, the City of Menlo Park including the City Attorney, the Superior Court of California for San Mateo County in full unison with the cited representatives of the Christian Congregation of Jehovah's Witnesses, Inc. and varied persons within local congregations of Jehovah's Witnesses including but not limited to the Menlo Park Congregation.

459. In being provided through formal channels in each case, these material misrepresentations and/or omissions have been reasonably and justifiably relied upon by Plaintiff. As a direct, proximate, and foreseeable result of Defendants' fraud, Plaintiff and others have been harmed, including pecuniary, reputational, and other damages including pain and suffering, emotional distress and all other damages caused by the recurring false allegations and other attacks upon Plaintiff's character and person without due cause.

460. Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and/or are complicit in the commission of such by virtue of conspiracy, and because of the reprehensible and outrageous nature of these acts, Plaintiff is entitled to, and should be awarded,

1  punitive damages.

2
## SIXTH CLAIM FOR RELIEF

3
Civil Conspiracy in violation of CA Civil Code 1714.10

4
(Against All Defendants)

5  461. Plaintiffs reallege and incorporate herein by references each and every foregoing

6  paragraph of this Complaint as if set forth in full.

7  462. As set forth above, Defendants have committed torts against Plaintiffs including acts of

8  racketeering giving rise to violations of RICO, fraud and defamation.

9  463. Defendants agreed to participate in a common scheme against Plaintiffs. As described

10 herein, Defendants intentionally participated in the furtherance of a plan to defraud the United States,

11 The Honorable Judge Maria-Elena James, Plaintiffs and other interested and concerned parties within

12 the meaning of 18 U.S.C. §§ 371, 1341, 1343 and 1346.

13 464. As a direct and proximate result of Defendants' conspiracy, the overt acts committed in

14 furtherance of that conspiracy, and the torts committed against Plaintiffs and other interested and

15 concerned parties, Plaintiffs have been damaged in their property, and further damage to their

   property and persons is threatened and imminent.
16
17 465. Regardless of the given participants' rank and/or station, the Defendants are collectively

   bound within a ring of conspiracy with a view to a common goal and scheme as described herein. As
18
   varied tortious acts have been committed, including varied civil RICO violations, any and all
19
   participants in the scheme incur accountability as well as liability.
20
## PRAYER FOR RELIEF

21 WHEREFORE PREMISES CONSIDERED, Plaintiff prays for judgment as set forth below.

22 1. Plaintiff demands a judgment from the Defendants of damages according to proof pursuant

23 to the provisions of 18 U.S.C. § 1964(c). The initial and present estimation stands at $76,300.00.

24 2. Plaintiff demands punitive damages of $70,000,000.

25 3. Plaintiff demands any and all general damages to which he may be entitled as afforded by

26 both state and federal law.

27 4. Plaintiff demands a Declaratory Judgment and Writ of Mandate dissolving and dismissing

28

1
2
3
4
5
6
7

the travesty that is family law case 116981 including any and all orders issued therein as this proceeding has been and is entirely compromised being an intrinsic act of fraud that has been and remains completely dysfunctional and entirely incapable of meeting the standard of justice, fairness and due process that Plaintiff and all citizens of this land are entitled to as a matter of law and right per the Constitution of the United States. This demand must be granted in the prevailing interests of justice as further acts of injustice, oppression, prejudice and retaliation under color of law, pursuant to the filing of this action in the Northern District, are anticipated.

8
9
10
11

5. Plaintiff demands that any and all evidence of wrongdoing on the part of any officer or agent of the Superior Court of California for San Mateo County, any officer or agent of the court, which is to say an attorney, be remanded to the appropriate authority for further investigation and prosecution as called for.

12
13
14

6. Plaintiff demands that any and all evidence of wrongdoing on the part of any officer or agent of a law enforcement entity, whether in San Mateo County or Santa Clara County, be remanded to the appropriate authority for further investigation and prosecution as called for.

15

7. Plaintiffs pray for such other relief as in law or equity that he may be entitled.

16

### DEMAND FOR JURY TRIAL

17
18

Plaintiff Jason Cobb hereby demands a jury trial of all issues in this action triable as of a right by a jury.

19

20

Dated: April 23, 2013

21
22
23

_____
Jason E. Cobb, Plaintiff

24
25
26
27
28

95