# EXHIBIT 1

# The English Congregation of Jehovah's Witnesses in Menlo Park

Thursday, September 24th, 2009

CHRISTIAN CONGREGATION OF JEHOVAH'S WITNESSES
SERVICE DEPT
2821 ROUTE 22
PATTERSON, NY  12563-2237

Dear brothers,

In-line with points from the 12/1/97 WA pp. 30-31, we are writing to express some concerns regarding Brother Paul Koehler (CA-13).

Our brother's willingness to serve others in such a special way is appreciated. However his attitude and approach has been discouraging.

Since his arrival in 2008, Brother Koehler has exhibited an uncommon aggressiveness. During his initial inspection of the Hall with a local elder, he was very critical of local maintenance efforts. At one point during the walkthrough, while making one of his remarks, Brother Koehler emphatically drove his open-faced hand into the shoulder of our brother, knocking him back a step. Upon doing so, Brother Koehler looked him in the eye intently. In retrospect, our brother viewed this action as an attempt to "get a rise" out of him as the expression goes. He remained calm. Nevertheless, what makes Brother Koehler feel that he can get physical in such a case? Why would that be needed? His words had made the point. It's best to leave it at that.

At the end of the week during his final talk, Brother Koehler made some remarks regarding the Kingdom Hall before the friends. At one point, he shared an observation of a past congregation he served. He spoke of their fine efforts to maintain the Kingdom Hall. He concluded by saying that the condition of *their* Kingdom Hall *really* showed that it was loved. He then admonished our congregation to care for the Hall in like manner. At face value, this would appear to be a fine expression. However, with the benefit of direct observation, his comments constituted a condescending slight. This proved offensive to many in the congregation. In one sense, however sharp a traveling overseer's remarks may or may not be, as elders, it is our duty to hear them. There's no need for the sheep to be subjected to that, especially with non-believers in attendance. This proved to be discouraging to the congregation.

The following week (11/8/2008), we and the body of elders serving in the Japanese congregation convened for the initial discussion with the RBC. (Brother Koehler attended)

811 Bay Road · Menlo Park, CA 94025 · Phone: (650) 325-2345

views could be expressed in an attached letter and forwarded to the branch. He said we would sign off on everything Sunday. We could not understand the sense of urgency, why everything had to move so fast. We were made to feel that we had no basis of input whatsoever in this matter.

The next day, after the meeting for service, two members of our body saw Brother Koehler speaking at length with two elders from the Japanese congregation. In passing, they overheard him admonishing them to accept the RBC's recommendation. He was very emphatic.

That very afternoon, our coordinator received the latest letters from the branch, which included the 4/2/2009 & 4/6/2009 letters to all BOEs. He read them both then circulated them amongst the body. Upon reading the slave's directives, it became clear why the RBC referred *only* to the 4/2/09 letter and why Brother Koehler had been in such a hurry to get us to sign-off on the merger proposal. The body decided to refrain from acting hastily. (1 Kings 2:3; Prov 14:15)

The next day (Sunday), an elder worked with Brother Koehler in service and advised that we were still undecided and needed more time. Brother Koehler said that he was still sending in his recommendation and that we would meet the following Saturday to sign off on everything.

After the week ended, the body sent a letter to Brother Koehler reiterating that more time was needed. He replied to an elder via email, acknowledged receiving our letter then advised that he would be away for the next five days and that we would meet to sign-off on the merger when he returned. Upon his return, Brother Koehler frantically began pestering our brother, in an effort to press him and us into signing off on the proposal. We were disturbed that he continued to press the matter and literally press our brother with phone calls for over a week on both his home and cell number even after our communication with him (and even after being advised that Brother Cobb was bedridden with a serious flu). Despite his condition, our brother did stay in touch with Brother Koehler via email and kept him posted on our efforts to convene ahead of reaching a conclusion.

Brother Koehler's behavior was uncalled for. It exhibited a brazen disregard for others. All that mattered was the checklist on his clipboard and he didn't care what he had to do to complete it. His conduct and the overall circumstances made for a strange situation as we endeavored to reconcile the clear disconnect between the directives of the slave (4/6/09 Letter) and the recommendations of Brother Koehler and Brother Trevino.

We continued to reflect on matters. In doing so we discerned that the Kingdom Hall itself was the real focal point of the merger proposal. During our meeting with Brother Koehler, when we expressed a desire for more time to think things over, he yelled out "You don't own the Kingdom Hall! Jesus Christ owns this Kingdom Hall!" He sat there on stage smoldering in anger as he stared us down. This was an interesting response because it

The discussion went well. Leonardo Trevino (RBC #7) provided the initial overview and other RBC members shared key points thereafter. After the RBC members toured the Hall and grounds they briefly shared some observations. The brothers generally felt that our starter scope of work captured the essence of what was needed. They commented on the number of projects they were undertaking and actively encouraged us to determine what could be done by local congregation members. The meeting adjourned.

After the next meeting and tour of the Hall, the RBC invited both bodies into the Hall library for a brief discussion of finances. They did not offer a formal quote but generally discussed the range of needs for the Hall which, in their estimation, had expanded from the first walkthrough. After a brief Q&A session they concluded that a conservative quote, in-line with our starter scope of work, would be roughly $25,000.00. However, they made every effort to encourage us to do more, citing the feelings of Brother Koehler and the two overseers for the Spanish Circuit. Brother Trevino promised to produce a formal quote for our review during the next meeting and we adjourned.

The next meeting was held 4/11/2009 in Santa Clara. During this discussion, Brother Trevino again mentioned the prevailing feeling among the local Circuit Overseers relative to our renovation project. Brother Trevino next advised that the RBC had recently recommended a complete remodel of the Kingdom Hall in Menlo Park to Brother Paul Koehler and his fellow overseers serving the Spanish circuit and that these brothers agreed that this should be done. Consequently, the RBC raised the estimated costs of the project to $70,000.00. Brother Trevino repeatedly stated that this was simply a ball-park quote that was subject to change as the project progressed. Our then LBC representatives voiced some concern over the increased project scope and costs. In doing so, they felt pressured to accept this recommendation. Next, Brother Trevino quoted a few points from the 4/2/2009 letter to all BOEs regarding the discontinuance of the local building committee arrangement. He mentioned that there was *another letter* as well. He advised that we could review both letters once we received them. The meeting adjourned.

Why would the RBC continue to push for a complete remodel, despite the fact that they had already received and read that 4/6/2009 letter to all BOEs?

Two days later (4/13/2009), Brother Koehler, who was scheduled to visit us that week, gave our coordinator a call. He mentioned the idea of merging with a neighboring congregation. He emphasized that this would help to position us to accept the RBC's recommendation for a complete remodel of the Hall.

During our meeting that Friday night, Brother Koehler raised the topic of the merger proposal. We proceeded to ask questions. After some discussion, the body was not ready to make a decision either way and expressed a desire for more time. Brother Koehler was not happy. He wanted us to decide that very night. When we still expressed a desire for more time he abruptly said he planned to submit a recommendation for the merger anyway that would *have to be signed* by our service committee. Any opposing

revealed that, in his mind, the idea of merging and ownership of the Kingdom Hall were interrelated. At another point in the discussion he stated that a land search committee had been formed. The intent was to acquire land, build a Kingdom Hall and then sell an older Hall to finance it. "That's the way it works! That's how it's done!" Brother Koehler exclaimed. He added that, after merging, the (newly configured) body of elders would then decide what is best.

These points in conjunction with other comments from Brother Trevino further defined the context in which to view this proposed merger. Since we had expressed a reluctance to accept the RBC's recommendation for a complete remodel of the Hall, which had been presented as a means of maximizing our investment with a view to the "possibility" of selling it in the future, than this merger would apparently facilitate an elegant circumvention of our body to the end of proceeding with the project. The timing of the presentation of this proposal underscores this as well as it came right on the heels of our meeting with the RBC (4/11/2009). It was discouraging to see such tactics employed. (Mal 3:18; Rom 12:2; Heb 13:18)

As time passed, Brother Koehler's persistent involvement with our RBC engagement became more apparent as he asserted his will vicariously through some of the direct participants. Both bodies had been in full agreement as respects the original project scope. However, over time several of our Japanese brothers, began to express a desire to accept the RBC's recommendation for a complete remodel. When our differing views became clear, they became hesitant to meet with us and further discuss matters. Through direct observation and conversations with some of these brothers we learned that Brother Koehler was making the effort to influence their thought process relative to the renovation project. This contributed to the growing distance between us. (Prov 16:28; 17:9b)

Even in the midst of honest misunderstandings or even genuine differences of opinion, we are under obligation to put forth the effort to maintain our unity. At every turn when discussing topics relating to the maintenance of the Kingdom Hall, the slave stresses the need for open communication not the formation of "cold war" silos. Brother Koehler's involvement did not produce good fruitage. It seems clear that had the slave's timely directives been applied in a *uniform* manner this situation would not have occurred.

When a soldier receives his orders, he will do *whatever it takes* to accomplish the mission regardless of the cost to himself *or to others*. The mission is all that matters.

Paul Koehler exhibits that same single-mindedness.

He carries himself as a "take charge" decision maker instead of an advisor. When elders may not readily embrace his view he gets upset, becomes combative and proceeds to employ *any method* to neutralize and bypass them to the end of reaching his goals.

During his last visit, ahead of our meeting with him that Friday to discuss the merger, Brother Koehler spent the week having discussions with varied publishers. In doing so,

he asked for their input as regards congregation needs and reportedly intimated that changes were coming.

While working with a local sister in service, Sister Koehler said, in very *definite* terms, that there were *going* to be changes in the congregation. The sister went home and related this to her husband who later notified us.

Sister Koehler's comment, which she reportedly repeated through the week, struck us as a reference to the then *proposed* merger. What basis would she have to know about that? As a Christian sister, what basis would she have to say, in any respect, what will or won't happen in the congregation, especially in such definite terms? (John 2:1-4) The body had not even met to discuss the matter, much less come to any conclusion.

By the end of the week, it seemed that Brother Koehler engaged in far more discussion of congregation matters with certain publishers than he did with the body of elders.

The actions of both Brother and Sister Koehler appeared to constitute an effort to, in a sense, propose the merger within the court of public opinion and to manufacture a feeling of inevitability ahead of any discussion by the body of elders. Such a course of action seems presumptuous and disrespectful, not so much of us as individuals, but *more* importantly of the elder arrangement.

As time passed and no such "changes" occurred, certain members of the flock, began to murmur. It's a small group but that's often all it takes to disrupt the peace of the entire congregation. (*Compare* w97 11/15 pp. 16-17 par. 15) These ones are currently exhibiting a negative spirit. This is particularly disturbing because, over the past six months, we have enjoyed adding six new unbaptized publishers in addition to welcoming back two formerly inactive ones. We and, more importantly, Jehovah want them and everyone to enjoy the spiritual paradise and to be refreshed. (Matt 11:28; Mark 9:42)

If Brother Koehler had discussed matters with the body and left it at that instead of attempting to use the weight of public opinion as a means to prod us along a certain line, this present situation would not have occurred. If the congregation can be compared to a china closet, then he has been the bull. However righteous his end goal may be in this case, his *methods* toward that end, the disruptive effects of such, are proving to be too costly. (Phil 1:10; 1 Pet 5:2, 3)

**\*\*\* yb91 p. 253 Doing Jehovah's Work in Jehovah's Way \*\*\***

Jehovah is displeased if his work is not done in his way. The results will not be for the good. For a striking example of this, consider when King David was having the sacred Ark transported to Jerusalem. Bringing the ark of the covenant to Jerusalem was Jehovah's work, but the way David first tried to do it—on a wagon instead of on the shoulders of the Levites—was not Jehovah's way. The results were disastrous! In time David saw his mistake and then proceeded to have the Ark carried Jehovah's way. Then, the time came for truly great rejoicing.—1 Chron. 13:6-11; 15:12-29; 16:1-36.

### *** w93 4/1 p. 30 Be Happy and Organized ***

Even when organizational responsibilities multiply, caring elders will never lose sight of the fact that they are dealing with people—people whom God loves. (1 Peter 5:2, 3, 7; 1 John 4:8-10) They will never be so occupied with organizational matters or procedures that they forget their prime role as shepherds, guardians, and protectors of the flock.— Proverbs 3:3; 19:22; 21:21; Isaiah 32:1, 2; Jeremiah 23:3, 4.

An intense preoccupation with schedules and figures, for example, might crowd out concern for people. Consider a bus driver who thinks his prime duty is to stick efficiently to his schedule come what may. He is consumed with a desire to get from one end of his route to the other in exactly the time allotted. Unfortunately, from his point of view, passengers get in the way. They are slow and disorganized and always arriving at the bus stop just as he is moving away. Instead of remembering that the whole point of his job is to serve the needs of his passengers, he sees them as a hindrance to efficiency and avoids them.

---

Lastly, over the years, as in this case, we have noticed a certain pattern when it comes to traveling overseers. In many cases these brothers come to us with a prejudicial view of who we are and what we're about. Often, usually near the end of their assignment, they have commented that what they heard about us (evidently from self-proclaimed experts in the circuit) wasn't true. Traveling brothers will read and hear all sorts of things about people and it is their choice to decide what they will do with that information as it is yours. (Job 12:11; 1 Thes 5:21) If we have done or are doing something wrong to contribute to this trend then we'll appreciate your helpful counsel so we can work to improve. (1 Tim 4:15)

We welcome any other assistance with this current matter.

Your brothers,

Arlen St. Clair          George T. Stock          Jonathan D. Cobb          Jason E. Cobb

6

# Christian Congregation
# of Jehovah's Witnesses

2821 Route 22, Patterson, NY 12563-2237   Phone: (845) 306-1100

### SDG:SSX  October 20, 2009

BODY OF ELDERS
ENGLISH CONGREGATION OF
JEHOVAH'S WITNESSES, MENLO PARK, CA
C/O JASON E COBB
531 SANDLEWOOD ST
MENLO PARK CA  94025-1374

Dear Brothers:

Your September 24, 2009, letter has been received. You are writing to express concerns you have with your circuit overseer, Brother Paul Koehler. This is to inform you that we will look into this matter.

United with you in fulfilling our resolve to continue bearing thorough witness to the good news.—Acts 20:24.

Your brothers,

*Christian Congregation*
*of Jehovah's Witnesses*

cc:     Charles Valorz, D-26

# EXHIBIT 2

# MARK WEST ENGLISH CONGREGATION

184 Ursuline Rd., CA 95403
Talbert Petersen – P.O. 707-576-1068

11/11/09

Menlo Park Congregation
c/o Jason Cobb
531 Sandlewood St.
Menlo Park, CA 94025

RE: Nanise Vaka

Dear Brothers,
Sister Vaka has been attending our Kingdom Hall for some time now and we have enjoyed getting to know her. Since her employment appears to be permanent here in our area and she is attending all of our meetings it would be best if her publisher record cards were forwarded to us so we can best care for her spiritual needs.
We will transfer her pioneer information on the JW.org web site once letter of introduction is received. Thank you very much.
We send our love and greetings.
Your Brothers,

Talbert Petersen  PO                Marco Vasquez  SO        Joel Cook  SEC
                                                                    707 - 695 - 9367

# Christian Congregation
# of Jehovah's Witnesses

2821 Route 22, Patterson, NY 12563-2237  Phone: (845) 306-1100

SDG:SSX  January 18, 2010

BODY OF ELDERS
ENGLISH CONGREGATION OF
JEHOVAH'S WITNESSES, MENLO PARK, CA
C/O JASON E COBB
531 SANDLEWOOD ST
MENLO PARK CA  94025-1374

Dear Brothers:

    Recently we received correspondence from the body of elders of the Mark West English Congregation in Santa Rosa.  Therein they explain that they have been unable to obtain a letter of introduction as well as the *Congregation's Publisher Record* cards for Sister Nanise Vaka.  They say they have made repeated requests but have yet to receive a response.  In view of the time that has past, it would be a kindness to give this matter your prompt attention and forward a letter of introduction and the *Congregation's Publisher Record* cards for Sister Nanise Vaka to the body of elders of the Mark West English Congregation.  Thank you brothers for your prompt follow through in this matter.  We pray Jehovah's direction as you endeavor to fulfill your weighty responsibilities as shepherds of the flock of God.  (1 Pet. 5:2)  We send our warm Christian love.

Your brothers,

*Christian Congregation
of Jehovah's Witnesses*

cc:   Body of Elders
       Mark West English, Santa Rosa, CA

# The English Congregation of Jehovah's Witnesses in Menlo Park

**Wednesday, February 3, 2010**

CHRISTIAN CONGREGATION OF JEHOVAH'S WITNESSES
SDG: SSX
2821 Route 22
Patterson, NY 12563-2237

Dear brothers,

Your letter dated 1/18/2010 has been received. Our response is as follows.

Sister Nansie Vaca is a kind, loving pioneer sister who has been a member of our congregation for some time. She works as a care giver for elderly ones. According to Sister Vaca, the company she works for determines her assignments, which can be located almost anywhere within Northern California. The lengths of her assignments are generally undetermined and typically change without much notice.

Sister Vaca has a deep attachment to this congregation due to some past experiences. Years ago she had been stumbled by an act of unkindness that was very hurtful to her. Sadly, she became inactive. As time passed a local elder made an ongoing effort to find her. After a year of searching, he did. For some time, he encouraged her to return to the meetings and eventually she agreed. She was able to make a full recovery, eventually being appointed as a pioneer. The experience made a deep impression on her. She couldn't believe that the brother kept searching for her after all of that time and that he persisted to reach out to her despite her initial apathy. She said that if she was in any other congregation she would have been lost forever. Obviously that is not true and she was told as much but she continued to hold this feeling within herself from that time on.

When Sister Vaca began working her current assignment in Santa Rosa, members of our body spoke with her about her changing circumstances. During the discussion she stated that she intended to keep living in Menlo Park and that she desired to remain a member of the congregation. There was some concern because most of her time was being spent in Santa Rosa.

After speaking with her, a local elder contacted the pioneer desk and explained the situation. The brother at the desk listened then advised that pioneers in varying locales spend extended periods of time elsewhere throughout the year for various reasons. He referred to such ones as "snowbirds" and added that as long as their whereabouts were known, that they were associated with a congregation and as long as they remained active in the service, getting their time and turning it in etc...then the location of their S-21 card was not of great concern. The brother concluded by saying that there was no reason to force the sister to change congregations. Our body also discussed this point with our circuit overseer and he affirmed the points made by the brother at the pioneer desk.

In receiving the letter from our brothers in the Mark West English Congregation, our coordinator contacted their coordinator, Brother Talbert Petersen, and discussed the situation by phone. Brother Petersen explained that Sister Vaca has been doing well spiritually. He added that our circuit overseer, Brother Paul Koehler (CA-13), had discussed Sister Vaca's situation with their circuit overseer and that they had subsequently been directed by their circuit overseer to obtain Sister Vaca's S-21 card. Our coordinator assured Brother Petersen that sending the card would not be a problem. However, he did express our desire to speak with Sister Vaca directly ahead of doing so to ensure her awareness and agreement with this. He asked for Sister Vaca's current phone number and was directed to obtain it from Brother Joel Cook, the secretary.

In time our Coordinator spoke with Brother Cook, confirmed Sister Vaca's number and then reached out to her and left a message. A few days later, Brother Cook called Brother Jonathan Cobb, our former Secretary, requesting Sister Vaca's card. Brother Cook advised that Sister Vaca *did not want to speak with us* and that we should just send her card. Five minutes after that conversation ended Brother Cobb's phone rang. It was Sister Vaca calling to express her condolences as his mother had recently died. The two spoke for some time. He mentioned the situation about her S-21 card and she again stated that she wanted to remain a member of the Menlo Park congregation. She also advised that she is endeavoring to obtain a work assignment closer to her home as she still has her apartment here in Menlo Park. She also mentioned that she had received a phone call from Paul Koehler (CA-13), sometime back and that he had requested the phone number of the circuit overseer serving the Mark West English Congregation. Evidently this led to the conversation that Brother Petersen had referred to when speaking with our coordinator. At any rate, Brother Cobb has advised us that Sister Vaca was anxious as she felt like she was being pressured to change congregations. Sensing that her being a pioneer was a factor in this situation, Sister Vaca stated that she was wondering if she should stop pioneering. Brother Cobb told her that we would do whatever was best for her and that, no matter what, she should continue pioneering.

Brothers, Sister Vaca is a sensitive and fragile soul. Her feelings and actions are not always grounded in reason but rather emotional sentiments. She can't take a lot of pressure or stress. She can be easily intimidated, upset and given to worry. Further, as mentioned, she has been stumbled in the past to the point of inactivity. In view of this, we do not want to do anything that would unnecessarily burden her and we are sure that all others involved with this situation feel the same way as she is one of Jehovah's little sheep. (Mark 5:25-34; 9:42; John 10:14, 15) From the very beginning, our prime concern has been what is in *her* best interests...not ours. At the same time this is a theocracy that is to exhibit the orderliness of our God Jehovah. (1 Corin. 14:33) So, having provided these added details, we'll be happy to submit to whatever direction is given in this instance.

Your brothers,

Arlen St. Clair            George T. Stock            Jonathan D. Cobb            Jason E. Cobb

2

Cc: Body of Elders – Mark West English, Santa Rosa, CA

# The English Congregation of Jehovah's Witnesses in Menlo Park

Thursday, March 4, 2010

CHRISTIAN CONGREGATION OF JEHOVAH'S WITNESSES
SDG: SSX
2821 Route 22
Patterson, NY  12563-2237

Dear Brothers,

In response to your letter dated 1/18/2010, we wanted to advise that the *Congregation's Publisher Record* cards for Sister Nansie Vaca along with her original pioneer letter (S-202-E) have been sent to our brothers serving in the Mark West English Congregation.

Please accept our warm greetings.

Your brothers,

Arlen St. Clair                George T. Stock        Jonathan D. Cobb            Jason E. Cobb

**June 7, 2010**

**Summary:**

- September, 24, 2009 –

Our body sent a letter of concern to the branch regarding our circuit overseer. We received a brief acknowledgement letter dated 10-20-09 but never received any other response to the issues thereafter.

- January 18, 2010 –

We received a letter from the branch directing us to send an S-21 card that had been requested by another congregation.

- February 3, 2010 –

Our body sent a response to the branch's 1-18-10 letter requesting further direction in view of the sister's circumstances (we never received a response).

- February 27, 2010 –

During the visit of our C.O. and the substitute D.O., our body is advised that a recommendation for our deletion will be submitted solely due to our failure to send the S-21 card when directed.

- March 4, 2010 –

The S-21 card in question is sent to the requesting congregation; branch is advised of such (we never received a response).

- May 24, 2010 –

Letter is received advising our body of its deletion.

Arlen St. Clair          George T. Stock          Jonathan D. Cobb          Jason E. Cobb

# EXHIBIT 3



# Christian Congregation
## of Jehovah's Witnesses

2821 Route 22, Patterson, NY 12563-2237  Phone: (845) 306-1100

SDG:SSX May 21, 2010

BODY OF ELDERS
SOUTH CONGREGATION OF
JEHOVAH'S WITNESSES, REDWOOD CITY, CA
C/O ERNEST DOUGLAS BREDE
2068 OAKWOOD DR
EAST PALO ALTO CA 94303-1825

Dear Brothers:

We are in receipt of a letter submitted by your circuit overseer, Brother Paul Koehler, dated March 22, 2010, wherein it is recommend that the South Congregation in Redwood City, California, be dissolved and the publishers should begin associating with the English Congregation in Menlo Park, California. In view of what has been written, the branch office is approving this recommendation and we will mark our records to show this as **effective July 1, 2010.** We will leave it up to you to determine the last meeting prior to the above date. Your last Congregation Report submitted to the branch office will be for the month of June.

The complete congregation files of the South Congregation in Redwood City, including the judicial files, should be transferred to and be held by the English Congregation in Menlo Park. Therefore, when a person who was disfellowshipped from the South Congregation seeks reinstatement, a committee from the English Congregation in Menlo Park will review the case.

Regarding the elders and ministerial servants in the South Congregation in Redwood City, they will be reappointed in the English Congregation in Menlo Park, as of July 1, 2010. We encourage you to work together closely as these adjustments are made, endeavoring to care for the needs of the sheep locally in line with the direction given at 1 Peter 5:2, 3.

The literature supply for your congregation can be joined with the literature supply for the English Congregation in Menlo Park. This transfer of literature can simply be recorded on the Monthly Movement of Literature form (S-28). After the branch office records have been updated, a revised map of the congregation territory assignment will be sent to the Menlo Park Congregation.

According to our records, the South Congregation in Redwood City holds title to the Kingdom Hall. Therefore, it will be necessary to transfer the title to another congregation that meets at the Kingdom Hall, as the legal entity associated with your congregation will no longer be active upon your congregation's dissolution. The way in which this should be handled depends upon whether the Kingdom Hall is owned by a corporation or through a trustee arrangement. If ownership is by trustees, *at least a month before the dissolution,* the elders should (1) ensure that its trustees are up-to-date and available to complete the sale of Kingdom Hall property on behalf of the congregation; (2) draft resolutions for congregation approval for the sale (or transfer to another congregation) of its property, authorizing its trustees to sell its

SOUTH CONGREGATION, REDWOOD CITY, CA
May 21, 2010
Page 2

property (or transfer it to another congregation), and, if there will be a sale, directing how the proceeds should be distributed; and (3) retain a local attorney to draft whatever legal documents are needed to authorize and complete the sale (or transfer).

If a corporation owns the Kingdom Hall, *at least a month before the dissolution,* the elders should (1) draft resolutions for congregation approval for the sale (or transfer to another congregation) of its property and, if it is to be sold, authorizing the officers of the corporation to sell the property, directing how the proceeds of the sale should be distributed, and authorizing the officers to wind up and dissolve the corporation if necessary; and (2) retain a local attorney to draft whatever legal documents are needed to authorize and complete the sale (or transfer) and dissolve the corporation, if necessary.

Additionally, if there is an existing loan from the Kingdom Hall fund, it will be necessary for another congregation to assume the monthly payments. Appropriate resolutions should be passed by your congregation and the congregation that will take on this responsibility. The Society's Treasurer's Office should be notified as soon as possible regarding the transfer of a Kingdom Hall Fund Loan.

Our heartfelt desire is that this adjustment will result in even greater attention being given to the preaching work and the spiritual needs of those related to you in the faith.—Matt. 28:19, 20; Gal. 6:10.

Thank you for your sincere efforts to assist the congregation in keeping uppermost in mind our 2010 yeartext that love endures all things and will never fail.—1 Cor. 13:7, 8.

Your brothers,

*Christian Congregation*
*of Jehovah's Witnesses*

cc:    Body of Elders
  ✓    English, Menlo Park, CA
       Paul Koehler Jr, CA-13

PS to the Menlo Park Body of elders:

Please find enclosed an S-52 form acknowledging the reappointments of elders and ministerial servants from the South Congregation of Redwood City, California. As noted on the form, they will begin serving in the Menlo Park Congregation effective July 1, 2010. Thank you.

# Christian Congregation
## of Jehovah's Witnesses

2821 Route 22, Patterson, NY 12563-2237 Phone: (845) 306-1100

SDG:SSX July 1, 2010

BODY OF ELDERS
ENGLISH CONGREGATION OF
JEHOVAH'S WITNESSES, MENLO PARK, CA        19059
C/O JASON E COBB
531 SANDLEWOOD ST
MENLO PARK CA 94025-1374

Dear Brothers:

This is to advise that the recommendation for appointment(s) of the following brother(s) has been approved under the direction of the branch office and holy spirit.

**ELDER(S)**
Ernest Douglas Brede
Luis Contreras
Larry L. Lavedure
Aaron Patrick Lucas
William B. Mac Keon
Don Theodore Showers III

**MINISTERIAL SERVANT(S)**
Matthew A. Contreras
Larry C. Krusemark
Masaaki Tashiro

Serving with you under the appointed
Head of the congregation, Jesus Christ,

*Christian Congregation*
*of Jehovah's Witnesses*

PS to body of elders:

If any brother recommended is appointed, please have two elders speak to him *before announcing the appointment*. In every case, the elders must ask the following questions: "Is there anything from your past or in your personal or family life that disqualifies you or that would prevent you from accepting this appointment? Is there any reason why your appointment should not be announced to the congregation?" If the brother has not previously served as an elder or a ministerial servant, ask the following question: "Have you ever been involved at any time in the past with child sexual molestation?" If the answers yes to any of the above questions, **do not announce the appointment.** Rather, return this letter to the branch office along with an explanation of why he is disqualified. Each one appointed should be sure that he is well acquainted with what the Bible says about his responsibilities in the congregation. In all that he does, he should look to God's Word for guidance and should cooperate closely with the faithful and discreet slave class, through whom the Lord is providing direction for his congregation.

Whenever a deletion is announced to the congregation, the announcement should read as follows: "Brother [individual's name] is no longer serving as an elder (a ministerial servant)." If the individual(s) listed below has been dealt with judicially and thus an announcement of his deletion has already been made, it is not necessary to make a second announcement upon receipt of this letter. If an elder is deleted for reasons other than moving to another congregation with a favorable recommendation, he should turn over his Kingdom Ministry School textbook to the Congregation Service Committee.

**DELETION(S)**

# EXHIBIT 4

**Statement of Facts:** 11-973

I, Herbet D. Atkins, am a current member of the Menlo Park Congregation of Jehovah's Witnesses. I began attending this congregation in 1988.

In and around the first or second week of November 2010, during a regularly scheduled congregation meeting, Ernest Brede provided a financial report to the congregation from the platform. During such he advised that the total funds within the congregation's local building fund totaled $3,500.00.

This reported amount caused a stir in the audience and general concern on the part of many as it was considerably less than previously reported amounts, which, in recent years, had typically been in the $10,000.00 - $17,000.00 range.

After the conclusion of the meeting several members said "Where's our money?"

When presented with this question, Ernest Brade stated that concerned members should ask the previous body of elders*, inferring that they had something to do with the missing funds.

In speaking with Jason E. Cobb, he has confirmed that none of the previous elders had anything to do with the dramatic drop in the building fund. Mr. Cobb has referenced recently acquired bank records which verify his statement.

To date, Ernest Brede's report to the congregation has not been corrected despite the fact that it clearly conflicts with congregation bank records.

Please feel free to contact me directly with any further questions. Thank you.

Herbet D. Atkins
471 O'Connor St
Menlo Park, CA 94025
650-248-6932

Date: _____

* Jason E. Cobb, Jonathan D. Cobb Sr., W. Arlen St. Clair, George T Brock

# EXHIBIT 5

# Wells Fargo Advantage ® Checking



Account number: 87894705    October 21, 2010 - November 18, 2010    Page 1 of 3

M P JEHOVAS WITNESS K H O F
GLENN MICHELE WATSON
811 BAY RD
MENLO PARK CA 94025-1609

## Questions?

*Available by phone 24 hours a day, 7 days a week:*

**1-800-TO-WELLS** (1-800-869-3557)

*TTY:* 1-800-877-4833
*En español:* 1-877-727-2932   *TTY:* 1-888-355-6052
華語 1-800-288-2288   *(8 am to 7 pm PT, M-F)*

*Online:* wellsfargo.com

*Write:* Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## You and Wells Fargo

Sign up for free* Account Alerts. Get timely notifications sent right to your email or wireless device when: your balance is above or below a specified amount; a withdrawal or deposit posts to your account; your daily ATM withdrawals and debit card purchases exceed an amount you choose. Sign up or log on to Online Banking and click the Account Services tab, Messages & Alerts section to get started.

*Your mobile carrier's text messaging and Web access charges may apply.

## Account options

*A check mark in the box indicates you have these convenient services with your account. Go to wellsfargo.com or call the number above if you have questions or if you would like to add new services.*

| | | | |
|---|---|---|---|
| Online Banking | ☐ | Direct Deposit | ☐ |
| Online Bill Pay | ☐ | Overdraft Protection | ☐ |
| Online Statements | ☐ | Rewards Program | ☐ |
| Mobile Banking | ☐ | Auto Transfer/Payment | ☐ |
| My Spending Report | ☐ | | |



### With you when *you want a spending plan you can stick to*

We can help you stay on top of your holiday spending with our checking packages that come with free online tools to help you monitor your purchases. These packages also offer account alerts that send balance* updates to your mobile phone. For more information, talk to us today, call 1-800-WFB-OPEN or visit wellsfargo.com.

*The balance update may not reflect all of your transactions such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchant.

## Activity summary

| | |
|---|---|
| Beginning balance on 10/21 | $8,437.65 |
| Deposits/Additions | 0.33 |
| Withdrawals/Subtractions | - 0.00 |
| Ending balance on 11/18 | $8,437.98 |

Account number:  87894705

M P JEHOVAS WITNESS K H O F
GLENN MICHELE WATSON

*California account terms and conditions apply*

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 121042882

# Wells Fargo Advantage ® Checking

Account number: 87894705     November 19, 2010 - December 17, 2010     Page 1 of 4



M P JEHOVAS WITNESS K H O F
GLENN MICHELE WATSON
811 BAY RD
MENLO PARK CA 94025-1609

## Questions?

*Available by phone 24 hours a day, 7 days a week:*

**1-800-TO-WELLS** (1-800-869-3557)

*TTY:* 1-800-877-4833

*En español:* 1-877-727-2932   *TTY:* 1-888-355-6052

華語 1-800-288-2288   *(8 am to 7 pm PT, M-F)*

*Online:* wellsfargo.com

*Write:* Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## You and Wells Fargo

Save time and money with tools to help manage your account. With Wells Fargo Online, you can stay on top of your balance* with alerts sent to your email or mobile device**, transfer funds and pay bills. To learn more, visit a banker or wellsfargo.com/wfonline.

*This balance may not reflect all transactions, such as checks written or debit card transactions approved but not submitted for payment by the merchant.

**Your mobile carrier's text messaging and Web access charges may apply.

## Account options

*A check mark in the box indicates you have these convenient services with your account. Go to wellsfargo.com or call the number above if you have questions or if you would like to add new services.*

| Service | | Service | |
|---|---|---|---|
| Online Banking | ☐ | Direct Deposit | ☐ |
| Online Bill Pay | ☐ | Overdraft Protection | ☐ |
| Online Statements | ☐ | Rewards Program | ☐ |
| Mobile Banking | ☐ | Auto Transfer/Payment | ☐ |
| My Spending Report | ☐ | | |

Account number:  **87894705**

**M P JEHOVAS WITNESS K H O F
GLENN MICHELE WATSON**

*California account terms and conditions apply*

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 121042882

## Activity summary

| | |
|---|---|
| Beginning balance on 11/19 | $8,437.98 |
| Deposits/Additions | 0.34 |
| Withdrawals/Subtractions | - 0.00 |
| **Ending balance on 12/17** | **$8,438.32** |

## Overdraft Protection

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed at the top of your statement or visit your Wells Fargo branch.

# Advantage Business Package Checking

Account number: 1940935883     November 1, 2010 - November 30, 2010     Page 1 of 3



M P JEHOVAS WITNESS K H O F
811 BAY RD
MENLO PARK CA 94025-1609

## Questions?

Available by phone 24 hours a day, 7 days a week:
**1-800-CALL-WELLS** (1-800-225-5935)

TTY: 1-800-877-4833
En español: 1-877-337-7454

Online: wellsfargo.com/biz

Write: Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Wells Fargo offers business owners a full-service payroll solution with payroll processing, reporting, and tax services. That means you can spend less time working in your business and more time growing your business. And now, enjoy the convenience of processing your payroll online. Online payroll from the online banking leader. For more information, visit wellsfargo.com/biz/payroll or call us at 1-800-421-4714.

### Account options

A check mark in the box indicates you have these convenient services with your account. Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.

Business Online Banking ☐
Rewards for Business Check Card ☐
Online Statements ☐
Business Bill Pay ☐
Business Spending Report ☐
Overdraft Protection ☐

## Activity summary

| | |
|---|---|
| Beginning balance on 11/1 | $10,280.68 |
| Deposits/Credits | 2,000.00 |
| Withdrawals/Debits | - 995.02 |
| Ending balance on 11/30 | $11,285.66 |
| Average ledger balance this period | $10,338.22 |

Account number: 1940935883

M P JEHOVAS WITNESS K H O F

California account terms and conditions apply

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 121042882

For Wire Transfers use
Routing Number (RTN): 121000248

## Overdraft Protection

Your account is linked to the following for Overdraft Protection:
Savings - 000009841455224

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 11/1 | 1010 | Check | | 81.89 | 10,198.79 |
| 11/10 | | Recurring Transfer Ref #Opebyped2K to Business High Yield Savings xxxxxS224 | | 100.00 | 10,098.79 |

# Business High Yield Savings

Account number:  9841455224    November 1, 2010 - November 30, 2010    Page 1 of 3



WELLS FARGO

M P JEHOVAS WITNESS K H O F
811 BAY RD
MENLO PARK CA 94025-1609

### Questions?

Available by phone 24 hours a day, 7 days a week:
**1-800-CALL-WELLS** (1-800-225-5935)

TTY:1-800-877-4833
En español: 1-877-337-7454

Online: wellsfargo.com/biz

Write: Wells Fargo Bank, N.A. (114)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Wells Fargo offers business owners a full-service payroll solution with payroll processing, reporting, and tax services. That means you can spend less time working in your business and more time growing your business. And now, enjoy the convenience of processing your payroll online. Online payroll from the online banking leader. For more information, visit wellsfargo.com/biz/payroll or call us at 1-800-421-4714.

### Activity summary

| | |
|---|---|
| Beginning balance on 11/1 | $340.06 |
| Deposits/Credits | 100.04 |
| Withdrawals/Debits | - 20.00 |
| Ending balance on 11/30 | $420.10 |
| Average ledger balance this period | $410.06 |

Account number:  9841455224

M P JEHOVAS WITNESS K H O F

California account terms and conditions apply

For Direct Deposit and Automatic Payments use
Routing Number (RTN): 121042882

For Wire Transfers use
Routing Number (RTN): 121000248

### Interest summary

| | |
|---|---|
| Interest paid this statement | $0.04 |
| Average collected balance | $410.06 |
| Annual percentage yield earned | 0.12% |
| Interest earned this statement period | $0.04 |
| Interest paid this year | $0.10 |

(114)
Sheet Seq = 3079424
Sheet 00001 of 00002

# EXHIBIT 6

**MENLO PARK PD CASE 11-973**

**Overt Acts**

CA Penal Code 148.5 - False report of criminal offense (substantive crime; overt act)

CA Penal Code 186.10 – Money Laundering

CA Penal Code 484 – False financial report to shareholders intended to induce contributions (also in violation of CA Corp. Code 6812, 6813); theft by false or fraudulent pretense; theft by trick or device; larceny by trick

CA Penal Code 503 – Embezzlement

CA Penal Code 530.5 – Business Identity Theft

CA Penal Code 532(a) – False financial statement

**Criminal Conspiracy**

CA Penal Code 182(a)(1) – If two or more persons conspire to: commit any crime (e.g.: CA Penal Code 148.5)

CA Penal Code 182(a)(2) – If two or more persons conspire to: Falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime (criminal conspiracy)

CA Penal Code 182(a)(4) – If two or more persons conspire to: To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises...(e.g.: 6812, 6813)

CA Penal Code 182(a)(5) – If two or more persons conspire to: To commit any act injurious to the public health, to public morals, or to pervert justice, or the due administration of the laws (U.S.C. 18 section 1503)

# Criminal Infractions: CA Corporations Code

**1100.** Any two or more corporations may be merged into one of those corporations. A corporation may merge with one or more domestic corporations (Section 167), foreign corporations (Section 171), or other business entities (Section 174.5) pursuant to this chapter. Mergers in which a foreign corporation but no other business entity is a constituent party are governed by Section 1108, and mergers in which another business entity is a constituent party are governed by Section 1113.

**1102.** Each corporation shall sign the agreement by its chairman of the board, president or a vice president and secretary or an assistant secretary acting on behalf of their respective corporations.

**6812.** (a) Every director or officer of any corporation is **guilty of a crime** if such director or officer knowingly concurs in making or publishing, either generally or privately, to members or other persons (1) **any materially false report or statement as to the financial condition of the corporation,** or (2) any willfully or fraudulently exaggerated report, account or statement of operations or financial condition, **intended to induce and having a tendency to induce, contributions or donations to the corporation by members or other persons.**

- In Nov 2010, Defendant **Ernest Brede** announced to Menlo Park congregation members and shareholders that the funds on-hand totaled $3500.00 which was not true at that time or now.

**6813.** (a) Every director, officer or agent of any corporation, who knowingly receives or acquires possession of any property of the corporation, otherwise than in payment of a just demand, and, with intent to defraud, omits to make, or to cause or direct to be made, a full and true entry thereof in the books or accounts of the corporation is **guilty of a crime.**

(b) Every director, officer, agent or member of any corporation who, with intent to defraud, destroys, alters, mutilates or falsifies any of the books, papers, writings or securities belonging to the corporation or makes or concurs in omitting to make any material entry in any book of accounts or other record or document kept by the corporation is **guilty of a crime.**

(c) **Each crime specified in this section is punishable by imprisonment in state prison, or by imprisonment in a county jail for not exceeding one year,** or a fine not exceeding one thousand dollars ($1,000), or by both such fine and imprisonment.

**9690.** The provisions of Chapter 18 (commencing with Section 6810) of Part 2 apply to religious corporations. In so providing, the Legislature encourages the **criminal courts** of this state in sentencing persons convicted of fraudulent activities in the guise of religious activity to exercise their authority to impose restitution as a means of compensating the victims.

# EXHIBIT 7

11-913

RICHARD CLINE
MAYOR

KIRSTEN KEITH
MAYOR PRO TEM

ANDREW COHEN
COUNCIL MEMBER

KELLY FERGUSSON
COUNCIL MEMBER

PETER OHTAKI
COUNCIL MEMBER

**Building**
TEL 650.330.6704
FAX 650.327.5403

**City Clerk**
TEL 650.330.6620
FAX 650.328.7935

**City Council**
TEL 650.330.6630
FAX 650.328.7935

**City Manager's Office**
TEL 650.330.6610
FAX 650.328.7935

**Community Services**
TEL 650.330.2200
FAX 650.324.1721

**Engineering**
TEL 650.330.6740
FAX 650.327.5497

**Environmental**
TEL 650.330.6763
FAX 650.327.5497

**Finance**
TEL 650.330.6640
FAX 650.327.5391

**Housing &
Redevelopment**
TEL 650.330.6706
FAX 650.327.1759

**Library**
TEL 650.330.2500
FAX 650.327.7030

**Maintenance**
TEL 650.330.6780
FAX 650.327.1953

**Personnel**
TEL 650.330.6670
FAX 650.327.5382

**Planning**
TEL 650.330.6702
FAX 650.327.1653

**Police**
TEL 650.330.6300
FAX 650.327.4314

**Transportation**
TEL 650.330.6770
FAX 650.327.5497



**701 LAUREL STREET, MENLO PARK, CA  94025-3483**
**www.menlopark.org**

CITY OF
**MENLO
PARK**

— COPY —

July 5, 2011

Mr. Jason Cobb
1101 Menlo Oaks Drive
Menlo Park, CA  94025

Mr. Cobb:

Our department has conducted a thorough review of the documents you submitted to date in support of your report of fraud and embezzlement.  We have interviewed and collected statements from several individuals connected with this matter, identified all known parties, and collected additional relevant documents within the periods we discussed.  I believe we have a good understanding of the issues presented since your first report to us in April 2011.

A preliminary review of the facts by San Mateo County prosecutors has determined the current evidence received does not establish a substantiated loss to any party and is insufficient to seek court process at this time.  The various forms of documents we received from all parties to date have included bank statements for one Wells Fargo bank account before and after July 2010 and activity for two other Wells Fargo accounts after July 2010.  This material has been insufficient to proceed further with the investigation.

In order to proceed, we ask that you obtain and deliver three complete years of certified bank statements and checks from January, 2008 to January, 2011, for each bank account opened at any bank and used or associated with the Menlo Park Congregation of Jehovah's Witnesses, Inc.  We will suspend any further investigation until all such bank documents are received by the Menlo Park Police Department.

Please feel free to contact me with any further questions you might have.

Sincerely,

Sergeant William A. Dixon
Menlo Park Police Department

# EXHIBIT 8

# Stephen M. Wagstaffe, District Attorney/Public Administrator



**KAREN GUIDOTTI**
CHIEF CRIMINAL DEPUTY

**ASSISTANT DISTRICT ATTORNEYS**
MORLEY PITT • ALBERT SERRATO

# COUNTY OF SAN MATEO

400 COUNTY CENTER, 3ᴿᴰ FLOOR • REDWOOD CITY • CALIFORNIA 94063
DISTRICT ATTORNEY (650) 363-4636 • PUBLIC ADMINISTRATOR (650) 363-4475

July 27, 2011

Jason E. Cobb
1101 Menlo Oaks Drive
Menlo Park, CA 94025

Dear Mr. Cobb,

Thank you for the opportunity to review your Criminal Investigation Request Form and the additional background information you provided. The entirety of the documentation related to your Request has been reviewed by multiple experts in preparing this response.

Based on this office's detailed review of your Request Form and accompanying documents, the San Mateo County District Attorney's Office respectfully declines to undertake investigation of your allegations.

Regards,

John Warren

John Warren, Chief Inspector
San Mateo County District Attorney's Office

# EXHIBIT 9

1   Jason Cobb
    1101 Menlo Oaks Drive
2   Menlo Park, CA  94025
    (650) 815-1547
3
    Plaintiff
4

(ENDORSED)
**FILED**
SAN MATEO COUNTY

MAR 0 7 2012

Clerk of the Superior Court
By _REGGIE R. TOLENTINO_
DEPUTY CLERK

5               SUPERIOR COURT OF THE STATE OF CALIFORNIA

6                       FOR THE COUNTY OF SAN MATEO

7

8

9                                              Civil Action No. CIV 508137
    JASON E. COBB,
10                                             **PLAINTIFF'S   NOTICE   OF   MOTION   AND
                          Plaintiff,           MOTION FOR NEW TRIAL PURSUANT TO CRC
11                                             RULE 3.1600; SUPPORTING MEMORANDUM**

12               vs.                           **DATE:**  APRIL 27, 2012
                                               **TIME:**   2:00 P.M.
13  ERNEST BREDE, LUIS                         **DEPT:**   20
    CONTRERAS, LARRY
14  LAVERDURE                                  **COMPLAINT FILED: SEPTEMBER 2, 2011**

                          Defendant.
15

16          TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

17              NOTICE IS HEREBY GIVEN that on April 27, 2012 at 2:00 p.m., or as soon thereafter as the

18  matter may be heard, in the Law & Motion department of this court located at 400 County Center Road,

19  Redwood City, CA, Plaintiff will move the Court for a new trial to determine the validity of the

20  appointments of Ernest Brede, Luis Contreras and Larry Laverdure as directors and officers of The Menlo

21  Park Congregation of Jehovah's Witnesses, Inc. (Entity No: C0983980). This motion is made pursuant to

22  the provisions of CRC Rule 3.1600.

23              The motion will be based on this notice of motion, motion and the supporting memorandum

24  served filed herewith, on the records and file herein, and on such evidence as may be presented at the

25  hearing of the motion.

26  Date: March 7,2012

27                                                 Jason E. Cobb, Plaintiff in Pro Per

28                          MOTION FOR NEW TRIAL

                                                            CASE NO.: CIV 508137

1

## MOTION FOR NEW TRIAL

2

Plaintiff Cobb hereby submits this motion for a new trial.

3

Pursuant to CRC Rule 3.1600, this Court has discretion to grant this motion, which is appropriate

4

in this case in the interests of justice.

5

WHEREFORE, in view of the overall circumstances in conjunction with the clearly stated

6

provisions and requirements of CRC Rule 3.1600, Plaintiff respectfully requests that this Court grant his

7

request for a new trial.

8

Date: March 7, 2012

9

Jason E. Cobb, Plaintiff in Pro Per

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

**CASE NO.: CIV 508137**

1

2

## SUPPORTING MEMORANDUM

3

4

### STATEMENT OF FACTS

Plaintiff Cobb has filed a motion for a new trial, which is now scheduled to be heard on April

18, 2012. A new trial is necessary as the matter was not fully reviewed and heard during the hearing

on February 22, 2012 as key and indispensible evidence was not eligible for review due to the fact

that Plaintiff, who appears pro per, did not expect the hearing to occur on that day pursuant to the

tentative ruling released on February 21, 2012, to take the hearing off-calendar. For reasons that

remain unclear, the tentative ruling was not reviewed, argued or discussed in the Law and Motion

department the morning of February 22, 2012. Once Defendant Brede's AOR, Calvin Rouse, was

admitted, all parties proceeded to the Presiding Judge and thereafter to the hearing judge. In

anticipation of a continuance based on the posted tentative ruling, Plaintiff did not expect the hearing

to occur on February 22, 2012. Consequently Plaintiff had no basis to refute the Defendants

arguments as the required evidence to do so was not eligible for consideration during the hearing,

which greatly influenced the outcome. Now Plaintiff draws upon the provisions of CRC Rule 3.1600

in moving the court for a new trial so that the matter may be fully heard and ruled upon.

### STATEMENT OF LEGAL AUTHORITY

For cause shown in the Motion and Memorandum of Plaintiff Cobb, and under the authority

of CRC Rule 3.1600, this Court has discretion to grant this timely request for a new trial, which is

appropriate in this case in the interests of justice for reasons stated above.

### ARGUMENT

As is the case with all U.S. citizens, Plaintiff has an inalienable right to due process within the

due administration of justice. Pursuant to the cited circumstances, Plaintiff did not receive such being

generally disadvantaged by the turn of events leading to the hearing as described above. CRC Rule

3.1600 is an impartial and fair provision of law that can be employed to rectify this situation in the

interests of justice.

In their Corporation Code Section 5617(c) Hearing Brief, attached hereto in Exhibit 1,

3

Defendants argued that the First Amendment bars any court from entangling itself in ecclesiastical controversies...Defendants added that "The Ecclesiastical Abstention Doctrine particularly extends to churches that are classified as being "hierarchical" in structure." In so doing, Defendants reference *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999); *Concord Christian Center v. Open Bible Standards Churches* (2005) 132 Cal.App 4th 1396, 1409. In reviewing this particular case, the Court's reasoning is consistent with standing Constitutional law as amplified in Employment Division v. Smith (1995):

> "The Supreme Court has held that, wholly apart from the hierarchical decision-making apparatus of the religious organization, a court may resolve property disputes by applying secular principles of property, trust and corporate law when the instruments upon which those principles operate are at hand. Thus no First Amendment issue arises when a court resolves a church property dispute by relying on state statutes concerning...the terms of corporate charters of religious organizations.
>
> The primary advantage of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity...It thereby promises to free civil courts completely from entanglements in questions of religious doctrine, polity and practice.
>
> Jones v. Wolf, 443 U.S. at 603, 99 S.Ct 3020. These advantages were deemed substantial enough in Jones to permit the state court to decide the property dispute by neutral principles *even though the outcome might contravene the decision of the hierarchical church!* See id.at 604-06, 99 S.Ct. 3020."

In *Concord Christian Center v. Open Bible Standards Churches* (2005), a matter, in principle, not unlike this current action was presented to the Court for review. Interestingly, the Court "determined that Open Bible was a hierarchical church as to which a civil court must defer with respect to its ecclesiastical decisions. Having found the ecclesiastical rule appropriate to the circumstances, *the trial court appropriately applied it to abstain from making a determination as to only one issue*: namely, the propriety of Open Bible's revocation of Mashore's ministerial

4

credentials." Thereafter the Court focused on the trial court's application of *neutral principles* of law to the *non-ecclesiastical* issues.

A similar distinguishing approach is called for in this case. If Plaintiff were petitioning the court to overturn his removal as an elder in the Menlo Park congregation than the Defendants Constitutional Law defense would be relevant to these proceedings. However, Plaintiff is not petitioning the Court for such relief. The points of concern relate to the Menlo Park Corporation, as a separate and distinct legal entity within the state of California. This is a secular question that has standing for review under the *neutral principles of civil law* doctrine born from *Jones v. Wolf* as cited above and definitively substantiated in *Employment Division v. Smith* (1990).

In *Smith* the Court held that the First amendment's protection of the "free exercise" of religion does not allow a person to use religious motivation as a reason not to obey generally applicable laws (e.g.: corporate law). "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." The Court added: "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, (Cantwell v. Connecticut, 310 U.S. at 304, 307). The present case does not present such a hybrid situation, but a free exercise claim unconnected with any communicative activity or parental right. Respondents urge us to hold, quite simply, that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation. We have never held that, and decline to do so now."

In this state action, the neutral-principles approach is appropriate and warranted in view of the fact that the question before the court is secular in nature being born of established corporate law that state courts are free to regulate. Consequently there is no risk of the entanglement ruled out by the Abstention Clause.

This state action simply involves a question of corporate law and the requirement upon any

5

and all persons and organizations, whether religious or not, to comply with such. Suggesting that the matter is entirely resolved beyond any other consideration simply based on the erroneous assertion that Jehovah's Witnesses are a hierarchical organization is an oversimplification, especially in view of the neutral-principles approach discussed above as established by the Supreme Court.

The actual practices of Jehovah's Witnesses as such relate to complying with secular laws, including corporate law, must be considered in order to reach a just decision. Exhibit 2 establishes that Jehovah's Witnesses recognize, account for and endeavor to comply with state corporation laws. This is key evidence that was not eligible for review during the February 22, 2012 hearing for the previously stated reasons.

Even if Jehovah's Witnesses were actually a hierarchical organization, that in itself would not validate the actions of the Defendants relative to the Menlo Park Corporation and property *(Jones v. Wolf ; Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar)*. However, per Exhibit 3, the religious organization of Jehovah's Witnesses is *not* hierarchical but rather theocratic in structure and operation and the Free Exercise Clause unequivocally entitles Jehovah's Witnesses to that point of view and belief regardless of the definitions, terms and concepts born of case law. This, again, is key evidence that was not eligible for review during the February 22, 2012 hearing for the previously stated reasons.

The line of demarcation between spiritual/religious appointments and corporate appointments, and the specific procedures/processes for each must be recognized and understood in order to reach a just decision. Bylaws are the means to establish an inherent correlation between such. However, the Menlo Park Corporation had no by-laws prior to July 1, 2010 and further, no director signed any contract or agreement specifying that they would automatically be removed as such upon being removed from a position of spiritual oversight in the congregation, which, by law, is a distinct entity from the corporation. Consequently, in the absence of by-laws, the CA Corp. Code becomes the governing standard to resolve questions of corporate procedure and practice, which fully aligns with the neutral-principles approach referenced above and standing Constitutional law.

It is interesting to note the example set by the Governing Body of Jehovah's Witnesses in this

6

1   regard. In the year 2000, when members of the Governing Body of Jehovah's Witnesses decided to

2   relinquish their legally held corporate positions in order to focus primarily on matters of spiritual

3   instruction and oversight, this transition was performed not by some religious process or ritual but

4   rather in full accord with New York State law as each of them resigned according to law to ensure

5   their compliance with such, per Exhibit 4. This helps to amplify the general regard that Jehovah's

6   Witnesses are to have, in accord with bible principles, for law in general and in this includes corporate

7   law as administered by the state.

8       **CONCLUSION**

9       For the reasons and based on the law set forth above, in conjunction with the clearly stated

10  provisions and requirements of CRC Rule 3.1600, Plaintiff respectfully requests that this Court grant

11  his request for a new trial so that the matter can be fully reviewed, argued and heard in the interests of

12  justice.

13

14  Date: March 7, 2012

15                                                          Jason E. Cobb, Plaintiff in Pro Per

16

17

18

19

20

21

22

23

24

25

26

27

28

7

# EXHIBIT: 1

**Defendants' Corporation Code Section 5617(c) Hearing Brief**

1   Anthony V. Smith, Esq. (SBN 124840)
    LAW OFFICE OF ANTHONY V. SMITH
2   204 East Second Avenue, #331
3   San Mateo, CA 94401-3904
    Tel: 650.548.0100
4   Fax: 650.548.9741

5   Attorney for Defendants ERNEST BREDE, LUIS CONTRERAS
6   and LARRY LAVERDURE

7   Calvin A. Rouse (*Pro Hac Vice*)
    WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC.
8   LEGAL DEPARTMENT
    100 Watchtower Drive
9   Patterson, New York, 12563
    Telephone: 845-306-1000
10  Facsimile: 845-306-0709

11  Attorney for Defendant ERNEST BREDE
12

13

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA
15                      FOR THE COUNTY OF SAN MATEO

16

17  JASON E. COBB,                        )   Case No. CIV508187
                                          )
18              Plaintiff,                )   **DEFENDANTS' CORPORATION CODE**
                                          )   **SECTION 5617(c) HEARING BRIEF**
19  v.                                    )
                                          )
20  ERNEST BREDE, LUIS CONTRERAS,         )   JUDGE: V. Raymond Swope
21  AND LARRY LAVERDURE,                  )   DATE: February 22, 2012
                                          )   TIME: 9:00 a.m.
22              Defendants.               )   DEPT: Law & Motion (Department 23)
                                          )
23

24

25      COME NOW, Defendants, ERNEST BREDE, LUIS CONTRERAS, and LARRY

26  LAVERDURE (hereinafter collectively "Defendants"), by and through their attorney(s) of

27  record, and hereby submit their Corporation Code Section 5617 Hearing Brief.

28

---

## PLAINTIFF'S CLAIM

Plaintiff Jason E. Cobb filed this law suit for the sole purpose of challenging "the validity of the appointments of [defendant ministers], Ernest Brede, Luis Contreras and Larry Laverdure as both directors and officers of The Menlo Park Congregation of Jehovah's Witnesses, Inc. [a religious corporation]," pursuant to "the provisions of California Corporations Code sections 5527 and 5617." [**Complaint, P. 2, ¶ 1**]

## DEFENDANTS' EVIDENCE

Defendants contend that this is a grudge suit brought by Jason E. Cobb in retaliation for an ecclesiastical disciplinary action (i.e., his removal as an elder in the Menlo Park Congregation) by the ecclesiastical authorities within the religious organization of Jehovah's Witnesses. The evidence will show that the Defendants have a complete defense for the corporate election claim brought against them and that the case should be dismissed on the grounds discussed below.

I. **CONSTITUTIONAL LAW DEFENSE:** Evidence will show that the issue of Plaintiff Jason Cobb's qualifications for appointment and continued service as a congregation elder (minister) and his right to hold corporate office in the Menlo Park religious corporation is exclusively governed by the ecclesiastical doctrines and practices of the "hierarchical" religious organization of Jehovah's Witnesses. As a matter of First Amendment Constitutional law, the provisions of the California Corporation Code do not override the internal religious governance and practices of a hierarchical structured religious organization.

✓ **A.**    **Plaintiff's Suit is Barred by the Ecclesiastical Abstention Doctrine**

The First Amendment bars any court from entangling itself in ecclesiastical controversies related to internal church governance or the appointment, removal, or discipline of ministers.    *Watson v. Jones* (1871) 80 U.S. (13 Wall) 679, 729, 20 L. Ed. 666.    The Ecclesiastical Abstention Doctrine particularly extends to churches that are classified as being "hierarchical" in structure. *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1248 (9th Cir. 1999); *Concord Christian Center v. Open Bible Standards Churches* (2005) 132 Cal.App. 4th 1396, 1409.

✓ **B.**    **Jehovah's Witnesses Is a Hierarchical Religious Organization**

Decisions by "hierarchical" religious organizations regarding internal governance, and the discipline, appointment, or removal of ministers are not subject to review by civil courts. The case law defines a hierarchical church as one in which individual churches are "organized as a body with other churches having similar faith and doctrine, [and] with a common ruling convocation or ecclesiastical head" vested with ultimate ecclesiastical authority over the individual congregations and members of the entire organized church. *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, n. 15, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *Watson v. Jones*, supra, 80 U.S. at pp. 722-723; *Committee of Missions v. Pacific Synod*, 157 Cal. 105, 106 P. 395 (1909); *Wheelock v. First Presb. Church*, 119 Cal. 477, 51 P. 841 (1897).

The evidence will show that Jehovah's Witnesses are a "hierarchical" religious organization. In this case, the Menlo Park Congregation of Jehovah's Witnesses is "under the government and control" of the United States Branch Office of Jehovah's Witnesses (hereinafter "National Organization"), headquartered in Brooklyn, New York. The local congregation members and appointed elders are "bound by the orders and judgments" of the National

1    Organization which has ecclesiastical authority over congregations of Jehovah's Witnesses

2    throughout the United States. *Watson*, 80 U.S. at pp. 726-727; *Pacific Synod*, 157 Cal. at 105;

3    *Wheelock*, 119 Cal. at 477.

4        The church's internal property-holding rules supplant any secular voting rights

5    provisions that might be cited by the Plaintiff in the California Corporation Code. *New v.*

6    *Kroeger*, 167 Cal.App.4th 800, 824, 84 Cal. Rptr. 3d 464 (2008) ("to the extent the

7    *determination of who are the lawful directors* involves the resolution of a matter of

8    
9    ecclesiastical doctrine, polity or administration, the civil court must defer to the resolution of the

10   issue by the 'authoritative ecclesiastical body.' *Jones*, 443 U.S. at pp. 602-606.") (emphasis

11   added).

12

13       ✓ **C.    Actions Taken by the National Organization of Jehovah's Witnesses**

14       The evidence will show that the following Constitutionally protected actions taken by

15   the National Organization cannot be evaluated without this court becoming entangled in the

16   
17   ecclesiastical governance and discipline exercised by the National Organization of Jehovah's

18   Witnesses:

19       (a)    On June 30, 2010, Plaintiff Jason Cobb was formally "deleted" (removed), as an

20              elder from serving in the Menlo Park Congregation. After that date, as a matter

21              of the religious doctrine, custom, and practice of the faith of Jehovah's

22              Witnesses, Jason Cobb

23              (i)    No longer served as an elder in any congregation of Jehovah's Witnesses;

24              
25              (ii)   No longer qualified to occupy a secular corporate position of fiduciary

26                     trust (officer, director or trustee) in any corporation or legal entity used by

27

28

1                  any congregation of Jehovah's Witnesses, including Menlo Park

2                  Congregation.

3     (b)    On May 24, 2010, Defendants were formally appointed to serve as elders in the

4                  Menlo Park Congregation of Jehovah's Witnesses, and have continuously served

5                  in that capacity since that date by authority of the National Organization of

6                  Jehovah's Witnesses.

7

8      Jason Cobb's complaint should be dismissed because the Plaintiff cannot present a

9 triable issue (an issue free of religious entanglement) as to whether his removal *from all*

10 *positions* of responsibility in the Menlo Park Congregation was lawful and appropriate.

11

12     **II.**    **CALIFORNIA STATUTE OF LIMITATIONS DEFENSE:** Evidence will

13              show that Plaintiff Jason Cobb's September 2, 2011, filing of this lawsuit

14              occurred more than nine (9) months after the expiration of the limitation period

15              (CA Corp. § 5527[1]) for challenging the validity of the corporate appointment of

16

17              the Defendants, which occurred on September 16, 2010[2].

18

19

20

---

21 [1] § 5527 states: "An action challenging the validity of any election, appointment or removal of a

22 director or directors must be commenced within nine months after the election, appointment or removal. If no such action is commenced, in the absence of fraud, any election, appointment or

23 removal of a director is conclusively presumed valid nine months thereafter."

24 [2] See also, West's Ann.Cal.Corp.Code § 9419: "In the absence of fraud, any election,

25 appointment or removal of a director is conclusively presumed valid nine months thereafter if the only defect in the election, appointment or removal is the failure to give notice as provided

26 in this part or in the corporation's articles or bylaws."

27

28

---

**III.    CALIFORNIA CORPORATION CODE DEFENSE:** Evidence will show that the election proceedings of the current officers did not materially violate the provisions of the California Corporation Code.

Defendants respectfully submit that the evidence presented compels the court to dismiss the Plaintiff's claim with prejudice, and that all costs be awarded to the Defendants, and that Defendants receive any other relief this Court deems just and proper.

DATED:  February 22, 2012

WATCHTOWER BIBLE AND TRACT SOCIETY OF
  NEW YORK, INC., LEGAL DEPARTMENT

By: _____
   Calvin A. Rouse
   Associate General Counsel

Attorney for Defendant ERNEST BREDE

DATED:  February 22, 2012

LAW OFFICE OF ANTHONY V. SMITH

By: _____
   Anthony V. Smith, Esq.

Attorney for Defendants ERNEST BREDE, LUIS CONTRERAS
and LARRY LAVERDURE

# EXHIBIT: 2

## January 1, 1980 Letter to All Congregations in the State of California

# WATCHTOWER
**BIBLE AND TRACT SOCIETY OF NEW YORK, INC.**

CABLE WATCHTOWER

OFFICE OF THE SECRETARY AND TREASURER     TELEPHONE (212) 625-1240
124 COLUMBIA HEIGHTS, BROOKLYN, NEW YORK 11201, U.S.A.

T:TD January 1, 1980

TO ALL CONGREGATIONS IN THE
STATE OF CALIFORNIA

Dear Brothers:

Re: New Non-Profit Corporation
Filing Requirement

The following information is herein conveyed to you
upon advice of legal counsel. It applies to corporations
which congregations have, and in order for us to convey the
information to those congregations which have corporations,
we are sending this letter to all congregations in your
State. The following has been brought to our attention:

A new form is required to be filed by all
California non-profit corporations. This will
apply only to those Congregations which have a
corporate charter. For the last few years, the
corporations have regularly been receiving, and
hopefully have been filing, a similar form that
asked for the name of the corporate officers and
the address of the principal place of business.
The new form requires the naming of an agent for
service of process, and requires an annual filing
fee of $2.50, with provisions for a $50.00 penalty
for failure to comply.

Since all of the corporations have different
inception dates, they will also have different
anniversary dates. It is probable that some cor-
porations may not have correct addresses listed
with the Secretary of State, and thus will not
receive notice of the new law. Then, of course,
there will be a failure to comply, plus the en-
suing penalty.

All corporations which had their incorpora-
tion date in the month of January must complete
and return the statement by January 30, 1980.

Those incorporated in February should soon be receiving notice to comply within that calendar month, and so on thru the end of the year. We suggest that all at this time write the Secretary of State for a copy of Form S/O 100 STATEMENT BY DOMESTIC NON-PROFIT CORPORATION, so that compliance can be timely. Be alerted to the fact that this is an annual requirement that must be met within the time period set forth in the instructions on the form.

In order that the Society might be aware promptly of any pending claims or litigation, we believe it will be well for all congregations to name the same agent for service of process. We would like for all of the California Congregations to name as agent Kenneth A. Barwick, 3434 Grove Street, Lemon Grove, California 92045. Brother Barwick is an attorney, and we have discussed with him his serving in this capacity for all of the congregations in the State.

Your body of elders should give prompt attention to this matter and take the necessary steps if your congregation has a corporation.

With warm Christian love and wishing you Jehovah's continue blessings.

Your brothers and fellow servants,

*Watchtower B. & S. Society*
OF NEW YORK, INC.

cc: Brother Kenneth A. Barwick

# EXHIBIT: 3

**Watchtower Magazine Excerpts Establishing that Jehovah's Witnesses
are NOT a Hierarchical Religious Organization**

It is *Jehovah God's view* that matters over and above anything else. Consequently, Jehovah's Witnesses do not define themselves as a hierarchical religious organization but rather recognize the fact that they are a **theocratic** organization in full submission to Jehovah God.

The government of God is, in structure and function, a pure theocracy (from Gr. *the·os'*, god, and *kra'tos*, a rule), a rule by God. *(Insight on the Scriptures Vol-2 p. 159 Kingdom of God)*

Watchtower 1/15/2001 p. 13 par. 6: Simply stated, a true theocracy is rule by God. Witnesses of Jehovah voluntarily submit to his rulership and cooperate together in order to do the divine will. (Psalm 143:10; Matthew 6:9, 10) Appointments of Christian overseers, or elders, and ministerial servants are theocratic because the process of recommending and appointing such responsible men is carried out according to God's arrangement as set out in the Holy Scriptures. And *as the "head over all," Jehovah of course has the right to determine how his visible organization will operate.*—1 Chronicles 29:11; Psalm 97:9.

Watchtower 5/15/1995 p. 22 pars 7-8.: *To get away from the hierarchical structure prevalent in Christendom,* The Watchtower of June 1 and of June 15, 1938, contained flashes of light showing that the servants in the congregation were to be, not elected, but appointed, that is, appointed theocratically.

Watchtower 1/15/2001 p. 13 par. 7: In contrast with many religious groups in Christendom, *Jehovah's Witnesses do not decide for themselves the form of spiritual government under which they operate.* These sincere Christians endeavor to stick to Jehovah's standards. Overseers among them are not put into office by some congregational, **hierarchical,** or presbyterian form of church government.

Watchtower 1/15/1994 p. 14 pars. 20-21: Paul warned that after the death of the apostles, apostasy would develop, which is exactly what happened. (2 Thessalonians 2:3) As time went by, the number of those claiming to be Christians rose to the millions and then to the hundreds of millions. They developed different kinds of church government, such as **hierarchical,** presbyterian, and congregational. However, neither the conduct nor the beliefs of these churches reflected the rulership of Jehovah. *They were not theocracies!*

# EXHIBIT: 4

**Washington Post Article Discussing Governing Body's Formal and Legal Resignation from Watchtower Corporation in 2000**



PRINT EDITION   TOP NEWS   WORLD   NATION   POLITICS   METRO   BUSINESS & TECH   HEALTH   OPINION   WEATHER

**Partner Sites:**
- **Newsweek.com**
- **Britannica Internet Guide**

# Jehovah's Witnesses Order Shake-Up

AP Religion Writer
Monday, Oct. 9, 2000; 11:59 p.m. EDT

NEW YORK — Leaders of the Jehovah's Witnesses have ordered the biggest organizational shake-up since the evangelist sect was incorporated 116 years ago, saying it would help the 5.9-million member group expand worldwide.

The Watch Tower Bible and Tract Society of Pennsylvania, as the group is officially known, had been run by a so-called Governing Body. Now, religious and administrative duties will be divided, with three newly formed corporations running the group's U.S. operations.

President Milton Henschel, 80, and the group's six other board members resigned their posts on Saturday.

"The reason for the changes was both theological and practical," said public affairs director James N. Pellechia.

He said the Governing Body, now relieved of its administrative tasks, would be able to "concentrate more on the ministry of the Word."

Don Adams, a 50-year veteran of the organization, has been named president of the organization, and seven lower-ranking members will make up the new board. Henschel will remain a member of the Governing Body, which will have a rotating chairman rather than a permanent leader.

Until Saturday, the head of the Watch Tower society was always regarded as the single leader of the religion, dating back to founder Charles Taze Russell. He began publishing a magazine detailing the

imminent end of the world system in 1879,
incorporated the Watch Tower society in 1884 and
ruled the religion till his death in 1916.

Watch Tower presidents have taken a lower profile
since the days of Russell and his flamboyant successor
Joseph Rutherford, who died in 1942. "I don't believe
the Witnesses look to any one person" as leader,
Pellechia said.

———

On the Net:

http://www.watchtower.org/

© Copyright 2000 The Associated Press

Back to the top



Yellow Pages

# EXHIBIT 10

FL-340

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br>PREPARED BY FAMILY LAW FACILITATOR | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.:        FAX NO. *(Optional)*:

E-MAIL ADDRESS *(Optional)*:

ATTORNEY FOR *(Name)*: IN PRO PER

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SAN MATEO

    STREET ADDRESS: 400 COUNTY CENTER

    MAILING ADDRESS: 400 COUNTY CENTER

    CITY AND ZIP CODE: REDWOOD CITY, CA 94063

    BRANCH NAME: SOUTHERN BRANCH

PETITIONER/PLAINTIFF: JENNIFER COBB

RESPONDENT/DEFENDANT: JASON COBB

OTHER PARTY:

**FILED**
**SAN MATEO COUNTY**

**MAY 0 3 2012**

Clerk of the Superior Court
By _____
DEPUTY CLERK

| **FINDINGS AND ORDER AFTER HEARING** | CASE NUMBER:<br>116981 |
|---|---|

1. This proceeding was heard
   on *(date)*: 4/26/2012    at *(time)*: 2:00PM    in Dept.: 32    Room: 7D
   by Judge *(name)*: HON. SUSAN GREENBERG    ☐ Temporary Judge
   On the order to show cause, notice of motion or request for order filed *(date)*: 4/16/12    by *(name)*: JENNIFER COBB
   a. ☒ Petitioner/plaintiff present      ☐ Attorney present *(name)*:
   b. ☒ Respondent/defendant present    ☐ Attorney present *(name)*:
   c. ☐ Other party present            ☐ Attorney present *(name)*:

**THE COURT ORDERS**

2. Custody and visitation/parenting time:   As attached   ☒ on form FL-341   ☐ Other   ☐ Not applicable

3. Child support:   As attached   ☐ on form FL-342   ☐ Other   ☒ Not applicable

4. Spousal or family support:   As attached   ☐ on form FL-343   ☐ Other   ☒ Not applicable

5. Property orders:   As attached   ☐ on form FL-344   ☐ Other   ☒ Not applicable

6. Attorney's fees   As attached   ☐ on form FL-346   ☐ Other   ☒ Not applicable

7. Other orders:   ☐ As attached   ☒ Not applicable

8. All other issues are reserved until further order of court.

9. ☒ This matter is continued for further hearing on *(date)*: 5/24/2012   at *(time)*: 2:00PM   in Dept.: 32
   on the following issues:

Date:   MAY 0 3 2012

▶ _____
                                JUDICIAL OFFICER

Approved as conforming to court order.

▶

_____
SIGNATURE OF ATTORNEY FOR   ☐ PETITIONER/PLAINTIFF   ☐ RESPONDENT/DEFENDANT   ☐ OTHER PARTY

Form Adopted for Mandatory Use
Judicial Council of California
FL-340 [Rev. January 1, 2012]

**FINDINGS AND ORDER AFTER HEARING**
**(Family Law—Custody and Support—Uniform Parentage)**

www.courts.ca.gov

Martin Dean's
**ESSENTIAL FORMS™**

1 of 5

FL-341

| PETITIONER/PLAINTIFF: JENNIFER COBB | CASE NUMBER: |
|---|---|
| RESPONDENT/DEFENDANT: JASON COBB | 116981 |

### CHILD CUSTODY AND VISITATION ORDER ATTACHMENT

TO    [X] *Findings and Order After Hearing*    [ ] *Judgment*

[ ] *Stipulation and Order for Custody and/or Visitation of Children*

[ ] *Other (specify)* :

1. [X] **Custody.** Custody of the minor children of the parties is awarded as follows:

| Child's name | Date of birth | Legal custody to (person who makes decisions about health, education, etc.) | Physical custody to (person with whom the child lives) |
|---|---|---|---|
| COBB | 06/02/01 | JOINT | JENNIFER COBB |
| COBB | 07/28/03 | JOINT | JENNIFER COBB |

2. [X] **Visitation**

   a. [ ] Reasonable right of visitation to the party without physical custody **(not appropriate in cases involving domestic violence)**

   b. [X] See the attached ____2____ -page document dated *(specify date)*:   04/11/12

   c. [X] The parties will go to mediation at *(specify location)*:   Family Court Services for minor children interview only.

   d. [ ] No visitation

   e. [ ] Visitation for the   [ ] petitioner   [ ] respondent   will be as follows:

       (1) [ ] **Weekends starting** *(date)* :
   *(The first weekend of the month is the first weekend with a Saturday.)*
   [ ] 1st   [ ] 2nd   [ ] 3rd   [ ] 4th   [ ] 5th   weekend of the month

       from _____ at _____ [ ] a.m. [ ] p.m.
            *(day of week)*       *(time)*

       to _____ at _____ [ ] a.m. [ ] p.m.
          *(day of week)*       *(time)*

        (a) [ ] The parents will alternate the fifth weekends, with the   [ ] petitioner   [ ] respondent having the initial fifth weekend, which starts *(date)* :

        (b) [ ] The petitioner will have fifth weekends in   [ ] odd   [ ] even   months.

       (2) [ ] **Alternate weekends starting** *(date)* :
   The [ ] petitioner   [ ] respondent   will have the children with him or her during the period

       from _____ at _____ [ ] a.m. [ ] p.m.
            *(day of week)*       *(time)*

       to _____ at _____ [ ] a.m. [ ] p.m.
          *(day of week)*       *(time)*

       (3) [ ] **Weekdays starting** *(date)* :
   The [ ] petitioner   [ ] respondent   will have the children with him or her during the period

       from _____ at _____ [ ] a.m. [ ] p.m.
            *(day of week)*       *(time)*

       to _____ at _____ [ ] a.m. [ ] p.m.
          *(day of week)*       *(time)*

       (4) [ ] **Other** *(specify days and times as well as any additional restrictions)* :

                                              [ ] See Attachment 2e(4).

Form Approved for Optional Use
Judicial Council of California
FL-341 [Rev July 1, 2008]

Martin Dean's
ESSENTIAL FORMS™

**CHILD CUSTODY AND VISITATION ORDER ATTACHMENT**

Family Code, §§ 3020, 3022, 3025,
3040-3043, 3048, 3100, 6340, 7604
www.courtinfo.ca.gov

2:15

FL-341

| PETITIONER/PLAINTIFF: JENNIFER COBB | CASE NUMBER: |
|---|---|
| RESPONDENT/DEFENDANT: JASON COBB | 116981 |

3. ☐ **The court acknowledges** that criminal protective orders in case number *(specify):*
   in *(specify court):*                                                    relating to the parties in this case are in effect
   under Penal Code section 136.2, are current, and have priority of enforcement.

4. ☐ **Supervised visitation.** Until ☐ further order of the court ☐ other *(specify)* :
   the ☐ petitioner ☐ respondent will have supervised visitation with the minor children according to the schedule
   set forth on page 1. **(You must attach form FL-341(A).)**

5. ☐ **Transportation for visitation**
   a. ☐ Transportation **to** the visits will be provided by the ☐ petitioner ☐ respondent
      ☐ other *(specify)* :
   b. ☐ Transportation **from** the visits will be provided by the ☐ petitioner ☐ respondent
      ☐ other *(specify)* :
   c. ☐ Drop-off of the children will be at *(address)* :
   d. ☐ Pick-up of the children will be at *(address)* :
   e. ☐ The children will be driven only by a licensed and insured driver. The car or truck must have legal child restraint
      devices.
   f. ☐ During the exchanges, the parent driving the children will wait in the car and the other parent will wait in his or
      her home while the children go between the car and the home.
   g. ☐ Other *(specify)* :

6. ☐ **Travel with children.** The ☐ petitioner ☐ respondent ☐ other *(name)* :
   **must** have written permission from the other parent or a court order to take the children out of
   a. ☐ the state of California.
   b. ☐ the following counties *(specify)* :
   c. ☐ other places *(specify)* :

7. ☐ **Child abduction prevention.** There is a risk that one of the parents will take the children out of California without the other
   parent's permission. Form FL-341(B) is attached and must be obeyed.

8. ☐ **Holiday schedule.** The children will spend holiday time as listed in the attached ☐ form FL-341(C)
   ☐ other *(specify)* :

9. ☐ **Additional custody provisions.** The parents will follow the additional custody provisions listed in the attached
   ☐ form FL-341(D) ☐ other *(specify)* :

10. ☐ **Joint legal custody.** The parents will share joint legal custody as listed in the attached ☐ form FL-341(E)
    ☐ other *(specify)* :

11. ☒ **Other** *(specify)* :
    The Court adopts the FCS Report with the following modifications:
    1.  If the parties choose to live in the same house Paragraph 2 will be
    deleted.
     2.   Paragraph 3 visitation shall be in the presence of one or two
    congregation members.

12. **Jurisdiction.** This court has jurisdiction to make child custody orders in this case under the Uniform Child Custody Jurisdiction and
    Enforcement Act (part 3 of the California Family Code, commencing with section 3400).

13. **Notice and opportunity to be heard.** The responding party was given notice and an opportunity to be heard, as provided by the
    laws of the State of California.

14. **Country of habitual residence.** The country of habitual residence of the child or children in this case is
    ☒ the United States ☐ other *(specify)* :

15. **Penalties for violating this order.** If you violate this order, you may be subject to civil or criminal penalties, or both.

FL-341 [Rev. July 1, 2008]                    **CHILD CUSTODY AND VISITATION ORDER ATTACHMENT**                    Page 2 of 2

Martin Dean's
ESSENTIAL FORMS™

3-15

**COBB AND COBB**    *F0116981*    **C.D. 4/11/2012**

**AGREEMENTS:** *Adopted As Court Order*

1. The father and minors may participate together in the congregation's services occurring on Thursdays at 7:30 P.M. and Sundays at 10:00 A.M.

4.15

**COBB AND COBB**      **F0116981**      **C.D. 4/11/2012**

**RECOMMENDATIONS:** *Adopted As Amended*

1. The parents shall have joint legal custody of the minors. The parents shall consult and cooperate with each other in making decisions and sharing information related to the health, education, and welfare of the minors. Each parent shall have access to medical and school records pertaining to the minor. It is each parent's responsibility to request report cards, parent-teacher conferences, progress reports, school calendars, and the like directly from the minors' school.

2. The mother shall have sole physical custody of the minors.

3. The minors' time with the father shall be as follows. *With 1 or 2 congregation*
   a. Every Monday for family study from 6:00 P.M. to 8:00 P.M. with *members* the mother present.
   b. With _____ on Tuesdays from 6:00 P.M. to 7:00 P.M.
   c. With _____ on Wednesdays from 6:00 P.M. to 7:00 P.M.
   d. Every Sunday from 9:00 A.M. to 5:00 P.M.

4. Each parent shall take the Court recommended workshop "Kids in the Middle" (650) 403-4300 extension 4549 and provide written verification upon completion to Family Court Services by July 5, 2012.

Respectfully submitted,

April 11, 2012          By: _____

Eddie Estrada, MSW
Family Court Services

cc:   Parents
      Mallika Kaur, Esq.

5

*5 of 5*



## CLERK'S CERTIFICATE OF MAILING

CASE # __6116981__

Ỉ Petitioner:
Name

> Jennifer Cobb

Ỉ Respondent:
Name

> Jason Cobb

Ỉ Other:
Name

I certify that I am not a party to this cause and that a true copy of the: FINDINGS AND ORDER AFTER HEARING
was mailed first class, postage fully prepaid, in a sealed envelope, and that the notice was mailed.

at (place) : _Redwood City,_                    California, on (date) : __MAY 0 3 2012__

---

☒ Order mailed to: ☒ Petitioner ☒ Respondent ☐ Other (self addressed envelope provided to the court by litigant/s ).
☐ Order mailed to: ☐ Petitioner ☐ Respondent ☐ Other (mailed to the address obtained from court records).
☐ No envelope provided by: ☐ Petitioner ☐ Respondent ☐ Other (address not in court records, unable to mail order).
☐ Proof of service provided to: ☐ Petitioner ☐ Respondent ☐ Other (litigant needs to serve:
                      ☐ Petitioner ☐ Respondent ☐ Other with a copy of the court order by mail).

Clerk, by _____ , Deputy
(Ana Villegas)

# EXHIBIT 11

**Subject:** Re: Marriage of Cobb

**From:** J Cobb

**To:** bjfadem@fademlaw.com;

**Cc:** ronnerio@fademlaw.com;

**Date:** Tuesday, February 5, 2013 5:46 PM

BJ,

I don't agree with the recurring assertion that my motion for consideration, which Ron withdrew without authorization from me, was subject to sanction based on the reference below. It was timely as it was filed on 9/27/2012 which was within Ten days of service of the order (9/17/2012). CCP 1008(a) quoted below fits the circumstances here perfectly. There is no basis for sanction. Ron - I told you several times about this motion and each time we mentioned having the existing hearing continued if you came on NOT withdrawn. You withdrew my standing motion that was filed in a timely manner without discussion with me and without my authorization. Since you screwed up, what basis exist for my original concern to be heard by the court and I know that such will not cost $5,000. I'm a pro se litigant but I'm not stupid.

Jason

Cal CCP 1008
(a)When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, **within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order.** The party making the application shall state by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown.

---

**From:** B J Fadem <bjfadem@fademlaw.com>
**To:** Jason Cobb <jcobb16@rocketmail.com>
**Cc:** ronnerio@fademlaw.com; Darshika Patel <darshikapatel@fademlaw.com>; Maggie LaBranch <maggielabranch@fademlaw.com>
**Sent:** Tuesday, February 5, 2013 1:57 PM
**Subject:** Marriage of Cobb

Hi Jason: Ron just advised me regarding your request for contact with your wife about potential reconciliation. Ron will be pursuing that on your behalf. However, I also reviewed the attorney fee order and your last discussion with Ron. I would recommend one of the following:

1. If you still wish to contest the order - We would have to do so as a Motion to Set Aside pursuant to CCP Section 473c based on mistake and inadvertence - based on the fact that you were unrepresented and because the attorney fee issue was continued from earlier and not on the latest pleadings, you did not recall it was to be heard that day and did not show up because you did not object to the latest relief requested. The motion you filed [Motion for Reconsideration] is not the appropriate basis - you could be sanctioned for pursuing that motion. However, you may have a chance under 473c. However, a motion to set aside would probably

cost between $3,500 to $5,000 to draft and present to the court. We would need your father to testify and we would have to present the appropriate supporting documents.

or

2.  If you choose not to pursue the Motion to Set Aside under 473c, then I would strongly urge you to pay the fees by obtaining an equity line of credit [HELOC] on the family residence. The court order allows for the fees to come from community assets . By doing it this way, when there is a final disbursement and distribution of assets [whether the house is sold or bought out by one spouse], there is a very strong argument that the HELOC would just be considered a community debt to the property just as the 1st mortgage and treated the same - i.e. taken off the fair market value to determine the true community equity.

If you would like to discuss these options further, please feel free to give me a call.

--

*B J Fadem, Esq.*
*LAW OFFICES OF B J FADEM & ASSOCIATES, APC*
*111 W. St. John Street,  Suite 1140*
*San Jose,  CA  95113*
*VOICE:  408-280-1220*
*FAX:     408-971-9940*
*bjfadem@fademlaw.com*

FYI - 2

From: jcx295
To: ronnerio@fademlaw.com
Subject: RE: Cobb: Case Status - retainer
Date: Tue, 4 Dec 2012 16:26:52 -0800

Ron,

There are some documents that you should have in view of current events. I'm updating the USB drive I previously gave you. Had to address another matter this afternoon so I will finish up the doc prep and drop everything off tomorrow in the AM.

**I have a motion to reconsider hearing currently scheduled for 12/10/12. This is the same set of issues I discussed with you last time** regarding the bogus supervised visitation ruling and my spouse' petition for attorney's fees. The relevant docs will be included tomorrow and **you can determine if it makes sense to proceed as-is or <u>continue</u>.**

The 730 evaluation continues. TTYL...

Jason Cobb

From: jcx295(
To: ronnerio@fademlaw.com
Subject: RE: Cobb: Fee Agreement
Date: Fri, 12 Oct 2012 06:58:37 -0700
Hi Ron,

**Message received. I got the required continuance, so my hearing to have the judge reconsider
and/or set aside the order from 8/27/2012 is set for 10/22/12 at 2pm.** I will send the pertinent docs to
you a bit later. I may be able to initiate the engagement formally today but if not, for sure on Monday.
Thanks for the response.

Jason Cobb
650-815-1547

FL-116981 (San Mateo County)

close this page



# CALIFORNIA COURTS
THE JUDICIAL BRANCH OF CALIFORNIA

# Options to Appealing

Before you appeal, find out if an appeal is the best option. An appeal may not be the correct or easiest way to try to address what you feel was a wrong with the trial court's decision.

## FIGHTING A JUDGMENT WITHOUT FILING AN APPEAL

### SETTLEMENT OR MEDIATION

Depending on the circumstances in your case, you may be able to file a motion asking the court to change, fix, or cancel the judgment against you. Some of the more common motions are: a motion to vacate or set aside (cancel) the judgment and enter a different judgment, a motion for reconsideration of an order, an application for renewal, or a motion for a new trial.

#### Motion to vacate or set aside the judgment
This is when a party that is affected by a trial court's judgment or order asks the same court to cancel the judgment or order that was made. There are different laws that apply in different cases, and usually you have to meet very specific requirements to be able to file a motion to set aside or to vacate. Your court's self-help center may be able to help you; if your case is a family law case, talk to your court's family law facilitator, or you can talk to a lawyer for advice.

#### Motion for reconsideration
This is when a party that is affected by a trial court's order asks the same court to reconsider the order, based on new facts, circumstances, or law. You must file a motion for reconsideration within 10 days of being served with the written notice of entry of the order you want the court to reconsider. The motion must also include an affidavit with information about the original order and the new facts, circumstances, or law. The requirements are very specific.

For more information, see California Code of Civil Procedure section 1008(a) .

#### Application for renewal
This is when the same party who made a motion (a request for an order) that was refused (the entire motion or just part) asks a judge (same or different) to grant the order. This request must be based on new facts, circumstances, or law. There is no time limit. The application must also include an affidavit with information on the original order and the new facts, circumstances, or law.

For more information, see California Code of Civil Procedure section 1008(b) .

#### Motion for a new trial
A motion for new trial asks the trial court to reexamine 1 or more issues of fact or law after a trial and decision by the judge or jury. There are a number of reasons why someone can ask for a new trial, such as jury misconduct; an irregularity with the jury, a party, or a lawyer in the case; insufficient evidence for the verdict; excessive or inadequate damages; an irregularity in the case that prevented one of the parties from having a fair trial; and others. The law allowing a judge to grant a new trial is based on California Code of Civil Procedure section 657 .

Your court's self-help center may be able to give you some information about your options or you can talk to a lawyer about your case. Click for help finding a lawyer. For family law cases, you can talk to your family law facilitator.

# EXHIBIT 12

**Subject:** Re: Fw: Meeting

**From:** Ron Nerio (ronnerio@fademlaw.com)

**To:** jcobb

**Cc:** bjfadem@fademlaw.com; darshikapatel@fademlaw.com; shybyrd@fademlaw.com; maggielabranch@fademlaw.com;

**Date:** Wednesday, February 6, 2013 11:27 AM

Jason,

Based upon your previous e-mails the firm can no longer represent you in your family law case. I have attached the substitution of attorney for your signature. Please sign and return it to the office (e-mail or fax is fine). Your file will be ready for you to pick up, please contact Shampelle to arrange for pick-up.

In regards to the brief for the March 4 hearing, it has not been prepared and the firm will not be working on it.

Sincerely,

Ron B. Nerio, Esq.

On Wed, Feb 6, 2013 at 11:06 AM, J Cobb <                    > wrote:
BJ/All,

Please confirm the status of the hearing brief/argument that stands to be presented for the 3/4/12 hearing. Is it complete? I'd like to get this confirmed today please...ahead of our discussion. Please advise. Thank you.

Jason Cobb

----- Forwarded Message -----
**From:** J Cobb <
**To:** "bjfadem@fademlaw.com" <bjfadem@fademlaw.com>; "ronnerio@fademlaw.com" <ronnerio@fademlaw.com>
**Sent:** Wednesday, February 6, 2013 6:50 AM
**Subject:** Meeting

Please arrange a time for us to meet, discuss the current issue and determine the best course of action. Please advise.

Jason Cobb

--
Ron B. Nerio
Attorney
Law Office of BJ Fadem & Associates
111 W. St. John Street Suite 1140
San Jose, CA 95113
Phone: 408.280.1220
Fax: 408.971.9940
Ronnerio@fademlaw.com
www.Fademlaw.com

-----------------------------------------------------
This email transmission (and/or the attachments accompanying it) may contain
information that is privileged, confidential and exempt from disclosure under
applicable law. It is intended only for the use of the individual or entity to which it is
addressed. If you are neither the intended recipient, nor the employee or agent
responsible for delivering the message to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this communication is
strictly prohibited. If you have received this communication in error, please promptly
notify the sender by reply email, and then destroy all copies of the transmission.
Thank you.
-----------------------------------------------------

# EXHIBIT 13

**Subject:** Re: Follow-up: Subpoenas

**From:** Cameron Bowman (cbowman@viblaw.com)

**To:** symmetry_law@ymail.com;

**Cc:** jmiller@viblaw.com;

**Date:** Wednesday, March 27, 2013 1:46 PM

We are doing the subpoenas we feel are needed. Those have been sent out and notice has been sent to DA and your spouse's attorney.

I don't foresee the need for additional subpoenas.

I don't have availability for a meeting within the next 48 hours but Jo will confirm something with you soon.

On Wed, Mar 27, 2013 at 9:27 AM, J C <symmetry_law@ymail.com> wrote:
  All,

  The DA subpoena will be needed. Please issue it.

  Please confirm the form and process to file proofs of service with the clerk.

  I am requesting a meeting within the next 48 hours. Please respond and confirm availability. Thx.

  Jason Cobb

---

**From:** Johanna Miller <jmiller@viblaw.com>
**To:** J C <symmetry_law@ymail.com>
**Cc:** Cameron Bowman <cbowman@viblaw.com>
**Sent:** Tuesday, March 26, 2013 5:35 PM
**Subject:** Re: Follow-up: Subpoenas

Hello Jason,

Mr. Bowman has stated no further subpoenas at this time!


***Johanna Miller***
VIB Law
675 North First St. Suite 250
San Jose, CA 95112
Phone: (408) 920-9720
FAX: (408)882-0699

On Tue, Mar 26, 2013 at 3:30 PM, J C <symmetry_law@ymail.com> wrote:
Jo,

We had discussed doing a subpoena for the "Good Cause" report filed by my spouse with the DA for San Mateo Cty back on 3/2/12. This report is specifically referenced in the supplemental report and is material to this case as regards the general credibility profile we are building so please generate a subpoena for this report as previously discussed and agreed to and confirm when it is ready. Thank you.

Jason Cobb

_____

**From:** Johanna Miller <jmiller@viblaw.com>
**To:** J C <symmetry_law@ymail.com>; Cameron Bowman <cbowman@viblaw.com>
**Sent:** Tuesday, March 26, 2013 10:12 AM
**Subject:** Re: Follow-up: Subpoenas

Jason,

When are you gonna pick up these completed subpoenas so you can deliver them to the various agencies?

*Johanna Miller*
VIB Law
675 North First St. Suite 250
San Jose, CA 95112
Phone: (408) 920-9720
FAX: (408)882-0699

On Mon, Mar 25, 2013 at 7:37 PM, J C <symmetry_law@ymail.com> wrote:
Cameron,

Following up per the email below.

Please proceed in issuing the subpoenas that have already been discussed. The pending justifications will be delivered tomorrow. I would like to meet briefly to discuss or chat by phone. Please reply and confirm receipt of this message and your availability to talk briefly tomorrow. Thank you.

Jason Cobb

----- Forwarded Message -----
**From:** J C <symmetry_law@ymail.com>
**To:** "cbowman@viblaw.com" <cbowman@viblaw.com>; "jmiller@viblaw.com" <jmiller@viblaw.com>
**Cc:** "symmetry_law@ymail.com" <symmetry_law@ymail.com>
**Sent:** Monday, March 25, 2013 9:47 AM
**Subject:** Fw: Subpoenas

Cameron,

Following up on this email as I'm yet to receive any response.

I will provide the completed subpoena justifications for your review by COB today. The ask is that we all review them and discuss any concerns at that point to the end of confirming the best course of action in presenting my defense. Please confirm a time that you are available to meet either today or tomorrow. The subpoenas will need to be issued and served soon to allow for the typical 30 response time. Please advise thank you.

Jason Cobb

----- Forwarded Message -----
**From:** J C <symmetry_law@ymail.com>
**To:** Cameron Bowman <cbowman@viblaw.com>
**Cc:** Johanna Miller <jmiller@viblaw.com>
**Sent:** Friday, March 22, 2013 4:16 PM
**Subject:** Re: Subpoenas

Thanks for the response Cameron. I respect your expertise and view. I will complete the justifications as I feel that they will generally be helpful in articulating the need for the desired information. Let's have a brief discussion on Monday, review the strategy and confirm the best course of action. Please confirm a time that you can meet on Monday.

Jason

---

**From:** Cameron Bowman <cbowman@viblaw.com>
**To:** J C <symmetry_law@ymail.com>
**Cc:** Johanna Miller <jmiller@viblaw.com>
**Sent:** Friday, March 22, 2013 4:07 PM
**Subject:** Re: Subpoenas

I am not going to have Johanna do the additional subpoenas as I don't see the basis and you and I have discussed before the justifications. So no. there is no point in doing justifications as I will not be doing the additional subpoenas.

On Fri, Mar 22, 2013 at 4:04 PM, J C <symmetry_law@ymail.com> wrote:
    Hi Cameron,

    Thanks for the update. I'm going to go ahead and complete the justifications for each one. I prefer serving the subpoenas and letting the judge decide the merits as called for. There will be a discussion or hearing either way and all the judge can say is "No." I'm trying to give myself the best chance to obtain key information. I'll provide the justifications on Monday and we can discuss as called for and go from there. You want to set up a time now so we can have the basis to address this quickly? I'm good in the morning or lat afternoon. LMK. Thx.

    Jason Cobb

**From:** Cameron Bowman <cbowman@viblaw.com>
**To:** Johanna Miller <jmiller@viblaw.com>
**Cc:** J C <symmetry_law@ymail.com>
**Sent:** Friday, March 22, 2013 3:27 PM
**Subject:** Re: Subpoenas

Jason,

I don't think it is realistic or possible or smart to do the additional subpoenas you want. Honestly, it will be very difficult to even get a response on the subpoenas we want. They need to be narrowly focused. The financial documents in particle are not realistic.

We essentially told the Judge last time in court that we were doing just a few subpoenas and they would be narrowly focused. I think it is bad idea to turn around and do 12 subpoenas on top of those.

Johanna we are going to do the ones we have. coordinate with Jason about serving them. However, I want a copy (the notice to consumer) send to Jennifer's attorney as she requested. I also want an additional copy sent to Thang Ngo at the DA's office. I told him we would mail him a copy as well.

Again..as we have all agreed in past, in no way shape or form is anyone to attempt personal service on the victim in this case.

Cameron

On Wed, Mar 20, 2013 at 4:15 PM, Johanna Miller <jmiller@viblaw.com> wrote:
Hi Jason,

The following Subpoenas are completed:

Ventura Police Dept.
Menlo Park Police Dept.
Bay Area Aesthetic Surgery
Quest Diagnostics
CVS Pharmacy
Stanford Hospital & Clinics

The Subpoenas you requested this morning:

Any and all Currency transaction and money orders from 3/1/12-Present
Financial Account Records and Statements with account ending in 4381
Financial Account Records and Statements with account ending in 4663
Financial Account Records and Statements with account ending in 9898
Financial Account Records and Statements with account ending in 2300 (Federal Tax ID
            & Corporate Entity #C0983980 & Corporate Entity Name: Menlo Park Congregation
of Jehovah's Witnesses,Inc. & Ernest Brede, Luis Contreras, Donald Showers, Lawrence Lee,
Larry Laverdure, Michael Marchi, William Douglas, Dwayne Forester, Glenn Watson or any
variation thereof)
Financial Account Records and Statements Account #                    171

Payment Details regarding Online Bill Pay Check and Cashier's Check
Mobile Phone Call History
Documents/Diagrams/Pictures/Schematics/Entire Floor Plan of the 5th Wheel
DMV Records confirming make/model/vin # of the 5th Wheel
Written Statement of confirmation of the 5th Wheel


Mr. Bowman would like a brief reason why you feel all these are necessary?


***Johanna Miller***
VIB Law
675 North First St. Suite 250
San Jose, CA 95112
Phone: (408) 920-9720
FAX: (408)882-0699


--
Cameron K. Bowman
VIB Law
675 North First Street
Suite 250
San Jose, CA 95112
Ph: (408) 920-9720
Fax:(408) 882-0699
www.viblaw.com


--
Cameron K. Bowman
VIB Law
675 North First Street
Suite 250
San Jose, CA 95112
Ph: (408) 920-9720
Fax:(408) 882-0699
www.viblaw.com

# EXHIBIT 14

**Subject:** Re: Follow-Up

**From:** J C (symmetry_law@ymail.com)

**To:** cbowman@viblaw.com; jmiller@viblaw.com;

**Date:** Tuesday, March 12, 2013 3:25 AM

Mr. Bowman,

As an officer of the court you can issue the subpoena yourself so there is no need to "file" the subpoenas in this case, as if by a pro per litigant. Once the subpoenas are issued the notice to consumer can then be served personally or by US mail. US mail is the best option in this case. Once the notice period ends, the subpoena can then be personally served on the witness (e.g: Stanford). In view of this, we don't appear to have a problem.

Guys - I know this case is politically charged but I have to mount a defence here, and I can't do that without information gathered through discovery. We need to get to it as I do not intend to settle. The DA wants to essentially rehash what took place in the civil restraining order hearing so we have to gather the required information to be ready to fully articulate matters and prove my innocence, something my enemies do not want but that's too bad. I did not do anything, pure and simple. Please confirm our readiness to proceed with the subpoenas as discussed herein. My father and I are also open to coming in for further discussion to confirm we're good to go in all respects.

I need a response to this email asap. Thx.

Jason

PS - Good read

http://www.legalargument.net/sdt.html

Some criminal defense attorneys comply with section 1985.3 when they subpoena the medical or mental health records of a witness. One reason they do this is to avoid litigation costs when the civil attorney hired by the person or entity served with the subpoena files a motion to quash on the ground that section 1985.3 was not complied with. While Civil Procedure Code section 1985.3 might not be the authority requiring "consumer notice" in criminal cases, there are legal principles that require such notice. Code of Civil Procedure section 1985.3 was adopted to protect a consumer's right of privacy under the California Constitution. (*Lantz v. Superior Court* (1994) 28 Cal.App.4th 1839, 1848 [34 Cal.Rptr.2d 358].) Whether or not the Penal Code has any requirements for third party notice, the fact remains that third parties have constitutional rights to privacy and from unreasonable searches and seizures. Third-party notice should be given when a criminal subpoena duces tecum is issued. *Sehlmeyer v. Department of General Services* (1993) 17 Cal.App.4th 1072 [21 Cal.Rptr.2d 840] dealt with the administrative subpoena duces tecum. The Court of Appeal held that there was a constitutional and common law right of privacy requiring third party notice when one's personal records are being subpoenaed. (17 Cal.App.4th at p. 1077.) The court adopted the notice provisions and proceedings of Civil Procedure Code section 1985.3 for the administrative subpoena duces tecum. (*Id.* at pp. 1080-1081.)

As to medical records, third-party-notice is required by the federal HIPAA regulations. In Section 8 below, however, I argue that HIPAA preempts the California subpoena duces tecum procedure. But I also explain

that, in my view of the proper way to comply with HIPAA, a criminal defense attorney will still be required
to give notice to the third party whose medical records are sought.

---

**From:** Cameron Bowman <cbowman@viblaw.com>
**To:** Johanna Miller <jmiller@viblaw.com>
**Cc:** J C <symmetry_law@ymail.com>
**Sent:** Monday, March 11, 2013 5:37 PM
**Subject:** Re: Follow-Up

FYI. The judge was very concerned about you trying to serve these on your own given the restraining order
so that is not an option unfortunately

Sent from my iPhone

On Mar 11, 2013, at 5:34 PM, Johanna Miller <jmiller@viblaw.com> wrote:

> Hello Jason,
>
> I have completed the following Subpoenas:
>
> Stanford Hospital
> Quest Diagnostics
> Bay Area Aesthetic Surgery
> CVS Pharmacy
> Menlo Park Police Dept.
> Ventura Police Dept.
>
> The problem is Amanda our investigator files these, and you have an outstanding bill with her. She really
> needs to be paid in full, so that we can carry out with these!
>
> Thanks!
>
>
> **Johanna Miller**
> VIB Law
> 675 North First St. Suite 250
> San Jose, CA 95112
> Phone: (408) 920-9720
> FAX: (408)882-0699
>
>
> On Fri, Mar 8, 2013 at 3:24 PM, Johanna Miller <jmiller@viblaw.com> wrote:
>> Sounds good! I am working on it! I will let you know if I have any questions!
>
>> Thanks again!
>
>> **Johanna Miller**
>> VIB Law
>> 675 North First St. Suite 250
>> San Jose, CA 95112

Phone: (408) 920-9720
FAX: (408)882-0699


On Fri, Mar 8, 2013 at 2:37 PM, J C <symmetry_law@ymail.com> wrote:
Hi Jo,

Thanks again for your time this morning. Upon further review it would be good for you to also generate a subpoena for the "good cause" report my spouse filed with the DA's Office for San Mateo County on 3/2/2012. Please do so. The subpoena I generated is attached with the criteria. The subpoena you generate should include my spouse' driver license number for further ID purposes so the DA will be sure to pull the correct report. Also her DOB should be included as well for the same reason (7/15/1972).

Please confirm receipt of this email so I know you're good to go in this regard. Thanks again for your assistance.

Jason Cobb


DA San Mateo County
**Main Office**
400 County Center, 3rd Floor
Redwood City, CA 94063
(650) 363-4636

# EXHIBIT 15

**Subject:** Re: Follow-up: Subpoenas

**From:** Amanda Freel (amanda@thefreelagency.com)

**To:** jcobb

**Cc:** jmiller@viblaw.com;

**Date:** Wednesday, February 27, 2013 7:43 AM

Jason,

My office is no longer working on your case as your invoice still hasn't been paid and you never did address what part of the invoice specifically you were objecting to. Please send your emails to Cameron's office. Your bill is now past due and payable immediately. Thank you.

Amanda Freel
The Freel Agency, Private Investigators
PI License #22490
675 N. First Street
Suite 250
San Jose, CA 95112
Phone:(408)799-3752
Fax:(408)297-1533
Website: www.thefreelagency.com

On Feb 27, 2013, at 7:27 AM, J Cobb <                    > wrote:

Hi Amanda,

Please confirm receipt and the next steps in view of my comments. Thx.

Jason

----- Forwarded Message -----
**From:** J Cobb <
**To:** "amanda@thefreelagency.com" <amanda@thefreelagency.com>
**Cc:** "jmiller@viblaw.com" <jmiller@viblaw.com>; "cbowman@viblaw.com" <cbowman@viblaw.com>
**Sent:** Tuesday, February 26, 2013 9:34 AM
**Subject:** Re: Follow-up: Subpoenas

In civil, the notice to consumer can be served via US Mail to the last known address...then the subpoena is served personally on the witness. Can the same be done in a criminal case?

Please provide the answer to my question in your response. Thx.

Jason

---

**From:** Amanda Freel <amanda@thefreelagency.com>
**To:** 'J Cobb' <                    >; cbowman@viblaw.com; jmiller@viblaw.com
**Sent:** Tuesday, February 26, 2013 9:20 AM
**Subject:** RE: Follow-up: Subpoenas

Jason,

We are trying to subpoena her medical records directly from the two sources you wanted medical records from. However, we are legally required to *first* serve Jennifer with a Notice to Consumer and allow her five days to object to the records being sought *prior* to being able to serve Stanford and Quest.  We are *not* asking her to produce her medical records.  But we *must* serve her with the NTC first.

Amanda Freel
The Freel Agency, Private Investigators
CA Private Investigator License #22490
675 N. First Street, Suite 250
San Jose, CA 95112
Phone: (408)799-3752
Fax: (408)297-1533
www.thefreelagency.com

**From:** J Cobb [mailto:jcobb16@rocketmail.com]
**Sent:** Tuesday, February 26, 2013 8:11 AM
**To:** cbowman@viblaw.com; jmiller@viblaw.com
**Cc:** amanda@thefreelagency.com
**Subject:** Follow-up: Subpoenas

Mr. Bowman/All,

Following up to confirm that there is a hearing for 3/6/13. I was not aware of this. Please confirm if I am required to attend.

Also regarding subpoenas, endeavoring to subpoena information from the alleged vic in this instance (Jennifer Cobb) is a bad strategy. Instead, the desired evidence should be sought directly from the witness or holder of the records (eg: Stanford Hospital; Quest Diagnostics). That will simplify the task for all concerned as the witness can then be personally served, which will prove much easier to accomplish. So unless this is somehow not an option in a criminal proceeding pursuant to some point of law that can be cited, then the tactics in this regard should be changed immediately. Please confirm receipt of this email and your adjusted course of action so we can achieve and maintain clarity on this point. Thank you.

Jason Cobb

# EXHIBIT 16

William Douglas
3366 Ramona St.
Palo Alto, Ca 94306

March 8, 2013

Jason Cobb
331 Curtner Avenue, Apt. D
Palo Alto, CA 94306

      **RE:    Deposition Subpoena for Production of Business Records**
              **San Mateo County Case Number FAM 0116981**

Dear Mr. Cobb:

      This shall serve as notice of my objection to the Subpoena for Production of Business Records issued in your name on February 21, 2012 in the above-referenced case. The Subpoena lists Arlen St. Clair as the deposition officer. I do not believe that Mr. St. Clair is qualified under California law to serve as a deposition officer. Absent written documentation that Mr. St. Clair is qualified under California law to serve as a deposition officer I will not respond to your subpoena.

              Very truly yours,

              William Douglas

William Douglas
3366 ramona st
Palo alto ca
94306

April 19, 2013

Jason Cobb
331 Curtner Avenue, Apt. D
Palo Alto, CA 94306

    **RE:    Deposition Subpoena for Production of Business Records**
             **San Mateo County Case Number FAM 0116981**

Dear Mr. Cobb:

       This shall serve as notice of my objection to the Subpoena for Production of Business Records issued in your name on April 2, 2013 in the above-referenced case. I am not a party to this action; to the best of my knowledge there is nothing currently before the court in this action that pertains to me or to the vehicle that you want information about; it appears that you have served this subpoena only for the purpose of harassing me and causing me unwarranted annoyance, oppression, and undue burden. This is a misuse of the discovery process.

                    Very truly yours,

                    William Douglas

# EXHIBIT 17

# JPMorganChase 🔵

Christina M Wilson
Telephone: (317) 757-7491
Facsimile: (317) 757-7421

National Subpoena Processing
Mail Code IN1-4054
7610 West Washington Street
Indianapolis, Indiana 46231

3/18/2013

Jason Cobb
Jason Cobb
331 Curtner Ave. Apt D
Palo Alto, CA 94306

**RE: Subpoena Type: Deposition Subpoena**
    **Case Name: Jennifer Cobb v Jason Cobb**
    **Case No.: FL-116981**
    **JPMC File No.: SB454750-F1**

Dear Mr. Cobb :

JPMorgan Chase Bank, N.A. is in receipt of the Deposition Subpoena for the above-referenced matter. Based on the information you provided in the Deposition Subpoena for the subject(s), a good faith search was conducted of our existing computer systems for any information or records related to the named subject(s). However, JPMorgan Chase Bank, N.A. was unable to locate any information or records related to the named subject(s).

Please provide additional information such as: social security number, tax identification number or account number, etc. Upon receipt of the additional information from you, JPMorgan Chase Bank, N.A. will conduct another search of its existing computer systems for any information or records related to the subject(s) of the Deposition Subpoena.

If JPMorgan Chase Bank, N.A. is able to locate information or records based upon the new information provided, it will need approximately thirty to forty-five (30-45) business days from receipt of the additional information to produce documents.

Please contact me directly should you obtain additional information that will assist in locating information or records for the named subject(s).

Sincerely,

Christina M Wilson

Christina M Wilson
Document Review Specialist

# Haight

Haight Brown & Bonesteel LLP

555 South Flower Street
Forty-Fifth Floor
Los Angeles, California 90071
213.542.8000
213.542.8100 fax
www.hbblaw.com

Jeffrey A. Vinnick
*direct:* (213) 542-8065
jvinnick@hbblaw.com

April 4, 2013

## VIA FEDERAL EXPRESS

Mr. Jason Cobb
331 Curtner Avenue, Apt. D
Palo Alto, CA 94306

          Re:    Cobb v. JPMorgan Chase Bank, N.A., et al.

Dear Mr. Cobb:

      JPMorgan Chase Bank, N.A. has retained the law offices of Haight, Brown & Bonesteel, LLP to respond to two Deposition Subpoenas for Production of Business Records that you recently served on it. The Subpoenas request bank records that refer or relate to The English Congregation of Jehovah's Witnesses, Menlo Park, California, Inc. and Jennifer Cobb. In light of our law firm's retention, we request that all further communication concerning your request for production of documents be made, in writing, to the undersigned, and that you refrain from contacting JPMorgan Chase Bank in the future.

      JPMorgan Chase is unable to comply with the Subpoenas because the consumers have served timely objections to the subpoenas and/or have filed motions to quash. *Monarch Healthcare v. Superior Court* (2000) 78 Cal.App.4th 1282, 1290; *Code of Civil Procedure* §§ 1987.1(c), 1985.3(g). Unless and until a court of competent jurisdiction makes a full and final determination that the records identified in the two subpoenas must be produced, no such bank records shall be forthcoming.

# Haight

Mr. Jason Cobb
April 4, 2013
Page 2


Thank you.


Very truly yours,


Jeffrey A. Vinnick
Haight Brown & Bonesteel LLP

JAV:rjw

Cc:  Beverly White

# EXHIBIT 18



## REQUEST FOR ACCOMMODATION

**Section I.**    *To be completed by the Employee/Patient:*

Name: _____

Job Title: _____

**Section II.**    *To be completed by the Employee's/Patient's Health Care Provider:*

**NOTE:** Cisco will provide written information on the Employee/Patient's job requirements for use in completing this form. If the Health Care Provider believes that he/she needs further information, contact Rose Marrelli at (416) 306 7084.

**PLEASE ALSO NOTE:** The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. "Genetic information," as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

A.       1. Does the Employee/Patient have a physical or mental impairment:
              (Note: "Impairment" means a disorder, disease, condition, disfigurement or loss.)

              _____ Yes                 _____ No

         2. Does the impairment affect one or more of the following body systems: neurological, musculo-skeletal, speech organs, respiratory, cardio-vascular, reproductive, digestive, genito-urinary, hemic, lymphatic, skin and/or endocrine?

              _____ Yes                 _____ No

         If no, describe the impairment, if any:

         3. How long is the impairment expected to last?

4

4. Does the impairment limit the Employee/Patient with respect to a major life activity to any degree? Major life activities include but are not limited to caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, eating, sleeping, standing, lifting, bending, reading, concentrating, thinking and communicating, sitting, reaching, interacting with others, and/or working?

_____ Yes         _____ No

5. Describe the nature of the functional limitations:

B.     With specific reference to the relevant aspects of the Employee/Patient's job function(s), method of work and/or work environment (as you understand them), please describe how the Employee/Patient is limited—because of his/her impairment—with respect to performance of his/her job function(s):

C.     What specific modifications are needed in order to allow the employee to perform the essential functions of his/her job?

D.     What is the duration of this requested accommodation?

5

# EXHIBIT 19

**As Taken From the 5/22/1990 Awake! Article:**

**Five Common Fallacies – Don't Be Fooled By Them!**

**\*\*\* g90 5/22 pp. 12-13 Five Common Fallacies—Don't Be Fooled by Them! \*\*\***

"LET no man deceive you with empty words." This advice was given nearly 2,000 years ago and still rings as true as ever. Today, we are bombarded with persuasive voices: movie stars peddling cosmetics, politicians promoting policies, salesmen pushing products, clergymen expounding doctrine. All too often the persuasive voices prove to be deceptive—little more than empty words. Yet, people in general are easily mislead by them.

Often this is because people fail to distinguish truth from fallacy. Students of logic use the word "fallacy" to describe any departure from the path of sound reasoning. Simply stated, a fallacy is a misleading or unsound argument, one in which the conclusion does not follow from preceding statements, or premises. Fallacies may, nevertheless, be powerfully persuasive because they often make a strong appeal to the emotions—not to reason.

A key to avoiding deception is knowing the workings of fallacy. Let us therefore take a look at five common ones, with a view to sharpening our God-given "power of reason."—Romans 12:1.

## FALLACY NUMBER 1

***Attacking the Person*** This type of fallacy attempts to disprove or discredit a perfectly valid argument or statement by making an irrelevant attack on the person presenting it.

Consider an example from the Bible. Jesus Christ once endeavored to enlighten others regarding his coming death and resurrection. These were new and difficult concepts for his listeners. But rather than weigh the merits of Jesus' teachings, some attacked Jesus himself, saying: "He has a demon and is mad. Why do you listen to him?"—John 10:20; compare Acts 26:24, 25.

How easy it is to label someone "stupid," "crazy," or "uninformed" when he or she says something we don't want to hear. A similar tactic is to attack the person with a subtle dose of innuendo. Typical examples of this are: "If you really understood the matter, you wouldn't have that point of view" or, "You only believe that because you're told to believe it."

But while personal attacks, subtle and not so subtle, may intimidate and persuade, never do they disprove what has been said. So be alert to this fallacy!

**\*\*\* g90 5/22 p. 14 Five Common Fallacies—Don't Be Fooled by Them! \*\*\***

An ancient proverb says: "Anyone inexperienced puts faith in every word, but the shrewd one considers his steps." (Proverbs 14:15) So don't fall for fallacies. Learn to differentiate between legitimate attacks on what is said and cheap attacks on personalities. Don't be fooled by invalid appeals to "authority," urgings to 'join the crowd', either/or reasoning, or gross oversimplifications—especially when something as vital as religious truth is involved. Check all the facts, or as the Bible puts it, "make sure of all things."—1 Thessalonians 5:21.

# EXHIBIT 20

**Subject:**  FW: Metrics

**From:**  Jason Cobb

**To:**  symmetry_law@ymail.com;

**Date:**  Thursday, April 25, 2013 1:51 PM

**From:** Alicia Perdue
**Sent:** Tuesday, February 19, 2013 8:51 AM
**To:** Jason Cobb
**Subject:** Metrics

Hi Jason,

I hope your migraine from yesterday is gone and that you're feeling better. Now that it's Tuesday, I wanted to check in with you again regarding the metrics pull.

After our initial sync-up last Wednesday, when I reached back out to you on Friday to see if you had any questions, you mentioned that other priorities had taken up your time.

Do you think you will get a chance today to tackle them?

Once again, we are looking for Final Q2 Service metrics numbers for case count, PDFs, MSD, and QRI. These metrics are fed into the quarterly service reviews for Rebecca and help provide critical insight for our service owners to understand how their services are preforming. I want to stress how timely this information is (Q2) as month 1 of Q3 is set to end this Sunday and we will have to pull M1 data that following Monday on the 24th.

We are really looking to drive an organizational best practice here and it would be great to have you help out on this initiative with your available bandwidth.

Thanks and let me know your status,

Alicia

**Subject:** FW: Q3M1 Metrics Pull

**From:** Jason Cobb

**To:** symmetry_law@ymail.com;

**Date:** Thursday, April 25, 2013 1:52 PM

**From:** Alicia Perdue
**Sent:** Monday, February 25, 2013 8:55 AM
**To:** Jason Cobb (jcobb)
**Cc:** Jeff Kitagawa
**Subject:** Q3M1 Metrics Pull

Hi Jason,

Latha and I ended up pulling the Q2 data we needed, so your assistance is no longer required for that ask. However, as we discussed a few weeks back, this is an monthly activity and yesterday was the last day of Q3M1. I typically start pulling the data today, but we send out the email notification to the directors on Friday, so we have till Thursday, February 28th to complete it.

As always, please let me know if you have any questions, otherwise I'll reach out to you again mid-week to see how things are going.

Alicia

**Subject:**   FW: Service Metrics Data Pull

**From:**   Jason Cobb

**To:**   symmetry_law@ymail.com;

**Date:**   Thursday, April 25, 2013 4:15 PM

**From:** Jason Cobb (jcobb)
**Sent:** Wednesday, March 27, 2013 8:03 PM
**To:** Tara Fortier
**Cc:** Rose Marrelli           ; hholderness@morganlewis.com
**Subject:** RE: Service Metrics Data Pull

Tara,

In reflecting more on today's conversation I wanted to provide the following response.

I feel that an effort is being made to bully me in these regards which is cause for concern. I feel that a concerted effort is being made to force me into a set of circumstances that are known and/or intended to create difficulty for me which is causing me to recall varied experiences here in CVC IT, specifically the hostile work environment that I have contended with.

I am not the only person available to handle the metrics task. I am open to assisting in the effort to complete these tasks, as a participant within a group effort, which makes more sense in view of my challenges as discussed, your expressed willingness to accommodate such and the urgency typically associated with this deliverable that, as you know, has an added degree of difficulty for me. It feels like you're endeavoring to make some point to me within some effort to assert power, more so than simply assigning tasks that need to get done in the general sense.

It is my understanding that this task has been executed by two people working in unison and now it seems the intent is to assign it solely to me and with the same

timelines that have been in place with two people doing the work, despite my known challenges. That seems less than fair. My concerns are not a matter of personal preference but rather a matter of personal well-being in view of my medical history, which Cisco is and has been aware of for some time pursuant to the record of communications from my healthcare providers dating back to 2006.

I have noted an interesting point of alignment and synergy between events in certain legal proceedings and corresponding events in the workplace, which do not appear to be coincidental. I am conscious of the fact that legal considerations have influenced my work experience here at Cisco before and I feel that this remains an issue at present. This left field metrics push previously presented in a week where a legal deadline existed specific to a federal action with implications for Morgan, Lewis and in some regards, Cisco. The same task reappears in conjunction with other things in and around the current deadline in that same civil action and these are just two of many such examples. When milestones are achieved in these other legal matters, with implications for Morgan, Lewis and by extension Cisco, then things consistently "heat up" in the workplace. I have tracked this trend for some time now and I can speak to it comprehensively.

I do not want to feel that I am being picked on in the workplace, and  I do not want to be made to feel that there is some unspoken yet understood cause and effect relationship between matters in my personal life and matters in my professional life. The two should be separate and distinct. However, I fully recognize that they are not.

Jason Cobb

PS:

Mr. Holderness – I haven't forgotten about Dennis,…or you. Tomorrow's revised deadline will be met. Check your mail.

**From:** Tara Fortier (tlappin)
**Sent:** Wednesday, March 27, 2013 4:31 PM
**To:** Alicia Perdue (alperdue); Jason Cobb (jcobb)
**Subject:** RE: Service Metrics Data Pull

Alicia,

I had a conversation with Jason this morning with regard to the work that has been done in the past and with making this a monthly cadence of work. He will be reaching out to set up a meeting with you to understand the full scope of work, and the timelines.

Thanks

Tara

**From:** Alicia Perdue (alperdue)
**Sent:** Tuesday, March 26, 2013 12:04 PM
**To:** Tara Fortier (tlappin)
**Subject:** Service Metrics Data Pull

Hi Tara,

As I mentioned earlier, I'm currently focusing my priorities on KDD and CVC-wide tableau dashboard development but still need to complete the FY13Q3M2 data pull by end of this week for the Service Review Dashboard. As work continues to expand in this space, I was wondering if we can continue to leverage some of our other team members' help collecting this.

Thanks,

Alicia



**Alicia Perdue**
ANALYST.IT
Cisco Value Chain (CVC) IT


Think before you print.

# EXHIBIT 21

1   Jonathan D. Cobb, Sr.
    828 Weeks Street

2   Palo Alto, CA 94303
    (650) 323-9155

3

    Jason Cobb

4   1101 Menlo Oaks Dr.
    Menlo Park, CA 94025

5   (650) 815-1547

6   Plaintiffs

7

8

9                UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11

12   JONATHAN D. COBB, SR., JASON      Civil Action No: CV 12-01372-JSW
    COBB

13

14           Plaintiffs,

                      **PLAINTIFFS' CHALLENGE OF ATTORNEY**
15            vs.            **GENERAL'S SCOPE OF EMPLOYMENT**
                      **CERTIFICATION**
16   JPMORGAN CHASE BANK, N.A.,
    MORGAN, LEWIS & BOCKIUS LLP,

17   WELLS FARGO BANK, N.A. THE
    CITY OF MENLO PARK, DENNIS J     **COMPLAINT FILED: MARCH 19, 2012**

18   SINCLITICO JR, ANTHONY V SMITH,
    CHRIS NATHAN, BRENDA TOLBERT,

19   IVY GARCIA, MARYANN BUCKLEY,
    ERNEST BREDE, LUIS CONTRERAS,

20   DONALD T SHOWERS III, DOES 1 –
    100

21           Defendants.

22

23

24

25

26

27

28

                                      CV 12-01372-JSW

RECEIVED

SEP 14 P 4:01

RICHARD W. WIEKING, CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA.

FILED

SEP 14 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In providing the following response to United States Attorney Melinda Haag's 12(b)(1) and 12(b)(6) motion to dismiss, Plaintiffs' reiterate that in considering a motion to dismiss a complaint for alleged failure to state a claim, the court must view the factual allegations in the complaint in the light most favorable to the plaintiff, and those allegations must be presumed to be true. Papasan v. Allain, 478 U.S. 265, 283 (1986). See also Neitzke v. Williams, 490 U.S. 319, 327 (1989)

As the Supreme Court stated in Scheuer, 416 U.S. at 236:

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test. Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader.

Indeed, motions to dismiss pursuant to Rule 12(b)(6) are "viewed with disfavor and [are] rarely granted." 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 321 (1990 ed.); Wilkerson v. United States, 839 F. Supp. 440, 442 (E.D. Tex. 1993). Courts are reluctant to dismiss a case on technical grounds and, consistent with the federal rules, prefer to decide cases on their merits. See, e.g., Kauffman v. Moss, 420 F. 2d 1270, 1276 (3d Cir.) (citing Foman v. Davis, 371 U.S. 178, 181 (1962)) (relying on Conley, court stated "[i]t is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of . . . mere technicalities."); Texas v. Am. Tobacco Co., 14 F. Supp. 2d 956, 961 (E.D. Tex. 1997); Yeitrakis v. Schering-Plough Corp., 804 F. Supp. 238, 240 (D.N.M. 1992).

In their FAC, Plaintiffs' detail the current state and progression of events stemming from a foundational scheme intended to acquire operational control of an existing non-profit corporation and subsequent control and ownership of said corporation's real property located at 811 Bay Road in Menlo Park, CA as well as any and all liquid assets. A further aim of this scheme involved the execution of a theft by trick or device micro-scheme that was perpetrated on corporation members.

As sincere men endeavored to stand against these acts by notifying authorities and by lawfully

2

raising their concerns via related federal action C 10-03907-MEJ, the association-in-fact RICO Enterprise, as described in Plaintiffs' FAC, bribed then conspired with the cited financial institutions, local law enforcement agencies as well as other agents of San Mateo County and the U.S. District Court including Ivy Garcia, Chris Nathan, and Brenda Tolbert amongst others, to the end of obstructing any and all efforts to expose and defeat its scheme.

Two of the key milestones in this campaign are the criminally fraudulent dismissals of federal civil actions C 10-03907-MEJ and C 11-02496-DMR as executed in part by the cited US District Court employees who acted beyond the scope of their official capacities pursuant to their participation in the commission of predicate RICO acts including conspiracy to commit RICO, bribery and obstruction of justice. (*Melton v. United States* (1980, DC Dist Col) 488 F Supp 1066))

**Responses to Legal Argument**

**I.    THE UNITED STATES IS THE ONLY PROPER DEFENDANT AND SHOULD BE SUBSTITUTED FOR THE INDIVIDUAL FEDERAL DEFENDANTS.**

This assertion and argument fails in view of the circumstances detailed throughout Plaintiffs' FAC, particularly in view of the alleged violations of 18 U.S.C. § 201, 371, 1503, as well as fraud upon the court.

**Quasi-Judicial Immunity**

As stated in *Stump v. Sparkman*, the Court recognized that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself." Bradley v. Fisher, supra, at 347

As stated in *O'Neil v. City of Lake Oswego* "[a] judge...will be subject to liability only when he acted in the `clear absence of all jurisdiction.'" *Id.* at 356-57, 98 S.Ct. at 1104-05. *See* Gregory v. Thompson, 500 F.2d 59, 62 (9th Cir. 1974).

While judges have judicial immunity and clerks quasi-judicial immunity, judges and clerks are not granted the same degree of authority nor are their respective roles interchangeable. While both judges and clerks can perform acts which are judicial in nature, this in no way suggests that judges and clerks have equal standing as regards authority or jurisdiction. ( See FRCP 77(c)(2) )

In allegedly participating in the obstruction scheme, Defendants Garcia, Nathan, Tolbert et al.,

3

1   acted in "clear absence of all jurisdiction" in that they usurped the respective presiding judge's

2   authority by effectively rendering "judgments," independent of the judge, prior to falsifying a series

3   of court orders including the dispositive orders for federal civil actions C 10-03907-MEJ and

4   C 11-02496-DMR. While clerks are called upon to perform a variety of tasks that in some regards

5   may constitute judicial acts, they are not judges and therefore have no basis whatsoever to render

6   judgments in a judicial action, especially to the exclusion of and in contradiction to the expressed

7   convictions and intentions of the actual and duly assigned district court judge. FRCP 77 generally

8   establishes the clerk's authority and jurisdiction.

9          **Scope of Employment**

10          On page 5 of the United States Attorney's reply brief at line 9, reference is made to the

11   certification that the Federal Defendants "were acting within the scope of their employment at all

12   times..."

13          Plaintiffs' hereby exercise their right to challenge this certification of employment as the

14   scope of employment certification is subject to judicial review (Plaintiff may challenge Attorney

15   General's scope of employment certification – Kelly v. U.S., D.Mass.1990, 737 F.Supp. 711)

16          A government employees' actions performed in the course of their official capacity receives

17   extensive protection pursuant to the sovereign immunity doctrine as cited by the United States

18   Attorney. However, said protection is not indiscriminate, nor is it absolute. Federal case law

19   establishes that when a government employee acts without authority, and in particular, acts against

20   governmental interests, they cease to act in an official capacity and are viewed by the government as

21   acting on their own and thus personally liable for their own actions. (*McHugh v. University of*

22   *Vermont*, D.Vt. 1991, 758 F.Supp. 945, affirmed 966 F.2d 67; *Melton v. United States* (1980, DC Dist

      Col) 488 F Supp 1066))

23          The general conspiracy statute, 18 U.S.C. § 371, which is accounted for within 18 U.S.C. §

24   201, creates an offense "[i]f two or more persons conspire either to commit any offense against the

25   United States, or to defraud the United States, or any agency thereof in any manner or for any

26   purpose."

27          "The statute is broad enough on its terms to include any conspiracy for the purpose of

28   impairing, obstructing or defeating the lawful function of any department of government." (*Hass v.*

*Henkel,* 216 U.S. 462 (1910))

"To conspire to defraud the United States means primarily to...interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the Government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane or the overreaching of those charged with carrying out the governmental intention." (*Hammerschmidt v. United States,* 265 U.S. 182 (1924))

*Hammerschmidt,* 265 U.S. at 188:

"The general purpose of this part of the statute is to protect governmental functions from frustration and distortion through deceptive practices."

Under 18 U.S.C. § 371, the fraud or impairment of legitimate government activity can include bribery of a government employee, kickbacks to government employee, alteration or falsification of official records, submission of false documents...in the most general terms, obstructing, in any manner, a legitimate governmental function.

Based on the allegations of insurrection and fraud upon the court as supported by the body of evidence including the series of status hearing transcripts, which constitute admissible evidence pursuant to FRCP 80, the cited federal employees defrauded the United States within the meaning of 18 U.S.C. § 371, which inherently removes any basis to substitute the United States as the sole federal defendant since the United States has not acted against its own interests in this case but rather the cited individuals, acting on their own, without authority and any jurisdiction, have acted against the interests of the United States. (*Oklahoma ex rel. Philips v Guy F. Atkinson Co.* (1941 DC Okla) 37 F Supp 93; *McHugh v. University of Vermont,* D.Vt. 1991, 758 F.Supp. 945, affirmed 966 F.2d 67; *Melton v. United States* (1980, DC Dist Col) 488 F Supp 1066))

While federal law, in itself, provides a fine context in which to evaluate the U.S. Attorney's scope of employment certification, it is state law that governs the scope of employment determination. (*Capozzi v DOT* (2001, DC Mass) 135 F Supp 2d 87)) Consequently, whether or not the cited federal employees acted within the scope of their employment, is to be determined by standing principles of respondeat superior for California.

As cited in *Dan Hartline v. Kaiser Foundation Hospitals* (2005), ""The modern justification

5

for respondeat superior is a deliberate policy allocation of risk. (Hinman, supra, 2 Cal.3d at p. 959.)...A risk is inherent in or created by an enterprise when "in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.] In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one 'that may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer. [Citation.]" (Id. at p. 619; see Perez v. Van Groningen & Sons, supra, 41 Cal.3d at p. 968.)...Accordingly, the employer's liability extends beyond his actual or possible control of the employee to include risks inherent in or created by the enterprise. (Hinman, supra, 2 Cal.3d at p. 960.) (Id)""

In Hinman, the California Supreme Court states ""We are not here looking for the master's fault but rather for risks that may fairly be regarded as typical of or broadly incidental to the enterprise he has undertaken...Further, *we are not looking for that which can and should reasonably be avoided*, but with the more or less *inevitable* toll of a *lawful* enterprise.""

**Admissible Evidence**

The burden of proof in a civil RICO action is far less stringent and demanding in comparison to a criminal RICO action. Consequently, a preponderance of the evidence to the end of determining which competing assertions of fact are more likely to have occurred sufficiently meets the burden of proof in a civil action.

Contrary to the U.S. Attorney's assertion that Plaintiffs have offered only conclusory allegations, proof does exist and has been referenced in Plaintiffs' previous filings. Consequently, a clear and reasonable inference has already been established that the clerks, in the clear absence of any jurisdiction and beyond the scope of employment, did in fact participate in a scheme to obstruct justice and fraudulently dismiss federal civil actions 10-03907-MEJ and C 11-02496-DMR in violation of 18 U.S.C. § 371 amongst other federal statutes as well as Plaintiffs' constitutional right to due process and equal protection under law. (28 U.S.C. § 2679(a); 28 U.S.C. § 2679(b)(2)(B); *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 29 L.Ed.2d 619, 91 S. Ct. 1999 (1971))

Pursuant to FRCP rule 80, stenographic transcripts, which constitute testimony, can be used as

6

evidence at a hearing or trial. Consequently, Exhibits 1 – 3 constitute evidence already in hand to support the statement directly above. This evidence establishes the clearly stated and repeatedly affirmed point of conviction and intent on the part of Chief Magistrate Maria-Elena James as regards the acquisition of the bank records in question by court order.

Per the allegations, RICO Defendants Garcia, Nathan and Tolbert acted beyond the scope of their authority and official capacities when called upon to do so by their fellow RICO Defendants pursuant to being promised and/or given something of value in exchange for their participation in the obstruction micro-scheme perpetrated by the cited federal employees in concert with their fellow RICO Defendants to the end of circumventing and impeding Judge James' clearly stated order and directives. Pursuant to this intentional act of obstruction, the court's Order never appeared in the docket and it was never mailed to the parties prior to the fraudulent dismissal of the action. Interestingly, this Order (3:10-cv-03907-MEJ; Dkt No. 84) appeared in the docket, along with several other missing filings, after the appeal for C 10-03907-MEJ was filed with the 9th Circuit in February 2012. To date, no explanation has been given as to why this order was never executed per Judge James' directive, and despite Plaintiffs' filing their *Acknowledgment and Agreement to be Bound to Protective Order* (3:10-cv-03907-MEJ; Dkt No. 113), the import of which is further amplified by the fact that the Plaintiffs' proper invocation of FRCP 56(d) for the exact same records specified in this Order was denied. Judge Maria-Elena James would not do that, and point of fact, she didn't.

Instead of the expected order for the bank records, an order, literally from left field, calling for a settlement conference was sent to all parties on July 28, 2011 (3:10-cv-03907-MEJ; Dkt No. 68). This act was initiated by the RICO Defendants and *not* Judge James. Contrary to the falsified entries in the transcript for the 9/1/11 status conference, as discussed in Plaintiffs' FAC at paragraphs 164 & 165, Judge James did not call for a settlement conference, making no mention of such or Judge Ryu in either the July 28, 2011 or September 1, 2011 hearings. As clearly stated in Plaintiffs' FAC at paragraph 139, Defendants Nathan and Tolbert, acting in concert with their co-RICO Defendants and *independently of Judge James,* "ordered" the settlement conference, pursuant to the bribery scheme, by and through the fraudulent production and mailing of the Order calling for such. When the Plaintiffs in C 10-03907-MEJ chose not to settle, the case continued. However, as obstruction of Judge James' directive for a court Order to obtain the outstanding bank records also continued,

7

1   Defendant Tolbert et al. had to assume ongoing control of the proceedings, manipulating such to

2   ensure that the Plaintiffs never again appeared before Judge James as the topic of the bank records

3   would have naturally come up exposing the fact that Judge James' Order for such had not been

4   executed per her directive. This is an additional reason why federal civil action C 10-03907-MEJ was

5   dismissed fraudulently, to prevent discovery of the overt acts of obstruction and fraud upon the court

6   that had occurred in earnest subsequent to that July 28, 2011 status conference, *in direct opposition to*

7   *the Court's stated intention and directives* (3:10-cv-03907-MEJ; Dkt Nos. 66, 84).

8       Simply put, C 10-03907-MEJ was hijacked. That can't occur without complicit acts from the

9   clerks supporting the judge assigned to the very case in question. Further, it does not stand to reason

10  that said clerks would assume such a risk, including termination and, at the highest level, federal

11  prison, without some form of compensation.

12      Overall, indications of dual or multiple personalities, so to speak, readily manifest when

13  reviewing the complete history of federal civil action C 10-03907-MEJ. (e.g.: 3:10-cv-03907-MEJ;

14  Dkt Nos. 66 v. 68; 13 v. 137) There is a clear disconnect between Judge James' established pattern of

15  thought, reasoning, comments and judgment, per the transcript record, and the "reasoning," or lack

16  thereof, exhibited in the fraudulent dispositive order (3:10-cv-03907-MEJ; Dkt No. 137).

17      It is presumed that the court, in this case, is acquainted with Chief Magistrate Maria-Elena

18  James and has the basis to know how she conducts her business as a Magistrate Judge, her tendencies,

19  preferences and reasoning. The dispositive order is entirely inconsistent with the manner in which

20  Judge James presided over case C 10-03907-MEJ. This dispositive order, when viewed in the light of

21  the transcript record, would appear to establish the legitimacy of Plaintiffs' allegations of fraud upon

22  the court and the subsequent and recurring acts of mail fraud. That Defendant Brenda Tolbert no

23  longer serves as Judge James' clerk establishes a basis of inference in support of this fact.

24      "If Plaintiff comes forward with competent evidence that would permit conclusion contrary to

25  AG's certification that defendant was acting within scope of his employment, defendant and

26  government, after discovery...are entitled to evidentiary hearing at which district court will resolve all

27  issues of law and fact relevant to issue and find whether defendant did or did not act within scope of

28  his or her employment. *Melo v. Hafer* (1994, CA3) 13 F3d 736, reh, en blanc, den (CA3) 1994 US

App LEXIS 2833.

8

1
2
3
4
5
6
7

Plaintiffs are also concerned that the AG's scope of employment certification is specifically intended to immunize the cited federal employees from prosecution in an effort to cover over the fact that the Department of Justice was already aware of the clerk's fraudulent actions. This concern initiated upon Plaintiffs' receiving the letter attached hereto in Exhibit 4, allegedly from the Department of Justice, pursuant to a subpoena being served upon Judge Ryu and her clerk Ivy Garcia. Having previously received written correspondence from other DOJ representatives, said letter does not appear to be authentic.

8
9
10

Plaintiffs fear that this action has become politicized and unduly affected by a standing effort to generate any basis of dismissal to the end of obscuring the clerk misconduct cited herein in violation of the 14th Amendment as well as other federal statutes.

11
12
13

**II. THE CASE SHOULD BE DISMISSED WITH PREJUDICE BECAUSE THE COURT LACKS SUBJECT MATTER JURISDICTION AND PLAINTIFFS CANNOT STATE ANY CLAIM UPON WHICH RELIEF COULD BE GRANTED.**

14
15

This assertion has been rendered academic and fails pursuant to the preceding argument as supported by case law.

16

**CONCLUSION**

17
18
19

The United States Attorney has certified that the government employees' actions were performed within the scope of their employment and capacities and the Plaintiffs are hereby challenging such.

20

Dated: September 14, 2012

21
22

Jonathan D. Cobb Sr., Plaintiff

23
24

Jason E. Cobb, Plaintiff

25
26
27
28

9

# <u>EXHIBIT 1</u>

## C 10-03907-MEJ: TRANSCRIPT OF PROCEEDINGS

## (STATUS CONFERENCE)

## JUNE 30, 2011

### PAGE 14: LINES 15-25

### PAGE 15: LINES 1-9, 23-25

### PAGE 16: LINES 1-5, 12-14

### PAGE 20: LINES 16-17

PAGES 1 — 24

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARIA-ELENA JAMES, JUDGE

JONATHAN D. COBB, SR., AND    )
WALTER ARLEN ST. CLAIRE,      )
                              )
          PLAINTIFFS,         )
                              )
 VS.                          )          NO. C 10-3907 MEJ
                              )
ERNEST BREDE, ET AL.,         )
                              )
          DEFENDANTS.         )
_____)

                         SAN FRANCISCO, CALIFORNIA
                         THURSDAY, JUNE 30, 2011

                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFF:          JONATHAN D. COBB, SR.
                        IN PRO PER
                        828 WEEKS ST.
                        PALO ALTO, CA  94303

                   BY:  WALTER ARLEN ST. CLAIRE
                        IN PRO PER
                        1227 SEVIER ST.
                        MENLO PARK, CA  94025

FOR DEFENDANT:          LAW OFFICES OF ANTHONY V. SMITH
                        204 EAST SECOND AVENUE
                        NO. 331
                        SAN MATEO, CA  94401
                   BY:  ANTHONY VINCENT SMITH
                        ATTORNEY AT LAW

REPORTED BY:       |    JAMES YEOMANS, CSR 4039, RPR
                   |    OFFICIAL REPORTER

            COMPUTERIZED TRANSCRIPTION BY ECLIPSE

1    AND THE POINT IS IF THESE ARE OFFICERS OF THE

2    CORPORATION, IF THEY'RE LEGAL OFFICERS OF THAT CORPORATION,

3    THEY'VE TAKEN OVER THE BANK ACCOUNTS THEY SHOULD BE ABLE TO GET

4    THOSE FORMS THEMSELVES.

5    MR. SMITH:  IF I COULD.  I THINK, THAT'S ULTIMATELY

6    WHAT'S GOING TO BE THE QUESTION HERE.  IS WHO ARE THE PROPER

7    OFFICERS OF THE CORPORATION THAT ACTED AS THE AGENT FOR THE

8    CONGREGATION?

9    THEY'RE CONTENDING CERTAIN INDIVIDUALS, MY CLIENTS WE

10   CONTEND THAT THEY ARE PROPER OFFICERS.  SO I THINK WHAT

11   HAPPENED HERE BECAUSE THERE'S BEEN MULTIPLE REQUESTS BY ALL

12   THESE DIFFERENT PARTIES, BOTH -- WELLS FARGO IS ESSENTIALLY

13   FROZEN AND BECAUSE THEY'RE CONCERNED ABOUT THEIR OWN LIABILITY,

14   SO THERE'S A COUPLE OF WAYS I CAN GO ABOUT THIS.

15   THE COURT:  WHAT'S THE RELEVANCE OF THESE BANK

16   RECORDS?

17   MR. SMITH:  WELL, THEY'RE CONTENDING IN THEIR

18   COMPLAINT THAT THERE WAS BANK FRAUD INVOLVED, SO GOES TO THE

19   HEART OF THEIR CLAIMS AND IT GOES TO THE HEART OF OUR DEFENSE

20   THERE WAS NO FRAUD, AND ANY ACCOUNTS MY CLIENTS ARE SIGNATORIES

21   THEY WERE PROPERLY AUTHORIZED THROUGH APPROPRIATE CORPORATION

22   PROCEDURE.

23   THE COURT:  ARE YOU STILL CONTENDING THEY'RE BANK

24   FRAUD?

25   MR. COBB:  YES.

JAMES YEOMANS - OFFICIAL REPORTER - (415) 863-5179

Case3:13-cv-01955-JSW  Document1-1  Filed04/29/13  Page118 of 169
Case3:12-cv-01372-JSW  Document89  Filed09/14/12  Page13 of 29

15

1          THE COURT:  LET ME POINT SOMETHING OUT TO YOU.  WHEN

2    YOU SAY THERE'S BANK FRAUD, YOU CAN'T THEN SAY YOU CAN'T HAVE

3    THESE RECORDS TO DEFEND YOURSELF AGAINST IT, ONCE YOU PUT THIS

4    OUT HERE IT'S ALL GOT TO COME TO LIGHT.

5          EVERYBODY'S LAUNDRY GETS AIRED AND EVERYTHING COMES TO

6    THE SURFACE, GOES BACK AND FORTH.  YOU GOT TO -- HAVE TWO

7    CHOICES.  ONE YOU CAN WITHDRAW THE BANK FRAUD AND THEN THESE

8    SUBPOENAS WILL GO AWAY OR STAY WITH THE BANK FRAUD EVERYTHING

9    COMES OUT.  GETS EVERYTHING TO LOOK AT.

10          NOW, THE COURT WILL PROTECT IT BECAUSE SOME PRIVACY

11    ISSUES HERE.  I CAN'T TELL THEM THEY CAN'T DEFEND THEMSELVES

12    AGAINST YOUR CLAIM NO MATTER WHAT YOUR SON FEELS ABOUT IT.  DO

13    YOU UNDERSTAND THAT STUFF IS GOING TO COME OUT?

14          SO YOU GOT TO MAKE A DECISION WHAT YOU WANT TO DO.

15    YOU CAN'T HAVE IT BOTH WAYS.  YOU CAN'T SAY I'M CHARGING YOU

16    WITH THIS AND I'M NOT GOING TO LET YOU SEE ANYTHING TO DEFEND

17    YOURSELF, I CAN'T LET YOU DO THAT.

18          MR. COBB:  WE DON'T HAVE ANY PROBLEM SHARING

19    INFORMATION WITH MR. SMITH.  WHAT HE'S SUGGESTED IS GOING

20    TOGETHER, AND WHAT I POINTED OUT TO HIM WAS THE BANK DID NOT

21    HONOR THE SUBPOENAS INDIVIDUALLY, WHAT MAKES YOU THINK THEY'RE

22    GOING TO HONOR THEM.

23          THE COURT:  THEY'LL HONOR A COURT ORDER, SO MY

24    QUESTION IS --

25          MR. COBB:  THAT'S WHAT WE NEED.

Case3:13-cv-04955-JSW   Document1-1   Filed04/29/13   Page119 of 169
Case3:12-cv-01372-JSW   Document89   Filed09/14/12   Page14 of 29

16

1        **THE COURT:** -- YOU WANT A COURT ORDER I WILL ISSUE A

2    COURT ORDER INDICATING, AND COUNSEL YOU CAN PREPARE A COURT

3    ORDER, THOSE WILL BE RELEASED. AND I'M GOING TO ORDER YOU AS

4    AN OFFICER OF THE COURT TO PROVIDE A COPY TO MR. COBB AND

5    MR. SINCLAIR OF ALL THE RECORDS YOU OBTAINED.

6        **MR. COBB:** ALSO, YOUR HONOR, MIGHT I MENTION THAT THE

7    BANK INVESTIGATOR FOR WELLS FARGO CALLED THEY ARE INTENDING IN

8    NOT COMPLYING BECAUSE THEY SEE EXPOSURE FOR THE BANK. THERE'S

9    BEEN SOME CONFEDERATES LIKE WE'LL CLAIM.

10        **THE COURT:** WE'LL HAVE TO DEAL WITH THAT. THEY'LL

11    HAVE TO COME IN HERE AND DEFEND THEMSELVES AGAINST THE

12    SUBPOENAS. I UNDERSTAND, THANK YOU FOR THE WARNING. I DIDN'T

13    SAY IT WAS GOING TO BE EASY. I SAID I'M GOING TO HAVE TO

14    FOLLOW THE LAW.

15        COUNSEL, WHAT I'M GOING TO DO BEFORE YOU TURN THOSE

16    OVER, I'M GOING TO ORDER THAT YOU GET A CONFIDENTIALITY, YOU

17    SIGN ONE, YOU GET CONFIDENTIALITY AGREEMENT YOU WON'T BE ABLE

18    TO EXPOSE WHAT'S IN THOSE RECORDS UNTIL I SAY YOU CAN.

19        OKAY. THIS PRIVACY ISSUE, OKAY, YOU'LL GET TO LOOK AT

20    THEM, YOU'LL GET TO USE THE INFORMATION TO MAKE YOUR CASE

21    BEFORE -- I DON'T WANT TO SEE THEM ATTACH TO ANY PLEADINGS OR

22    FILED WITH THE COURT UNTIL I SAY IT'S OKAY, ALL RIGHT?

23        **MR. COBB:** THERE'S NO PROBLEM.

24        **THE COURT:** THIS IS FOR YOU TO GATHER INFORMATION, NOT

25    FOR THIS TO BE A CAMPAIGN. I DON'T CARE WHAT'S GOING ON IN THE

1           **MR. SMITH:**  ORDER THEM TO PRODUCE THE RECORDS, ALONG

2   WITH THAT I'M PREPARING A STIPULATION THAT THE PLAINTIFFS WILL

3   SIGN OR JUST A ORDER RE CONFIDENTIALITY.

4           **THE COURT:**  GOING TO SIGN IT BEFORE ANY OF THESE

5   RECORDS ARE DISCLOSED TO ANYONE.  IF YOU VIOLATE THIS ORDER,

6   I'M GOING TO HOLD ANYONE WHO VIOLATES MY ORDER IN CONTEMPT OF

7   COURT.  DO YOU UNDERSTAND THAT?

8           **MR. COBB:**  WOULD THIS ALSO APPLY TO THE CHASE ACCOUNT?

9           **THE COURT:**  I WOULD SUBMIT ALL THE ACCOUNTS, WE'RE

10  GOING TO BRING THEM ALL TO LIGHT HERE.

11          **MR. COBB:**  OKAY.

12          **THE COURT:**  THEY ARE CONFIDENTIAL, ONLY FOR YOUR AND

13  MR. ST. CLAIRE'S EYES ONLY AT THIS POINT UNTIL I TELL YOU.  AND

14  WHOSE YOUR LEGAL ADVISOR?

15          **MR. COBB:**  JOHN STEEL.

16          **THE COURT:**  IS HE WILLING TO SIGN THIS AS WELL?

17          **MR. COBB:**  SURE.

18          **THE COURT:**  THE ONLY WAY HE'S GOING TO GET TO LOOK AT

19  THEM IF HE SIGNS IT.

20          **MR. SMITH:**  YOU'LL INFORM YOUR SON JASON HE'S THE ONE

21  THAT STANDS IN THE POSITION TO START ANY OBJECTION FROM THE

22  DISCLOSURE OF THE WELLS FARGO RECORDS.

23          **THE COURT:**  IF HE DOES OBJECT TO IT HE'S GOING TO HAVE

24  TO COME IN COURT AND EXPLAIN.  HE'S GOING TO HAVE TO FILE

25  SOMETHING AND COME INTO COURT, OTHERWISE MY ORDER STANDS.

1       MR. COBB: LET ME SEE IF I UNDERSTAND THAT. A REQUEST

2   IS MADE FOR HIM TO GIVE UP THOSE RECORDS AND HE'S COMPELLED TO

3   DO THAT?

4       THE COURT: NOW THERE'S A COURT ORDER ORDERING THEY BE

5   RELEASED.

6       MR. COBB: RELEASE THE RECORDS HE HAS?

7       THE COURT: HE CAN OBJECT TO THAT LEGALLY, BUT HE'S

8   GOT TO FOLLOW THE LEGAL CHANNELS TO DO THAT. IF HE WANTS TO

9   OBJECT HE NEEDS TO COME BRING IT BACK BEFORE ME AND I'LL

10  CONSIDER HIS OBJECTION.

11      BUT AT THIS POINT THERE'S AN ORDER OUT THERE. IF HE

12  DOESN'T FOLLOW -- AND HE DOESN'T FOLLOW IT WE'RE GOING TO HAVE

13  SOME TROUBLE. I CAN'T ISSUE ORDERS AND HAVE PEOPLE IGNORE

14  THEM, OTHERWISE IT'S GOING TO SPIN OUT AND I CAN'T HAVE THAT.

15      OKAY. SO WHAT WAS THE LAST THING THEN, COUNSEL?

16      MR. SMITH: ONE OTHER THING HAD TO DO WITH THE

17  DEPOSITION THEY REQUESTED, THAT I MOVE THEIR DEPOSITION OUT.

18  I'LL ACCOMMODATE THEIR SCHEDULE THEY'LL WORK WITH ME ON MY

19  SCHEDULE, TOO.

20      THE ONE THING I DON'T KNOW WHETHER WE'RE LOOKING AT

21  THE DISCOVERY PLAN IN THE CASE, I ASK THEM ABOUT ON FRIDAY IS

22  IF THEY INTENDED TO TAKE ANYONE'S DEPOSITION, I HAVE A NUMBER

23  OF DIFFERENT PARTIES AND I HAVE NO IDEA WHAT THEY PLAN TO DO,

24  AND I'M TRYING TO WORK WITHIN THE FRAMEWORK OF YOUR ORDER. AND

25  SO IF THEY CAN BE --

Case3:13-cv-01955-JSW Document1-1 Filed04/29/13 Page122 of 169
Case3:12-cv-01372-JSW Document89 Filed09/14/12 Page17 of 29

20

1          **THE COURT:** IS THIS SET FOR TRIAL YET?

2          **MR. SMITH:** SET FOR TRIAL MARCH THE 12TH OF NEXT YEAR,

3    BUT WE HAVE DISPOSITIVE MOTIONS SET TO BE HEARD ON NOVEMBER THE

4    10TH, WHICH NEED TO BE FILED BY OCTOBER THE 6TH OR SO I BELIEVE

5    IT IS. SO TIME IS STARTING TO GET PRETTY CLOSE HERE FOR THESE

6    THINGS.

7          **THE COURT:** ALL RIGHT. THIS IS WHAT I'M GOING TO DO.

8    I'M NOT GOING TO MOVE THE DISPOSITIVE MOTION, BUT I'M GOING TO

9    EXTEND THE DISCOVERY CUTOFF FOR 30 DAYS.

10          DOES THAT HELP YOU?

11          **MR. SMITH:** YEAH, THAT WILL HELP. I'M NOT SURE THE

12    EXACT THE DATE.

13          **MR. COBB:** IS THAT 30 WORKING DAYS?

14          **THE COURT:** NO, JUST 30 DAYS. REGULAR CALENDAR DAYS.

15          **MR. SMITH:** THAT WOULD BE FEBRUARY 4TH?

16          **THE COURT:** THIS IS NOT A LICENSE FOR YOU TO SLOW UP

17    ON EITHER SIDE BECAUSE I'M STAYING ON TOP OF THIS CASE. I JUST

18    DON'T WANT YOU TO HAVE -- ARE YOU GOING TO TAKE DEPOSITIONS, DO

19    YOU PLAN TO?

20          **MR. COBB:** YES, WE DO.

21          **THE COURT:** SO I WANT TO -- YOU SHOULD WORK WITH

22    COUNSEL TO GET THOSE SET. OKAY?

23          **MR. COBB:** YES.

24          **THE COURT:** IS THERE ANYTHING ELSE?

25          **MR. SMITH:** NOT THAT I CAN THINK OF AT THE MOMENT.

# **EXHIBIT 2**

## C 10-03907-MEJ: TRANSCRIPT OF PROCEEDINGS

## (STATUS CONFERENCE)

## JULY 28, 2011

### PAGE 4: LINES 13-16

### PAGE 5: LINES 10-14, 24-25

### PAGE 6: LINES 12-17

1

```
 1                                      Pages 1 - 22

 2                    UNITED STATES DISTRICT COURT

 3                   NORTHERN DISTRICT OF CALIFORNIA

 4          BEFORE THE HONORABLE MAGISTRATE MARIA-ELENA JAMES

 5    JONATHAN D. COBB, SR., Pro Se,    )
      et al.,                          )
 6                    Plaintiffs,       )
                                        )
 7               vs.                    )NO. C 10-3907 MEJ
                                        )
 8    ANTHONY V. SMITH, et al.,         )
                                        )SAN FRANCISCO, CALIFORNIA
 9                    Defendants.       )July 28, 2011
                                        )11:50 a.m.
10    _____)

11                    TRANSCRIPT OF PROCEEDINGS

12                      (STATUS CONFERENCE)
      APPEARANCES:
13
      Plaintiffs Pro Per:
14                         JONATHAN D. COBB, SR.
                           828 Weeks St.
15                         Palo Alto, CA 94303

16    and                  WALTER ARLEN ST. CLAIR
                           1227 Sevier St
17                         Menlo Park, CA 94025

18


19    For Defendants:
                           LAW OFFICES OF ANTHONY V. SMITH
20                         204 East Second Avenue No. 331
                           San Mateo, CA 94401-3904
21                         650-548-0100
                           BY:  ANTHONY VINCENT SMITH
22


23    Reported by:   MARGARET "MARGO" GURULE, CSR #12976
                      PRO TEM COURT REPORTER,  USDC
24

25
```

4

1  anyone could be able to refer to in an organized manner.

2      So what the agreement was, and which they did comply with,

3  was that they would produce a complete response to both the

4  interrogatories and also to the document production, which they

5  delivered to my office this past Tuesday.  So I just received

6  them.  I have not had a chance to review them.

7      And we did discuss some other things, too, during that

8  session which I would like to address once you're done.

9      **THE COURT:**  All right.  So you don't know whether or not

10  you're satisfied with the responses at this point?

11     **MR. SMITH:**  I haven't had a chance.  I just got them a

12  couple of days ago, at 5:00 on Tuesday.

13     **THE COURT:**  Okay.  And then I ordered that you prepare a

14  stipulation proposed order for the production of records from

15  Chase Bank and Wells Fargo Bank by July 26th, which would have

16  been Tuesday, as well.  And what happened on that?

17     **MR. SMITH:**  Well, if I could, we discussed the bank

18  records on Friday.  During the -- in between our last court

19  appearance and this past week, Wells Fargo actually produced

20  the records.  I think I sent a letter to the Court indicating

21  that Wells Fargo -- they complied with the subpoena that I

22  served them and they produced the records.

23     And what I did because I had assumed that the plaintiffs

24  would have wanted a copy of those records, I had them

25  photocopied to provide them a copy.  And I instructed my

5

1    clients to go to Chase Bank to -- excuse me -- of Chase Bank to

2    make a complete copy of the Chase Bank records.  In other

3    words, I was trying to avoid having to have you issue an order

4    if we already had the records.

5        They weren't comfortable with that process.  They said

6    that what they would rather do is have you order the records --

7    this is what we discussed on Friday -- order the complete set

8    of records, and then they can have a copy sent to them directly

9    from Chase Bank and Wells Fargo.

10       Also what took place during the interim was a letter filed

11   by Jason Cobb, who is president of the corporation -- that's

12   Jonathan Cobb's son -- which gave a little bit more detail

13   about the specific account numbers because apparently I didn't

14   have all the account numbers.

15       So, I think, according to our discussion on Friday, now we

16   have a complete set of all the Wells Fargo account numbers.  Is

17   that correct; that's what we agreed on Friday?

18       MR. COBB:  Yes.

19       MR. SMITH:  So I'll draft this order, since they're

20   unwilling to receive the records that I already have in my

21   possession.  But we still have to address the confidentiality

22   issue, and if you want me to address that now, I can go ahead

23   and talk about that.

24       THE COURT:  Okay.  So, at this point, you're going to

25   draft an order ordering the banks to release all these

6

1  documents to both sides; is that correct?

2     MR. SMITH:  Yes, that's correct.

3     MR. COBB:  Actually, I'm supposed to work along with

4  brother -- with Mr. Steele on that, to make sure that they had

5  all the information, because Jason presented that letter of the

6  bank numbers that they didn't have.

7     THE COURT:  So what I would ask that you do is to send a

8  copy of proof of performance to Mr. Steele before it's sent

9  out.

10     MR. SMITH:  Will do.

11     THE COURT:  All right?

12     MR. COBB:  And also, there were some other accounts that

13  we wanted to -- we wanted to get them all, and so that was the

14  whole purpose of this.

15     THE COURT:  So are you getting them all now?

16     MR. COBB:  Well, as soon as it's drafted up and we have

17  all the numbers, we will see if we got them all.

18     MR. SMITH:  So as far as we know, we've given them all --

19  the defendants have given them all the account numbers.

20  Plaintiffs have provided me all the account numbers from Wells

21  Fargo, so I'll put that in the order and send it over to have

22  it approved by Mr. Steele, who was present and actually was

23  somewhat helpful being present.

24     We do still have this issue of the confidentiality matter.

25  I think that they were still considering it, but it kind --

# EXHIBIT 3

## C 10-03907-MEJ: TRANSCRIPT OF PROCEEDINGS

## (STATUS CONFERENCE)

## SEPTEMBER 1, 2011

### PAGE 2: LINES 13-18

### PAGE 25: LINES 5-9, 14

Pages 1 - 27

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MARIA-ELENA JAMES, MAGISTRATE

JONATHAN D. COBB, SR., and WALTER ARLEN ST. CLAIR, )
)
)
Plaintiffs, )
)
vs. ) NO. C 10-03907 MEJ
)
ERNEST BREDE, LUIS CONTRERAS, )
PAUL KOEHLER, LARRY LAVERDURE, )
DONALD SHOWERS, AARON LUCAS, STEVE )
MISTERFELD, ALLEN SHUSTER, and )
RICHARD ASHE, )
) San Francisco, California
Defendants. ) Thursday
) September 1, 2011
) 10:22 a.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

**For Plaintiff**          Jonathan David Cobb, Sr.
                           828 Weeks Street
                           Palo Alto, CA  94303
                    BY:    JONATHAN DAVID COBB, SR., PRO SE

**For Plaintiff**          Walter Arlen St. Clair
                           830 Weeks Street
                           Palo Alto, CA  94303
                    BY:    WALTER ARELN ST. CLAIR, PRO SE

**For Defendant**          Law Offices of Anthony V. Smith
                           24 East Second Avenue, No. 331
                           San Mateo, CA  94401-3904
                           (650) 548-010
                    BY:    ANTHONY VINCENT SMITH

Reported by:    Lydia Zinn, CSR #9223, RPR, CRR
        Official Reporter - U. S. District Court

```
 1          THE CLERK:  Your Honor, we will now call Civil
 2   10-3907, Cobb, et al. versus Brede, et al.  And, your Honor,
 3   this matter is before you for a status conference.
 4          Counsel and parties, please step forward and state
 5   your appearances for the record.
 6          MR. ST. CLAIR:  My name is Walter Arlen St. Clair,
 7   plaintiff pro per.
 8          THE COURT:  Good morning, Mr. St. Clair.
 9          MR. COBB:  Jonathan David Cobb.
10          THE COURT:  Mr. Cobb, good morning.
11          MR. SMITH:  Good morning, your Honor.  Anthony Smith,
12   for defendants.
13          THE COURT:  Good morning, Mr. Smith.
14          All right.  The parties were to file a stipulated
15   proposed order re:  The production of records from the
16   Chase Bank and Wells Fargo Bank.  Did that happen?
17          MR. SMITH:  No, it didn't, your Honor.  There are
18   reasons for that.
19          I did prepare a proposed stipulation that the
20   plaintiffs objected to.
21          I prepared a revised stipulation, just for those
22   records to which they also objected to -- and I have never
23   received -- I don't know what their position is, to be quite
24   honest, on the proposed stipulation.
25          MR. COBB:  That's not entirely accurate, your Honor.
```

1 || expensive to my clients or to burden your Court calendar.

2 ||         **THE COURT:**  Okay.  Well, you should be serving it on

3 || him anything that you get.  Okay?  All right.  You both know

4 || that.  All right.

5 ||         So you have a settlement conference with Judge Ryu on

6 || October 18th?

7 ||         **MR. SMITH:**  That's correct, your Honor.

8 ||         **THE COURT:**  I'm ordering you there at that time.  And

9 || I'm ordering you to these depositions.  That is a Court order.

10 || Now okay?

11 ||         **MR. ST. CLAIR:**  Saint no problem.

12 ||         **THE COURT:**  Thank you.

13 ||         **THE CLERK:**  Records.

14 ||         **THE COURT:**  The bank records?  What's happening?

15 ||         **MR. SMITH:**  Where did we leave off on the bank

16 || records?  Were we going to submit --

17 ||         **THE COURT:**  Thank you, Chris.

18 ||         **MR. SMITH:**  Thank you.  I think we were going to

19 || submit -- they filed a proposed order on August the 11th.

20 ||         **THE COURT:**  You were going to subpoena their bank

21 || records.  You got your bank records.  As soon as the protective

22 || order protective order is signed, you're going to be handing

23 || them a copy of that.  You want to be compensated for the --

24 ||         **MR. SMITH:**  Well, yeah.  If they want the records, I

25 || have the bill to pay for it.  They should pay their fair share

# EXHIBIT 22

# FW: UPDATE: 4/21/12 Meeting

From: **J C** (              )
Sent: Sat 4/28/12 11:53 AM
To:    allan.lee@netscape.net

---

From: jcx295
To: allanlee@pacbell.net
Subject: UPDATE: 4/21/12 Meeting
Date: Sat, 28 Apr 2012 11:49:17 -0400

Brother Lee,

I am following up per my last communication below. I remain open to discussing matters with two brothers for said reasons.

I can advise that civil action CIV 508137 will be withdrawn. This case involves confirmation of the directors/officers for the Menlo Park Cong. corporation. The process of withdrawing this case will begin next week. I called Brother Anthony Smith to advise him of such several weeks ago with no response. So closing this matter out has been the idea for some time. For the good of my family, I am endeavoring to simplify on several fronts so this is one aspect of that effort. Other adjustments will be made as well along this line.

I remain open to speaking with you and Brother Pierce at any time but remain uncomfortable with engaging any brothers from Menlo Park at this time. This is based on standing concerns relative to the previously stated issues regarding a close relative. I will give you a call as well to ensure that you receive this communication. Thanks again for your hard work.

Jason Cobb
650-815-1547

---

From: jcx295
To: allanlee@pacbell.net
Subject: 4/21/12 Meeting
Date: Fri, 20 Apr 2012 01:58:06 -0400

Dear Brother Lee,

I am writing to acknowledge the notification of a meeting to discuss matters, per Brother Pierce, as reported by Jonathan D. Cobb, Sr., regarding the current legal matters.

In speaking with my father it appeared that the intent was to have a discussion to the end of confirming the key and relevant facts in these regards. I am generally open to such, and welcome the opportunity to speak with you and Brother Pierce. However, on April 12, 2012, Lawrence Lee represented the discussion to me as a judicial meeting, which created a different impression than the one offered by you and Brother Pierce. Consequently, I am somewhat confused.

With all due respect and love, I am open to meeting with two brothers to discuss matters, confirm facts etc in-line with the typical procedures and practices. I am not able to discern any act that I have or allegedly have committed that would warrant the formation of a committee without the benefit of any preliminary discussion with two brothers. Whatever the approach, I am very uncomfortable with the idea of Lawrence Lee having any involvement in these matters. I remain affected by what appears to be a general course of deception on the part of someone very close to me, and Brother Lee has been a participant in some instances of concern. I do not feel that he can be objective as he has been more involved in matters than he would have me think and I am not open to meeting with him at this point in time, especially under these circumstances. I hope that you can understand and respect that.

I am not endeavoring to dictate what occurs. I do have concerns of becoming engulfed in a "witch hunt" as the expression goes. Nevertheless, I am willing to meet with you and Brother Pierce at this point to have what I believe and hope can be a productive discussion to the end of achieving some tangible results. I will wait to hear from you as to whether or not this can be accommodated before taking any further action. Thank you for your hard work and your time.

Your brother,

Jason Cobb

1101 Menlo Oaks Drive

Menlo Park, CA 94025

650-815-1547

# EXHIBIT 23

**Friday, May 25, 2012**

Christian Congregation of
Jehovah's Witnesses
Service Department
2821 Route 22
Patterson, NY 12563-2237

Dear Brothers:

In the spirit of 1 Thess 5:21, I am writing to express some concerns and request general input and direction.

On April 10, 2012, Brother Allan Lee and Jerome Pierce visited the home of Jonathan D. Cobb, Sr. advising that they desired to meet with him to discuss the current legal issues specific to the Menlo Park Congregation (and corporation). Brother Pierce specifically stated that the purpose and intent was to gather facts and discuss general concerns in this regard.

Thereafter, on April 12, 2012, I was approached by Brother Lawrence Lee and Michael Marchi and advised that a judicial meeting had been arranged due to concerns of apostasy and fraud. No other information was provided despite my efforts to make further inquiry. No scriptural discussion or explanation occurred so things were not clear at all leaving me to wonder what this was about.

Pursuant to this I sent the letter attached hereto to Brother Allan Lee expressing my willingness to meet with two brothers and discuss matters. I also visited Brother Allan Lee's home and called him several times to follow-up but failed to reach him and he did not respond. I also sent two emails to him without response. As stated in my letter, I have been awaiting a response and further direction. These same points were also shared with Brother Lawrence Lee.

In all, no specific details or scriptures were shared with me at any point by anyone. A general air of secrecy was noted and, collectively speaking, the involved brothers seemed hesitant to communicate openly and/or respond to messages by phone or email. All of this seemed strange. If a judicial meeting has been called it would seem that the specific reasons for such should be clearly specified and explained scripturally prior to any hearing. It also would seem that one would have the benefit of a discussion with two brothers prior to receiving notice of a judicial meeting. Aside from concerns regarding procedural protocol, I did inform Brothers Allan Lee, Lawrence Lee and Michael Marchi of my aversion to having Brothers from Menlo Park involved.

Notably, both Lawrence Lee and Michael Marchi have been in close contact with my wife, Jennifer Cobb, who appears to have questionable motives as evidenced by a course of conduct toward me that has included slander and disorderly conduct marked by a Jezebel like spirit. It appears that my wife may have been called upon by someone within the organization to accept an assignment that involved obtaining and providing information specific to these legal matters from our home (Lev 5:1). She appears to have been engaged in this course for some time and appears very angry and resentful toward me, which has led to an almost vengeful intent where I am concerned. I feel that my wife was singled out and subjected to ill treatment by members of the English Menlo Park Congregation to obscure the fact that she was in fact working as an operative within my household to impede and undermine efforts specific to the cited legal cases as well as gather information. I also feel that she has been hunting for any basis to raise an issue that would lead to me ending up in a judicial hearing. Consequently, her frequent conversations with Brothers Lee and Marchi added to my stated concerns.

All of this created concern regarding the motives, intent and authenticity of the judicial hearing. While represented as being commissioned directly by "the branch," efforts to conduct this hearing have appeared hurried and reactive, which has caused me to consider its actual source. I am concerned with the idea of a meeting being called in the name of "the branch" perhaps without the actual benefit of a formal directive to do so. I have wondered if this meeting could be a locally sponsored effort to generate the basis to execute an extra-judicial act to the end of expeditiously "resolving" the situation as regards the legal issues. In saying this I mean no disrespect to you or anyone else. Further, this concern is not born of any ill regard for the spirituality and character of the involved Brothers but more so the general dynamics of the present situation, which are politically charged.

This concern deepened when I attended the Menlo Park Congregation meeting on May 20, 2012. Prior to the meeting, I was approached by Brothers Lawrence Lee and Michael Marchi who advised that a judicial committee had met and decided that I should be disfellowshipped. He then advised that Brothers Allan Lee and Jerome Pierce would be at the Kingdom Hall that day. After the meeting, I was advised by Larry Laverdure that Brother Lee and Brother Pierce were waiting for me in the library since I had expressed a desire to speak with two brothers. I entered the room expecting them to conduct the preliminary investigation and discussion that had not occurred to that point. However, Brother Pierce simply said "You wanted to talk to two brothers. Go ahead." No questions were presented to me. I explained my previously stated aversion to having any brothers from Menlo Park participate and cited my efforts to communicate such. That essentially was the extent of the dialogue.

While, technically speaking, this was a discussion with two brothers, it did not occur prior to the judicial hearing. Consequently it seemed to be perfunctory, as if to establish that two brothers had spoken with me in these regards.

Brother Pierce stated that the decision to disfellowship me had already been made and that I had seven days to appeal. He then added that he intended to contact our C.O., Brother Nilges (CA-13) the next day (May 21, 2012) to the end of having an appeal committee formed.

I called the service desk this week to discuss some of these points and the brother advised that there is a specific process and procedure relative to judicial hearings. We all know this but it was reassuring to hear him make that statement. In reflecting on matters, it seems that said process has not occurred in this case. It seems the intent is to essentially get me and the other brothers into a meeting, by whatever means, to achieve a particular outcome when the actual scriptural basis for such is and has been unclear.

Having provided this letter, I will appreciate any helpful input or directives. Thank you.

Jason Cobb
1101 Menlo Oaks Drive
Menlo Park, CA 94025
650-815-1547

Cc: District Overseer, D-26, Dan Nilges, CA-13; Allan Lee; Lawrence Lee; Michael Marchi; Jerome Pierce

# EXHIBIT 24

1    Jason E. Cobb
     1101 Menlo Oaks Dr
2    Menlo Park, CA 94025

3
     Non-Party
4

5              IN THE UNITED STATES DISTRICT COURT

6            FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8

9    JONATHAN D. COBB, AND            Civil Action No. C 10-03907 MEJ
     W. ARLEN ST. CLAIR
10                                    **DECLARATION OF JASON COBB IN
                 Plaintiffs,          SUPPORT OF PLAINTIFFS' OPPOSITION
11                                    TO DEFENDANTS' MOTION FOR
           vs.                        SUMMARY JUDGEMENT**
12
     ERNEST BREDE, LUIS
13   CONTRERAS, PAUL KOEHLER,
     LARRY LAVERDURE, DONALD          COMPLAINT FILED: AUGUST 31, 2010
14   SHOWERS, AARON LUCAS,
     STEVE MISTERFELD, ALAN
15   SHUSTER, RICHARD ASHE AND
     DOE SDG:SSX
16
                 Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

                                              CASE NO.: C 10-03907 MEJ

1       1. This declaration is provided in an effort to provide a focused commentary on the

2    matters prompting this action in a factual, and informative manner.

3       2. My name is Jason Everett Cobb. I am a member of the English Congregation of

4    Jehovah's Witnesses in Menlo Park, CA. I am the Chairman and CEO of The Menlo Park

5    Congregation of Jehovah's Witnesses, Inc. (Corporate Entity Number: C0983980).

6       3. In 2008, representatives of the Spanish Menlo Park Congregation of Jehovah's

7    Witnesses contacted me to express their desire to begin using the meeting facility or Kingdom

8    Hall located at 811 Bay Rd, Menlo Park, CA, to which the Menlo Park Congregation of

9    Jehovah's Witnesses, Inc. holds title. Discussion of the proposal ensued and it was eventually

10   determined that this request could not be accommodated at that time. The representatives of the

11   Spanish congregation were disappointed with this conclusion and advised that they would express

12   their concerns to representatives of the Christian Congregation of Jehovah's Witnesses, Inc.

13   located in Patterson, NY.

14      4. Thereafter, representatives of the Christian Congregation of Jehovah's Witnesses, Inc.

15   reassigned Paul Koehler, one of their traveling field representatives to the San Francisco bay area.

16   His initial visit to the Menlo Park congregation occurred during October 2008. From the

17   beginning, he seemed angry and resentful. In particular, he appeared to have an agenda that

18   involved the Menlo Park Kingdom Hall. Based on his comments and actions, I believe that this,

19   in part, was the direct result of and in direct response to the complaints from *some* members of the

20   Spanish Menlo Park Congregation, as discussed above. When Paul Koehler attended the initial

21   renovation planning meeting with representatives of Regional Building Committee #7 held in

22   November 2008, he expressed a desire to have the Spanish congregation meet in the Menlo Park

23   meeting facility. During a subsequent meeting, members of the Regional Building Committee or

24   RBC expressed the idea of somehow using the Menlo Park Kingdom Hall as a means of

25   addressing varied needs within the area for meeting facilities etc. In short, a plan was forming

26   regarding the desired use and/or sale of the property and Paul Koehler, the RBC and members of

27   both the Spanish and Japanese Menlo Park congregations were in alignment as regards said plan

28

2                                    CASE NO.: C 10-03907 MEJ

7. On the topic of property ownership, Jehovah's Witnesses believe that all Kingdom Halls whether directly owned by a corporation employed by our global religious organization or not, ultimately belong to Jehovah God and his son Jesus Christ as local congregations are organized for the purpose of furthering our preaching and teaching work. Like the Plaintiffs, I share this belief. However, this belief does not undermine our general regard for law and in this case, corporate and property ownership laws. Actual organizational directives establish this fact. In 1980, California amended its Corporations Code in several regards. These changes prompted a letter dated January 1, 1980 addressed to all Congregations in the State of California regarding the New Non-Profit Filing Requirement. This policy letter and others, in accord with bible principles establish the collective regard that Jehovah's Witnesses are to have for law in general and in these particular areas. It is also interesting to note that in the year 2000, when members of the Governing Body of Jehovah's Witnesses decided to relinquish their legally held corporate positions in order to focus primarily on matters of spiritual instruction and oversight, this transition was performed not by some religious process or ritual but rather in full accord with New York State law as each of them resigned according to law to ensure their compliance with such. (See Exhibit A)

8. Repeatedly, the Defendants have endeavored to legitimize their actions under the color of religious right by stating that they have acted within the scope of their organizational stations as specifically appointed by the Governing Body of Jehovah's Witnesses. This can be an oversimplification as well as a fallacious appeal to authority. While it is true that the Defendants have or had appointed roles within the organization, this in no way constitutes an endorsement of their conduct to whatever extent such is actually known by members of the Governing Body. Notably, the Plaintiffs have alleged a scheme that has been devised and executed in a *clandestine* manner. Suggesting that the actions of the Defendants necessarily establish a basis of knowledge and, further, approval from the Governing Body is analogous to the surreptitious actions of a "dirty cop" necessarily implicating his entire department, precinct or city. To put it directly in the courts language, clerks have a measure of autonomy within a defined role. Nevertheless, it is

4                                    CASE NO.: C 10-03907 MEJ

1    fairly common knowledge that in some cases clerks can and do take liberties whether it's

2    providing a slanted synopsis of a document presented to the actual Judge for signing or producing

3    and "rubber stamping" a written response to a motion with the judges' signature that was actually

4    never presented to the judge, and perhaps is more reflective of the clerks' views and feelings then

5    that of the actual Judge. The Governing Body of Jehovah's Witnesses are God fearing men with a

6    full allotment of Holy Spirit and intelligence. Per Exhibit B, they are capable of speaking for

7    themselves. Further, they should be spared *any* misrepresentation by a group of self-willed

8    individuals and schemers on the wrong side of the law who evidently are looking to legitimize

9    their alleged criminal activity at the expense of those good brothers and men.

10       9. So, pursuant to these points, a scheme *covertly devised* by a select few *individuals*, was

11   *needed* in this case to essentially move us out of the way. Once this was accomplished the

12   Defendants then sought to assume operational control of the property and meeting facility by and

13   through a seizure of the corporation. In their minds, this in turn, positioned them to assume

14   control of the corporate banking accounts as they endeavored to proceed with the building project

15   that, collectively speaking, *they* wanted, over and above what the members had already said that

16   they wanted and/or could afford. Their seeking to commandeer the banking accounts by trick and

17   force, as will be discussed further on, is significant in light of the current allegations of bank

18   fraud, providing false information to a financial institution, identity theft, providing false financial

19   reports to corporate members and money laundering. All of this, occurred, per the allegations,

20   pursuant to our removal since the Defendants, in particular Defendants Shuster and Ashe, would

21   have had the basis to know from prior experiences that we would *never* engage in such conduct.

22       10. At this point we clearly step beyond a simple disagreement over what to do with the

23   meeting facility, the Kingdom Hall that might be represented by Defendants as a so-called

24   "church dispute," an internal matter barred from court review and progress to the deeper and

25   more sinister layers of the **overall** alleged scheme at the most basic level: criminal activity. This

26   helps us to appreciate that there are considerations and issues in these matters that clearly

27   encompass far more than matters of faith and religion and such are without question subject to

28

1   review by the court. This is amplified when considering that the opposing counsel and Defendants

2   alike have fought vigorously to prevent the bank records from seeing the light of day. In doing so,

3   they have as much substantiated the allegations by virtue of their behavior.

4       11. The scheme to affect our removal was born from and *predicated* on the doctrine of

5   abstention and the supporting case law. In *Watson v. Jones*, the United States Supreme Court

6   developed a framework for the judicial review of *so-called* ecclesiastical disputes that has

7   persisted essentially unchanged to this day. The Court held that "whenever the questions of

8   discipline, or of faith, of ecclesiastical rule, custom, or law have been decided by *the highest*

9   *church judicatory to which the matter has been carried*, the legal tribunals must accept such

10  decisions as final, and as binding on them . . . ."

11      12. With this in mind, the Defendants felt that they could arbitrarily remove us

12  presumably with impunity in order to further the overall scheme. When Defendant Koehler failed

13  to find a legitimate basis to push us *all* out of the way he proceeded to manufacture a charge of

14  convenience relative to the S-21 card (membership card), as discussed in the complaint.

15  (See Exhibit C for comments made by the Governing Body of Jehovah's Witnesses that establish

16  that no basis for disciplinary action exists in such regards as family heads and/or single adults are

17  at liberty to make such decisions for themselves)

18      13. This brings us to the topic of *Serbian*, which has been a recurring reference through

19  these proceedings.

20      14. Pursuant to *Watson*, the court mentioned a possible exception to the Doctrine of

21  Abstention. In Gonzalez, the Court prohibited civil court interference in the determinations of

22  ecclesiastical bodies regarding the qualifications of clergy—even if "civil rights" are involved—

23  *absent fraud, collusion, or arbitrariness.*

24      15. In SERBIAN ORTHODOX DIOCES V. MILIVOJEVTCH, 426 U. S. 696 (1976), the

25  Court repudiated its 1928 ruling in *Gonzalez* to the extent that "arbitrariness" is no longer an

26  available basis for civil court review of ecclesiastical determinations. However, it left open

27  "fraud" and "collusion" as possible grounds for review. In doing so, the Court in *Serbian* severely

28

6                                    CASE NO.: C 10-03907 MEJ

limited the availability of "fraud and collusion" as grounds for civil court review by limiting their use to those occasions "when church tribunals act in bad faith for secular purposes." The mere assertion of fraud or collusion thus cannot invoke civil court review of ecclesiastical determinations regarding church discipline. A plaintiff also must establish that the alleged fraud or collusion was *motivated* by "bad faith for *secular purposes*" as the Plaintiffs have in this current action. It is this statement and line of reasoning that effectively coin the terms **Serbian Collusion** and **Serbian Fraud**.

16. In this case, upon information and belief, our judicial meeting or tribunal hearing occurred in bad faith. Defendant Misterfeld had prejudged the matter which is a generous assessment since the whole idea from the beginning was to displace us by whatever means. Furthermore, the seminal events and circumstances that prompted the hearing were manufactured pursuant to acts of collusion. Exhibit C sheds further light on this. These observations in conjunction with points already stated in the complaint, establish that there was a basis of intent toward us *before* the hearing, during the hearing and even after the hearing as well as discussed in state action CIV 508137 as detailed in the complaint for such which I believe has been filed with the court.

17. The hearing concluded on 2/27/2011 when Defendant Misterfeld advised us that he and Defendant Koehler would be recommending our removal as elders. As described in the complaint and during my recent deposition, the ruse extended into the next day where Defendants Misterfeld and Koehler induced the perception that the meeting, recommendation, everything had been a hoax, a practical joke of some kind. Defendant Koehler's intimations and references specific to the lack of any reference to the hearing and decision on his report form as reviewed on 2/28/2011, and the intended implications of such contributed to this as we relied on the fact that any serious matter would have to be included on the report. Since his report, as represented materially to us made no mention of the hearing and decision then they had either had a change of heart or the whole thing was a ruse from the very beginning. This point of deception is significant because it caused us to feel that there was no need to appeal the judicial decision, which was

7

1    inherently hard to believe anyway being highly improbable and outrageous, since it essentially

2    had not been rendered, in actuality, per the report, as materially represented. Our not appealing

3    the judicial decision within the primary window of time for such simplified the task of finalizing

4    our removal, per the scheme.

5        18. At any rate, while this action may more directly hinge on the range of Civil RICO

6    charges and allegations than on *Serbian*, it *is* interesting to note that the prerequisites to invoke

7    this possible exception to the Doctrine of Abstention, as defined by the Supreme Court, for the

8    very first time in U.S. history definitely exists within this action, pursuant to the allegations as

9    stated.

10       19. This brings us to a point that has required clarification for some time. At every turn,

11   the Defendants have endeavored to characterize the situations and circumstances that prompt this

12   action as a "church" or religious dispute. That is a completely false assertion born of the

13   Defendants desperation to seek the virtual equivalent to diplomatic immunity by virtue of the

14   Free Exercise Clause. However, this is not a church or religious dispute. The Plaintiffs are not

15   suing to regain their spiritual positions of oversight, to become elders again, as the Defendants

16   have asserted time and again specifically to misrepresent these men. Such a privilege of service is

17   not for secular authorities or courts to give. Even if the court had some basis to reinstate us, I

18   would *not* accept it and I'm sure that George Stock, Arlen St. Clair and Jonathan Cobb feel the

19   same. Our being removed as elders has been referenced only to service the overall narration and

20   illumination of a multifaceted and phased scheme. Our being removed was simply one particular

21   phase of the scheme that triggered a sequence of events and a range of egregious acts. The

22   scheme could not advance with us in place and so the change was made by trick, deceit, chicane

23   or overreaching pursuant to a premeditated intent to execute a very specific plan, with a view to a

24   *secular purpose*, per the allegations.

25       20. Pursuant to Defendants' filing of a 12(b) motion to dismiss in October 2010, which

26   cited the Free Exercise Clause as a basis for immediate dismissal with prejudice, Plaintiffs' filed

27   their opposition to said motion drawing upon Employment Division V. Smith (1990) to the end of

28

8                           CASE NO.: C 10-03907 MEJ

detailing suspicions concerning fraudulent activity including a money laundering scheme. Of course, the motion to dismiss was denied.

21. That theory and allegation, that initially struck me as inconceivable, has gained plausibility pursuant to the efforts to subpoena the bank records and local financial records. In speaking with law enforcement officers including Jeff Keegan of the Menlo Park Police department and varied FBI agents, their input has helped to establish the legitimacy of concern in these regards. Apparently, bank accounts associated with non-profit religious corporations can be and often have been leveraged in money laundering and tax evasion schemes.

22. Officer Jeff Keegan, who himself owns a Church, related an experience to me in April 2011 regarding an instance when he and other church members were approached by individuals who wanted to donate funds to the church. For expediency, we'll say they offered Mr. Keegan's church $100,000.00 to "hold" on their behalf. In a few months, the church would return $90,000.00, keeping $10,000.00 as a "donation" which sounds like a good deal for the church. Mr. Keegan stated that they declined the offer as it constituted a form of tax evasion. He explained to me that in donating the funds ($100,000.00) to the church, the individuals would gain a tax break that would exceed the smaller amount, the $10,000.00 that was actually left with the church. I may not be explaining it properly but I'm sure the court and reader get the idea. A variation would be for someone to "donate" funds to a local church, gain the tax break and have the local church return and/or "donate" the exact same amount back to them. It's a way of moving money around. Another wrinkle could be having the benefactor send say, $150,000.00 to the local church prior to performing some service for the church, perhaps some repair work, that actually costs $50,000.00...only the local church "pays" $200,000.00 for the service. This would include the original $150,000.00 that had been "donated" plus the extra 50,000.00 that had been collected locally from congregation members under the fraudulent pretense of "raising money" for the "repair work" that they were told that they "needed" by their loving pastor pursuant to his agreement with the original benefactor. Such a laundering scheme could be used as a means to insidiously implement involuntary tithing that would constitute a form of religious affinity fraud.

CASE NO.: C 10-03907 MEJ

23. Aside from such considerations, I can speak to the idea of the Defendants conspiring with bank insiders. I actually encountered manifestations of this. A key instance occurred in March 2010. I visited the Wells Fargo Branch in downtown Palo Alto, CA. In being assisted by Michael L. Gutierrez, I was advised that my name was not associated with account **87894705**, which is strange as I had remembered being listed on this account in the past. I'd also remembered there being other signers as well. However, Mr. Gutierrez advised that only one name was on the account: Glenn M. Watson.

24. Per <u>Exhibit D</u>, I learned in April 2011 that the information provided to me by Mr. Gutierrez was completely false. Business banking rep Linda Pham of the Rivermark Santa Clara Wells Fargo branch advised me that my name and that of Jonathan Cobb had been removed from this account by Glenn Watson and Defendants Brede and Showers apparently on the same day when Mr. Watson added them to the accounts as part of the takeover, 7/12/2010, four months after I was repeatedly told by Mr. Gutierrez that my name was not on the account.

25. Based on my interactions with him, upon information and belief, Mr. Gutierrez is one of Jehovah's Witnesses or has some affiliation with a local congregation of Jehovah's Witnesses, perhaps the very same Spanish congregation that had expressed a desire to meet at the Kingdom Hall located at 811 bay Rd in Menlo Park, CA back in 2008, as previously discussed. The judicial meeting/tribunal hearing with Defendants Misterfeld and Koehler that concluded on 2/27/2010 preceded my visit to Wells Fargo Bank in March 2010. Mr. Gutierrez apparently had been advised by a member of the conspiratorial ring that a recommendation for the removal of our elders had been made and that it was a foregone conclusion that it would be approved, essentially by Defendants Shuster and/or Ashe as they work in the department that would have received said recommendation. In short, the fix was in (Serbian Collusion, Serbian Fraud with a view to a secular purpose).

26. For Mr. Gutierrez to intentionally deceive me in an apparent effort to "keep watch" over the money until our removal became official, constitutes a deliberate act to further a fraudulent scheme, which in turn constitutes bank fraud as Mr. Gutierrez's actions, and those of

other insiders with a similar basis of affinity with the Defendants, have created financial liability for Wells Fargo Bank, N.A. and the statute of limitations for a Civil RICO action is four years from the last committed racketeering act.

27. So here we have a religious matter that hadn't even been formally decided and settled yet that had crossed over the boundaries and directly influenced and affected an established banking relationship, a business matter within a financial institution, and why? Because of religiously motivated action.

28. In this present action, the Defendants continue to assert that this is a religious matter that is exempt from court review pursuant to the Free Exercise Clause and the associated Doctrine of Abstention. However, if the standing pattern of criminal activity on the part of the Defendants is confirmed to further involve the establishment and/or expansion of a money laundering ring within an overall tax evasion scheme that crosses state lines, as suspected, then the Free Exercise Clause ceases to have *any* relevance whatsoever. Again, this is true pursuant to the court's decision and reasoning in Employment Division V. Smith (1990) which refocused constitutional law on the fact that the Free Exercise Clause "embraces two concepts-- freedom to believe and freedom to act. The first is absolute, but in the nature of things, the second *cannot be*." - Cantwell v. Connecticut. 310 U.S. 296, 304 (1940)

29. In Reynolds v. U.S. (1878) the Court distinguished between religious belief and religious conduct or action, stating that Congress was "deprived of all legislative power over mere opinion, but was left free to reach actions which were in violation of social duties or subversive to good order." The Court added that recognizing the religious defense, which the Defendants desperately cling to in this case, would "permit every citizen to become a law unto himself" thus rendering the government irrelevant.

30. In refocusing on, Employment Division V. Smith (1990), the court stated "We have never held that an individual's religious beliefs [p879] excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. As

described succinctly by Justice Frankfurter in Minersville School Dist. Bd. Of Educ. v. Gobitis, 310 U.S. 586, 594-595 (1940): Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs.

31. In summation on this point, the Court added: The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press, (Cantwell v. Connecticut, 310 U.S. at 304, 307). The present case does not present such a hybrid situation, but a free exercise claim unconnected with any communicative activity or parental right. Respondents urge us to hold, quite simply, that when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation. We have **never** held that, and decline to do so now.

32. In focusing on the Defendants' Motion for Summary Judgment pursuant to their systematic refusals to comply with a range of subpoenas, the court knows best, but as a non-party observer, granting such would seem to be a gross miscarriage of justice, especially if such occurred prior to the acquisition of the bank records that are poised to be obtained by court order.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Dated: November 16, 2011

Jason E. Cobb

# EXHIBIT 25

**\*\*\* rs p. 34 Apostasy \*\*\***

**Definition:** Apostasy is abandoning or deserting the worship and service of God, actually a rebellion against Jehovah God. Some apostates profess to know and serve God but reject teachings or requirements set out in his Word. Others claim to believe the Bible but reject Jehovah's organization.

**\*\*\* rs p. 34 - p. 35 Apostasy \*\*\***

*They may claim to serve God but reject his representatives, his visible organization*

Jude 8, 11: "These men, too, indulging in dreams, are defiling the flesh and disregarding lordship and speaking abusively of glorious ones. Too bad for them, because they . . . have perished in the rebellious talk of Korah!"

Num. 16:1-3, 11, 19-21: "Korah . . . proceeded to get up, together with . . . two hundred and fifty men of the sons of Israel, chieftains of the assembly . . . So they congregated themselves against Moses and Aaron and said to them: 'That is enough of you, because the whole assembly are all of them holy and Jehovah is in their midst. Why, then, should you lift yourselves up above the congregation of Jehovah?' . . . [Moses said:] 'You and all your assembly who are gathering together are against Jehovah. As for Aaron, what is he that you men should murmur against him?' When Korah got all the assembly together against them at the entrance of the tent of meeting, then Jehovah's glory appeared to all the assembly. Jehovah now spoke to Moses and Aaron, saying: 'Separate yourselves from the midst of this assembly, that I may exterminate them in an instant.'"

*Not only do they abandon the true faith but they then "beat" their former associates, using public criticism and other methods to hinder their work; the efforts of such apostates are devoted to tearing down, not building up*

Matt. 24:45-51: "Who really is the faithful and discreet slave whom his master appointed over his domestics, to give them their food at the proper time? . . . But if ever that evil slave should say in his heart, 'My master is delaying,' and should start to beat his fellow slaves and should eat and drink with the confirmed drunkards, the master of that slave will come on a day that he does not expect and in an hour that he does not know, and will punish him with the greatest severity and will assign him his part with the hypocrites."

2 Tim. 2:16-18: "Shun empty speeches that violate what is holy; for they will advance to more and more ungodliness, and their word will spread like gangrene. Hymenaeus and Philetus are of that number. These very men have deviated from the truth, saying that the resurrection has already occurred; and they are subverting the faith of some."

# EXHIBIT 26

**\*\*\* jd chap. 8 pp. 105-107 'What Is Jehovah Asking From You?' \*\*\***

**"LOVE KINDNESS"**

[14] Micah stressed that Jehovah asks us to "love kindness." To be kind involves doing good things rather than anything harmful. Kindness is closely associated with goodness and moral excellence. It calls on us to be honest and just in our personal affairs and in our dealings with others. In Chapter 6 of this book, we examined important areas of life, such as business and money matters, in which justice and honesty play a vital role. But those are not the only areas of life in which we should be just, honest, and kind.

[15] People who love kindness and who want to do good toward others strive to be above reproach. Jehovah said to the Israelites who were not fulfilling their material obligations toward pure worship: "You are robbing me." (Malachi 3:8) Can you discern ways that one might be "robbing" God today? What if a Christian has access to funds contributed for the advancement of Kingdom interests in the local congregation or in another setting? Whose money is it? Such funds ultimately belong to Jehovah, since they were offered for the furtherance of his worship. (2 Corinthians 9:7) Should anyone think that he can "borrow" such money to care for a personal emergency or otherwise use dedicated funds without proper authorization? Of course not. That would be tantamount to stealing from God! And it would certainly not be acting kindly or justly toward those who contributed such funds for God's work.—Proverbs 6:30, 31; Zechariah 5:3.

**\*\*\* w90 11/1 p. 19 pars. 7-8 The Role of the Superior Authorities \*\*\***

[7] Most governments would say that the purpose of their laws is ... to promote the welfare of citizens and good order in society. Hence, they penalize antisocial acts, such as murder and theft, and lay down regulations, such as speed limits and parking laws. Any who deliberately break their laws take a stand against the authority and "will receive judgment to themselves." Judgment from whom? Not necessarily from God. The Greek word here translated judgment can refer to civil procedures rather than judgments by Jehovah. (Compare 1 Corinthians 6:7.) If anyone acts unlawfully, the superior authority has the right to punish him.

[8] Jehovah's Witnesses have a good reputation for not opposing human authorities. **If it happens that an individual in the congregation does break the law, the congregation will not help him evade lawful punishment.** If anyone steals, murders, libels, cheats on his taxes, rapes, defrauds, uses illegal drugs, or in any other way opposes lawful authority, he will face severe discipline from the congregation—**and he should not feel persecuted when he is punished by the secular authority.**—1 Corinthians 5:12, 13; 1 Peter 2:13-17, 20.

# EXHIBIT 27

**JORGENSON, SIEGEL, McCLURE & FLEGEL, LLP**

ATTORNEYS AT LAW

WILLIAM L. McCLURE
JOHN L. FLEGEL
MARGARET A. SLOAN
DAN K. SIEGEL
DIANE S. GREENBERG
JENNIFER H. FRIEDMAN
MINDIE S. ROMANOWSKY
DAVID L. ACH
LEIGH F. PRINCE

NICOLAS A. FLEGEL
KRISTINA·B. ANDERSON
WILLIAM R. BENNETT

1100 ALMA STREET, SUITE 210
MENLO PARK, CALIFORNIA 94025-3392
(650) 324-9300
FACSIMILE (650) 324-0227
www.jsmf.com

RETIRED
JOHN D. JORGENSON
JOHN R. COSGROVE
MARVIN S. SIEGEL

February 14, 2013

**VIA EMAIL: symmetry_law@ymail.com
AND U.S. MAIL**

Jason Cobb
P.O. Box 446
Palo Alto, CA 94301

      Re:    Request for Public Records to the City of Menlo Park

Dear Mr. Cobb:

      This office represents the City of Menlo Park ("City"). The City is in receipt of your Request for Public Records dated Monday, February 4, 2013. The request you sent to my attention as an attorney for the City, requests copies of actual and complete statements provided by Mr. Brede and Mr. Showers made during the investigation in case 11-973. You have also requested any and all statements made and documentation provided by Anthony V. Smith and Luis Contreras, including notations or comments made by Officers Keegan, Bruttig or Dixon. A copy of your request is enclosed. I note that you previously requested a copy of the full police report and these documents on February 28, 2012. Enclosed please find a copy of your previous request, as well as the response which was provided by the Menlo Park Police Department. The Department's response included a summary of the police report, as required by the Public Records Act.

      As you are aware, this investigation has been suspended pending your delivery of bank statements to the Menlo Park Police Department. I understand from our telephone conversation of last week that you are willing to authorize the City to close the investigation. However, even with the closure of the investigation, under California law you are not entitled to receipt of the witness statements and officer notations you request. Under Government Code Section 6254(f), investigation records of state and local police are exempt from disclosure. Investigatory records include all records of investigations undertaken for the purpose of determining whether a violation of law may occur or has occurred. *Haynie v. Superior Court* (2001) 26 Cal. 4th 1061, 1071. This exemption applies to the witness statements you have requested, and to all parts of the file that reflect the analysis and conclusions of the investigating officers.

Jason Cobb
February 14, 2013 - Page 2

Please feel free to contact me if you have questions regarding this request. If you believe that I have misunderstood your request, please let me know at your earliest opportunity. As always, the City is willing to work with requestors in responding to public records requests.

Sincerely,

Nicolas A. Flegel

Enclosures

NAF:rr
cc:     Margaret S. Roberts, City Clerk (via email w/encls.)
        Pam Aguilar, Deputy City Clerk (via email w/encls.)
        William A. Dixon, Adm. Sergeant (via email w/encls.)

**Monday, February 4th, 2013**

Nicolas A. Flegel
Jorgensen, Siegel, McClure & Flegel, LLP
1100 Alma Street, Suite 210
Menlo Park, CA 94025-3392

Mr. Flegel,

Having been directed to your firm by Sergeant Anthony Dixon and pursuant to the discussion you and I had on Friday, February 1, 2013, I am submitting a written request to receive information specific to Menlo Park PD case 11-973.

I opened case 11-973 in April 2011. Thereafter, individuals suspected of misconduct, Ernest Brede and Donald Showers, provided statements in response to the issues I had raised.

The primary objective is to obtain copies of the actual and complete statements provided by Mr. Brede and Mr. Showers. Additionally, I would appreciate receiving as much information as possible from the file including any and all statements made and documentation provided by Anthony V. Smith and Luis Contreras. Any notations and/or comments made by Officers Keegan, Bruttig or Dixon specific to discussions with and statements made by the civilians cited herein would also be appreciated. Thank you.

Jason Cobb
PO Box 446
Palo Alto, CA 94301

KRISTEN KEITH
MAYOR

PETER OHTAKI
MAYOR PRO TEM

ANDREW COHEN
COUNCIL MEMBER

RICHARD CLINE
COUNCIL MEMEBR

KELLY FERGUSSON
COUNCIL MEMBER

**Building**
TEL 650.330.6704
FAX 650.327.5403

**City Clerk**
TEL 650.330.6620
FAX 650.328.7935

**City Council**
TEL. 650.330.6690
FAX 650.328.7935

**City Manager's Office**
TEL 650.330.6610
FAX 650.327.5409

**Community Services**
TEL 650.330.2200
FAX 650.324.1721

**Engineering**
TEL 650.330.6740
FAX 650.327.5497

**Environmental**
TEL 650.330.6763
FAX 650.327.5497

**Finance**
TEL 650.330.6640
FAX 650.327.5391

**Housing &
Redevelopment**
TEL 650.330.6706
FAX 650.327.1759

**Library**
TEL 650.330.2500
FAX 650.327.7030

**Maintenance**
TEL 650.330.6780
FAX 650.327.1953

**Personnel**
TEL 650.330.6670
FAX 650.327.5382

**Planning**
TEL 650.330.6702
FAX 650.327.1653

**Police**
TEL 650.330.6300
FAX 650.327.4314

**Transportation**
TEL 650.330.6770
FAX 650.327.5497



701 LAUREL STREET, MENLO PARK, CA 94025-3483
www.menlopark.org

CITY OF
MENLO
PARK

March 8, 2012

Jason Cobb
531 Sandalwood St
Menlo Park, CA 94025

Re: Public Records Act Request Pursuant to Government Code 6250, et. seq.

Dear Mr. Cobb,

The City of Menlo Park is in receipt of your Request for Public Records. You have requested a copy of Menlo Park Police Department Case Report #11-973. Please be aware that the California Public Records Act does not require the City to release actual case reports and investigatory records. While the records are exempt from disclosure, however, the California Public Records Act requires that in lieu of disclosing the records, the City must disclose certain information derived from them.

**Report #11-973**

**Time, date and location of report**: April 14, 2011, 1642 hours, 811 Bay Road, Menlo Park

**Factual circumstances surrounding report**: On April 9, 2011 at approximately 1700 hours, reporting party (RP) Jason Cobb came to the Menlo Park Police Department (MPPD) lobby and spoke to Officer Keegan to report irregularities occurring with bank accounts for the church he is a corporate officer for – The Menlo Park Congregation of Jehovah's Witnesses. RP provided Officer Keegan with some documents which were submitted to MPPD evidence. Officer Keegan directed RP to get further information as well as provide written statements with further details. RP returned to MPPD lobby on April 14, 2011 at approximately 1610 hours and spoke with Officer Keegan again and provided one additional document which was booked into evidence. Officer Keegan determined at that time that this was a civil matter and that Mr. Cobb needed to provide further documentation in order to determine if any crime had occurred. On April 18, 2011 at approximately 1630 hours Officer Bruttig spoke to Party Ernest Brede and Party Donald Showers, also wanting to report irregularities with the church at the same location, which they stated was named "The English Congregation of Jehovah Witnesses of Menlo Park". Both parties provided Officer Bruttig with some

documents which were booked into evidence. Both parties were advised by Officer Bruttig that further documentation was needed in order to determine if a crime had occurred. Officers Bruttig and Keegan discovered that this case was involved in civil litigation and advised all parties that in order to determine if a crime occurred in Menlo Park, further documentation was necessary.

**Disposition**: Determined to be civil matter at this time. A copy of the letter that Sergeant Dixon wrote to Mr. Cobb is attached, confirming that this investigation is suspended until all documents requested have been received by MPPD.


If you have any questions, please do not hesitate to contact me at 650-330-6313.

Sincerely,

*Susie Eldred*

Susie Eldred
Technical Services Manager
Menlo Park Police Department

cc: file

2

CSO - 815 - 1847

Conf city attny will rel by end of week.

# MENLO PARK POLICE DEPARTMENT
## REPORT COPY REQUEST

Today's Date: 2 - 29 - 12

Case/Incident Number: 11 - 973

Name: Jason Cobb

Address: _____

☒ I am,

☐ I represent the party of interest
identified in the report recorded hereon.

_____
Signature

---

Office Use Only:

Info Released:
☐ Incident
☐ Full Case
☐ Redacted Case (Attach Copy)
☒ Other:_____

---

Information released by : JN + SS

Date: 3 - 8 - 12

11-913

RICHARD CLINE
MAYOR

KIRSTEN KEITH
MAYOR PRO TEM

ANDREW COHEN
COUNCIL MEMBER

KELLY FERGUSSON
COUNCIL MEMBER

PETER OHTAKI
COUNCIL MEMBER



701 LAUREL STREET, MENLO PARK, CA 94025-3483
www.menlopark.org

CITY OF
MENLO
PARK

— COPY —

**Building**
TEL 650.330.6704
FAX 650.327.5403

**City Clerk**
TEL 650.330.6620
FAX 650.328.7935

**City Council**
TEL 650.330.6630
FAX 650.328.7935

**City Manager's Office**
TEL 650.330.6610
FAX 650.328.7935

**Community Services**
TEL 650.330.2200
FAX 650.324.1721

**Engineering**
TEL 650.330.6740
FAX 650.327.5497

**Environmental**
TEL 650.330.6763
FAX 650.327.5497

**Finance**
TEL 650.330.6640
FAX 650.327.5391

**Housing &
Redevelopment**
TEL 650.330.6706
FAX 650.327.1759

**Library**
TEL 650.330.2500
FAX 650.327.7030

**Maintenance**
TEL 650.330.6780
FAX 650.327.1953

**Personnel**
TEL 650.330.6670
FAX 650.327.5382

**Planning**
TEL 650.330.6702
FAX 650.327.1653

**Police**
TEL 650.330.6300
FAX 650.327.4314

**Transportation**
TEL 650.330.6770
FAX 650.327.5497

July 5, 2011

Mr. Jason Cobb
1101 Menlo Oaks Drive
Menlo Park, CA 94025

Mr. Cobb:

Our department has conducted a thorough review of the documents you submitted to date in support of your report of fraud and embezzlement. We have interviewed and collected statements from several individuals connected with this matter, identified all known parties, and collected additional relevant documents within the periods we discussed. I believe we have a good understanding of the issues presented since your first report to us in April 2011.

A preliminary review of the facts by San Mateo County prosecutors has determined the current evidence received does not establish a substantiated loss to any party and is insufficient to seek court process at this time. The various forms of documents we received from all parties to date have included bank statements for one Wells Fargo bank account before and after July 2010 and activity for two other Wells Fargo accounts after July 2010. This material has been insufficient to proceed further with the investigation.

In order to proceed, we ask that you obtain and deliver three complete years of certified bank statements and checks from January, 2008 to January, 2011, for each bank account opened at any bank and used or associated with the Menlo Park Congregation of Jehovah's Witnesses, Inc. We will suspend any further investigation until all such bank documents are received by the Menlo Park Police Department.

Please feel free to contact me with any further questions you might have.

Sincerely,

Sergeant William A. Dixon
Menlo Park Police Department

# EXHIBIT 28

Congregation members are called publishers as each member has the obligation to participate in the door to door ministry. A Publisher's Record Card is made out for each congregation member and is maintained within the congregation file. The card details a person's name, address, date of birth, date of baptism and a record of the time they have spent in the ministry each month. When a publisher joins a different congregation, the previous congregation will forward their publisher record card (aka S-21 card) and an introduction letter to the new congregation.

As established by the accompanying statements of organizational policy, family heads and/or single congregation members are at liberty to decide for themselves which congregation they will join. The Governing Body of Jehovah's Witnesses, the highest ecclesiastical authority, does not make this decision for others. Consequently, in being subject to organizational directives from the Governing Body, the Branch Office has no authority to make such decisions for others or to mandate a particular course of action in such regards. Again, the decision rests with family heads.

In-line with the record of correspondence as provided, the branch office sent a letter dated 1/18/2010 to the Menlo Park congregation elders (managers) directing them to send the publisher card and introduction letter as requested by another congregation. The Menlo Park elders (managers) sent a letter dated 2/3/2010 in response explaining that the publisher in question desired to remain a member of the Menlo Park congregation and concluded the letter by asking for further direction in view of the circumstances. No response was received. The accompanying timeline completes the narration.

The accompanying statements of organizational policy establish that there is no basis for disciplinary action in such cases as the congregation a publisher joins is a matter of choice.

The record of correspondence establishes a basis of intent toward the Menlo Park congregation meeting facility and by extension toward the Menlo Park elders (managers). The "disciplinary" action executed by the Doe at the branch office (SDG:SSX), under the color of religious right, was a means to further the scheme which had already been conceived and enacted prior to the judicial hearing held 2/26 – 2/27/2010 as established by the letter of complaint dated 9/24/2009 submitted by the Menlo park elders to the Branch Office regarding Paul Koehler.

Further, the request for the publisher card and letter and the subsequent directive from the Branch Office are in themselves elements of the fraudulent activity as such constituted a means to manufacture a basis of complaint, against the Menlo Park elders. Paul Koehler conspired with Leonardo Trevino (RBC #7) who then conspired with Talbert Petersen (Mark West English Congregation) who is also a member of RBC #7 and one of the elders who sent the letter of concern to the Branch Office regarding the request for the publisher record card in question.

Once the Menlo Park elders were removed, the basis to advance the Enterprise' scheme was fully established.

**\*\*\* km 11/02 p. 7 Question Box \*\*\***

**• What are the advantages of attending the congregation that holds the territory where we live?**

Through the congregation arrangement, we receive encouragement 'inciting us to love and fine works.' (Heb. 10:24, 25) Through the congregation we learn the truth and are equipped to fulfill our assignment to make disciples. (Matt. 28:19, 20) We are also strengthened to endure trials faithfully and are provided with loving overseers to help us cope with mounting pressures and anxieties. Clearly, the congregation is vital to our spiritual survival. However, are there advantages in attending the congregation that holds the territory where we live?

Individual circumstances vary, and such factors as secular employment, an unbelieving mate, and transportation may affect **one's final decision in this regard**. Yet, there are definite advantages, both spiritual and otherwise, when a person associates with the congregation holding the territory where he lives. The elders may be able to get in touch with all the publishers more quickly in cases of emergency. Past Question Boxes have highlighted a number of other advantages.—May 1991, March 1976, and January 1967.

Generally, it is more convenient to attend meetings nearby, allowing us to arrive early enough to speak with others, care for necessary matters, and share in the opening song and prayer. When newly interested ones live in our neighborhood, we are usually in a better position to reach them, conduct Bible studies with them, and direct them to the meetings most convenient for them.

**We are confident that family heads will prayerfully consider this matter**, weighing all the factors involved in **determining what is best for the spiritual and physical welfare of their family.**—1 Tim. 5:8.

**\*\*\* km 3/76 p. 8 Question Box \*\*\***

**• Is it permissible to live in the territory of one congregation but attend meetings elsewhere?**

Generally speaking, it is best to attend the meetings of the congregation holding the territory where you live. In most cases this proves to be in the best spiritual interests of the family, since it ordinarily makes it convenient to attend meetings, share in field service in territory close by and take advantage of help provided by the elders.

It is recognized, however, that individual circumstances vary. Such factors as one's secular work schedule, having an unbelieving mate or transportation problems may lead someone to conclude that it would be more advantageous spiritually to attend another congregation. **Each family head bears responsibility for his own household.** After considering all the factors involved, **he will have to decide what is best.** He may want to discuss matters with the elders to get the benefit of their advice before he makes a decision. Perhaps they know of overlooked advantages that would result to the family in attending the congregation holding the territory where they live, or possible disadvantages that may be encountered in transferring to a neighboring congregation. Often it is easier for the congregation holding the territory to render loving assistance. And the home of the family might be used as a book study location within the congregation holding the territory. But in the final analysis, the elders will want to encourage the family head to decide in a way that will ensure the best spiritual benefits to his family. There is no reason to be critical of his decision when made.

In metropolitan areas, there is often a large number of congregations located in a concentrated area. There may be a number of reasons why the elders may decide that the interests of the work would be advanced by a transfer of publishers. For example, there may be territory adjustments in connection with the formation of a new congregation, or to give additional territory to a congregation covering its assignment frequently, or to strengthen a congregation having few publishers or mature brothers to take the lead. The elders in each congregation can outline what seems to be advisable and request that each family affected consider it. In many instances, there likely will be no problems in making the suggested adjustment. **Again, each family head will have to weigh all the factors and decide if such a transfer should be made.** The same would be true of elders, ministerial servants or pioneers who are asked if they can transfer elsewhere to assist a congregation needing help. (See "Question Box" in February 1973 *Kingdom Ministry*.)

### *** km 2/73 p. 7 Question Box ***

### • Can congregations with one or two elders get the help of elders from nearby congregations that have numerous elders?

Sometimes circuit overseers observe that one congregation has many elders while another congregation has only one elder, so some help could be used. The circuit overseer may make the need known to the congregation where there are many elders, but then it is up to the body of elders there to consider their own needs for elders to conduct studies and take care of the congregation activities. There is no reason for an elder to travel to another territory if he is needed where he is now. If they believe that it will not work a hardship in their congregation for an elder to go to work with a nearby congregation that has real need of older brothers, they can discuss the matter among themselves and see whether anyone among them wishes to travel to the nearby congregation.

Any elder considering such service should take into account what this would mean to himself spiritually and physically and how it would affect his family's interests. He may wish to see how they feel about it. How much time would be required to go there and what are the traveling conditions and expenses involved in going from his home to the territory of the nearby congregation? He should take into consideration the hours when the other congregation has their meetings. He will be wise to give such a matter his prayerful consideration.

If, after such consideration of matters, someone is found to be available to serve with the nearby congregation, the presiding overseer may communicate with the nearby congregation to let them know that there is an elder who is willing to serve with them regularly. Upon receiving the information, if the brothers representing the nearby congregation wish to meet and discuss matters with the available elder they may do so. Then if they would like to have him serving with them they should send their recommendation of the brother to the Governing Body, asking that he be appointed to serve as an elder in their congregation, explaining the circumstances in the letter. When the recommendation is approved, the elder may serve in the new congregation and his name will be deleted from the list of elders of his former congregation.

# EXHIBIT 29

**DEPUTIES**
REBECCA M. ARCHER
AIMEE B. ARMSBY
CLAIRE A. CUNNINGHAM
JAN E. ELLARD
PETER K. FINCK
TIMOTHY J. FOX
JUDITH A. HOLIBER
DAVID A. LEVY
GLENN M. LEVY
INGA B. LINTVEDT
KIMBERLY A. MARLOW
JUSTIN W. MATES
KATHRYN E. MEOLA
DAVID A. SILBERMAN
WILLIAM E. SMITH
JENNIFER A. STALZER
DAN J. VALIM
EUGENE WHITLOCK
BRIAN J. WONG
CEIDE ZAPPARONI

**COUNTY COUNSEL**
JOHN C. BEIERS

**CHIEF DEPUTIES**
JOHN D. NIBBELIN
PAUL A. OKADA
LEE A. THOMPSON



# COUNTY COUNSEL
### COUNTY OF SAN MATEO
HALL OF JUSTICE AND RECORDS · 6TH FLOOR
400 COUNTY CENTER · REDWOOD CITY, CA 94063-1662
TELEPHONE: (650) 363-4250 · FACSIMILE: (650) 363-4034

*Please respond to: (650) 363-4750*

March 29, 2013

Mr. Jason Cobb
331 Curtner Avenue, Apt. d
Palo Alto, California 94306

    *Re:   Subpoena for Production of Records of Jennifer Cobb*

Dear Mr. Cobb:

    I represent the County of San Mateo and more specifically the San Mateo County District Attorney's Office. I am in receipt of your subpoena for production of records associated with case number FAM116981.

    Enclosed, please find a copy of a letter from Deborah Appel, attorney for Jennifer Cobb. In this letter Ms. Appel objects to the production of records. Ms. Appel states that the person you have identified as the deposition officer to whom you would like the records produced is not a qualified deposition officer able to receive such records pursuant to the Code of Civil Procedure and the Business & Professions Code.

    Based on this information, my client cannot produce records in response to your subpoena as written. Should you serve a new subpoena which directs the production of responsive documents to a proper party, my client will review such subpoena and respond accordingly.

               Very truly yours,

               JOHN C. BEIERS, COUNTY COUNSEL

By: _____
           Daniel J. Valim, Deputy

JCB:DJV/jb
cc: Deborah Appel, Esq.

# DEBORAH APPEL
Attorney at Law
P.O. Box 620403
Woodside, CA 94062

Phone: (650) 464-0452        FAX: (650) 716-0606        E-Mail: debbieappel@yahoo.com

March 19, 2013

Custodian of Records
San Mateo County District Attorney
400 County Center
Redwood City, CA 94063

**RE:  Deposition Subpoena for Production of Business Records
San Mateo County Case Number FAM 0116981
Jennifer Cobb v. Jason Cobb**

Dear Sir or Madam:

You are hereby notified that, pursuant to California Code of Civil Procedure §§ 1983.5 and 1985.6, Jennifer Cobb objects to the release of any records pertaining to her that are in the possession or under the control of the San Mateo County District Attorney. You also are notified that the Deposition Officer, Arlen St. Clair, listed in that certain Deposition Subpoena for Production of Business Records issued Feb. 19, 2013 to the "Custodian of Records of District Attorney's Office of San Mateo County" is believed **not** to be a qualified deposition officer pursuant to California Code of Civil Procedure §2020.420 and California Business & Professions Code §22450 et seq. I am informed and believe that Mr. St. Clair is not a professional photocopier pursuant to Business & Professions Code §22450 et seq., nor does he meet any of the exceptions to this requirement that are set forth in Business & Professions Code §22451. Accordingly, no records should be released to Mr. St. Clair.

You also are informed that the Superior Court of California for the County of San Mateo has issued a Restraining Order After Hearing, filed Nov. 28, 2012, protecting Jennifer Cobb from Jason Cobb, who has issued the subpoena that is the subject of this letter. That Restraining Order After Hearing specifically prohibits Jason Cobb from taking any action, directly or through others, to obtain the addresses or locations of Jennifer Cobb. The disclosure to Mr. Cobb of any records that contain this information would violate the Restraining Order After Hearing filed Nov. 28, 2013.

Received Fax : Mar 27 2013 12:09PM Fax Station : SMCo-COUNSEL D 4
Case3:13-cv-01955-JSW Document1-1 Filed04/29/13 Page169 of 169
7/2013 12:13 PM    From: Deborah Appel, Attorney at Law / 650-716-0606    To: 16503634034    4 of 4

Thank you for your attention to this letter. Please feel free to contact me if you have any questions regarding this matter.

Very truly yours.

Deborah Appel, Esq.
Attorney for Jennifer Cobb

cc:    Jennifer Cobb

Jason Cobb
331 Curtner Avenue, Apt. D
Palo Alto, CA 94306